FILED UNDER SEAL

ORAL ARGUMENT SCHEDULED FOR MAY 19, 2023
No. 23-5044

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

IN RE SEALED CASE

---

On Appeal from the United States District Court
for the District of Columbia, No. 1:23-SC-31-BAH
Before the Honorable Beryl A. Howell

---

## BRIEF FOR APPELLANT TWITTER

---

ARI HOLTZBLATT (D.C. BAR NO. 1009913)
BENJAMIN POWELL (D.C. BAR NO. 464823)
WHITNEY RUSSELL (D.C BAR NO. 987238)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000

GEORGE P. VARGHESE (MASS. BAR NO. 706861)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

March 31, 2023

**FILED UNDER SEAL**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1)(A), X Corp. hereby states that all parties, intervenors, and amici appearing in this court are listed below.

### A.    Parties And Amici

Appellant (Movant/Respondent below) X Corp. (successor in interest to named Appellant Twitter, Inc.) (hereinafter "Twitter") appeared in the district court and is a party in this Court.

Appellee (Movant/Respondent below) United States of America appeared in the district court and is a party in this Court.

No amici appeared in the district court and no amici appear before this Court.

### B.    Rulings Under Review

The rulings under review include the district court's March 3, 2023 opinion and judgment denying Twitter's Motion to Vacate or Modify the Non-Disclosure Order and Stay Twitter's Compliance with the Search Warrant, holding Twitter in civil contempt for failing to comply with the district court's February 7 Minute Order, and assessing a $350,000 sanction against Twitter for the same, JA354.  The rulings under review further encompass the January 17 Non-Disclosure Order, JA1, the February 3 scheduling order regarding briefing for Twitter's Motion to Vacate and for the government's Motion to Show Cause Why Twitter Should Not

**FILED UNDER SEAL**

be Held in Contempt, JA30, the February 7 minute order holding Twitter in

contempt if it failed to comply with the Warrant by February 7 at 5:00pm, JA216,

the oral orders regarding production timelines delivered during the February 7

hearing, JA213-215, and the oral order delivered during the February 9 hearing

requiring the government to calculate a sanction once Twitter completed

production, JA271-272.

    **C.**    **Related Cases**

     This case has not previously been before this Court or any court other than

the district court below.  There are no related cases pending in this Court or in any

other court of which counsel is aware.

**FILED UNDER SEAL**

## CIRCUIT RULE 26.1 REVISED DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Appellant X Corp., as successor in interest to named Appellant Twitter, Inc., discloses that Twitter, Inc. has been merged into X Corp. and no longer exists.  X Corp. is a privately held company.  Its parent corporation is X Holdings Corp.  No publicly held corporation owns 10 percent or more of X Corp. or X Holdings Corp.

FILED UNDER SEAL

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

CIRCUIT RULE 26.1 REVISED DISCLOSURE STATEMENT ........................ iii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

RELEVANT STATUTES AND CONSTITUTIONAL PROVISIONS .................. 4

STATEMENT OF ISSUES ................................................................... 4

STATEMENT OF THE CASE ............................................................... 5

    A.    Statutory Background ................................................................ 5

    B.    Twitter And The Technology Industry's Commitment To Data Protection And Privacy ................................................ 7

    C.    The Warrant And Non-Disclosure Order ............................ 11

    D.    Procedural History ............................................................... 13

SUMMARY OF ARGUMENT ............................................................ 18

STANDARD OF REVIEW ................................................................. 19

ARGUMENT ..................................................................................... 20

I.    THE ORDER SHOULD BE VACATED BECAUSE IT DOES NOT COMPORT WITH THE STORED COMMUNICATIONS ACT OR THE FIRST AMENDMENT ..................................................................... 20

    A.    The Order Is Not Justified Under The Act Or The First Amendment ....................................................................... 23

        1.    The government failed to show the Order was necessary to prevent the harms identified by the district court ............................................................... 23

2.    The district court's non-statutory reasons for upholding the Order violate both the Act and the First Amendment......................................................27

3.    The district court undermined the adversarial process......................................................28

B.    The Government Failed To Show That The Order Is Narrowly Tailored .............................................31

II.    THE CONTEMPT ORDER SHOULD BE VACATED BECAUSE COMPLIANCE WITH THE WARRANT SHOULD HAVE BEEN DELAYED PENDING RESOLUTION OF TWITTER'S FIRST AMENDMENT CHALLENGE ..............................................34

A.    The District Court Failed To Recognize The Relationship Between Twitter's Speech Interest And The Timing Of The Warrant......................................................35

B.    The District Court's Error Was Especially Significant Given The Time-Sensitive Claim Of Executive Privilege That Twitter's Speech Concerned .......................37

C.    Twitter's Challenge To The Contempt Order Is Not Moot ...............42

III.    THE CONTEMPT FINES AGAINST TWITTER SHOULD BE VACATED BECAUSE THE DISTRICT COURT ERRED IN SELECTING AND ASSESSING THOSE FINES ..............................................46

A.    Contempt Was Unfounded Because Twitter Substantially Complied In Good Faith With The Warrant .......................47

B.    The District Court Based Its Sanction On Supposed Conduct That It Was Legally Prohibited From Considering ......................................................49

1.    The district court erroneously based its sanction on supposed conduct that preceded the February 7 order ......................................................49

2.    The district court erroneously based its sanction on Twitter's legitimate assertion of its legal challenges to the Warrant and the Order .................................53

v

C.    The District Court's Sanction Was Unreasonably Severe ..................55

CONCLUSION ......................................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND
    WORD-COUNT LIMITATIONS

ADDENDUM

CERTIFICATE OF SERVICE

**FILED UNDER SEAL**

# TABLE OF AUTHORITIES*

## CASES

Page(s)

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986).............................29

*Alexander v. United States*, 509 U.S. 544 (1993)....................................21

*Amador County v. United States Department of Interior*, 772 F.3d 901
　　(D.C. Cir. 2014)..............................................................................20

*Ameziane v. Obama*, 620 F.3d 1 (D.C. Cir. 2010)..................................19

*Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485
　　(1984).................................................................................... 19-20

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor &
　　Aroostook Railroad Co.*, 380 F.2d 570 (D.C. Cir. 1967) ..............50

* *Brown v. Entertainment Merchants Association*, 564 U.S. 786
　　(2011)...................................................................................22, 24, 26

*Burlington Northern Railroad Co. v. Surface Transportation Board*,
　　75 F.3d 685 (D.C. Cir. 1996).........................................................45

*CNA Financial Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987)......41

*Carroll v. President & Commissoners of Princess Anne*, 393 U.S. 175
　　(1968)..............................................................................................36

*Chabad v. Russian Federation*, 915 F. Supp. 2d 148 (D.D.C. 2013)......57

*City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S.
　　Ct. 1464 (2022)...............................................................................21

*City of Lakewood v. Plain Dealer Publishing Company*, 486 U.S. 750
　　(1988)..............................................................................................29

*Del Monte Fresh Produce Company v. United States*, 570 F.3d 316
　　(D.C. Cir. 2009)..............................................................................45

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ...........................................28

*Food Lion, Inc. v. United Food & Commercial Workers International Union*, 103 F.3d 1007 (D.C. Cir. 1997)..........................................47

*\*Freedman v. Maryland*, 380 U.S. 51 (1965)...................................29, 36

*Frisby v. Schultz*, 487 U.S. 474 (1988) ...................................................31

*Google LLC v. United States*, 443 F. Supp. 3d 447 (S.D.N.Y. 2020) ......8

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)........................................................................20

*Ibrahim v. Department of Homeland Security*, 2012 WL 6652362 (N.D. Cal. Dec. 20, 2012) ...............................................................30

*In re Application of the United States of America for Nondisclosure Order Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena #GJ014032122836*, 2014 WL 1775601 (D.D.C. Mar. 31, 2014). ............................................................................ 8

*In re Fannie Mae Securities Litigation*, 552 F.3d 814 (D.C. Cir. 2009)...........20, 47

*In re Grand Jury Subpoena Duces Tecum*, 955 F.2d 670 (11th Cir. 1992) ................................................................................44

*In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9287146 (N.D. Tex. Sept. 22, 2017) ...................................................... 27-28

*In re Grand Jury Subpoena No. 7409*, 2018 WL 8334866 (D.D.C. Oct. 5, 2018) ...................................................................57

*In re Grand Jury Subpoena (T-112)*, 597 F.3d 189 (4th Cir. 2010).......................43

*In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004) ..............................................................................33

*In re Leopold to Unseal Certain Electronic Surveillance Applications & Orders*, 964 F.3d 1121 (D.C. Cir. 2020) .................................. 5-6

*In re Ryan*, 538 F.2d 435 (D.C. Cir. 1976) ............................................3

*In re Sealed Case ("Espy")*, 121 F.3d 729 (D.C. Cir. 1997) ..................40

*In re Sealed Search Warrant & Application*, 11 F.4th 1235 (11th Cir. 2021) ....................................................................................41

*In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876 (S.D. Tex. 2008)..........................................21

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ...............................................................................41, 54

*In re Search Warrant (Sealed)*, 810 F.2d 67 (3d Cir. 1987)...................54

*In re Trump*, 781 F. App'x 1 (D.C. Cir. 2019) .......................................42

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201 (D.D.C. 2018)..................................................5

* *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 (1994)................................................................49, 55

*Jove Engineering, Inc. v. Internal Revenue Service*, 92 F.3d 1539 (11th Cir. 1996) ..........................................................................55

*Kickapoo Tribe of Indians in Kansas v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995)............................................................................20

*Larsen v. United States Navy*, 525 F.3d 1 (D.C. Cir. 2008) ...................42

*MasTec Advanced Techs v. National Labor Relations Board*, 2021 WL 4935618 (D.D.C. June 3, 2021) ...................................57

*Matter of Providence Journal Company*, 820 F.2d 1342 (1st Cir. 1986) ..........................................................................35, 37

*Matter of Search of Information Associated with E-Mail Accounts*, 468 F. Supp. 3d 556 (E.D.N.Y. 2020)..........................................22

*Matter of Search of Kitty's East*, 905 F.2d 1367 (10th Cir. 1990) .........35

*Matter of Search Warrant for [redacted].com*, 248 F. Supp. 3d 970 (C.D. Cal. 2017)............................................................................22

*Matter of Subpoena 2018R00776*, 947 F.3d 148 (3d Cir. 2020) .......4, 21

*Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009) ...................4

**FILED UNDER SEAL**

*Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976) ...................................21

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) .................. 39-40

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) ........................................................40

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971).....................21, 33

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................26

*Reid v. Hurwitz*, 920 F.3d 828 (D.C. Cir. 2019).....................................................45

*Shuffler v. Heritage Bank*, 720 F.2d 1141 (9th Cir. 1983) .....................................43

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969)..........................................28, 35

*Twitter v. Garland*, 61 F.4th 686 (9th Cir. 2023) ...................................................10

*United States v. City of Yonkers*, 856 F.2d 444 (2d Cir. 1988) ..............................56

*United States v. Kis*, 658 F.2d 526 (7th Cir. 1981)................................................54

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995).................... 29-30

*United States v. Nixon*, 418 U.S. 683 (1974)...................................................... 38-39

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)...............................................................................................31, 33

*United States v. Philip Morris USA Inc.*, 287 F. Supp. 2d 5 (D.D.C. 2003) ...............................................................................................................57

*United States v. Quattrone*, 402 F.3d 304 (2d Cir. 2005).......................................37

*United States v. United Mine Workers of America*, 330 U.S. 258 (1947)...............................................................................................................55

*United States v. Watson Chapel School District No. 24*, 446 F.2d 933 (8th Cir. 1971) ...............................................................................................43

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) ...........................33

*Walters v. People's Republic of China*, 72 F. Supp. 3d 8 (D.D.C. 2014) ...............................................................................................................58

\* *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union, National Capital Local Division 689*, 531 F.2d 617 (D.C. Cir. 1976)......................................... 47, 50-53, 55

*Weinstein v. Bradford*, 423 U.S. 147 (1975) ............................................45

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ...............................31

*Wood v. Georgia*, 370 U.S. 375 (1962) ...................................................36

## DOCKETED CASES

*In re Application of USA for 2703(d) Order for Six Email Accounts Serviced by Google LLC*, SC No. 20-sc-3361 (D.D.C.)............................8, 33

*In re Specified E-Mail Accounts*, No. 1:18-mj-00723 (E.D.N.Y.) ..........................8

*Microsoft Corp. v. United States*, No. 20-1653 (2d Cir.) ..........................9

*Walters v. People's Republic of China*, No. 01-mc-300 (D.D.C.) ..........................58

## STATUTES

18 U.S.C.
§ 2702 .........................................................................................5
§ 2703 ......................................................................................3, 5
\* § 2705 ...........................................................................6, 11, 23
§ 2707 .........................................................................................5
§ 3123 ........................................................................................23

28 U.S.C.
§ 1291 .........................................................................................3
§ 1331 .........................................................................................3

Presidential Records Act, 44 U.S.C. § 2206....................................12, 42

## LEGISLATIVE MATERIALS

H.R. Rep. No. 117-361 (2022).........................................................9

**FILED UNDER SEAL**

## OTHER AUTHORITIES

Allyn, Bobby, *Privacy Advocates Fear Google Will Be Used to Prosecute Abortion Seekers*, National Public Radio (July 11, 2022), https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions ...............................................................................7

Haberman, Maggie & Alan Feuer, *Former Trump Officials Must Testify in 2020 Election Inquiry, Judge Says*, N.Y. Times (Mar. 24, 2023) ..............................................................................25

International Association of Privacy Professionals, *Join Us In Celebrating Data Privacy Day*, https://iapp.org/connect/data-privacy-day/ (visited Mar. 31, 2023) .........................................7

Nicas, Jack, et al., *In Leak Investigation, Tech Giants are Caught Between Courts and Customers*, N.Y. Times (updated June 16, 2021), https://www.nytimes.com/2021/06/11/technology/apple-google-leak-investigation-data-requests.html ...............................7

Polantz, Katelyn, et al., *Dozens of Mar-a-Lago Staff, from Servers to Aides, Are Subpoenaed in Classified Documents Probe*, CNN (Mar. 17, 2023) .............................................................25

Savage, Charlie, *Trump's Claim of Executive Privilege in the Jan. 6 Inquiry, Explained*, N.Y. Times (updated Oct. 13, 2022), https:// www.nytimes.com/2021/10/19/us/politics/trump-executive-privilege.html ....................................................13

Schwartz, Adam, *California Leads on Reproductive and Trans Health Data Privacy*, Electronic Frontier Foundation (Oct. 1, 2022), https://www.eff.org/deeplinks/2022/09/california-leads-reproductive-and-trans-health-data-privacy ...............................7

Twitter, *A Brief History of Twitter: Transparency*, https:// transparency.twitter.com/en/about.html (visited Mar. 31, 2023)..................10

Twitter, *Guidelines for Law Enforcement*, https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support (visited Mar. 31, 2023) .............................................................10

United States Department of Justice, *Appointment of a Special Counsel* (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0.................................................11, 24

United States Department of Justice, *Seeking Enterprise Customer Data Held by Cloud Service Providers* (Dec. 2017), https://www.justice.gov/criminal-ccips/file/1017511/download ............................41

United States Department of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)* (May 27, 2022), https://www.justice.gov/d9/pages/attachments/2022/05/31/section_2705b_supplemental_policy_-_dag_memo_-_05.27.22_005.pdf................................................6-7, 23-24, 28

United States District Court for the Northern District of California, Standard Protective Order (2022), https://www.cand.uscourts.gov/wp-content/uploads/forms/model-protective-orders/CAND_StandardProtOrd.Feb2022.pdf.......................................................................41

**FILED UNDER SEAL**

## INTRODUCTION

This case concerns a non-disclosure order ("Non-Disclosure Order" or the "Order") barring Twitter from notifying its user—former President Donald Trump—that a warrant obtained by federal law enforcement ("Warrant") would compel Twitter to disclose private communications he sent and received during his presidency. Under the Stored Communications Act, the government could obtain the Order only by demonstrating reason to believe disclosure "will" cause one of five statutorily enumerated harms. And because the Order is a content-based prior restraint on Twitter's speech, the government bore the further burden to prove it served a compelling government interest that no less restrictive alternative could achieve. Rigorous adherence to these mandates was especially critical here, where Twitter sought to notify the former President so he could decide whether to assert executive privilege over any presidential communications.

The government did not and cannot satisfy these demanding requirements. Its investigations of the former President are public. They were announced at a press conference by the Attorney General. And they have been pursued through scores of subpoenas that—like the Warrant—seek electronic communications with the former President but—unlike the Warrant—do not restrict the subpoena recipients from disclosing their existence. Disclosing the Warrant would add little to what the public and former President Trump already know, and thus cannot

1

**FILED UNDER SEAL**

meaningfully threaten new harm.  The government's and district court's shifting rationales further undermine any claim the Order is necessary.  The district court and government abandoned one of the Order's original justifications—preventing flight—after conceding the former President is no credible flight risk.  And the district court later adopted other justifications that either are not enumerated in the statute or were never advanced by the government—at least not in any filing disclosed to Twitter.  Moreover, any genuine risks could have been addressed by disclosing only the fact of the Warrant (rather than what it specifically sought), or by disclosing it only to the former President's counsel or one of the representatives he had expressly designated for "all" issues regarding presidential records.  Accordingly, the district court should have vacated the Order.

The district court further erred by refusing to postpone compliance with the Warrant until it could adjudicate Twitter's challenge to the Non-Disclosure Order.  That would have delayed production by as little as 48 hours while enabling Twitter to speak when it mattered most—before the confidentiality of any presidential communications was breached.  Severing Twitter's challenge to the Order from its production obligations infringed Twitter's time-sensitive First Amendment rights, ignored procedural safeguards required for prior restraints, and discounted issues regarding executive privilege.

FILED UNDER SEAL

Finally, the court compounded all these errors by imposing an unprecedented contempt sanction on Twitter.  After the court required Twitter to comply with the Warrant notwithstanding its pending challenge to the Order, Twitter produced all responsive data from its standard tooling by the deadline and worked around the clock to clarify the Warrant's scope and produce data inaccessible through its standard tools shortly thereafter.  The court nonetheless imposed $350,000 in sanctions for the 51 hours it took Twitter to get final clarifications and complete the extraordinary effort of producing data outside its standard system.  The court's sanction disregarded Twitter's good-faith substantial efforts to comply, impermissibly punished Twitter for pre-contempt conduct, and vastly outstripped any comparable sanction of which Twitter is aware.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331.  *See also* 18 U.S.C. § 2703(d) (permitting review of Stored Communication Act orders).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.  *See In re Ryan*, 538 F.2d 435, 437 (D.C. Cir. 1976) ("contempt judgment" is "appealable under 28 U.S.C. § 1291.").  The final order denying Twitter's requests for relief and holding Twitter in contempt was entered on March 3, 2023.  JA354-355 (order is "final and appealable").  Twitter timely filed a notice of appeal on March 7.  ECF 34.

**FILED UNDER SEAL**

This Court also has jurisdiction under the collateral-order doctrine, which permits appeal of "rulings that … do not end the litigation [but] are appropriately deemed final," because the rulings are "conclusive" of the appellate issue, "resolve important questions separate from the merits," and are "effectively unreviewable on appeal from the final judgment." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (cleaned up). The district court's orders delaying resolution of Twitter's First Amendment challenge until after Twitter produced and denying Twitter's motion to vacate the Order are conclusive of those issues. The issues do not go to the merits of the underlying criminal investigation, and they would be unreviewable on appeal of any criminal proceedings (to which Twitter would not be party). *See Matter of Subpoena 2018R00776*, 947 F.3d 148, 154 (3d Cir. 2020) (exercising appellate jurisdiction regarding challenge to non-disclosure order under the collateral-order doctrine).

## RELEVANT STATUTES AND CONSTITUTIONAL PROVISIONS

Relevant statutes and constitutional provisions are set forth in an addendum to this brief.

## STATEMENT OF ISSUES

1.    Whether the Non-Disclosure Order violated Twitter's First Amendment right to inform the former President of legal process involving his potentially privileged presidential communications.

4

2.     Whether the district court should have decided Twitter's First
Amendment challenge to the Order before mandating compliance with the Warrant.

3.     Whether the district court abused its discretion by imposing an unduly
punitive sanction that relied on pre-contempt conduct, and disregarded Twitter's
good-faith compliance efforts.

## STATEMENT OF THE CASE

### A.     Statutory Background

The Stored Communications Act ("the Act") regulates electronic
communications service providers, such as Twitter, that enable users to
communicate electronically with others.  18 U.S.C. § 2703(a)-(c).  The Act
"bestows upon" providers "great[] responsibilities regarding the disclosure and
safeguarding of … electronic information" by imposing penalties on providers for
improperly disclosing a user's communications.  *In re United States for an Order
Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 203 (D.D.C. 2018); *see* 18
U.S.C. §§ 2702, 2707.

Under the Act, the government can obtain information regarding
communications held by a service provider via subpoena, court order, or warrant,
depending on the information sought.  18 U.S.C. § 2703(a), (b)(1)(A), (c).  The Act
"contains no default sealing or nondisclosure provisions" preventing a provider
from disclosing legal process to its user.  *In re Leopold to Unseal Certain Elec.*

5

**FILED UNDER SEAL**

*Surveillance Applications & Orders*, 964 F.3d 1121, 1129 (D.C. Cir. 2020)

(cleaned up).  Instead, when the government wants to "displace[] the usual

presumption in favor of [disclosure]" of a warrant, it must also seek a non-

disclosure order under Section 2705.  *Id.* at 1130.  Non-disclosure orders

"command[] a provider … for such period as the court deems appropriate, not to

notify any other person of the existence of the" legal process.  18 U.S.C. § 2705(b).

The court may authorize a Section 2705(b) order only if "there is reason to

believe that notification of the existence of the" legal process "will result in" one

of five harms:

> (1)  endangering the life or physical safety of an individual;
> (2)  flight from prosecution;
> (3)  destruction of or tampering with evidence;
> (4)  intimidation of potential witnesses; or
> (5)  otherwise seriously jeopardizing an investigation or unduly
>      delaying a trial.

*Id.*[1]

Department of Justice ("Department") policy instructs that a non-disclosure

order "should be sought only after a … case- and fact-specific analysis."

Department of Justice, *Supplemental Policy Regarding Applications for Protective*

*Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 (May 27, 2022) [hereinafter "2022

---

[1] By contrast, the court may authorize Section 2705(a) "delay[ed]" notice for a renewable 90-day period based on a lesser showing that statutory harms "may" result.  18 U.S.C. § 2705(a).

FILED UNDER SEAL

Department § 2705(b) Policy"].  Even if a non-disclosure order might be justified for process obtained early in an investigation, the Department recognizes such an order may not be warranted for process obtained once "investigations progress or become public."  *Id.*

> **B.**    **Twitter And The Technology Industry's Commitment To Data Protection And Privacy**

The technology industry has long recognized the importance of "'respecting privacy, safeguarding data, and enabling trust'" with users.  International Association of Privacy Professionals, *Join Us In Celebrating Data Privacy Day*. This commitment has gained importance with rising concerns about secret government demands for public officials' and journalists' data.  *See* Nicas et al., *In Leak Investigation, Tech Giants are Caught Between Courts and Customers*, N.Y. Times (updated June 16, 2021) (in 2018, pursuant to subpoena, Apple unknowingly "hand[ed] over the data of congressional staff members, their families and at least two members of Congress" as "part of a wide-ranging investigation by the Trump administration").  It has also gained importance with rising concerns about online medical privacy.  *E.g.*, Allyn, *Privacy Advocates Fear Google Will Be Used to Prosecute Abortion Seekers*, National Public Radio (July 11, 2022); Schwartz, *California Leads on Reproductive and Trans Health Data Privacy*, Electronic Frontier Foundation (Oct. 1, 2022).

FILED UNDER SEAL

Consequently, technology companies have challenged impermissibly broad or facially unjustified non-disclosure orders—particularly when they could implicate important privileges or interests.  For example, in *In re Application of USA for 2703(d) Order for Six Email Accounts Serviced by Google LLC* [hereinafter "*Six Email Accounts*"], a district court granted the government's motion—made at Google's request—to modify a non-disclosure order so Google could alert the New York Times to a warrant directed at its reporter's account. Order, SC No. 20-sc-3361 (D.D.C. Mar. 3, 2021), ECF 4 at 1.[2]  In other cases, Google and Microsoft have sought to modify non-disclosure orders to enable their users to decide whether to raise any applicable defenses.  *See Google LLC v. United States*, 443 F. Supp. 3d 447, 451, 456 (S.D.N.Y. 2020); *In re Specified E-Mail Accounts*, No. 1:18-mj-00723 (E.D.N.Y Sept. 7, 2018), ECFs 8, 13.[3]  And while *amici* are unable to file briefs in this sealed case, technology firms, trade organizations, nonprofits, and even former federal prosecutors have filed *amicus*

---

[2] After five other modifications of the non-disclosure order—including permission for Google to disclose the warrant to additional user affiliates—the Department ultimately "determined that it [did] not wish to compel production" and withdrew the accompanying non-disclosure order.  *Six Email Accounts*, ECFs 5-16.

[3] Recognizing the "requested 'gag order' … would implicate Twitter's rights under the First Amendment," one court declined to rule "on the government's Application until … Twitter has filed a notice indicating whether it intends to be heard."  *In re Application of the United States of America for Nondisclosure Order*, 2014 WL 1775601, at *1-2 (D.D.C. Mar. 31, 2014).

FILED UNDER SEAL

briefs in similar, unsealed appeals, emphasizing the need to rigorously scrutinize non-disclosure orders. *E.g.*, *Microsoft Corp. v. United States*, No. 20-1653 (2d Cir.), ECFs 119, 123, 172, 174, 182.[4]

Congress, too, has expressed concern with overuse of non-disclosure orders, particularly against public officials and journalists. The House, reporting on a non-disclosure order reform bill, found that "[e]xperts … generally agree that the process to obtain [an order] has become a box-checking exercise" and "'rubber stamp process.'" H.R. Rep. No. 117-361, at 6-7 (2022). That same report recounted testimony that courts have approved thousands of non-disclosure orders annually against Microsoft "without any meaningful analysis of either the need for secrecy or the orders' compliance with fundamental constitutional rights." *Id.* at 8 (cleaned up).

Twitter is no exception. Twitter operates a global social media platform that fosters conversations among more than 450 million users, and it strives to safeguard those users' privacy. To this end, Twitter has produced "Transparency Reports" since 2012 to "provide the public with recurring insights into government pressures" such as the practice of "compelling account data through information

---

[4] Because *amici* cannot appear in this case, Twitter invites the Court to review the *Microsoft amici* briefs, which address substantially overlapping First Amendment issues.

9

**FILED UNDER SEAL**

requests." Twitter, *A Brief History of Twitter: Transparency*. And it has

challenged government restrictions limiting what information the reports may

disclose. *E.g.*, *Twitter v. Garland*, 61 F.4th 686 (9th Cir. 2023).

Consistent with this longstanding commitment to transparency, Twitter's

policy is to notify users of law enforcement requests for account information

unless legally prohibited from doing so.[5] Twitter annually receives thousands of

non-disclosure orders attached to various subpoenas, warrants, and other demands

for user information, and it challenges those that appear facially unjustified—

particularly when there is reason to believe the user might wish to assert privilege.

Twitter identified 32 such instances to the district court since 2011. JA217.[6]

Twitter also regularly negotiates informally with law enforcement to modify non-

disclosure orders, but does not maintain comprehensive records of such

negotiations.

The district court disregarded these examples, suggesting that Twitter's

challenge here was an outlier because the Order concerned a warrant, rather than

the more common subpoena or national security letter. *See* JA356. That

difference is irrelevant: Twitter challenges non-disclosure orders when they appear

---

[5] Twitter, *Guidelines for Law Enforcement*.

[6] The list is non-exhaustive because the district court gave Twitter only 25 hours to
compile it. JA216.

**FILED UNDER SEAL**

facially improper, regardless of the type of legal process to which they are

attached.

### C.     The Warrant And Non-Disclosure Order

On January 19, 2023, the government served a search warrant on Twitter for

data associated with the account @realDonaldTrump ("Target Account")

accompanied by a Non-Disclosure Order under 18 U.S.C. § 2705(b) prohibiting

Twitter from notifying anyone other than its counsel about the Warrant.  JA1, 295.

The Warrant requested public and non-public data, including private

communications sent to or from the Target Account during the user's Presidency.

JA298-300.  The Warrant required production within 10 days, i.e., by January 27.

JA295.  The district court issued the Order based on an *ex parte* application Twitter

has not seen and stated that there were "reasonable grounds to believe that …

disclosure will result in destruction of or tampering with evidence, intimidation of

potential witnesses, and serious jeopardy to the investigation," and would give the

former President "opportunity to … flee from prosecution."  JA1-2.

Several clear defects indicated to Twitter that the Order may be invalid.

Months before Twitter was served with the Warrant in January 2023, the Attorney

General publicly announced investigations into former President Trump.[7]  And the

government had already taken numerous public investigatory actions (including

---

[7] Department of Justice, *Appointment of a Special Counsel* (Nov. 18, 2022).

FILED UNDER SEAL

seizing electronic communications between the former President and his aides), such that disclosing the Warrant would not reasonably create an incremental risk of the harms alleged. Accordingly, the proffered justifications for silencing Twitter appeared clearly unjustified. Moreover, the district court eventually agreed that that the concern about the former President's flight from prosecution "doesn't make … sense" given his presidential candidacy, and the government likewise admitted it was "erroneous[]." JA195, 281.

Given Mr. Trump's status as the former President and the nature of the data sought, Twitter also had clear reason to believe he may have a time-sensitive claim of executive privilege presenting unique issues not yet publicly addressed by any court. Public reports indicated that Twitter was former President Trump's primary, and perhaps only, form of electronic communication during his presidency— suggesting his Twitter account may contain privileged communications. JA349. In recognition of their status as presidential records, Twitter had previously provided former President Trump's Twitter communications to the National Archives and Records Administration. JA52, 187-188. The Presidential Records Act provides that former Presidents should be notified when access is sought to their potentially privileged records from the National Archives. *See* 44 U.S.C. § 2206. Yet the Warrant directed seizure of former President Trump's private communications without notice to him. Moreover, Twitter was aware that the

**FILED UNDER SEAL**

former President had already demonstrated interest in asserting potential privilege in these investigations.[8]

### D.    Procedural History

Although the Warrant was issued on January 17, Twitter's legal team did not become aware of it until January 25—two days before its 10-day production deadline.  JA50.  Twitter directed immediate preservation of responsive data, informed the government it was processing the Warrant but would not be able to produce in the limited time left, communicated its concerns that the Order was facially deficient under the First Amendment, and objected to producing before resolving Twitter's concerns regarding the Order.  JA50-51.

The government asked Twitter to provide authority by February 1 for its objections to the Order and to immediate production.  JA154.[9]  Twitter provided the authority, and in the same email alerted the government it needed to "further discuss with you Attachment B and technical issues we will need to work through in responding once [the Order] is resolved"—namely, the Warrant's scope.  JA52-55.  The government rejected Twitter's attempts to discuss the Order's deficiencies

---

[8] *See, e.g.*, Savage, *Trump's Claim of Executive Privilege in the Jan. 6 Inquiry, Explained*, N.Y. Times (updated Oct. 13, 2022).

[9] The district court initially understood the government to have given Twitter an extension of the Warrant deadline.  "By my review … [the government] gave Twitter an extension—almost until February 1—for Twitter to provide authority … for refusing to comply with the warrant[.]" JA154.

FILED UNDER SEAL

or the flagged "technical issues," and instead moved on February 2 for an order to show cause why Twitter should not be held in contempt for failing to produce. JA22.

That same day, Twitter filed a Motion to Vacate or Modify the Order, arguing that it violated Twitter's First Amendment rights and requesting to stay production until after the former President had been notified, so that he could decide whether to assert any privilege.  JA3.  Twitter stated that it was prepared to produce communications and data "available in its standard production tooling," and proposed a briefing schedule that would have allowed the court to resolve both motions by February 9.  JA8, 14, 31.  The court instead set the government's motion to be fully briefed and heard by February 7, but set a three-week briefing schedule on Twitter's challenge to the Order.  JA30-31.  Leading up to that hearing, Twitter offered to produce responsive data to be held without review by the Court pending a decision on Twitter's First Amendment challenge, but the government refused Twitter's offer.  JA42.

At the February 7 show-cause hearing, the court characterized Twitter's constitutional claims as "tak[ing] up my time on what should be a simple processing of a warrant," and inaccurately suggested that Twitter had only challenged the Order "because the CEO wants to cozy up with the former President."  JA157, 183.  The court stated that, while Twitter might "think" former

14

FILED UNDER SEAL

President Trump's possible executive privilege claims present "difficult and novel issues," "[f]or the others of us in this room"—itself and the government—they did "not." JA167. Neither the court nor the government have disclosed to Twitter the binding law that so clearly disposed of any executive privilege claim a former president might have regarding non-public communications sent during the presidency (including privileges potentially preventing a communication's derivative use outside the Executive Branch).

The court granted the government's motion and ordered Twitter to comply with the Warrant by 5:00pm, or else be held in contempt and—at the government's urging, JA180—"fined $50,000, a fine amount that shall double every day, for failing to comply." JA215. Twitter substantially complied with the court's order by producing all responsive data accessible through standard tools by the 5:00pm deadline.[10] It then worked for two days straight to clarify the scope of the remaining Warrant requests, as it had attempted to do prior to February 7, and ultimately undertook extraordinary efforts to produce data that was not accessible

---

[10] As Twitter twice indicated in its February 2 Motion to Vacate, it preserved all responsive data "available in its standard production tooling." JA8, 14. And Twitter had attempted to clarify with the government the scope of the remaining requests for data outside of its standard tooling, to no avail. JA42, 55. Twitter's statement on February 7, that it "believe[d]" it could comply by 5:00pm that day, referred to what Twitter had indicated it was prepared to produce—all data available through standard production tools.

**FILED UNDER SEAL**

through Twitter standard tooling. *See* JA369. At the hearing on February 9, the district court noted it was "clear" Twitter had been "working hard to" comply since the February 7 hearing. JA272. It also recognized the need for additional "clarification" from the government about the Warrant's scope and elicited those clarifications. *E.g.,* JA243.

When Twitter's counsel attempted to explain that "prior to any filing in this case" Twitter had sought to discuss the Warrant's scope with the government, the court criticized Twitter for "putting the cart before the horse" and stated that Twitter "should have been working on getting the warrant production ready to go while litigat[ing] whatever else Twitter wanted to litigate." JA267. Further, despite acknowledging both Twitter's substantial efforts and that the court needed to clarify aspects of the Warrant in that very hearing, the court stated that it had already decided to sanction Twitter: "When production is complete, I will expect the government to let me know … [its] calculation …. I will enter an order at that time for the amount." JA272. After the government then waited until approximately 4:00pm on February 9 to further clarify the Warrant's scope, Twitter completed production just over four hours later. *See* JA369.

The government filed its 14-page, unredacted opposition to Twitter's motion to vacate one week later, along with an *ex parte* filing that was at least 16 pages. JA280, 376. The opposition identified the "compelling government interests at

16

FILED UNDER SEAL

stake" as "includ[ing] preserving the integrity and secrecy of an ongoing investigation" without acknowledging that neither purported interest is listed in Section 2705(b). JA287. Otherwise, the government asserted that the Order serves "a compelling governmental interest" "[f]or reasons explained in the Government's *ex parte* submission." JA288. Twitter has never seen the *ex parte* filing and does not know what purportedly compelling interests it advances.

The court denied Twitter's motion to vacate on March 3. It agreed the Order was a content-based, prior restraint and assumed strict scrutiny applied. JA370-372. Repeatedly citing the government's *ex parte* submission and "defer[ing]" to the government's assessment regarding disclosure, the court upheld the Order as necessary to prevent damage to the "integrity and secrecy" of ongoing investigations, "destruction of or tampering with evidence," "intimidation of potential witnesses," and "serious[] jeopard[y]" to the investigation. JA373, 377. The court also endorsed purported compelling interests the government had not advanced in any filing or hearing or disclosed to Twitter, including confidentiality of future investigative techniques and preventing "retaliatory attacks on law enforcement." JA373-377. The court further concluded the Order was narrowly tailored because it barred speech about only the Warrant for only 180 days. JA381-383. The court rejected Twitter's proposed less restrictive alternatives—permitting disclosure of just the fact of the Warrant, or only to one of the former

**FILED UNDER SEAL**

President's representatives—without any explanation as to the first proposal, and without addressing whether extending the Order to the chosen representative could have adequately safeguarded the government's purported interests.  JA383-384.

In the same order, the court held Twitter in contempt for not producing all responsive data by 5:00pm on February 7 and ordered Twitter to pay $350,000 for the approximately 51 hours it took to get final clarifications from the court and government and supplement its production with data accessible only outside Twitter's standard tooling.  JA354.

## SUMMARY OF ARGUMENT

The Non-Disclosure Order violates both the Stored Communications Act and the First Amendment.  As a content-based prior restraint on speech, the Order is presumptively unconstitutional, and is impermissible unless the government satisfies strict scrutiny.  The government cannot do so.  It cannot show the Order serves a compelling interest because its disclosure would add little to the public's already extensive knowledge about the investigations and their pursuit of the former President's electronic communications.  Furthermore, in concluding otherwise, the district court impermissibly relied on non-statutory interests, and on interests never-before disclosed to Twitter.  And the government cannot show the Order is narrowly tailored because either of Twitter's proposed alternatives— disclosing only limited portions of the Warrant or disclosing it only to the former

**FILED UNDER SEAL**

President's expressly designated representatives—would have addressed the government's purported concerns while restraining less speech.

The district court also erred in refusing Twitter's request to adjudicate Twitter's challenge to the Order before compelling production on the Warrant. That decision infringed Twitter's time-sensitive First Amendment rights, ignored procedural safeguards required for prior restraints, and paid insufficient regard to executive privilege.

Finally, the sanctions imposed on Twitter were improper in multiple ways. First, the district court failed to account for Twitter's good faith substantial compliance with the contempt order. Second, the court instead impermissibly sanctioned Twitter for pre-contempt conduct and for attempting to vindicate its legal rights. Third, the sanctions were vastly larger than what was needed to coerce compliance.

## STANDARD OF REVIEW

With respect to Twitter's First Amendment arguments (the first two issues presented), the Court reviews both legal and factual issues de novo. Legal issues are reviewed de novo because the Court reviews "de novo any errors of law upon which the court relied in exercising its discretion." *Ameziane v. Obama*, 620 F.3d 1, 5 (D.C. Cir. 2010). The Court also reviews any factual issues "de novo" because they are "questions of 'constitutional fact.'" *Bose Corp. v. Consumers*

FILED UNDER SEAL

*Union of U.S., Inc.*, 466 U.S. 485, 508 n.27 (1984). This is "because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and [reviewing courts] must thus decide for [them]selves whether … conduct falls on the near or far side of the line of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567 (1995).

The Court reviews "the contempt finding and the sanction for abuse of discretion." *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 818 (D.C. Cir. 2009). A "district court abuses its discretion when it applies the wrong legal standard," *Amador County v. U.S. Department of Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014), or "fail[s] to consider a relevant factor … or relie[s] on an improper factor," *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995).

## ARGUMENT

### I.    THE ORDER SHOULD BE VACATED BECAUSE IT DOES NOT COMPORT WITH THE STORED COMMUNICATIONS ACT OR THE FIRST AMENDMENT

Both the statute and the First Amendment place demanding burdens on the government to obtain or maintain a non-disclosure order. Section 2705(b) permits such an order only if a court "determines that there is reason to believe that notification of the existence of the warrant … will result in" one of five enumerated harms. This text requires the government to tie concrete and specific harms to disclosure of the warrant itself.

20

**FILED UNDER SEAL**

The First Amendment further restricts such orders, for two reasons.  First, non-disclosure orders are prior restraints because they "forbid[] certain communications … in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (cleaned up); *see Matter of Subpoena 2018R00776*, 947 F.3d 148, 156 (3d Cir. 2020) ("[Non-disclosure orders] are … presumptively unconstitutional prior restraints[.]").  Second, they are content-based, since they "appl[y] to particular speech because of the topic discussed or the idea or message expressed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (cleaned up).  Specifically, they "preclude speech on an entire topic—the electronic surveillance order and [the] underlying criminal investigation."  *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876, 881-882 (S.D. Tex. 2008).

A non-disclosure order is, therefore, among the "most serious and the least tolerable infringement[s] on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), accompanied by "a heavy presumption against its constitutional validity," *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (cleaned up).  The Order is constitutionally impermissible unless the government "demonstrate[s] that it passes strict scrutiny—that is, unless it is

21

**FILED UNDER SEAL**

justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011).[11]

The district court concluded that the Order satisfied both the statute and strict scrutiny because it believed the Order necessary to prevent several harms, including damage to the "integrity and secrecy" of the investigations, confidentiality of investigative techniques, "destruction of or tampering with evidence," "intimidation of potential witnesses," "serious jeopardy to the investigation," and "endangering the life or physical safety of an individual." JA359, 372-377.[12] Only some of these harms are enumerated in the statute. And several were never advanced by the government—at least as far as Twitter was informed. Reliance on such harms—that were either unauthorized by statute or undisclosed to Twitter—was serious error. More fundamentally, the government could not have established that disclosure would cause any of these harms given the immense public attention already trained on the investigations and their already-public pursuit of the former President's electronic communications. And

---

[11] Decisions subjecting non-disclosure orders to strict scrutiny are legion. *E.g.*, *Matter of Search of Info. Associated with E-Mail Accounts*, 468 F. Supp. 3d 556, 560 (E.D.N.Y. 2020); *Matter of Search Warrant for [redacted].com*, 248 F. Supp. 3d 970, 980 (C.D. Cal. 2017) (collecting cases).

[12] The government and the district court abandoned one of the Order's original justifications, preventing flight. JA281.

**FILED UNDER SEAL**

multiple less restrictive alternatives could address any purported harms.  Both the

statute and the First Amendment therefore require vacatur of the Order.

### A.    The Order Is Not Justified Under The Act Or The First Amendment

#### 1.    The government failed to show the Order was necessary to prevent the harms identified by the district court

The Act requires the government to show that "there is reason to believe that

notification of the existence of the warrant … *will* result in" the specified harm.  18

U.S.C. § 2705(b) (emphasis added).  As the Department has recognized, a

"prosecutor must provide a court with sufficient facts to permit the court to

conduct [a] case- and fact-specific analysis … [to] permit an individualized and

meaningful assessment regarding the need for protection from disclosure."  2022

Department § 2705(b) Policy, at 2.  This is a tall order; it is more demanding than

the standard for a 90-day "delay" of notification of a court order or subpoena

issued under the Act, which requires only that disclosure "may" have a specified

adverse result, § 2705(a), and the standard for an order barring disclosure of a pen-

register or trap-and-trace device under the Electronic Communications Privacy

Act, which requires only that the information "likely to be obtained" by such

surveillance is "relevant to an ongoing criminal investigation."  18 U.S.C.

§ 3123(a)(1), (d).

FILED UNDER SEAL

The First Amendment is even more demanding.  The government "must specifically identify an 'actual problem' in need of solving" and show that the Order is "actually necessary to that solution."  *Brown*, 564 U.S. at 799.  That requires "proof" of "a direct causal link between" the restricted speech and the feared harm—neither a mere "predictive judgment" nor "ambiguous proof will … suffice."  *Id.* at 799-800.

Rather than scrutinize the government's asserted justifications, as these statutory and constitutional standards require, the district court "defer[red] to the government" on the theory that it was "best position[ed]" to evaluate how disclosure "might impair an ongoing criminal investigation."  JA377-378.  But strict scrutiny forbids such deference.  *See Brown*, 564 U.S. at 799-800.

A properly searching inquiry—rather than a deferential one—exposes the flaws in the government's theory.  As the Department itself recognizes, non-disclosure orders may be unwarranted where an investigation has "become public." 2022 Department § 2705(b) Policy, at 2.  And the investigations here are plainly public.  The Attorney General announced them in a televised press conference.[13] At the time the district court issued its decision, the government had issued scores of subpoenas for the telephones, personal communications, and testimony of

---

[13] Department of Justice, *Appointment of a Special Counsel*, *supra* n.7.

**FILED UNDER SEAL**

numerous people who communicated with Mr. Trump, including his daughter and

son-in-law (JA331), his Vice President (JA336-337), his Chief of Staff (JA332-

335), his lawyers (JA350-353), and myriad state legislators (JA326-330).  The

scope of public disclosures has increased since then.  For example, the public now

knows that dozens of Mar-a-Lago staff have also received subpoenas,[14] and that

former President Trump's lawyer Evan Corcoran answered questions before the

grand jury.[15]

In short, the cat is out of the bag: the public—including former President

Trump—already knows that the Special Counsel is investigating the former

President and collecting his private electronic communications.  Disclosure of the

Warrant cannot threaten the secrecy or integrity of the investigations, which were

and are known.  Nor can disclosure cause any of the statutory harms the court

cited.  Given all the public information about the investigations and their focus on

Mr. Trump's electronic communications, anyone inclined to destroy or tamper

with evidence, intimidate a witness, endanger the life or physical safety of law

enforcement, or seriously jeopardize the investigation already has ample reason to

do so irrespective of the Warrant.  Twitter in no way doubts the seriousness of such

---

[14] Polantz et al., *Dozens of Mar-a-Lago Staff, from Servers to Aides, Are Subpoenaed in Classified Documents Probe*, CNN (Mar. 17, 2023).

[15] Haberman & Feuer, *Former Trump Officials Must Testify in 2020 Election Inquiry, Judge Says*, N.Y. Times (Mar. 24, 2023).

FILED UNDER SEAL

concerns, but the marginal disclosure of the Warrant did not generate and will not increase those risks.

Moreover, nothing apparently restricts the many recipients of the aforementioned subpoenas from disclosing them—indeed, they have been widely reported upon. It is unclear why the government can openly subpoena former President Trump's daughter and son-in-law, lawyers, Vice President, senior advisors, and staff for their communications with him but requires a non-disclosure order here—where the former President might wish to assert a colorable executive privilege claim. This insistence on silencing Twitter but not other witnesses whose speech would presumably "create the same problems" is "hopelessly underinclusive," *Reed v. Town of Gilbert*, 576 U.S. 155, 171-172 (2015), "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring" Twitter, *Brown*, 564 U.S. at 802.

The district court, however, stated that public reporting has not yet "indicated execution of search warrants for the contents of [Mr. Trump's] personal electronic communications and records, even if [he] is aware of the general contours of the government's investigation." JA376-377. Even if that were true, there is no reason to think disclosure of that information would materially harm the investigations given all that is concededly public. But the court's statement was also incorrect: it was already public that the Special Counsel had subpoenaed the

26

**FILED UNDER SEAL**

former President's allies for their communications with him, including electronic communications.[16]  It beggars belief that former President Trump—or anyone— would be surprised that a Special Counsel who is publicly investigating the former President and has publicly subpoenaed electronic communications between him and some of his close allies has also pursued his Twitter communications, especially given that Twitter was his primary form of electronic communication during the relevant period, *see supra* p.12.

> **2.    The district court's non-statutory reasons for upholding the Order violate both the Act and the First Amendment**

The district court's decision suffers from another major problem:  It leans heavily on non-statutory justifications: preserving the "integrity and secrecy" of the ongoing investigations and maintaining the "confidentiality of [its] investigative techniques" for future investigations.  JA372-373.

Section 2705(b) precludes reliance on these generalized interests.  It authorizes a non-disclosure order only if necessary to avoid one of five enumerated harms, and neither preserving the integrity or secrecy of an investigation nor maintaining confidentiality of investigatory techniques is among them.  *See In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9287146, at *6 (N.D. Tex. Sept. 22, 2017).  Such generalized interests "do[] not, without more, provide a

---

[16] *See* JA133-134, 326-328.

**FILED UNDER SEAL**

statutory basis for a nondisclosure order under Section 2705(b)." *Id*. The Department itself acknowledges that, to obtain a non-disclosure order, "the government *must establish*" one of the five statutory circumstances, and accordingly applications for an order "should identify which of the pertinent [statutory] factors apply and explain why." 2022 Department § 2705(b) Policy, at 2 (emphasis added). If a generalized desire for "secrecy" or investigatory "integrity" were sufficient to justify a non-disclosure order, the government could obtain one virtually whenever it wanted, vitiating the Act's specific requirements.

These generalized interests also cannot satisfy the First Amendment. A "prior restraint … is unconstitutional" "without narrow, objective, and definite standards." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969). Broad and vague concerns for "secrecy" and "integrity" are hardly narrow, objective, and definite. Nor can they qualify as compelling interests; confidentiality cannot be its own justification, else the First Amendment would never constrain non-disclosure orders. *See Doe v. Harris*, 772 F.3d 563, 580 (9th Cir. 2014) (rejecting asserted interest as "too broad … to serve as an effective constraint on law enforcement decisions").

### 3.    The district court undermined the adversarial process

Even apart from the merits of the district court's specific rationales, the court unlawfully denied Twitter a fair opportunity to challenge the Order by relying on

**FILED UNDER SEAL**

justifications either not invoked by the government or invoked only in *ex parte* filings.

Some grounds cited by the district court—that disclosure could lead former President Trump to pressure others to "engage in retaliatory attacks on law enforcement and other government officials," JA377, and impede "future investigations" by revealing investigatory techniques, JA373—were *never* asserted by the government, as far as Twitter knows. That evasion of the adversarial process is especially egregious here, where the court was adjudicating a prior restraint, which requires "a judicial determination in an *adversary* proceeding," *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) (emphasis added), and cannot be based on "*post hoc* rationalizations" or "shifting … criteria." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

The district court exacerbated that problem by relying heavily on the government's *ex parte* submissions. JA363, 369, 372, 378, 382. Indeed, the government appears to have identified its actual rationales—perhaps including those just discussed—*only* in the *ex parte* submissions. A "court may not dispose of the merits of a case on the basis of *ex parte*, in camera submissions." *Abourezk v. Reagan*, 785 F.2d 1043, 1060-1061 (D.C. Cir. 1986). Doing so "conflict[s] with" the "fundamental precept" that "a fair hearing requires a reasonable opportunity to know the claims of the opposing party." *United States v. Microsoft*

**FILED UNDER SEAL**

*Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (per curiam) (cleaned up).

Accordingly, the government should have made "available to [Twitter]… the

general purport of the [*ex parte*] argument and evidence such that [Twitter would

have had] an opportunity to respond to the general tenor of the proposed

submission," or at least "explained why more detail should not be made available."

*Ibrahim v. Department of Homeland Sec.*, 2012 WL 6652362, at *6 (N.D. Cal.

Dec. 20, 2012).

The government's and district court's inability to consistently and

transparently justify the Order not only transgressed due process; it also fatally

undermined any claim that the Order is truly necessary.  Over the course of the

proceedings, the government and district court jettisoned one rationale (flight risk)

and offered various new, never-before-disclosed justifications in their place.  Such

shifting explanations both imperil free speech and raise the possibility that the

government's motivation may be something else entirely: avoiding the

inconvenience of litigating the former President's privilege claim on the merits.

But avoiding the legal hassle occasioned by the former President becoming aware

his executive privilege may be imminently breached is hardly a compelling

government interest.

**B.     The Government Failed To Show That The Order Is Narrowly Tailored**

The district court likewise erred in concluding the government had demonstrated that the Order was narrowly tailored.  To meet that burden, the government must show that the Order "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Accordingly, when "a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).  That is possible only in "rare case[s]." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

The district court's and the government's theory of how disclosure causes harm rested on two assumptions: that "Attachment B to the Warrant provides significant insight into the type and nature of information that the government requested," JA376, and that if the contents of Attachment B were obtained by the former President, he might personally take actions to hinder the investigations, such as "ratchet[ing] up public and private pressure on others to refuse to be cooperative with the government, or even to engage in retaliatory attacks on law enforcement and other government officials," JA377.

Twitter proposed alternatives to address both concerns while still enabling it to meaningfully exercise its First Amendments rights by alerting its user of a

31

**FILED UNDER SEAL**

potential executive privilege issue before disclosure.  First, Twitter proposed disclosing only the Warrant form and Attachment A—or even just the fact of the Warrant—but not Attachment B.  JA314-315.  Second, Twitter proposed that it disclose only to the former President's lawyer or to one of seven representatives whom he already designated to act on his behalf "in all respects that pertain to the records of [his] Presidency."  JA135 (designating Mark Meadows, Pat Cipollone, John Eisenberg, Patrick Philbin, Scott Gast, Michael Purpura, and Steven Engel).  Alone or especially together, these proposals would have substantially alleviated the asserted concerns regarding disclosure.

The district court, however, failed even to address the proposal to disclose less information—either only the fact of the Warrant or the Warrant and Attachment A but not Attachment B.  The court did at least address the proposal to disclose only to the former President's pre-designated representatives, declaring it "preposterous since such the suggested representatives not only may themselves be witnesses, subjects, or targets of either the January 6th or Classified Documents Investigation, but also would be under no bar from immediately alerting the User."  JA383.  But neither of those concerns holds up.

As to the first, there is *no* suggestion—let alone a genuine factual showing— that all those representatives would use the fact of the Warrant or its contents (other than Attachment B) to undermine the investigations.  Nor is it evident that

32

**FILED UNDER SEAL**

all of them are implicated in the investigations; the court mustered only a "may." But the government must offer, and thus the court must rely on, "more than anecdote and supposition," *Playboy*, 529 U.S. at 822; it must present "*evidence that demonstrates why the challenged restriction, rather than a less restrictive alternative, is necessary to further its significant interests*," *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019) (citing *Playboy*, 529 U.S. at 820-822) (emphasis added).

The court's second concern was unfounded because Twitter's proposal would have extended the Order to encompass the representative in question. *See* JA314-315. Other courts have taken precisely this approach. *See Six Email Accounts*, ECF 4 at 1 (modifying non-disclosure order after government asked, on Google's behalf, for permission to alert counsel for the New York Times of a warrant directed at its reporter's account); *see also In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 180 (D.D.C. 2004) (permitting attorney review of sensitive evidence through protective order prohibiting counsel from "disclos[ing] classified information not provided by" their client to their client). Yet, the district court did not even address this feature of Twitter's proposal.

In effect, the court inverted the "heavy presumption" *against* the constitutionality of the Order, *Organization for a Better Austin*, 402 U.S. at 419, and transferred the burden of proof from the government—where the First

33

FILED UNDER SEAL

Amendment places it—to the party asserting a constitutional right. That is grave error.

## II. THE CONTEMPT ORDER SHOULD BE VACATED BECAUSE COMPLIANCE WITH THE WARRANT SHOULD HAVE BEEN DELAYED PENDING RESOLUTION OF TWITTER'S FIRST AMENDMENT CHALLENGE

The contempt order in this case is closely connected to Twitter's First Amendment challenge to the Non-Disclosure Order—and should have been resolved in a manner that took that relationship seriously. Twitter challenged the Order because it infringed its First Amendment rights, which in this instance were particularly important because the speech would provide former President Trump the opportunity to decide whether to assert executive privilege before Twitter was compelled, under threat of contempt, to produce any presidential communications. Twitter therefore requested that the court address Twitter's Warrant obligations and First Amendment challenge in tandem, and proposed a schedule requiring only 48 hours more than the government had requested for its show cause motion.

The district court erred in refusing Twitter's request and instead holding Twitter in contempt while delaying resolution of Twitter's First Amendment challenge for three weeks. The court's decision infringed Twitter's First Amendment rights, ignored procedural safeguards required for prior restraints, and paid insufficient regard to genuine issues about executive privilege.

A. **The District Court Failed To Recognize The Relationship Between Twitter's Speech Interest And The Timing Of The Warrant**

The district court's decision to compel production before adjudicating Twitter's Non-Disclosure Order challenge rested on the mistaken premise that the Order "was a wholly separate order from the Warrant."  JA366.   The First Amendment, however, required not only that Twitter be permitted to speak, but that it be permitted to speak when its speech mattered most—before complying with the Warrant.

"It is axiomatic that the timing of speech is often crucial to its impact." *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990).  Courts have therefore recognized that many restrictions on speech—especially prior restraints—cannot be isolated from the timing of other events to which the restrained speech pertains.  For instance, "delay" resulting from a prior restraint "involving news concerning an imminent event" could "cause the restrained information to lose its value."  *Matter of Providence Journal Co.*, 820 F.2d 1342, 1352-1353 (1st Cir. 1986).  Likewise for political speech, "timing is of the essence," and "it is often necessary to have one's voice heard promptly, if it is to be considered at all."  *Shuttlesworth*, 394 U.S. at 163.  So too speech bearing on pending grand jury proceedings—the "[c]onsistent suppression of discussion" related to pending investigations "would mean that some continuing public grievances could" not be discussed "at the moment when public discussion is most

35

**FILED UNDER SEAL**

needed"—before the investigation concludes. *Wood v. Georgia*, 370 U.S. 375, 392 (1962).

The common thread is that when a speaker aims to facilitate a third party's action in relation to some time-sensitive event—for example, to vote on election day or to react to breaking news—a prior restraint is anything but "wholly separate" from the related event. Serious and irreparable harm is done to the speaker's free speech right unless that prior restraint is adjudicated *before* the event occurs.

The Supreme Court has required procedural safeguards for prior restraints precisely to address the special danger such restraints pose to time-sensitive speech. A prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman*, 380 U.S. at 58. Among other things, a censored speaker must be "assure[d] a prompt final judicial decision"—meaning the speaker may not be subjected to a "delay" that "in practice" makes "the censor's determination … final." *Id.* at 58-59. The need for "procedural safeguards" and the avoidance of "delay" is especially "compelling" when a prior restraint involves "speech in which the element of timeliness may be important." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 181-183 (1968). The law thus ordinarily guarantees that a challenge will be heard and resolved *before* a prior restraint

36

irretrievably infringes the First Amendment's protections.  *See Providence*, 820

F.2d at 1351 ("prior restraint … issued prior to a full and fair hearing with all the

attendant procedural protections … faces an even heavier presumption of

invalidity"); *United States v. Quattrone*, 402 F.3d 304, 312 (2d Cir. 2005) ("the

lack of … opportunity to be heard normally renders a prior restraint invalid").

The court violated the First Amendment by denying Twitter any such

opportunity.  Twitter sought to speak to former President Trump so that he could

choose to assert any privilege before it was impaired by compelled disclosure of

any confidential presidential communications.  Twitter's speech was, therefore,

most needed before it produced those communications—and, as a result, the

district court's decision to compel production before addressing Twitter's first

Amendment claim was improper.

**B.    The District Court's Error Was Especially Significant Given The
Time-Sensitive Claim Of Executive Privilege That Twitter's
Speech Concerned**

The court's error was especially significant given that Twitter's speech

concerned a colorable and time-sensitive claim of the constitutionally grounded

executive privilege.

The claim is colorable because the Warrant encompassed potentially

privileged presidential communications, and disclosure to investigators arguably

implicated the privilege.  Public reports indicate that for much of Mr. Trump's

37

**FILED UNDER SEAL**

presidency, Twitter was his primary (perhaps only) form of electronic communication—making it his only means of writing electronic presidential communications. *See supra* p.12. And disclosure of those messages to investigators risked undermining the "expectation of a President to the confidentiality of his conversations and correspondence"—an expectation which serves to protect "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. 683, 708 (1974). It is at the very least plausible that full and frank communication of that sort could be threatened by the prospect of a subsequent administration's investigators poring through those communications with an eye toward criminal prosecution.

The privilege claim is time-sensitive because the public interest the privilege serves is irreparably undermined as soon as confidential presidential communications are disclosed. The point of the privilege, as explained, is to ensure that advisors can offer their "candid, objective" views to the President "in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Once a confidential presidential communication is disclosed to criminal investigators, that expectation of privacy is undermined.

The district court discounted these considerations because the communications here would initially be disclosed only within the Executive

branch.  JA198-200.  On the one hand, as the district court emphasized, executive

privilege is at least partially "rooted in the separation of powers," *Nixon*, 418 U.S.

at 708, and so might not be implicated by intra-branch disclosure.  On the other,

the privilege's purpose of facilitating full and frank communication between the

President and the President's advisors "is fundamental to the operation of

Government" writ large and therefore could be undermined even by intra-branch

disclosures.  *Id.*  That a prosecutor, especially under a different administration,

could seize presidential communications may well be the sort of risk that could

chill candid discussions that are vital to sound presidential decisionmaking.  True,

the privilege can be overcome in certain circumstances, as in *Nixon v.

Administrator of General Services*—but if the privilege could not be asserted

against intra-branch disclosures at all, the Court would have had no reason to rely,

as it did in that case, on the "safeguards" and "minimal" extent of intrusion there

challenged.  433 U.S. 425, 446-455 (1977).  Certainly, no published judicial

decision has rejected assertion of executive privilege against an order like the

Warrant.

　　　Moreover, the Warrant *also* implicates the separation of powers because, as

the district court acknowledged, Mr. Trump's communications would be disclosed

outside the executive branch if the government "present[s] them to the grand jury."

**FILED UNDER SEAL**

JA377.  *See In re Sealed Case ("Espy")*, 121 F.3d 729, 758-759, 762 (D.C. Cir. 1997); *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973).

In all events, the important point—which the district court brushed aside—is that whether the communications demanded by the Warrant are protected by executive privilege is a significant and debatable question, which should have been put to the former President, the real party in interest.

Further, courts have consistently recognized that questions about executive privilege ought to be resolved *before* the confidentiality of presidential communications is breached.  In *Administrator of General Services*, for instance, the Supreme Court recognized that disclosing confidential presidential communications to the Archivist even for "screening" purposes constituted an "intrusion into executive confidentiality."  433 U.S. at 449-455; *see also Espy*, 121 F.3d at 744 (explaining that, under the *Nixon* cases, the President may "invoke the privilege when asked to produce documents").  And this Court in *Sirica*, despite rejecting President Nixon's claim of absolute discretion over the disclosure of presidential communications, nonetheless instructed that, if the district court ordered the production of presidential communications to the grand jury, the court also "provide a reasonable stay to allow an opportunity to appeal"—ensuring a full judicial airing of privilege questions *before* potentially privileged documents were handed over.  487 F.2d at 721.

40

**FILED UNDER SEAL**

That approach aligns with protections afforded other time-sensitive privileges.  Courts have insisted on adjudicating privilege claims regarding seized documents before the government reviews them.  *E.g.*, *In re Sealed Search Warrant & Application*, 11 F.4th 1235, 1247 (11th Cir. 2021) (interlocutory review necessary because "[o]nce the government improperly reviews privileged materials, the damage … is definitive and complete" (cleaned up)); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 183 (4th Cir. 2019) (enjoining filter team's review of seized materials).

Notice and delayed production are similarly used in numerous contexts to protect third-party interests.  Model protective orders, for instance, contemplate notifying non-parties *before* their confidential information is disclosed in litigation.  *E.g.*, U.S. District Court for the Northern District of California, Standard Protective Order (2022).  The Freedom of Information Act requires notice prior to disclosure of a third-party company's proprietary information.  *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (D.C. Cir. 1987).  The Department of Justice suggests prosecutors "should seek data directly from" cloud providers' enterprise customers rather than from the provider so that customers have an "opportunity to interpose privilege and other objections."  Department of Justice, *Seeking Enterprise Customer Data Held by Cloud Service Providers* 2 (Dec. 2017).  And

the Presidential Records Act provides that former Presidents should be notified when access is sought to their potentially privileged records.  44 U.S.C. § 2206.

But the district court's decision to compel execution before even addressing Twitter's First Amendment challenge erroneously foreclosed a timely privilege challenge.  *Cf. In re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019) ("district court abused its discretion" by failing to "adequately address" whether it was "preferable" to "resolv[e] … legal questions" implicating "separation of powers issues" before proceeding with discovery).  That was a significant error—one that violated Twitter's First Amendment rights and risked damage to the interests served by executive privilege.

### C.    Twitter's Challenge To The Contempt Order Is Not Moot

Because the district court's refusal to postpone compliance with the Warrant while adjudicating Twitter's First Amendment challenge formed the basis for the contempt fines against Twitter, the issue remains a live controversy.  The government, however, has argued that Twitter already purged its contempt and mooted this issue.  Government Response, No. 23-5044 (D.C. Cir. Mar. 10, 2023), ECF #1989703, at 20.

The government is mistaken.  A "case is not moot if a court can provide an effective remedy."  *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008).  So long as a monetary sanction for contempt remains at issue, a remedy for the injury

**FILED UNDER SEAL**

inflicted by the corresponding contempt order is available: vacating the contempt order and thereby eliminating the payment obligation.  The availability of that remedy is not affected by Twitter's prior document production.[17]

The weight of authority confirms that a challenge to a contempt order remains live so long as a monetary sanction can be vacated.  The Ninth Circuit, for instance, held that a substantive challenge to the basis for contempt presented a "live controversy" in an appeal challenging the contemnors' "liab[ility] for the $500 daily fine imposed under [a prior] contempt order."  *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir. 1983).  The Fourth Circuit likewise explained that despite "purg[ing] their contempt by complying with their subpoenas," appellants' appeal had "not thereby been rendered moot" because the "monetary fees imposed on appellants suggest[ed] an obvious remedy. … [I]n the event th[e] court reverse[d], the assessments [would] be lifted."  *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 195 (4th Cir. 2010); *see also United States v. Watson Chapel Sch. Dist. No. 24*, 446 F.2d 933, 939 (8th Cir. 1971) (suggesting that a "sanction en force" would "present a justiciable controversy," but noting that the contemnor had been relieved from monetary penalties).

---

[17] Pursuant to the district court's order, JA362, Twitter tendered payment under protest, with the funds held in escrow.  JA363.  Upon vacatur of the contempt order, the funds will be returned to Twitter.

**FILED UNDER SEAL**

The only contrary decision appears to be the Eleventh Circuit decision on which the government previously relied. *See Grand Jury Subpoena Duces Tecum*, 955 F.2d 670, 672 (11th Cir. 1992). But that decision did no more than reflexively apply a principle articulated in prior, factually inapposite cases: that, usually, "once a civil contempt order is purged, no live case or controversy remains for adjudication." *Id.* And often, that *is* true—because the accrual of monetary sanctions has been stayed pending appeal, or the only sanction ever imposed was imprisonment. In either situation, a court can provide no remedy once contempt has been purged. If monetary sanctions have not accrued, relief from contempt changes nothing; if an individual was "confined for contempt" rather than financially penalized, his "lost time cannot be returned by judicial review of the underlying order." *Grand Jury Subpoena (T-112)*, 597 F.3d at 195. But as the Fourth Circuit explained in distinguishing those scenarios, the same is not true where vacatur of a monetary sanction provides an "obvious remedy." *Id.*

Moreover, the consequences of the Eleventh Circuit's approach show why it cannot be right. If correct, Twitter could have preserved its appellate rights only by refusing to produce anything even *after* being held in contempt—prolonging any harm to the government's investigations and threatening financial ruin for the company as fines doubled daily. Where there is plainly a live controversy and an

**FILED UNDER SEAL**

effective judicial remedy, the law cannot demand such measures as the price for

vindicating First Amendment rights.

Alternatively, even under the Eleventh Circuit's approach, this Court would

still have jurisdiction under the exception to mootness for issues "capable of

repetition, yet evading review." *Reid v. Hurwitz*, 920 F.3d 828, 832 (D.C. Cir.

2019). A challenged action is not moot when it is typically "in its duration too

short to be fully litigated prior to its cessation or expiration" and there is "a

reasonable expectation that the same complaining party would be subjected to the

same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam).

Those circumstances apply here. "[O]rders of less than two years' duration

ordinarily evade review." *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d

685, 690 (D.C. Cir. 1996). Here, litigation has proceeded on a timeline of less than

two months, which is typical of litigation concerning search warrants that generally

proceed on an expedited schedule. And Twitter can reasonably expect to be

subjected again to this same legal problem, i.e., the inability to fully litigate a

request to stay production under a warrant pending challenge to an accompanying

non-disclosure order. *See Del Monte Fresh Produce Co. v. United States*, 570 F.3d

316, at 325-326 (D.C. Cir. 2009) ("reasonable likelihood" of being "subject[ed] to

the same legal wrong" is sufficient, even if "the very same facts" will not recur).

As explained, Twitter has a longstanding policy of challenging facially invalid

**FILED UNDER SEAL**

non-disclosure orders, particularly when users have potential privileges to assert, so it is likely to be served again with a facially invalid non-disclosure order, and to again seek to stay production while it resolves a challenge to that order.  And the government has made clear that it will continue to oppose such stays of production.  *See* JA138-141.

## III.    THE CONTEMPT FINES AGAINST TWITTER SHOULD BE VACATED BECAUSE THE DISTRICT COURT ERRED IN SELECTING AND ASSESSING THOSE FINES

The district court erred not only in holding Twitter in contempt, but also in selecting and assessing sanctions against Twitter.  The sanctions the court selected were extraordinary—and legally improper—in multiple ways.  First, the district court failed to account for Twitter's good faith substantial compliance with the February 7 contempt order.  Second, the court instead imposed the sanction based on conduct it was legally precluded from considering: conduct occurring before the February 7 contempt order and conduct Twitter engaged in to vindicate its legal rights, namely, its challenge to the Warrant and the Order.  Consequently, instead of using sanctions properly to coerce future compliance with a judicial order, the court improperly used sanctions to retrospectively punish Twitter for its good faith exercise of legal rights.  And third, the sanctions were inordinately large, far beyond any precedent, far beyond what was appropriately needed to coerce compliance, and blind to Twitter's good faith efforts to comply.  For all these reasons, the sanction judgment is a clear abuse of discretion.

**FILED UNDER SEAL**

A.    **Contempt Was Unfounded Because Twitter Substantially Complied In Good Faith With The Warrant**

Avoiding civil contempt does not require perfect and complete compliance. Rather, "[s]ubstantial compliance … is … a defense in coercive contempt proceedings," at least if the result of "good faith efforts to comply." *Washington Metro. Area Transit Auth. v. Amalgamated Transit Union, Nat'l Cap. Loc. Div. 689*, 531 F.2d 617, 621 (D.C. Cir. 1976); *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 822 (D.C. Cir. 2009). "In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1017 (D.C. Cir. 1997) (cleaned up). But in making this evaluation, courts must exhibit "[f]lexibility" to ensure "consideration of the complexity of the outstanding order, possible ambiguities, the difficulties in arranging compliance and the extent of efforts to obey its terms." *Washington Metro.*, 531 F.2d at 622.

Here, the record shows that Twitter substantially complied with the Warrant in good faith in response to the district court's February 7 order. In fact, the undisputed record shows that, from the moment the court issued the February 7 order until the moment Twitter completed its production on February 9, it took all reasonable steps it could have; there was nothing Twitter could have done to comply faster. By the court's 5:00pm deadline on February 7, Twitter produced *all*

47

responsive data it could obtain using its standard production tools.  JA274.  After

then confirming that the government wished Twitter to undertake the extraordinary

engineering efforts required to produce additional data, Twitter produced further

data at 2:00am on February 9.  JA275-276.  In preparing that production, Twitter

discovered the parties had "different understanding[s]" of what one category of

data "represent[ed]," and therefore immediately asked the government to discuss

how to resolve that issue so that it could complete its production.  JA228.  But

when the parties conferred by phone later that morning, the government refused to

engage with Twitter's attempts to clarify and instead informed Twitter that it

would return to court.  JA276.

    At the resulting hearing, the district court itself noted that the Warrant

required further clarification and that it was "clear" Twitter had been "working

hard" since February 7 to produce the additional responsive material that could be

obtained only through extraordinary efforts.  JA242-243, 272.  The court then

elicited the clarifications the government had previously refused to provide and the

government continued providing further clarifications until approximately 4:00pm

that day.  JA242-272.  Now possessing those additional clarifications, Twitter

completed its production at 8:06pm on February 9—approximately 51 hours after

the court's initial deadline.

**B.    The District Court Based Its Sanction On Supposed Conduct That It Was Legally Prohibited From Considering**

The district court did not dispute any of the facts just recited showing that Twitter substantially complied in good faith with the February 7 order.  Instead, the court based its $350,000 sanction on supposed conduct that it was legally precluded from considering: events that occurred before its February 7 order, and Twitter's legitimate assertion of constitutional rights.  Each of those errors requires vacating the sanction.

**1.    The district court erroneously based its sanction on supposed conduct that preceded the February 7 order**

The district court rested its sanction decision almost entirely on Twitter's supposed conduct before the February 7 order.  That backward-looking analysis was impermissible.

The purpose of civil contempt is to force a recalcitrant actor to comply with an order.  The threatened contempt sanction therefore must "exert a constant coercive pressure"—the sanction may not be "imposed retrospective[ly] for a completed act of disobedience."  *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828-829 (1994) (cleaned up).

As a result, a court imposing contempt sanctions must do more than just announce a penalty in advance, and later "count[] the days" of noncompliance and "do[] the math."  JA272.  The court must also, after a contemnor comes into

49

FILED UNDER SEAL

compliance, carefully consider whether the full, originally threatened penalty should be imposed.  As this Court has explained, "not only must the District Court consider whether there is indeed a contempt but also whether if so, it be of such magnitude as to warrant retention … of the coercive fine originally provided for in contemplation of an outright refusal to obey."  *Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook R.R. Co.*, 380 F.2d 570, 582 (D.C. Cir. 1967).  And given the remedial purposes of civil contempt, the resulting inquiry into a contemnor's "compliance efforts" should be focused on the period after the court's order threatening sanctions, not on "events that occurred before the fine started to accrue."  *Washington Metro.*, 531 F.2d at 621.

But the district court here largely confined its inquiry to mechanically counting the days it took Twitter to fully comply.  To the extent the court went beyond that, it erred by focusing on the wrong time period: the period before the court's February 7 order.  The court faulted Twitter for not "identif[ying], rais[ing], and resolv[ing]" Twitter's "questions" about the Warrant's scope and Twitter's capacity to comply "upon receipt of the Warrant on January 19, 2023," i.e., long before the February 7 order issued.  JA388.  The court dismissed Twitter's diligent efforts following the February 7 order because they "occurred only *after* it had already delayed production since January 27."  JA387.

**FILED UNDER SEAL**

The court also remarked: "Twitter's good faith and substantial [compliance] defense fails because it did not attempt to resolve specific questions concerning the Warrant's document demands with the government prior to either the February 7 or February 9, 2023, hearings." JA388.  The reference to Twitter's supposed failure to resolve questions "prior to … February 7" again shows the court's impermissible reliance on pre-contempt-order conduct.  The court's reference to Twitter's supposed failure to resolve questions between February 7 and "February 9," however, is not accurate—in fact, the court's own opinion belies that assertion.  As the court acknowledged, Twitter undeniably attempted to resolve its outstanding questions about the Warrant as soon as it learned of them, in the middle of the night on February 9, well before the February 9 hearing; it was the *government* that refused to supply the necessary clarification until and after the hearing that day.  JA276-277; *supra* p.15-16.  Indeed, Twitter had attempted to discuss technical issues about the Warrant with the government since February 1, but the government rebuffed those efforts.  JA42, 55.

This Court's analysis in *Washington Metropolitan* highlights the district court's error.  In that case, an employer obtained a temporary restraining order enjoining a strike by its bus operators' union.  531 F.2d at 619.  The next day (May 3), the union members still refused to return to work, so the district court ordered the union to show cause by the following day (May 4) why it should not be held in

51

**FILED UNDER SEAL**

contempt.  *Id.*  In response to that second order, union leaders promptly began

"try[ing] to persuade [union] members to return to work," but the "members

refused" and "did not return to work" on May 4.  *Id.*  Accordingly, later that day

(May 4), the district court issued an order holding the union in contempt and

imposing a daily fine "commencing the next morning [May 5] … unless by that

time the work stoppage was ended."  *Id.*  By the next morning (May 5)—i.e., by

the court's sanction deadline—bus service had resumed only partially, and that

afternoon, the union's leadership rescinded its strike recommendation.  *Id.*

"[S]ervice was substantially restored" two days later, on May 7.  *Id.*  The district

court assessed a fine equal to two days of noncompliance, and limited its

consideration of the union's compliance efforts "solely to the pre-May 5 period,"

i.e., the period leading up to the order holding the union in contempt and

threatening sanctions.  *Id.* at 620.

On appeal, this Court vacated the sanction.  The Court faulted the district

court for refusing to "even … consider[]" the union's defense of good faith

substantial compliance, instead adopting the mistaken view that conducting only

"partial service … automatically equalled continuing contempt."  *Washington

Metro.*, 531 F.2d at 621.  The Court also held that the district court erroneously

"limited its inquiries about the Union's compliance efforts to events that occurred

before the fine started to accrue," i.e., before May 5, the deadline the court had set

FILED UNDER SEAL

for compliance in its May 4 contempt order.  *Id.*  That was improper because "the

May 4th contempt judgment was intended to be coercive."  *Id.* at 622.

The district court here made the same mistake.  Here, as in *Washington*

*Metropolitan*, the district court thought it irrelevant that the contemnor had,

following the court's contempt order, made substantial efforts to comply and

ceased all efforts at noncompliance—instead treating as dispositive the fact that the

contemnor had not attained full compliance.  And, as in *Washington Metropolitan*,

the court improperly held against the contemnor actions it purportedly took or

failed to take before the period when sanctions began to accrue.  Those errors

require vacatur of the contempt sanction, just as they did in *Washington*

*Metropolitan*.

      **2.**      **The district court erroneously based its sanction on**
                    **Twitter's legitimate assertion of its legal challenges to the**
                    **Warrant and the Order**

Even if it were generally proper for the district court to base its civil

contempt sanction on conduct that occurred before the contempt order, the sanction

would still be invalid because the pre-order activity the court relied on was

Twitter's good-faith effort to challenge the Warrant and to resolve the validity of

the Order before producing potentially privileged information.  Indeed, not only

did the court erroneously refuse to protect Twitter's First Amendment rights by

ordering compliance with the Warrant before resolving its challenge to the Order,

**FILED UNDER SEAL**

*see supra* Part II, but the court in fact *punished* Twitter for even trying to protect its constitutional rights.

In sanctioning Twitter, the court criticized Twitter for "delay[ing] production" beyond the Warrant's original deadline, JA387, and "focusing on intervening in this criminal investigation and obtaining permission to alert the User about the search warrant," JA357-358. But Twitter delayed production and focused on intervention only to raise its good-faith legal challenge to the Order, which Twitter legitimately believed needed to be resolved before it complied with the Warrant, as explained above. *See supra* Part II. The good-faith assertion of a legal challenge is a wholly inappropriate basis for imposing contempt sanctions. *E.g., Search Warrant Issued June 13, 2019*, 942 F.3d at 182 ("We do not fault the Law Firm for seeking a negotiated resolution of these important disputes before requesting court intervention. And we will not reward the government for ignoring those efforts."); *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987) (describing physician's motion for relief from execution of search warrant that encompassed patient files as "good faith" and "diligent[]" effort to "press[] the interests of his patients"). The court's punitive approach to Twitter's attempt to protect its First Amendment interests is particularly pernicious; it will only serve to chill future actors in a similar position from attempting to assert their constitutional rights. *Cf. United States v. Kis*, 658 F.2d 526, 534 n.17 (7th Cir. 1981) ("Courts

**FILED UNDER SEAL**

are quite correctly … wary of forcing litigants to choose between compliance and contempt in a First Amendment context, for the chilling effect of any such dilemma is considerable.").

### C.    The District Court's Sanction Was Unreasonably Severe

A civil contempt sanction must be "remedial and for the benefit of the complainant," aimed at "vindicat[ing] the authority of the court," and not "punitive." *Bagwell*, 512 U.S. at 828 (cleaned up).  A contempt sanction must "be no more in amount than is … necessary to secure compliance." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 372 (1947); *see also Jove Eng'g, Inc. v. Internal Revenue Serv.*, 92 F.3d 1539, 1558 (11th Cir. 1996) ("Sanctions imposed for civil contempt to coerce compliance cannot be any greater than necessary to ensure such compliance." (cleaned up)).  If a contempt sanction is more "excessive" than necessary to secure compliance, it becomes "punitive" and thus beyond the court's civil contempt power.  *Jove*, 92 F.3d at 1558.  Additionally, the "magnitude" of the contempt and the contemnor's "good faith should … be considered in mitigation of penalty." *Washington Metro.*, 531 F.2d at 621.  Although the crafting of a contempt sanction is reviewed for abuse of discretion, "the contempt power … uniquely is liable to abuse" and therefore must be scrutinized carefully.  *Bagwell*, 512 U.S. at 831 (cleaned up).

**FILED UNDER SEAL**

That the district court abused its discretion by imposing this sanction on Twitter is evident in multiple ways.  First, the sanctions schedule may be the most aggressive one ever imposed by any court in the United States.  According to that schedule, the sanction would exceed one million dollars *per day* in just six days and would exceed one *billion* dollars *per day* in just over two weeks.  The total fine would exceed Twitter's total valuation in about three weeks, and the entire world's gross domestic product in about one month.  A sanction of such astronomical proportions could not have been rationally calibrated to do no more than coerce compliance.

In the only case located with a sanctions schedule even remotely like the one here, the district court set the initial daily fine at a mere $100, and ordered it to double daily.  *United States v. City of Yonkers*, 856 F.2d 444, 459 (2d Cir. 1988), *rev'd on other grounds sub nom. Spallone v. United States*, 493 U.S. 265 (1990).  Yet, even though the contemnor had failed for years to comply with court orders ("totally default[ing]" on multiple obligations), *id.*, at 447-451, the Second Circuit held that the schedule was an abuse of discretion, *id.* at 459-460.

Second, the amount of the sanction actually imposed dramatically outsteps other contempt orders issued in this Circuit against far more well-resourced parties.  Because this fine doubled each day, Twitter was fined $50,000 on February 7, an additional $100,000 on February 8, and an additional $200,000 on February 9.  By

**FILED UNDER SEAL**

contrast, district courts in this Circuit have found a flat fine of $50,000 a day

suffced to coerce Russia–"one of the world's largest economies."  *See Chabad v.*

*Russian Fed'n*, 915 F. Supp. 2d 148, 154 (D.D.C. 2013); *see also In re Grand Jury*

*Subpoena No. 7409*, 2018 WL 8334866, at *3 (D.D.C. Oct. 5, 2018) (Howell, J.)

($50,000 per day contempt sanction against corporation owned by unnamed

foreign sovereign), *aff'd sub nom. In re Grand Jury Subpoena*, 749 F. App'x 1

(D.C. Cir. 2018).  Another court considered a flat fine of $25,000 a day enough to

coerce compliance from Philip Morris, a company in the top ten of the Fortune 500

the preceding year, with annual profits (at the time) of approximately

$190,000,000.  *United States v. Philip Morris USA Inc.*, 287 F. Supp. 2d 5, 15 &

n.11 (D.D.C. 2003).  (Twitter, by comparison, was recently sold for $44 billion and

has not turned a profit since 2019.)  And even those examples are on the high end.

*See, e.g.*, *MasTec Advanced Techs v. National Lab. Relations Bd.*, 2021 WL

4935618 (D.D.C. June 3, 2021) (imposing $2,500 daily sanction against

multinational infrastructure firm).

Third, the $350,000 sanction against Twitter for a mere 51 hours of

(supposed) delay was itself out of step with other contempt sanctions.  Twitter has

identified no instance in which any other court has assessed a similarly large

sanction for such a brief period of noncompliance—and certainly no case where a

court has done so against a private company (as opposed to a sovereign state) and

**FILED UNDER SEAL**

during a period when the court itself was still clarifying what constituted

compliance.  The only contempt order Twitter has identified that so much as

threatened a sanction as large as this one for such a brief period was issued against

China, the world's second largest economy.  *See Walters v. People's Republic of

China*, 72 F. Supp. 3d 8, 13 (D.D.C. 2014).  And that sanction was never actually

assessed.  *See* Order, *Walters v. People's Republic of China*, No. 01-mc-300

(D.D.C. Sept. 10, 2015), ECF 35.  Indeed, the United States opposed that sanction

because it was too big.  *See* Statement of Interest of the United States 8, *Walters*,

No. 01-mc-300 (D.D.C. Aug. 25, 2015), ECF 32.

Finally, as explained above, Twitter worked hard and in good faith to

comply with the February 7 order from the moment it was issued until the moment

Twitter completed production on February 9.  And Twitter declined to produce

before February 7 only because of its good-faith First Amendment challenge to the

Order, which it genuinely (and correctly) believed needed to be resolved before

any compliance.  Even if that good-faith substantial compliance does not vitiate the

entire contempt judgment (and it should), it at least undermines the validity of such

a large sanction.  Indeed, that Twitter's contempt resulted from its effort to press

its legitimate First Amendment interests makes this a uniquely improper case for

an extraordinarily large contempt sanction—the prospect of such massive sanctions

**FILED UNDER SEAL**

cannot but discourage parties, including Twitter, from asserting their constitutional rights in the future.

## CONCLUSION

For the foregoing reasons, Twitter respectfully requests that this Court reverse the judgment, vacate the Non-Disclosure Order, and vacate the contempt sanction.

Respectfully submitted,

s/  Ari Holtzblatt
ARI HOLTZBLATT (DC BAR NO. 1009913)
BENJAMIN POWELL (DC BAR NO. 464823)
WHITNEY RUSSELL (DC BAR NO. 987238)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

GEORGE P. VARGHESE (MASS. BAR NO. 706861)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Counsel for X Corp., successor in interest to Appellant Twitter, Inc.*

March 31, 2023

**FILED UNDER SEAL**

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND WORD-COUNT LIMITATIONS

Pursuant to Federal Rule of Appellate Procedure 32(g) and D.C. Circuit Rule 32(e)(2)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

1.     Exclusive of the exemption portions of the brief, as provided in Federal Rule of Appellate Procedure 32(f), the brief contains 12,998 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Office for Microsoft 365 MSO in 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

s/  Ari Holtzblatt
ARI HOLTZBLATT

March 31, 2023

FILED UNDER SEAL

# ADDENDUM

**FILED UNDER SEAL**

# ADDENDUM
## TABLE OF CONTENTS

U.S. Const. amend. I ........................................................................................Add. 1

18 U.S.C. § 2703 ............................................................................................Add. 2

18 U.S.C. § 2705 ............................................................................................Add. 9

18 U.S.C. § 3123 ..........................................................................................Add. 12

44 U.S.C. § 2206 ..........................................................................................Add. 15

**FILED UNDER SEAL**

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

FILED UNDER SEAL

## 18 U.S.C. § 2703

### §2703.  Required disclosure of customer communications or records

(a) CONTENTS OF WIRE OR ELECTRONIC COMMUNICATIONS IN ELECTRONIC STORAGE.—A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures and, in the case of a court-martial or other proceeding under chapter 47 of title 10 (the Uniform Code of Military Justice), issued under section 846 of that title, in accordance with regulations prescribed by the President) by a court of competent jurisdiction. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

(b) CONTENTS OF WIRE OR ELECTRONIC COMMUNICATIONS IN A REMOTE COMPUTING SERVICE.—(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection—

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures and, in the case of a court-martial or other proceeding under chapter 47 of title 10 (the Uniform Code of Military Justice), issued under section 846 of that title, in accordance with regulations prescribed by the President) by a court of competent jurisdiction; or

(B) with prior notice from the governmental entity to the subscriber or customer if the governmental entity-

(i) uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena; or

Add. 2

FILED UNDER SEAL

      (ii) obtains a court order for such disclosure under subsection (d) of this section;

except that delayed notice may be given pursuant to section 2705 of this title.

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service-

      (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

      (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

(c) RECORDS CONCERNING ELECTRONIC COMMUNICATION SERVICE OR REMOTE COMPUTING SERVICE.—(1) A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—

      (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures and, in the case of a court-martial or other proceeding under chapter 47 of title 10 (the Uniform Code of Military Justice), issued under section 846 of that title, in accordance with regulations prescribed by the President) by a court of competent jurisdiction;

      (B) obtains a court order for such disclosure under subsection (d) of this section;

      (C) has the consent of the subscriber or customer to such disclosure;

      (D) submits a formal written request relevant to a law enforcement investigation concerning telemarketing fraud for the name, address, and place of business of a subscriber or customer of such provider, which

Add. 3

**FILED UNDER SEAL**

subscriber or customer is engaged in telemarketing (as such term is defined in section 2325 of this title); or

        (E) seeks information under paragraph (2).

    (2) A provider of electronic communication service or remote computing service shall disclose to a governmental entity the-

        (A) name;

        (B) address;

        (C) local and long distance telephone connection records, or records of session times and durations;

        (D) length of service (including start date) and types of service utilized;

        (E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

        (F) means and source of payment for such service (including any credit card or bank account number),

of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1).

    (3) A governmental entity receiving records or information under this subsection is not required to provide notice to a subscriber or customer.

    (d) REQUIREMENTS FOR COURT ORDER.—A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation. In the case of a State governmental authority, such a court order shall not issue if prohibited by the law of such State. A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider.

Add. 4

**FILED UNDER SEAL**

(e) No Cause of Action Against a Provider Disclosing Information Under This Chapter.—No cause of action shall lie in any court against any provider of wire or electronic communication service, its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter.

(f) Requirement To Preserve Evidence.—

(1) In general.—A provider of wire or electronic communication services or a remote computing service, upon the request of a governmental entity, shall take all necessary steps to preserve records and other evidence in its possession pending the issuance of a court order or other process.

(2) Period of retention.—Records referred to in paragraph (1) shall be retained for a period of 90 days, which shall be extended for an additional 90-day period upon a renewed request by the governmental entity.

(g) Presence of Officer Not Required.—Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service.

(h) Comity Analysis and Disclosure of Information Regarding Legal Process Seeking Contents of Wire or Electronic Communication.—

(1) Definitions.—In this subsection—

(A) the term "qualifying foreign government" means a foreign government—

(i) with which the United States has an executive agreement that has entered into force under section 2523; and

(ii) the laws of which provide to electronic communication service providers and remote computing service providers substantive and procedural opportunities similar to those provided under paragraphs (2) and (5); and

(B) the term "United States person" has the meaning given the term in section 2523.

(2) MOTIONS TO QUASH OR MODIFY.—(A) A provider of electronic communication service to the public or remote computing service, including a foreign electronic communication service or remote computing service, that is being required to disclose pursuant to legal process issued under this section the contents of a wire or electronic communication of a subscriber or customer, may file a motion to modify or quash the legal process where the provider reasonably believes—

(i) that the customer or subscriber is not a United States person and does not reside in the United States; and

(ii) that the required disclosure would create a material risk that the provider would violate the laws of a qualifying foreign government.

Such a motion shall be filed not later than 14 days after the date on which the provider was served with the legal process, absent agreement with the government or permission from the court to extend the deadline based on an application made within the 14 days. The right to move to quash is without prejudice to any other grounds to move to quash or defenses thereto, but it shall be the sole basis for moving to quash on the grounds of a conflict of law related to a qualifying foreign government.

(B) Upon receipt of a motion filed pursuant to subparagraph (A), the court shall afford the governmental entity that applied for or issued the legal process under this section the opportunity to respond. The court may modify or quash the legal process, as appropriate, only if the court finds that—

(i) the required disclosure would cause the provider to violate the laws of a qualifying foreign government;

(ii) based on the totality of the circumstances, the interests of justice dictate that the legal process should be modified or quashed; and

(iii) the customer or subscriber is not a United States person and does not reside in the United States.

**FILED UNDER SEAL**

(3) COMITY ANALYSIS.—For purposes of making a determination under paragraph (2)(B)(ii), the court shall take into account, as appropriate—

(A) the interests of the United States, including the investigative interests of the governmental entity seeking to require the disclosure;

(B) the interests of the qualifying foreign government in preventing any prohibited disclosure;

(C) the likelihood, extent, and nature of penalties to the provider or any employees of the provider as a result of inconsistent legal requirements imposed on the provider;

(D) the location and nationality of the subscriber or customer whose communications are being sought, if known, and the nature and extent of the subscriber or customer's connection to the United States, or if the legal process has been sought on behalf of a foreign authority pursuant to section 3512, the nature and extent of the subscriber or customer's connection to the foreign authority's country;

(E) the nature and extent of the provider's ties to and presence in the United States;

(F) the importance to the investigation of the information required to be disclosed;

(G) the likelihood of timely and effective access to the information required to be disclosed through means that would cause less serious negative consequences; and

(H) if the legal process has been sought on behalf of a foreign authority pursuant to section 3512, the investigative interests of the foreign authority making the request for assistance.

(4) DISCLOSURE OBLIGATIONS DURING PENDENCY OF CHALLENGE.—A service provider shall preserve, but not be obligated to produce, information sought during the pendency of a motion brought under this subsection, unless the court finds that immediate production is necessary to prevent an adverse result identified in section 2705(a)(2).

**FILED UNDER SEAL**

(5) DISCLOSURE TO QUALIFYING FOREIGN GOVERNMENT.—(A) It shall not constitute a violation of a protective order issued under section 2705 for a provider of electronic communication service to the public or remote computing service to disclose to the entity within a qualifying foreign government, designated in an executive agreement under section 2523, the fact of the existence of legal process issued under this section seeking the contents of a wire or electronic communication of a customer or subscriber who is a national or resident of the qualifying foreign government.

(B) Nothing in this paragraph shall be construed to modify or otherwise affect any other authority to make a motion to modify or quash a protective order issued under section 2705.

FILED UNDER SEAL

## 18 U.S.C. § 2705

### §2705.  Delayed notice

(a) DELAY OF NOTIFICATION.—(1) A governmental entity acting under section 2703(b) of this title may—

(A) where a court order is sought, include in the application a request, which the court shall grant, for an order delaying the notification required under section 2703(b) of this title for a period not to exceed ninety days, if the court determines that there is reason to believe that notification of the existence of the court order may have an adverse result described in paragraph (2) of this subsection; or

(B) where an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury subpoena is obtained, delay the notification required under section 2703(b) of this title for a period not to exceed ninety days upon the execution of a written certification of a supervisory official that there is reason to believe that notification of the existence of the subpoena may have an adverse result described in paragraph (2) of this subsection.

(2) An adverse result for the purposes of paragraph (1) of this subsection is—

(A) endangering the life or physical safety of an individual;

(B) flight from prosecution;

(C) destruction of or tampering with evidence;

(D) intimidation of potential witnesses; or

(E) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

(3) The governmental entity shall maintain a true copy of certification under paragraph (1)(B).

(4) Extensions of the delay of notification provided in section 2703 of up to ninety days each may be granted by the court upon application, or by certification by a governmental entity, but only in accordance with subsection (b) of this section.

Add. 9

**FILED UNDER SEAL**

(5) Upon expiration of the period of delay of notification under paragraph (1) or (4) of this subsection, the governmental entity shall serve upon, or deliver by registered or first-class mail to, the customer or subscriber a copy of the process or request together with notice that—

    (A) states with reasonable specificity the nature of the law enforcement inquiry; and

    (B) informs such customer or subscriber-

        (i) that information maintained for such customer or subscriber by the service provider named in such process or request was supplied to or requested by that governmental authority and the date on which the supplying or request took place;

        (ii) that notification of such customer or subscriber was delayed;

        (iii) what governmental entity or court made the certification or determination pursuant to which that delay was made; and

        (iv) which provision of this chapter allowed such delay.

(6) As used in this subsection, the term "supervisory official" means the investigative agent in charge or assistant investigative agent in charge or an equivalent of an investigating agency's headquarters or regional office, or the chief prosecuting attorney or the first assistant prosecuting attorney or an equivalent of a prosecuting attorney's headquarters or regional office.

    (b) PRECLUSION OF NOTICE TO SUBJECT OF GOVERNMENTAL ACCESS.—A governmental entity acting under section 2703, when it is not required to notify the subscriber or customer under section 2703(b)(1), or to the extent that it may delay such notice pursuant to subsection (a) of this section, may apply to a court for an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order.  The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—

    (1) endangering the life or physical safety of an individual;

Add. 10

**FILED UNDER SEAL**

(2) flight from prosecution;

(3) destruction of or tampering with evidence;

(4) intimidation of potential witnesses; or

(5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

FILED UNDER SEAL

## 18 U.S.C. § 3123

### §3123.  Issuance of an order for a pen register or a trap and trace device

(a) IN GENERAL.—

    (1) ATTORNEY FOR THE GOVERNMENT.—Upon an application made under section 3122(a)(1), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.  The order, upon service of that order, shall apply to any person or entity providing wire or electronic communication service in the United States whose assistance may facilitate the execution of the order. Whenever such an order is served on any person or entity not specifically named in the order, upon request of such person or entity, the attorney for the Government or law enforcement or investigative officer that is serving the order shall provide written or electronic certification that the order applies to the person or entity being served.

    (2) STATE INVESTIGATIVE OR LAW ENFORCEMENT OFFICER.—Upon an application made under section 3122(a)(2), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device within the jurisdiction of the court, if the court finds that the State law enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

    (3)(A) Where the law enforcement agency implementing an ex parte order under this subsection seeks to do so by installing and using its own pen register or trap and trace device on a packet-switched data network of a provider of electronic communication service to the public, the agency shall ensure that a record will be maintained which will identify—

        (i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network;

FILED UNDER SEAL

(ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information;

(iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and

(iv) any information which has been collected by the device.

To the extent that the pen register or trap and trace device can be set automatically to record this information electronically, the record shall be maintained electronically throughout the installation and use of such device.

(B) The record maintained under subparagraph (A) shall be provided ex parte and under seal to the court which entered the ex parte order authorizing the installation and use of the device within 30 days after termination of the order (including any extensions thereof).

(b) CONTENTS OF ORDER.—An order issued under this section—

(1) shall specify—

(A) the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;

(B) the identity, if known, of the person who is the subject of the criminal investigation;

(C) the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of an order authorizing installation and use of a trap and trace device under subsection (a)(2), the geographic limits of the order; and

(D) a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and

(2) shall direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device under section 3124 of this title.

FILED UNDER SEAL

(c) TIME PERIOD AND EXTENSIONS.—(1) An order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed sixty days.

(2) Extensions of such an order may be granted, but only upon an application for an order under section 3122 of this title and upon the judicial finding required by subsection (a) of this section. The period of extension shall be for a period not to exceed sixty days.

(d) NONDISCLOSURE OF EXISTENCE OF PEN REGISTER OR A TRAP AND TRACE DEVICE.—An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that—

(1) the order be sealed until otherwise ordered by the court; and

(2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

**FILED UNDER SEAL**

## 44 U.S.C. § 2206

**§2206.  Regulations**

The Archivist shall promulgate in accordance with section 553 of title 5, United States Code, regulations necessary to carry out the provisions of this chapter.  Such regulations shall include—

(1) provisions for advance public notice and description of any Presidential records scheduled for disposal pursuant to section 2203(f)(3);

(2) provisions for providing notice to the former President when materials to which access would otherwise be restricted pursuant to section 2204(a) are to be made available in accordance with section 2205(2);

(3) provisions for notice by the Archivist to the former President when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have; and

(4) provisions for establishing procedures for consultation between the Archivist and appropriate Federal agencies regarding materials which may be subject to section 552(b)(7) of title 5, United States Code.

**FILED UNDER SEAL**

# CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2023, I caused the foregoing

to be served by email upon:

James I. Pearce
Assistant Special Counsel
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 840-7000

s/  Ari Holtzblatt
ARI HOLTZBLATT