**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2023**

No. 23-5044

In the

# United States Court of Appeals
for the District of Columbia Circuit

―――――――――

IN RE: SEALED CASE

(UNDER SEAL AND EX PARTE)

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
District Court No. 22-sc-2144 (Howell, C.J.)

―――――――

## ANSWERING BRIEF FOR THE UNITED STATES

―――――――

J.P. COONEY
Deputy Special Counsel

RAYMOND N. HULSER
Counselor to the Special Counsel

CECIL W. VANDEVENDER
JOHN M. PELLETTIERI
Assistant Special Counsels

JACK SMITH
Special Counsel

THOMAS P. WINDOM
Senior Assistant Special Counsel

JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530
(202) 705-9879
jip@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

**A.    Parties and Amici**

The parties that appeared in the district court and that are now before this Court are the United States (appellee) and appellant Twitter.

**B.    Rulings Under Review**

Twitter seeks review of the order of the district court (Howell, C.J.) denying its motion to vacate or modify a nondisclosure order, JA354, holding Twitter in contempt for failing to comply with an order directing it to produce materials responsive to a search warrant, and levying a $350,000 sanction, JA355; *see* JA356-95 (memorandum opinion).

**C.    Related Cases**

Counsel is not aware of any cases that would be deemed related under D.C. Cir. R. 28(a)(1)(C).

/s/ James I. Pearce
JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....i

TABLE OF AUTHORITIES ........................................................................iv

GLOSSARY OF ABBREVIATIONS ...........................................................x

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE .....................................................................2

    I.    Legal Background ......................................................................2

    II.    Factual and Procedural Background ..........................................6

        A.    Twitter refuses to comply with a valid search warrant.........6

        B.    After the district court orders Twitter to comply with the search warrant while it litigates the nondisclosure order, Twitter indicates it is prepared to meet the court's deadline but fails to do so. ......................................9

        C.    The district court denies Twitter's motion to vacate or modify the nondisclosure order and imposes a monetary sanction for Twitter's failure to comply. ...........12

SUMMARY OF ARGUMENT .....................................................................15

ARGUMENT ...............................................................................................19

    I.    Twitter's First Amendment challenge lacks merit. .....................19

        A.    The nondisclosure order survives strict scrutiny................19

            1.    The nondisclosure order serves compelling interests.................................................................20

            2.    The nondisclosure order is narrowly tailored...........25

B.    Twitter cannot challenge the district court's application of the Section 2705(b) factors. ......................................... 29

C.    The district court did not undermine the adversarial process. ............................................................... 31

II.    Twitter's claim that the district court erred by requiring compliance with the Warrant before adjudicating Twitter's challenge to the nondisclosure order is moot and lacks merit. .... 35

A.    Twitter's claim is moot.................................................... 36

B.    Twitter's claim lacks merit. .............................................. 39

III.    The district court did not abuse its discretion in holding Twitter in contempt and levying a sanction. ............................. 47

A.    The district court correctly determined that Twitter failed to substantially comply in good faith with the Warrant. ...................................................................... 48

B.    The sanction was reasonable. ........................................... 54

CONCLUSION.......................................................................... 58

CERTIFICATE OF COMPLIANCE ........................................... 59

CERTIFICATE OF SERVICE ................................................... 60

# TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1988) ............................................................ 33

*Butterworth v. Smith*,
  494 U.S. 624 (1990) ...................................................................... 26

*Church of Scientology of Cal. v. United States*,
  506 U.S. 9 (1992) ........................................................................ 38

*Corley v. Rosewood Care Ctr., Inc.*,
  142 F.3d 1041 (7th Cir. 1998) .......................................................... 38

*Dietz v. Boudin*,
  579 U.S. 40 (2016) ...................................................................... 35

*Douglas Oil Co. v. Petrol Stops Northwest*,
  441 U.S. 211 (1979) .................................................................21, 22

*FTC v. Lane Labs-USA, Inc.*,
  624 F.3d 575 (3d Cir. 2010) ........................................................... 49

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
  637 F.3d 373 (D.C. Cir. 2011) ......................................................... 48

*Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*,
  103 F.3d 1007 (D.C. Cir. 1997) ......................................................48, 49

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ...................................................................... 33

*Google LLC v. United States*,
  443 F. Supp. 3d 447 (S.D.N.Y. 2020) .....................................20, 31, 34, 40

*Haig v. Agee*,
  453 U.S. 280 (1981) ...................................................................... 21

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..................................................................................... 23

*In re Application of Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*,
964 F.3d 1121 (D.C. Cir. 2020) ................................................................ 4

*In re Application of the U.S. for an Ord. Pursuant to 18 U.S.C. sec. 2703(d)*,
830 F. Supp. 2d 114 (E.D. Va. 2011) ....................................................... 30

*In re Application of USA*,
No. 19-wr-10, 2019 WL 4619698 (D.D.C. Aug. 6, 2019) ......................... 25

*In re Campbell*,
628 F.2d 1260 (9th Cir. 1980) ................................................................. 37

*In re Fannie Mae Sec. Litig.*,
552 F.3d 814 (D.C. Cir. 2009) ................................................................. 51

*In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, Misc. Nos. 18-175, 18-176, 18-177, 2019 WL
2182436 (D.D.C. Apr. 10, 2019) .......................................................55, 56

*In re Grand Jury Subpoena Duces Tecum, 91-02922*,
955 F.2d 670 (11th Cir. 1992) ...........................................................37, 54

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) .............................................................. 32

*In re Grand Jury Witness*,
835 F.2d 437 (2d Cir. 1987) .................................................................... 54

*In re Hunt*,
754 F.2d 1290 (5th Cir. 1985) ................................................................. 37

*In re National Security Letter*,
33 F.4th 1058 (9th Cir. 2022) ..................................................... 20, 34, 42

*In re Sealed Case No. 98-3077*,
151 F.3d 1059 (D.C. Cir. 1998) .............................................................. 32

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ............................................................32, 45

*In re Sealed Case*,
676 F.2d 793 (D.C. Cir. 1982) ................................................................ 32

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*,
289 F. Supp. 3d 201 (D.D.C. 2018) .......................................................... 3

*Int'l Union, United Mine Workers of Amer. v. Bagwell*,
512 U.S. 821 (1994) ............................................................................52, 55

*John Doe Agency, et al. v. John Doe Corp.*,
488 U.S. 1306 (1989) .............................................................................. 36

*John Doe, Inc. v. Mukasey*,
549 F.3d 861 (2d Cir. 2008) ..............................................................19, 26

*Laffey v. Northwest Airlines, Inc.*,
567 F.2d 429 (D.C. Cir. 1976), *abrogated on other grounds by*
*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) .............................. 49

*Lee v. Bankers Tr. Co.*,
166 F.3d 540 (2d Cir. 1999) ...................................................................... 3

*Matter of Application of United States of Am. for an Ord. of Nondisclosure Pursuant*
*to 18 U.S.C. § 2705(B) for Grand Jury Subpoena # GJ2014031422765*,
41 F. Supp. 3d 1 (D.D.C. 2014) ............................................................... 31

*Matter of Grand Jury Subpoena for: [Redacted]@yahoo.com*,
79 F. Supp. 3d 1091 (N.D. Cal. 2015) ..................................................... 31

*Matter of Subpoena 2018R00776*,
947 F.3d 148 (3d Cir. 2020) ...........................19, 20, 21, 22, 25, 26, 27, 28

*Matter of the Search of Information Associated with E-mail Accounts*,
468 F. Supp. 3d 556 (E.D.N.Y. 2020) ...................................................20, 27

*Matter of Warrant to Search a Certain E-Mail Acct. Controlled &*
*Maintained by Microsoft Corp.*,
855 F.3d 53 (2d Cir. 2017) ...................................................................... 41

*McKeever v. Barr*,
   920 F.3d 842 (D.C. Cir. 2019) ................................................................. 24

*Nixon v. GSA*,
   433 U.S. 425 (1977) .........................................................................43, 44

*NLRB v. Blevins Popcorn Co.*,
   659 F.2d 1173 (D.C. Cir. 1981) ........................................................ 47

*NLRB v. Local 3, International Brotherhood of Elec. Workers*,
   471 F.3d 399 (2d Cir. 2006) ............................................................. 56

*People for the Amer. Way Found. V. U.S. Dep't of Educ.*,
   518 F. Supp. 2d 174 (D.D.C. 2007) ............................................... 37

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*,
   673 F.2d 53 (2d Cir. 1982) .............................................................. 54

*Pigford v. Veneman*,
   307 F. Supp. 2d 51 (D.D.C. 2004) ..............................................55, 56

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................................13, 20

*Reno v. ACLU*,
   521 U.S. 844 (1997) .......................................................................... 20

*Rhode Island Hosp. Trust Nat'l Bank v. Howard Commc'ns Corp.*,
   980 F.2d 823 (1st Cir. 1992) ............................................................ 38

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984) ............................................................................ 26

*SEC v. Jerry T. O'Brien, Inc.*,
   467 U.S. 735 (1984) .......................................................................... 21

*Shapiro v. U.S. Dep't of Justice*,
   No. 13-cv-555, 2016 WL 3023980 (D.D.C. May 25, 2016) ............. 36

*Thomas v. Chicago Park Dist.*,
   534 U.S. 316 (2002) .......................................................................... 33

vii

*Trump v. Thompson,*
    142 S. Ct. 680 (2022) ................................................................ 43

*Twitter, Inc. v. Garland,*
    61 F.4th 686 (9th Cir. 2023) ............................................. 34, 47

*United States v. Beaudion,*
    979 F.3d 1092 (5th Cir. 2020) ................................................ 30

*United States v. Brown,*
    249 F. Supp. 3d 287 (D.D.C. 2017) ................................... 27, 29

*United States v. Griffin,*
    816 F.2d 1 (D.C. Cir. 1987) .................................................... 36

*United States v. Grubbs,*
    547 U.S. 90 (2006) .................................................................. 47

*United States v. Nixon,*
    418 U.S. 683 (1974) ................................................................ 43

*United States v. United Mine Workers of America,*
    330 U.S. 258 (1947) ................................................................ 55

*Washington Metropolitan Area Transit Authority v. Amalgamated Transit*
    *Union, National Capital Local Division 689,*
    531 F.2d 617 (D.C. Cir. 1976) ..................................... 37, 52, 53

*Williams-Yulee v. Florida Bar,*
    575 U.S. 433 (2015) .......................................................... 26, 28

*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978) ................................................................ 46

**Statutes**

18 U.S.C. § 2518 ........................................................................... 3

18 U.S.C. § 2703 ................................................... 2, 4, 16, 30

18 U.S.C. § 2705 ............................................. 3, 16, 22, 23, 40

18 U.S.C. § 2708 ...................................................................16, 29

18 U.S.C. § 2709 ....................................................................... 20

18 U.S.C. § 3123 ......................................................................... 3

Stored Communications Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986) ........ 2

**Other Authorities**

13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3533.2.2 (3d ed.) ..........37, 38

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...................................................................... 30

Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022) .......................................... 45

U.S. Dep't of Justice, *Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)* (Oct. 19, 2017) ............................ 6

U.S. Dep't of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)* (May 27, 2022) .................... 6

**Rules**

D.C. Cir. R. 28 ..............................................................................i

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Br. | Opening brief filed by Appellant |
| ECF No. | Docket entries in the district court |
| JA | Joint Appendix |
| NDO | Nondisclosure order |
| PRA | Presidential Records Act |
| NARA | U.S. National Archives and Records Administration |

## JURISDICTIONAL STATEMENT

This is an appeal arising from a warrant to search information from the Twitter account of former President Donald J. Trump.  On January 17, 2023, the district court authorized a search warrant for that account and issued an order requiring that Twitter not disclose the warrant to anyone.  JA1-2.  On March 3, 2023, the district court denied Twitter's motion to vacate or modify the nondisclosure order and held Twitter in civil contempt for failing to comply with the search warrant.  JA354-55.  Twitter filed a timely notice of appeal on March 7, 2023.  ECF No. 34.  Twitter's notice of appeal supplies jurisdiction for its challenges to the nondisclosure order and the civil contempt finding, but as explained below, Twitter's claim that the district court erred by resolving Twitter's compliance with the warrant before adjudicating Twitter's challenge to the nondisclosure order is moot.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly ruled that the nondisclosure order was consistent with the First Amendment.

2.    Whether the district court correctly ruled that Twitter's challenge to the nondisclosure order was independent of its obligation to comply with the search warrant.

1

3.      Whether the district court abused its discretion by holding Twitter in civil contempt and levying a financial sanction against it where Twitter represented, at a hearing 11 days after Twitter's deadline to disclose materials pursuant to a search warrant, that it could comply with an order to produce materials that evening, but then failed to comply with the order for another 51 hours.

## STATEMENT OF THE CASE

### I.    Legal Background

The Stored Communications Act ("Act"), Pub. L. No. 99-508, 100 Stat. 1848 (1986), regulates access to electronic communications and information stored by providers of electronic communications services and remote computing services, like Twitter.  Within the Act, Section 2703 defines how the Government can require the disclosure of information pertaining to the customers and subscribers of covered services.  *See generally* 18 U.S.C. § 2703(a)-(c).  Section 2703 provides for different means of obtaining evidence—including via subpoenas, court orders under Section 2703(d), and search warrants.  *See* § 2703(c)(2).

Because the Act frequently entails providing some information about government investigations to third parties, Section 2705(b) complements Section 2703 by authorizing judges to prevent a provider from disclosing a

2

warrant, court order, or subpoena issued pursuant to Section 2703. *See* 18 U.S.C. § 2705(b); *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 208 (D.D.C. 2018). On the Government's application, a court shall issue a nondisclosure order "for such period as the court deems appropriate," based upon an independent judicial determination that "there is reason to believe that notification of the existence of the [legal process pursuant to Section 2703] will result" in (1) endangerment of a person's life or physical safety; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial. 18 U.S.C. § 2705(b). The Act's statutory scheme thus requires that, once a court has found that the Government has demonstrated a "reason to believe" that disclosure would result in one or more of the listed harms, the court must issue an order prohibiting the service provider to whom the Section 2703 process is directed from notifying "any other person" of the legal process for a period of time that the court deems appropriate. *Id.*[1] Section 2705(b) thus operates to "protect specified law enforcement interests

---

[1] Section 2705(b) is far from the only statute limiting disclosure of information related to government investigations. *See, e.g.*, 18 U.S.C. § 2518(8)(b) (governing disclosures of wiretap orders); 18 U.S.C. § 3123(d)(2) (authorizing courts to prohibit providers from disclosing orders for pen registers and trap-and-trace devices); *see also Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (observing that "even in a suit for damages based on disclosures allegedly made

in connection with ongoing investigations." *In re Application of Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1129 (D.C. Cir. 2020). At the same time, it allows for more efficient and effective investigations, preventing the need for more intrusive techniques than disclosure of information by third parties, and eliminating the need to weigh risks to witnesses and the case against the need to gather evidence.

The Act provides a mechanism for service providers to challenge certain court orders on specified grounds. Under Section 2703(d), a service provider may move to quash or modify a court order "if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider." But neither Section 2703 nor Section 2705 affords a service provider the opportunity to be heard on the merits of the statutory showing under Section 2705(b). Instead, a provider's challenge to a Section 2705(b) order is limited to whether the order complies with the First Amendment.

Section 2703 processes, and related Section 2705(b) orders, are employed in a wide array of contexts, often involving grand jury investigations that are not yet public or where only some aspects of the investigation are publicly known.

---

in a [suspicious activity report ("SAR")], a financial institution cannot reveal what disclosures it made in an SAR, or even whether it filed an SAR at all").

The Government may seek basic subscriber information at an early stage of an investigation, when investigators know nothing more than an Internet Protocol or email address used in connection with a potential crime, and the identity of the customer or subscriber is unknown. As an investigation progresses, the Government may seek a court order under Section 2703(d) to gather further information, such as identifying information about individuals with whom a suspect is communicating. Where, as here, probable cause exists to believe that information associated with an account includes evidence of a crime, warrants can be sought to search for such evidence.

In many such situations, absent the limited secrecy provided under the Act, the ability of grand juries and government investigators to collect evidence and identify wrongdoers would be seriously undermined by a provider's decision to disclose the existence of, or steps taken in, an ongoing investigation. In recognition of the evolving nature of federal criminal investigations, the U.S. Department of Justice policy regarding applications for orders pursuant to Section 2705(b) notes that "[w]hen applying for a § 2705(b) order to accompany a subpoena seeking basic subscriber information in an ongoing investigation that is not public or known to the subject(s) of the investigation, stating the reasons for protection from disclosure under § 2705(b) . . . usually will suffice." U.S. Dep't of Justice, *Policy Regarding Applications for Protective Orders Pursuant to 18*

*U.S.C. § 2705(b)*, at 2 n.2 (Oct. 19, 2017). "At a later stage of the investigation," the policy notes, such as "when a search warrant is being sought, the prosecutor should include more specific facts, as available, in support of the protective order." *Id.*; *see also* U.S. Dep't of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 (May 27, 2022) (noting that prosecutors "must provide a court with sufficient facts to permit the court to conduct" a "case- and fact-specific analysis," including by "identify[ing] which of the pertinent factors apply").

## II.    Factual and Procedural Background

### A.    Twitter refuses to comply with a valid search warrant.

On January 17, 2023, the district court issued a search warrant (the "Warrant") for information associated with the Twitter account "@realDonaldTrump" (the "Account") based on its conclusion that probable cause existed to search the information for evidence of certain criminal offenses. JA362. Along with the Warrant, the Government sought, and the district court issued, a nondisclosure order (the "NDO"). Under the statute, Twitter had no right to appear at that proceeding. The district court issued the NDO after finding reasonable grounds under Section 2705(b) to believe that disclosure would "result in destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation." JA1. The district

court ordered Twitter not to disclose "the existence or content of the Warrant" for 180 days.  JA2.

The Warrant required Twitter to produce responsive materials no later than January 27.  JA362.  The same day that the district court authorized the Warrant—January 17—the Government used Twitter's Legal Requests Submissions online site to attempt to serve the Warrant on Twitter.  *Id.*  Two service attempts failed, however, because Twitter's "page was down."  JA363 (brackets omitted).  On January 19, 2023, the Government successfully served the Warrant on Twitter through the website. *Id.*

The Warrant as served on Twitter incorporated by reference two attachments—describing the "Property to Be Searched" (Attachment A) and the "Particular Things to Be Seized" (Attachment B)—but not the warrant application or the probable cause affidavit.  ECF No. 4, at 2.  In other words, of the 116-page application, the Warrant itself (as served on Twitter) comprised only six pages.  *See* JA362-63.  Nevertheless, those six pages reflected (1) the existence of the Warrant; (2) the court and district court judge from whom the Warrant was obtained; (3) the date and time of the Warrant's issuance; (4) the specific account subject to the Warrant; (5) the specific categories of information sought by the Government, including certain content, subject areas, and persons of interest; and (6) the name, title, and official address of the agent with the

7

Federal Bureau of Investigation to whom responsive information should be produced.

When the Government contacted Twitter on January 25 to confirm that Twitter would meet the January 27 deadline, ████████████████████ ████████████, responded that ███ "was not aware of the Warrant but would consider it a priority." JA363 (internal quotation marks omitted). At the same time, ██████ noted that compliance by the deadline "would be a very tight turnaround." *Id.* (internal quotation marks omitted). The Government that evening sent the six pages to ██████, who directed Twitter personnel to preserve the available data. *Id.*

On January 26, Twitter informed the Government that it did not intend to comply with the Warrant by the following day's deadline. JA364. When asked for additional information, ██████ indicated that Twitter was "prioritizing the matter and taking it very seriously," while also erroneously claiming Twitter had only had the Warrant for two days even though the Government had in fact served it seven days earlier. *Id.* (internal quotation marks omitted). For the first time on January 31—four days after the compliance deadline—Twitter informed the Government that it would not comply with the Warrant absent revisions to the NDO. *Id.* Noting that "on occasion" Twitter "challenged nondisclosure orders," ██████ claimed that the district court was wrong to have

issued the NDO "given the intense publicity around the investigation." *Id.* (internal quotation marks omitted). ■ later communicated that Twitter would not comply with the Warrant "until we resolved our questions as to the NDO." *Id.* (internal quotation marks omitted).

**B.    After the district court orders Twitter to comply with the search warrant while it litigates the nondisclosure order, Twitter indicates it is prepared to meet the court's deadline but fails to do so.**

The parties filed cross motions on February 2, 2023. JA364-65. The Government moved for an order to show cause why Twitter should not be held in contempt for failing to comply with the Warrant by the January 27 deadline, arguing that Twitter's compliance with the Warrant was entirely distinct from any question concerning the validity of the NDO. JA22-25. Twitter cross-moved to vacate or modify the NDO on the grounds that it violated Twitter's First Amendment rights and that the former President may wish to assert an executive-privilege claim, while also contending that it should not be required to comply with the Warrant while its challenge to the NDO was pending. JA3-19. For the first time in its reply brief, Twitter argued (JA303-08) that the NDO violated the Stored Communications Act.

On February 7, 2023, the district court held a hearing (JA147-215) at which Twitter acknowledged that it lacked standing to assert any privilege on behalf of its users, had no confirmation that the former President intended to

assert a privilege claim, and was "operating on a mere sliver of the information" of what was presented to, and relied upon by, the district court in granting the NDO.  JA365-66.

For "practical," "logistical," and "legal" reasons, the district court rejected Twitter's request to forestall compliance with the Warrant while its challenge to the NDO was pending.  JA366.  Permitting Twitter's approach would "invite repeated litigation" and lead to "inevitable delays" that would undermine criminal investigations.  *Id.*  And legally, "the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each."  *Id.*  In short, "the 'public interest is served by prompt compliance with the [W]arrant' because 'any challenge to a NDO is separate from a challenge to a search warrant [and] any further delay on the production of the materials responsive to the Warrant increases the risk that evidence will be lost or destroyed, heightens the chance the targets will learn of the investigation, and jeopardizes the government's ability to bring any prosecution in a timely fashion.'"  *Id.*

When asked by the district court, Twitter represented that it "was prepared to and could comply with the Warrant" by 5 p.m. that afternoon.  JA367, 210. The district court therefore entered an order (the "Show Cause Order") that required Twitter to comply fully with the Warrant by 5 p.m. on February 7.

JA216.  Noting that Twitter was purchased in 2022 for over $40 billion and was solely owned by an individual with a net worth over $180 billion, the district court set a sanction of $50,000, doubling daily, if Twitter failed to comply with the deadline in the Show Cause Order—which was entered more than ten days after Twitter's initial deadline to comply with the Warrant.  JA216, 367.

Twitter again failed, however, to meet the deadline.  JA367.  Twitter produced some records to the Government before the 5 p.m. deadline but represented the following day in a phone call to the Government that it had "identified certain information that may (or may not) exist in their holdings" but "had not been produced."  *Id.* (internal quotation marks omitted).  Twitter produced additional records on February 9 and alerted the Government that further productions would be forthcoming, though the timing of those productions was uncertain.  JA368.  At the Government's request, the district court held a hearing on February 9.  JA224-73.

At that hearing, the district court meticulously reviewed what Twitter had and had not produced.  JA368.  It became evident to the district court when Twitter "raised questions for the first time about certain requests" that Twitter had "failed to confer effectively with the government."  *Id.*  Following that "line-by-line review" of the produced and outstanding materials, Twitter "promised" to update the Government by 4 p.m. that day (February 9) to explain what

11

remained outstanding and when that outstanding material would be produced. *Id.* Twitter made its final production at 8:28 p.m. on February 9. JA369. The district court then directed the parties to calculate the penalty for Twitter's failure to meet the February 7 deadline. *Id.* The Government asked the Court to impose a $350,000 sanction; Twitter contended that no sanction was appropriate because it had substantially complied in good faith with the Show Cause Order by providing some, though not all, responsive materials called for under the Warrant by 5 p.m. on February 7. *Id.*

**C.    The district court denies Twitter's motion to vacate or modify the nondisclosure order and imposes a monetary sanction for Twitter's failure to comply.**

On March 3, the district court issued a 35-page memorandum opinion denying Twitter's motion to vacate or modify the NDO and imposing a $350,000 sanction for its failure to comply. *See* JA356-90; ECF No. 30[2]; *see also* JA354-55 (order).

---

[2] The memorandum opinion in the Joint Appendix is redacted to ensure the secrecy of grand-jury proceedings under Rule 6(e) of the Federal Rules of Criminal Procedure. Wherever possible, this brief cites the Joint Appendix. In some instances, however, the brief cites and discusses materials that remain redacted; those portions of the brief will themselves be redacted in the version of the brief served on Twitter. The redacted portions are highlighted in the unredacted brief.

1.  With respect to Twitter's First Amendment challenge to the NDO, the district court identified "good reasons" not to apply the most exacting standard to nondisclosures order because they "tend to be narrow in scope" and "limited to their accompanying orders or warrants and the facts surrounding them." JA371.  Nonetheless, the district court assumed without deciding that strict scrutiny applied.  JA372.  Under that standard, a nondisclosure order must be "narrowly tailored to serve compelling state interests."  JA370 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

In the district court's view, the NDO survived strict scrutiny as "a narrowly tailored restriction for which no less restrictive alternative is available that would be at least as effective in serving the government's compelling interests."  JA372.  The NDO served the compelling government interest of furthering "the integrity and secrecy of an ongoing criminal investigation" of the former President, who had "a demonstrated history of seeking to interfere with and undermine the due process of law."  ECF No. 30 at 17 (internal quotation marks omitted).  Magnifying that interest was "the national import of the January 6th investigation into conduct that culminated in a violent riot at the U.S. Capitol."  JA372.  In reaching that conclusion, the district court observed that Twitter's "boldly contest[ed]" counterarguments illustrated its "ignoran[ce] of details" concerning "the scope of the government's current investigation."

13

EX PARTE

JA375. Those details included the former President's efforts to obstruct an ongoing investigation into potential mishandling of classified information, ECF No. 30, at 23 n.6, which bore particular significance in light of the former President's "prior efforts to obstruct investigative efforts into his and his associates' conduct," JA379 n.6. The district court also deemed "irrelevant" Twitter's claim that the former President might advance "unique and important" executive privileges because Twitter's interests were "purely about its right to speak to [its] . . . User, not what privileges that User may assert." JA379 (brackets and internal quotation marks omitted).

The district court likewise determined that the NDO was narrowly tailored. The NDO was "narrow in scope and time duration" because it prevented Twitter only from disclosing the Warrant's existence and was limited to 180 days. JA381-82. Moreover, Twitter's proposed alternatives—notifying the former President or one of his representatives under the Presidential Records Act—were "untenable" because they did not allow the Government to "maintain[] confidentiality about this covert investigative Warrant." JA383.

2. The district court then considered whether Twitter's failure to comply with the Show Cause Order merited sanctions. JA384-89. The district court noted that the parties agreed that Twitter failed to comply with the Warrant and with the Show Cause Order, leaving the only dispute whether Twitter

14

substantially complied and acted in good faith, which Twitter claimed was a defense to civil contempt. JA385. Assuming without deciding that such a defense existed, the district court concluded that Twitter's conduct did not amount to good-faith, substantial compliance. JA385-89. Although Twitter had "repeatedly represented" it was prepared to comply "promptly" with the Warrant when ordered to do so, it in fact "waited until after the Show Cause Order deadline passed on February 7 to raise, *for the first time*, multiple questions about the Warrant's document demands." JA387. Rather than engage in a "diligent and serious" effort to comply by trying to resolve those questions shortly after receiving the Warrant either on January 19—or even when ███████ personally received it on January 25—Twitter opted to litigate. JA388. Additionally, the district court reasoned, Twitter represented to the Government and the court that it "stood ready promptly to produce responsive records in full" by the Show Cause Order deadline, but "plainly" that was not accurate. JA388.

## SUMMARY OF ARGUMENT

I. The NDO comports with the First Amendment. Assuming as the district court did that strict scrutiny applies, the NDO serves compelling government interests and is narrowly tailored to serve those interests. The NDO protects the integrity and confidentiality of an ongoing criminal investigation.

15

As the district court recognized in issuing it, the NDO guarded against possible efforts by the former President to destroy or tamper with evidence, intimidate witnesses, or "otherwise seriously jeopardiz[e] an investigation." 18 U.S.C. § 2705(b)(3)-(5). Although the fact of the investigation is public, the Government's specific investigative steps, including that it has secured a search warrant for the former President's Twitter account, are unknown. The NDO is narrowly tailored because it restricts only Twitter's ability to inform others about the Warrant—and thus permits Twitter to speak publicly about nondisclosure orders generally or information Twitter has obtained independently—and because the NDO is limited to 180 days. Twitter's proposed alternatives, which Twitter largely forfeited, are untenable and unworkable because alerting the former President or his representatives would undermine the NDO's purpose.

Twitter lacks standing to challenge the district court's conclusion under the Stored Communications Act that the Government proffered sufficient evidence to support issuance of the NDO under the Section 2705(b) factors. The Act limits statutory challenges, *see* 18 U.S.C. § 2708, and while it permits service providers like Twitter to move to quash an order on the grounds that the order requests information that is "unusually voluminous" or that compliance would be unduly burdensome, *see* 18 U.S.C. § 2703(d), it provides no mechanism for service providers to challenge a court's consideration of the factors under Section

16

2705(b), which concern whether notifying others, including criminal suspects, would result in certain harms. Nor would a service provider, like Twitter here, generally have reason to know whether alerting others, including criminal suspects, would implicate a statutory harm.

Finally, the Government's *ex parte* submission, and the district court's *ex parte* consideration, of certain investigative information did not undermine the adversarial process. The *ex parte* procedures ensured grand-jury secrecy over investigative information, and the Government's filing of a separate sealed (but not *ex parte*) brief enabled Twitter to litigate its constitutional claim. Nor do the procedural safeguards required for prior restraints tantamount to censorship apply to the review of nondisclosure orders issued as part of a legitimate government investigation.

II.  Twitter's claim that the district court erred by requiring Twitter to comply with the Warrant before adjudicating the merits of Twitter's NDO challenge is moot and fails on the merits. The claim became moot when Twitter fully (though belatedly) complied with the Show Cause Order because no effective remedy now exists. Vacating the contempt order and associated sanction cannot undo Twitter's compliance or enable it to disclose the Warrant before producing responsive information. The claim lacks merit because compliance with a search warrant is entirely separate from any challenge to an

17

order requiring the recipient not to disclose the existence of that warrant, and once a court has made a probable-cause determination, service providers such as Twitter are not empowered to functionally overrule the court by demanding pre-enforcement review of the search warrant. Twitter's claim also fails because the putative executive-privilege claim it hypothesizes is not "colorable." Br.37.

III.    The district court did not abuse its discretion by holding Twitter in contempt and assessing a $350,000 sanction. First, the district court did not clearly err in determining that Twitter's dilatory tactics and failure to take steps to position itself to comply in a timely fashion demonstrated a lack of substantial, good-faith compliance. In finding that Twitter did not act in good faith, moreover, the district court properly assessed Twitter's conduct from the time it received the Warrant until the time it ultimately complied and did not punish Twitter for asserting a First Amendment challenge because declining to excuse Twitter's non-compliance on the basis of its First Amendment claim is not equivalent to punishing Twitter for raising such a claim. Finally, the district court properly exercised its discretion in imposing a $350,000 sanction because that amount was commensurate with the gravity of Twitter's non-compliance and appropriately calibrated to induce compliance in light of Twitter's ability to pay.

## ARGUMENT

## I.     Twitter's First Amendment challenge lacks merit.

Twitter principally contends (Br.20-34) that the NDO does not comport with the First Amendment, a claim that is reviewed de novo. *See Matter of Subpoena 2018R00776*, 947 F.3d 148, 154 (3d Cir. 2020) (*Matter of Subpoena*). That contention fails because the NDO serves compelling government interests and is narrowly tailored to further those interests. Twitter also purports to challenge the NDO under the Stored Communications Act, but any First Amendment interest that Twitter may claim in the NDO does not entitle it to interpose a (forfeited) statutory claim that the district court erred in granting the NDO. Likewise unavailing is Twitter's argument (Br.28-30) that the district court "undermined the adversarial process," Br.28, by not granting Twitter access to covert investigative materials protected by grand-jury secrecy rules.

### A.     The nondisclosure order survives strict scrutiny.

Twitter contends (Br.23-34) that the NDO cannot withstand strict scrutiny.[3] Under strict scrutiny, the NDO is valid if it is "narrowly tailored to

---

[3] No precedent from this Court has concluded that strict scrutiny applies when an electronic service provider challenges a nondisclosure order, and there are good reasons *not* to apply such "'exacting'" review to a nondisclosure order that "is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 876-78 (2d Cir. 2008). Because the NDO here nonetheless survives strict scrutiny, the Court can

serve compelling state interests," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and there are no "less restrictive alternatives [that] would be at least as effective in achieving the [NDO's] legitimate purpose," *Reno v. ACLU*, 521 U.S. 844, 874 (1997).  As the district court correctly concluded, JA370-84, the NDO at issue here satisfies strict scrutiny, *see Matter of Subpoena*, 947 F.3d at 159 (applying strict scrutiny and affirming district court order denying challenge to a nondisclosure order under Section 2705(b)); *Matter of the Search of Information Associated with E-mail Accounts*, 468 F. Supp. 3d 556, 560-63 (E.D.N.Y. 2020) (*E-mail Accounts*) (applying strict scrutiny and denying Microsoft Corporation's challenge to a nondisclosure order under Section 2705); *Google LLC v. United States*, 443 F. Supp. 3d 447, 452-55 (S.D.N.Y. 2020) (same for challenge brought by Google); *cf. In re National Security Letter*, 33 F.4th 1058, 1063 (9th Cir. 2022) (applying strict scrutiny and affirming a nondisclosure order obtained in connection with a national security letter issued under 18 U.S.C. § 2709(c)).

### 1.    The nondisclosure order serves compelling interests.

The compelling government interests at stake include preserving the integrity and secrecy of an ongoing investigation.  "Maintaining the integrity of an ongoing criminal investigation is a compelling government interest." *E-mail*

---

assume without deciding that it applies.  *See Google LLC v. United States*, 443 F. Supp. 3d 447, 452 (S.D.N.Y. 2020) (adopting that approach).

*Accounts*, 468 F. Supp. 3d at 560. The interest is particularly "acute" where, as here, the investigation remains ongoing. *Matter of Subpoena*, 947 F.3d at 156. And that interest is all the more compelling where the investigation concerns an effort to interfere with the lawful transfer of power following the 2020 president election and the certification of the Electoral College vote on January 6, 2021. *Cf. Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation.") (internal quotation marks omitted).

Closely linked to the compelling interest in maintaining the integrity of an investigation is protecting its secrecy, which in turns facilitates its "proper functioning." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). Relatedly, erosion of grand-jury secrecy "substantially increase[s] the ability of persons who have something to hide to impede legitimate investigations." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 750 (1984). Such secrecy also furthers several additional compelling governmental interests, including (1) "prevent[ing] the escape" of individuals who may be indicted; (2) ensuring free deliberations by the grand jury, while "prevent[ing] persons subject to indictment or their friends from importuning the grand jurors"; (3) forestalling efforts to suborn perjury or tamper with witnesses; and (4) encourag[ing] free and untrammeled disclosures by persons who have information with respect to

21

the commission of crimes." *Matter of Subpoena*, 947 F.3d at 157 (quoting *Douglas Oil Co.*, 441 U.S. at 291 n.10). Although articulated in the context of grand-jury investigations, those factors parallel similar considerations described in Section 2705(b), including destroying or tampering with evidence, intimidating witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5).

These are not hypothetical considerations in this case. Following his defeat in the 2020 presidential election, the former President propagated false claims of fraud (including swearing to false allegations in a federal court filing), pressured state and federal officials to violate their legal duties, and retaliated against those who did not comply with his demands, culminating in violence at the U.S. Capitol on January 6. *See* Government's Ex Parte Opposition to Twitter Inc.'s Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant, 23-sc-31, at 3-6 (D.D.C.) (filed Feb. 16, 2023) ("Ex Parte Opposition"). More recently, the former President has taken several steps to undermine or otherwise influence the investigation into the potential mishandling of classified information following the end of his presidency, including publicizing the existence of the Mar-a-Lago Warrant. *See id.* 6-9; ECF No. 30, at 23 n.6 (citing Mar-a-Lago Affidavit and ███████ Declaration). The former President's obstructive efforts continue unabated with

respect to this investigation here, in which he has determined to pay the legal fees of potential witnesses against him and repeatedly disparaged the lead prosecutor on his Truth Social platform. *See* Ex Parte Opposition, at 5, 9. Though Twitter has no basis to challenge the application of the Section 2705(b) factors here, *see infra* at 29-31, this pattern of obstructive conduct amply supports the district court's conclusion that the former President presents a significant risk of tampering with evidence, seeking to influence or intimidate potential witnesses, and "otherwise seriously jeopardizing" the Government's ongoing investigations. *See* 18 U.S.C. § 2705(b).[4]

Twitter's counterargument (Br.24-27) is unpersuasive. Suggesting that "the cat is out of the bag," Twitter contends that because some aspects of the investigation are publicly known, the "marginal disclosure of the Warrant" will not increase risks to any witnesses or the investigation. Br.25-26. That contention is flawed in several respects. Although the investigation's existence is no longer secret, it does not follow that the many ongoing investigative steps the Government is pursuing are therefore publicly known. The media accounts

---

[4] Twitter faults (Br.24) the district court for deferring to the Government's assessment of the potential effect on the ongoing investigation. But the Government's evaluation of "sensitive and weighty interests" of the sort implicated in the Government's investigation is indeed "entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010).

23

that Twitter cites (Br.25) attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses.[5]    And notwithstanding Twitter's suggestion (Br.27) that it "beggars belief" that the former President would not be aware that the Government has obtained a warrant for his Twitter account,[6] Twitter identifies no public reporting to suggest as much.    Providing the Warrant to the former president at this point in the investigation would thus provide him with considerable ammunition to engage in the same kind of obstructive efforts described above.

Nor does public revelation that certain individuals have received grand-jury subpoenas undermine the Government's compelling interest in maintaining the investigation's integrity and confidentiality.    Unlike Section 2705(b), which provides for nondisclosure orders when certain factors are met, Rule 6(e) of the Federal Rules of Criminal Procedure neither expressly limits grand-jury witnesses from publicly disclosing that they have received a subpoena nor authorizes courts to impose nondisclosure orders on such witnesses.    *See McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019); *In re Application of USA*,

---

[5] The same is true of the 80 pages of articles and other documents that Twitter submitted in the district court.  *See* JA56-135.

[6] Twitter offers no rationale for its speculation (Br.26-27 & n.16) that because public reporting suggests that the Government's investigation has sought other individuals' communications, the Government would necessarily have sought the former President's communications.

No. 19-wr-10, 2019 WL 4619698, at *3-*5 (D.D.C. Aug. 6, 2019) (concluding that, under *McKeever*, courts do not have the authority to impose nondisclosure orders on grand-jury witnesses).   That Congress provided a mechanism to safeguard criminal investigations in Section 2705(b) for which no analogue exists under the Federal  Rules of Criminal Procedure for grand-jury witnesses does not diminish the Government's compelling interest in maintaining the integrity and confidentiality of its investigative steps.

### 2.    The nondisclosure order is narrowly tailored.

The NDO is narrowly tailored to serve the Government's compelling interest because the restriction on Twitter is the least restrictive means of advancing compelling governmental interests.  *See Matter of Subpoena*, 947 F.3d at 157-58; JA383-84.  The NDO restricts Twitter from disclosing only discrete investigation-related information—information that is in Twitter's hands only because it received legal process in connection with the investigation.  And the NDO is limited in duration.

The scope of speech regulated by the NDO is extremely narrow.  The NDO prohibits Twitter from disclosing the existence of the Warrant.  The NDO does not purport to regulate Twitter's ability to speak about any other topics, such as the issue of nondisclosure orders generally or any information Twitter has obtained independent of its interactions with the Government (or the grand

jury) in this case. *See Matter of Subpoena*, 947 F.3d at 158 (finding a nondisclosure order narrowly tailored where it permitted the service provider to "discuss[] the government's requests abstractly, as service providers have done by disclosing the number of data requests and NDOs they receive in public docket civil complaints"). Thus, "[b]y any measure, [the NDO] restricts a narrow slice of speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 452 (2015). That approach is entirely consistent with cases permitting protective orders in civil litigation that prohibit disclosure of information obtained in discovery because such orders are "not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *see Butterworth v. Smith*, 494 U.S. 624, 631-32 (1990) (extending *Rhinehart* to government investigations by striking down a provision that limited a witness from disclosing his own testimony indefinitely into the future even after the conclusion of the investigation but not addressing "information which he may have obtained as a result of his participation in the proceedings").

The NDO is further narrowly tailored because it is limited to 180 days. The presence of a "temporal limitation" in a nondisclosure requirement is an "important" consideration in assessing "the balance of governmental versus free speech interests." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 877 (2d Cir. 2008). Courts have upheld as narrowly tailored nondisclosure orders that lasted up to

26

a year.  *See Matter of Subpoena*, 947 F.3d at 159; *E-mail Accounts*, 468 F. Supp. 3d at 563.  Here, the 180-day order appropriately balances the need for investigative secrecy and any speech interests.  *See* JA382.

Rather than dispute these straightforward factors, Twitter proposes (Br.31-34) two alternatives that it claims would permit it to "meaningfully exercise its First Amendment rights by alerting its user of a potential executive privilege."  Br.32.  The district court correctly rejected those alternatives as "untenable."  *See* JA383.  First, Twitter suggested (Br.31) notifying only "its user"—that is, the former President.  In its reply brief in the district court (JA314-15) and again on appeal (Br.32), Twitter offers further limitations, including providing only the fact of the Warrant or only the Warrant and Attachment A.  Twitter forfeited those modified suggestions by failing to raise them in its opening motion, *see United States v. Brown*, 249 F. Supp. 3d 287, 295 n.1 (D.D.C. 2017) (arguments raised for the first time in a reply brief in the district court are forfeited), but they would fail in any event to adequately protect investigation (for the reasons described previously) and could precipitate violence as occurred following the public disclosure of the search warrant executed at Mar-a-Lago. Ex Parte Opposition, at 6-8.

Second, Twitter proposes (Br.32-33) disclosing the information to one of the former President's "representative[s]," perhaps even one under the

Presidential Records Act ("PRA"), 22 U.S.C. § 2201 *et seq.* But some of the

individuals Twitter identifies ████████████████████████████ and

other of the former President's PRA representatives are attorneys who continue

to represent him. These "alternatives are untenable" because they are

"impractical," "would be ineffective in maintaining . . . secrecy," risk

"undermin[ing] the government's interest in maintaining the confidentiality of

an ongoing investigation," and would require a court to "assess the

trustworthiness of a would-be confidante chosen by a service provider." *Matter*

*of Subpoena*, 947 F.3d at 158-59. The district court thus properly "'decline[d] to

wade into this swamp' of unworkable line drawing." *Id.* at 159 (quoting

*Williams-Yulee*, 575 U.S. at 454). And Twitter does not explain why this

approach would be workable. In another alternative offered for the first time in

its reply brief below (JA315), Twitter suggests (Br.32-33)—without identifying

any statutory basis for such a suggestion—that the PRA representatives could be

ordered not to disclose the Warrant to the former President. But Twitter claims

to want to notify the PRA representative in an effort to permit the former

President to litigate any executive privilege concerns, and the PRA

representative would not have standing or authority to pursue such litigation

without telling the former President about the Warrant and securing his consent to assert any privilege.[7]

## B.   Twitter cannot challenge the district court's application of the Section 2705(b) factors.

Although Twitter's statement of the issues (Br.4) suggests only a First Amendment challenge to the NDO, Twitter repeatedly asserts that the NDO did not comport with the Stored Communication Act.  *See* Br.20, 22-24, 27-28. Twitter lacks standing to contest whether the Government appropriately established, and the district court appropriately concluded, that there was a "reason to believe" that disclosure would result in one or more of the harms identified in Section 2705(b).[8]

The Act's text and structure demonstrates that a service provider such as Twitter cannot raise a statutory challenge.  The Act explicitly states that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."   18 U.S.C.

---

[7] In the district court, Twitter also argued that the NDO was not narrowly tailored because the Government could obtain the information in question from the United States National Archives and Records Administration ("NARA"). JA17.  The argument lacks merit, *see* JA291-92, and Twitter has abandoned it on appeal.

[8] Even if Twitter could challenge the Act, it has forfeited any such claim here because it asserted its challenges to Section 2705(b) for the first time in its reply brief below.  JA303-08; *see Brown*, 249 F. Supp. 3d at 295 n.1.

§ 2708. Just as suppression is not an available remedy for a claimed violation of the Act, *United States v. Beaudion*, 979 F.3d 1092, 1101 (5th Cir. 2020), and account holders cannot obtain nonconstitutional review of an order issued under Section 2703(d), *In re Application of the U.S. for an Ord. Pursuant to 18 U.S.C. sec. 2703(d)*, 830 F. Supp. 2d 114, 128-29 (E.D. Va. 2011), so too is Twitter foreclosed from advancing a statutory claim that the district court misapplied the Section 2705(b) factors. That Congress afforded service providers grounds to move to quash an order "if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider," 18 U.S.C. § 2703(d), suggests under the negative-implication canon that Congress did not intend to permit service providers to challenge a court's order issuing a nondisclosure order under Section 2705(b). *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) (under the negative-implication canon, the "expression of one thing implies the exclusion of others"). And Twitter identifies no statutory basis permitting it to challenge a nondisclosure order under Section 2705(b). It follows that Twitter has no grounds to litigate the district court's conclusion that the NDO comported with Section 2705(b).

That conclusion makes practical sense. It is "unlikely" that a service provider could offer "pertinent information about whether notifying a subscriber

or customer" would implicate a statutory harm given that the Government "controls the scope of the criminal investigation" and "is better equipped to provide information about the potential compromises" to that investigation. *Matter of Application of United States of Am. for an Ord. of Nondisclosure Pursuant to 18 U.S.C. § 2705(B) for Grand Jury Subpoena # GJ2014031422765*, 41 F. Supp. 3d 1, 6 (D.D.C. 2014). As the district court correctly observed here, Twitter "has been privy to only a sliver" of information and "thus is quite ignorant of details" concerning the scope and extent of the Government's investigation. JA375. And as explained below, Twitter has no reason to learn investigative details, many of which are protected under grand-jury secrecy rules in Rule 6(e), to vindicate any First Amendment interests.

### C.     The district court did not undermine the adversarial process.

Twitter complains (Br.28-30) that the district court subverted the adversarial process by precluding Twitter's access to *ex parte* filings. That complaint lacks merit. Consistent with the statute, the Government explained *ex parte* the justification under Section 2705(b) for the NDO. *See Matter of Grand Jury Subpoena for: [Redacted]@yahoo.com*, 79 F. Supp. 3d 1091, 1092 (N.D. Cal. 2015); *Google LLC*, 443 F. Supp. 3d at 453. And in detailing the compelling government interest for purposes of First Amendment analysis in response to Twitter's challenge, the Government filed both an *ex parte* submission and a

sealed response. *See* Ex Parte Opposition; JA280-93. Those procedures were appropriate here.

A district court appropriately may ensure grand jury secrecy through "provisions for sealed, or when necessary *ex parte*, filings." *In re Sealed Case*, 121 F.3d 729, 757 (D.C. Cir. 1997) (per curiam). As this Court has recognized, a district court adjudicating certain types of motions "will not be able to receive a complete adversary presentation" because "one of the parties will not be privy to the information at issue." *In re Sealed Case*, 676 F.2d 793, 814 (D.C. Cir. 1982). Indeed, "courts often use *in camera*, *ex parte* proceedings . . . when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998) (per curiam); *accord In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1151 (D.C. Cir. 2006). Both the Government's application for the NDO under Section 2705(b)—which Twitter may not challenge for the reasons given above—and the Government's response to Twitter's motion to vacate or modify the NDO required discussion of matters occurring before the grand jury, which in turn necessitated an *ex parte* submission. Nonetheless, the Government's 14-page sealed (but not *ex parte*) response, JA280-93, alerted Twitter to the "general purport" (Br.30) of the Government's argument. Twitter's reliance (Br.29) on *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1988), is thus inapposite because

32

the district court there found the "public documentation" on which the prevailing defendants relied "inadequate" before ruling in their favor based solely on classified affidavits to which the plaintiffs had no access. *Id.* at 1059-61.

Twitter's invocation (Br.29) of *Freedman v. Maryland*, 380 U.S. 51 (1965), is also misplaced. In *Freedman*, a Maryland "motion picture censorship statute" required submission of any film to a "Board of Censors" before it could be sold or exhibited. *Id.* at 52 & n.1. The Supreme Court, recognizing that "any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity," held that the Maryland scheme was an unconstitutional prior restraint. *Id.* at 57-60 (brackets and internal quotation marks omitted). In *Freedman* and subsequent cases, the Supreme Court developed certain "procedural safeguards" for censorship regimes involving content-based prior restraints: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) (internal quotation marks omitted). But the procedural safeguards that *Freedman* prescribes, 380 U.S. at 58, apply to cases involving

33

"government censorship and licensing schemes," not to a law that prohibits disclosure of government requests for information "to assist in an investigation." *In re National Security Letter*, 33 F.4th at 1077. Because those procedures "were designed to curb traditional censorship regimes," they "are not required in the context of government restrictions on the disclosure of information transmitted confidentially as part of a legitimate government process, because such restrictions do not pose the same dangers to speech rights as do traditional censorship regimes." *Twitter, Inc. v. Garland*, 61 F.4th 686, 707 (9th Cir. 2023).

Twitter significantly overstates (Br.30) the perils of *ex parte* proceedings in this matter. For example, although the Government's application for the NDO did not rely on risk of flight, the proposed order submitted to the district court erroneously referred to flight from prosecution, *see* JA281 n.1 (Government filing acknowledging the error). The district court did not rely on risk of flight in issuing the NDO, however, *see* JA1, and the Government's error therefore did not undermine the justification for the NDO under Section 2705(b)(3)-(5), which encompasses evidence tampering, witness intimidation, and other efforts to "seriously jeopardiz[e] an investigation." Nor does Twitter's lack of access to materials appropriately submitted and reviewed *ex parte* support its "unjustified speculation" of inconsistency and shifting rationales. *Google LLC*, 443 F. Supp. 3d at 454. In fact, the district court's comprehensive memorandum opinion

34

carefully considered the parties' submissions and did not create arguments from whole cloth.  Finally, Twitter's suggestion that the Government seeks to avoid litigating executive privilege claims is inaccurate.  *See* JA167.

## II.     Twitter's claim that the district court erred by requiring compliance with the Warrant before adjudicating Twitter's challenge to the nondisclosure order is moot and lacks merit.

Twitter argues (Br.34-46) that the district court lacked authority to require Twitter to comply with the Warrant before adjudicating Twitter's challenge to the NDO, and that the resulting contempt sanction for its failure to comply should be vacated.  That claim of error became moot when Twitter produced responsive documents as required under the Warrant.  The claim also fails on the merits.  If the Court reaches the merits of Twitter's claim, it should review for abuse of discretion the district court's decision to resolve the question of Twitter's compliance with the Warrant before adjudicating Twitter's First Amendment challenge.  *See Dietz v. Boudin*, 579 U.S. 40, 47 (2016) (noting that "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases").  Twitter demonstrates no abuse of discretion here.[9]

---

[9] Twitter suggests (Br.19) that its claim that the district court erred by requiring it to produce information pursuant to the Warrant before addressing the separate NDO is a "First Amendment argument[]" meriting de novo review but supplies no authority for that novel proposition.

###### A.    Twitter's claim is moot.

Twitter seeks vacatur of the contempt order as relief for what it contends was the district court's error of ordering Twitter to produce responsive documents as required under the Warrant before resolving Twitter's challenge to the NDO.  Even if that claim were meritorious—which it is not, *see infra* at 39-47—vacating the contempt order would not remedy the error Twitter asserts. As described above, the contempt finding reflected Twitter's failure to follow through on its promise to comply fully with the Warrant after the district court in the Show Cause Order directed Twitter to produce all responsive materials by 5 p.m. on February 7, 2023.  *See* JA216.  Although Twitter failed to meet that deadline, it fully complied with the Warrant by February 9.  JA369.

Twitter's challenge to its obligation to comply with the Warrant pending resolution of the NDO challenge thus became moot when Twitter complied with the Warrant and disclosed the responsive documents.  *See John Doe Agency, et al. v. John Doe Corp.*, 488 U.S. 1306, 1308-09 (1989) (Marshall, J., in chambers) (granting a stay because the release of documents would moot a defendant's right to appeal); *United States v. Griffin*, 816 F.2d 1, 7 n.4 (D.C. Cir. 1987) (finding appeal of a contempt order moot where the defendant had fully complied with the underlying restitution order); *Shapiro v. U.S. Dep't of Justice*, No. 13-cv-555, 2016 WL 3023980, at *7 (D.D.C. May 25, 2016) (granting a stay because

"disclosure [of the documents] would moot [the appellant's] right to appeal"); *People for the Amer. Way Found. V. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (same).  In "the context of purely coercive civil contempt, a contemnor's compliance with the district court's underlying order moots the contemnor's ability to challenge his contempt adjudication," *In re Grand Jury Subpoena Duces Tecum, 91-02922*, 955 F.2d 670, 672 (11th Cir. 1992) (collecting cases), at least where a court cannot "undo the effects of compliance and a decision is not likely to affect future events," 13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3533.2.2 (3d ed.); *see also In re Hunt*, 754 F.2d 1290, 1293-94 (5th Cir. 1985); *In re Campbell*, 628 F.2d 1260, 1261-62 (9th Cir. 1980) (per curiam).

This Court's decision in *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union, National Capital Local Division 689*, 531 F.2d 617 (D.C. Cir. 1976), is instructive.  There, the Court dismissed as moot an appeal from a preliminary injunction and temporary restraining order, noting that the appellant "concedes that it was required to obey the terms of the restraining order, on which the fines were based, even if that order was improvidently granted."  *Id.* at 620.  Because the appellant had since fully complied, "neither the temporary restraining order nor the injunction has any present vitality."  *Id.* So too here.

In providing a generally unobjectionable account (Br.42-46) for why its challenge to the contempt order remains live, Twitter fails to explain how it may also challenge the district court's underlying decision to address Twitter's noncompliance with the Warrant before adjudicating Twitter's NDO challenge. As noted, mootness generally turns on the availability of an effective remedy. *See* 13B Fed. Prac. & Proc. Juris., *supra*, § 3533.2.2; *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992) (the "availability of [a] possible remedy is sufficient to prevent this case from being moot"). And here, if this Court ultimately agrees with Twitter that the district court abused its discretion in holding Twitter in contempt, Twitter's payment of the fine could be remedied by returning some or all of the money—particularly where, as here, the district court held the funds in escrow.  *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1057 (7th Cir. 1998) ("Payment of the sanction does not moot the appeal because the appellate court can fashion effective relief to the appellant by ordering that the sum paid in satisfaction of the sanction be returned."); 13B Fed. Prac. & Proc. Juris., *supra*, § 3533.2.2 ("An effective remedy is most clearly possible if the fine remains in the district court, not yet covered into the Treasury."); *Rhode Island Hosp. Trust Nat'l Bank v. Howard Commc'ns Corp.*, 980 F.2d 823, 829 n.9 (1st Cir. 1992) (rejecting mootness argument where money was held in escrow).  But a decision by this Court vacating the contempt finding

38

and returning funds to Twitter cannot undo Twitter's compliance with the Warrant[10] or enable Twitter to alert the former President about the Warrant before Twitter's production.[11]

## B.    Twitter's claim lacks merit.

Even if not moot, the district court did not abuse its discretion by resolving Twitter's compliance with the Warrant before Twitter's NDO claim.

1.    The district court correctly concluded that "the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each."   JA366.   Once a judge has issued a search warrant based on probable cause, the Government is entitled to execute that warrant—including by enforcing compliance where, as here, the relevant materials are held by a service provider—in as expeditious a manner as possible to further its investigative ends. If, as also occurred here, the Government demonstrates a "reason to believe" that disclosure of the Warrant would result in one or more of the harms

---

[10] To preserve the claim that Twitter now wishes to assert, Twitter would have had to disobey the Show Cause Order by not complying at all, be held in contempt, potentially request the district court or this Court to stay the accrual of the monetary sanction at some point, and then pursue its claim on appeal to this Court.

[11] The exception to mootness for issues "capable of repetition, yet evading review" (Br.45-46) has no application here.   The Government does not intend to seek another search warrant and nondisclosure order for the former President's Twitter account.

enumerated in Section 2705(b), the court must issue an order prohibiting the service provider from notifying "any other person" of the legal process for an appropriate period of time. 18 U.S.C. § 2705(b).  The provider may challenge the nondisclosure order on First Amendment grounds, but no legal authority permits it to hijack the Government's investigation by using its challenge to nondisclosure as a basis for refusing to comply at all.  Stated otherwise, the Warrant and the NDO "do not travel together."  JA174.

There are also sound "practical" and "logistical" reasons to reject Twitter's fellow-traveler argument, as the district court observed.  *See* JA366. The approach Twitter advocates would necessarily create delay in compliance with search warrants, which risks the destruction or loss of evidence, "heightens the chance that targets will learn of the investigation, and jeopardizes the Government's ability to bring any prosecution in a timely fashion." *Google LLC*, 443 F. Supp. 3d at 455.  Permitting third-party providers to effectively halt a government investigation in such a manner would "invite repeated litigation" that could enable those providers "to alert users . . . , particularly for high profile, highly placed users, such as current or government officials, with whom the providers might want to curry favor," JA366, or to contest the underlying investigation criminal investigation by proxy.

40

In the absence of legal support for its approach, Twitter appears to suggest that so long as a "colorable" argument (Br.37) exists, it (and presumably any third-party provider who receives a nondisclosure order accompanying legal process) should be permitted to halt execution of the underlying legal process. The practical consequences of adopting Twitter's amorphous standard would be momentous, as the district court recognized.    JA212-13.    As Twitter acknowledged below, JA6, Twitter users on whose accounts a search warrant has been executed could potentially advance any number of legal arguments related to information obtained as a result, including privilege claims (such as attorney-client, clergy-penitent, and public officials protected by "official privileges") and suppression claims under the Fourth Amendment.  Twitter correctly conceded below (JA6) that it lacks standing to assert its users' rights and privileges but nonetheless proceeds to advocate an approach that would permit it to avoid complying with a court order directing it to produce materials in response to a search warrant any time Twitter deems the situation "unique." Neither legal authority nor an overarching interest in protecting the privacy of its users permits Twitter to arrogate such power to itself.  *See Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 56 (2d Cir. 2017) (Carney, J., concurring in the order denying rehearing en banc) (noting that a warrant "issued by a neutral magistrate judge upon a

41

showing of probable cause . . . satisfied the most stringent privacy protections our legal system affords").

2. Second, Twitter argues (Br.37) that a "colorable and time-sensitive" executive privilege claim supported the relief it sought. That argument is flawed. For one, Twitter does not explain the relevance of a putatively "[u]nique" or "[i]mportant" issue—as Twitter characterized the executive privilege claim below, *see* JA14—to strict scrutiny analysis, which asks whether the NDO sought under Section 2705(b) is narrowly tailored to serve a compelling governmental interest. *See In re National Security Letter*, 33 F.4th at 1072. A Twitter user's potential ability to challenge legal process—here, the Warrant— is entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO. *See, e.g.*, JA5 n.1 (Twitter acknowledging below that it was not challenging the Warrant's validity); JA6 (Twitter acknowledging it "might lack standing to assert the rights and privileges of its users," and acknowledging many potentially privileged communications in which its users could engage).

But even if the executive privilege claim that Twitter postulates bore some relevance to the NDO, Twitter's contention that this case presents a "colorable" (Br.37) claim of executive privilege is mistaken. Even assuming a former President can invoke executive privilege, former President Trump would have

42

no basis to challenge the government's access to his Twitter account based on executive privilege because the Warrant requires access to the materials by the Executive Branch itself. Executive privilege is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. 683, 708 (1974), and it "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. GSA*, 433 U.S. 425, 447 (1977). The privilege exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449. Consistent with the privilege's function of protecting the Executive Branch as an institution, it may be invoked in appropriate cases to prevent the sharing of materials outside the Executive Branch—*i.e.*, with Congress, the courts, or the public. *Cf. Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (per curiam) (noting unresolved questions about whether and under what circumstances a former President can invoke the privilege to prevent such "disclosure"—there, to Congress). But the separation-of-powers principles that form the basis for executive privilege provide no justification to prevent the Executive Branch itself from accessing the materials.

Twitter cites no case in which executive privilege has been successfully invoked to prohibit the sharing of documents within the Executive Branch, and the Government is aware of none. To the contrary, in what appears to be the

43

only case in which such an assertion has ever been made, *Nixon v. GSA*, the Supreme Court rejected former President Nixon's assertion that a statute requiring the General Services Administration to take custody of and review recordings and documents created during his presidency violated either the separation of powers or executive privilege.  433 U.S. at 433-36.  Addressing the separation of powers, the Court emphasized that the Administrator of the GSA "is himself an official of the Executive Branch," and that the GSA's "career archivists" are likewise "Executive Branch employees."  *Id.* at 441.  The Supreme Court rejected the former President's invocation of privilege against the statutorily required review by the GSA, describing it as an "assertion of a privilege against the very Executive Branch in whose name the privilege is invoked."  *Id.* at 447-48.  The Supreme Court explained that the relevant question was whether review by Executive Branch officials within the GSA would "impermissibly interfere with candid communication of views by Presidential advisers."  *Id.* at 451.  And it held that the question was "readily resolved" because the review in question was "a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns."  *Id.*

Indeed, when former President Trump previously sought to prevent the Department of Justice from accessing documents from his presidency on the basis of executive privilege, NARA flatly rejected that attempt after consulting

with the incumbent President.[12]  After NARA notified the Department of Justice that it had found documents with classified markings within 15 boxes of presidential documents that the former President provided to NARA, the former President sought to prevent the Department of Justice from accessing the materials on the basis of executive privilege.  *See* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022) at 1-2, *available  at*  https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf.   NARA rejected those efforts, noting that with respect to the former President's attempt to assert executive privilege to prevent others within the Executive Branch from reviewing the documents, its decision was "not a close one."  *Id.* at 3.  The same is true here.

Moreover, Twitter has offered no support for its speculative premise that the former President's Twitter account could contain such communications. Plainly, none of his publicly accessible tweets, available to millions of viewers, could constitute the sorts of "materials that reflect presidential decisionmaking and deliberations . . . that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d at 744.  And Twitter offers no reason to conclude that

---

[12] At the time *Nixon v. GSA* was litigated, the National Archives was a part of the General Services Administration.  In 1985, Congress created the NARA as a separate agency.

the former President, with the full array of communication technologies available to the head of the Executive Branch, would have used Twitter's direct-message function to carry out confidential communications with Executive Branch advisors. Indeed, the materials Twitter produced to the Government included only 32 direct-message items, constituting a minuscule proportion of the total production. As such, Twitter sought to delay compliance with the entirety of the Warrant based on the speculative possibility that a tiny fraction of the total production could, implausibly, contain instances when the President sought to use the direct-messaging function to carry out sensitive and confidential deliberations with trusted advisors within the Executive Branch. The district court reasonably declined to delay Twitter's compliance deadline based on this speculative possibility.

3. Twitter asserts (Br.35-37) that the First Amendment entitles it to pre-enforcement review of a nondisclosure order accompanying a search warrant in a criminal case. But it cites no legal authority supporting such a proposition. *Cf. Zurcher v. Stanford Daily*, 436 U.S. 547, 565-67 (1978) (concluding that the "preconditions for a warrant" protect against potential First Amendment harms implicated in the search of a newspaper office, and not requiring investigators to obtain a subpoena that the newspaper could move to quash before enforcement). Whatever the importance under the First Amendment of "timing" (Br.35) in

46

cases involving prior restraints on news organizations or political speech, those considerations do not translate into the context of nondisclosure orders issued along with legal process in criminal investigations. Just as the procedural safeguards developed in *Freedman* "do not come into play in the case of statutory schemes that do not present the grave dangers of a censorship system," *Twitter*, 61 F.4th at 707 (internal quotation marks omitted); *see supra* 33-34, so too the First Amendment does not empower Twitter to displace the ordinary functioning of a criminal investigation. And if not even the owner of property to be searched may challenge a warrant before its execution, *see United States v. Grubbs*, 547 U.S. 90, 98-99 (2006), then certainly providers may not prevent a warrant's execution through a challenge to a nondisclosure order.

**III.    The district court did not abuse its discretion in holding Twitter in contempt and levying a sanction.**

A civil-contempt finding comprises three stages: (1) "issuance of an order"; (2) where a party has disobeyed that order, "issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions"; and (3) "exaction of the threatened penalty if the purgation conditions are not fulfilled." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981). The first two steps are not in dispute here: the district court issued the Warrant on January 17, 2023, which

47

required Twitter to produce responsive materials by January 27, 2023, *see* JA362; and then on February 7 the district court issued a conditional show-cause order threatening to impose a monetary sanction if Twitter failed to fulfill the purgation condition of complying with the Warrant by 5 p.m. the same day, *see* JA216.  Attacking only the third step, Twitter argues (Br.46-59) that the district court erred because (a) Twitter's substantial compliance with the Warrant by 5 p.m. on February 7 excused its failure to comply fully; (b) the contempt finding punished Twitter retrospectively and for exercising its legal rights; and (c) the $350,000 sanction was "inordinately large."  Those arguments fail because the district court acted well within its discretion.  *See FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 379 (D.C. Cir. 2011).

### A.    The district court correctly determined that Twitter failed to substantially comply in good faith with the Warrant.

Twitter first argues (Br.47-48) that its substantial, good-faith compliance with the Show Cause Order precludes any finding of contempt.  Where, as here, a district court issues a forward-looking conditional contempt order, and the contemnor fails to fully comply by the court-imposed deadline, the burden shifts to the contemnor to "prov[e] good faith and substantial compliance," assuming for these purposes that good faith substantial compliance "survives" as a defense.  *Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1017 (D.C. Cir. 1997).  When the claim of error rests on the

district court's finding that the party failed to carry its burden of establishing good faith and substantial compliance, the party must demonstrate clear error. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 464 & n.263 (D.C. Cir. 1976), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). Twitter cannot make such a showing here.

Twitter failed to prove that it "took all reasonable steps within [its] power to comply" with the Show Cause Order. *Food Lion*, 103 F.3d at 1017 (internal quotation marks omitted). Just as "good faith alone is not sufficient to excuse contempt," *id.* at 1017-18, so too substantial compliance absent good faith does not suffice to justify a contemnor's disobedience, *see FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 591 (3d Cir. 2010) (approving a standard under which a contempt finding is unsupported where the alleged contemnor "has made in good faith all reasonable efforts to comply with a court order" (internal quotation marks omitted)). Even assuming *arguendo* that Twitter's production by the 5 p.m. deadline on February 7 amounted to "substantial compliance," *see* JA387, the district court did not clearly err in concluding that Twitter did not act in good faith. Throughout the period from January 19, 2023 (when Twitter first received the Warrant), to January 25 (when Twitter's senior legal director became aware of the Warrant), to February 7 (when the district court entered the Show Cause Order directing Twitter to comply or face a monetary sanction), Twitter failed

to take the steps necessary to comply with the Warrant. JA387. Although Twitter suggested on February 1 that it would "want to further discuss . . . Attachment B and technical issues we will need to work through in responding," JA55, Twitter did not identify those technical issues or otherwise alert the Government about its inability to comply fully until *after* the February 7 deadline had passed, JA387. In short, rather than exert "diligent" and "serious" efforts evincing a "good faith intention to comply with the Warrant," JA388, Twitter delayed compliance while it litigated the NDO challenge. Twitter's failure to pursue negotiations over how to resolve any technical obstacles to its full compliance is particularly noteworthy because—as explained—Twitter would be required to produce responsive data pursuant to the Warrant even if the district court had resolved the separate NDO challenge in Twitter's favor. In that respect, Twitter's untested factual claim (Br.48) that it expended "extraordinary efforts" to comply but needed first to "clarify the scope" (Br.15) of the Warrant illustrate its lack of good faith because the onus was on Twitter, not the Government, to ensure that it was prepared to comply fully (as its representation at the February 7 hearing implied) after it had already delayed more than ten days beyond the deadline.

Rather than contend that the district court's factfinding was clearly erroneous or that the court otherwise abused its discretion in exercising its

reasoned judgment, Twitter maintains (Br.49-53) that the *process* by which the district court assessed good faith and substantial compliance was infected by legal error, on the theory that the district court engaged in an "impermissibl[y]" "backward-looking analysis." Br.49. But the case law does not support the artificial limitations on district court discretion that Twitter proposes. Assessing good faith is necessarily fact- and context-dependent, and courts may permissibly consider the contemnor's conduct over the full course of the litigation, and its stated justifications for non-compliance, when assessing whether the contemnor has carried its burden. *See In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 822-23 (D.C. Cir. 2009) (refusing to "overturn the district court's fact-bound conclusion that [the contemnor] dragged its feet until the eleventh hour," and emphasizing that the district court had "placed great weight on the long history of the discovery dispute").

To be sure, the distinction between a punishment imposed retrospectively for a completed act of disobedience, on the one hand, and a conditional sanction imposed prospectively to coerce compliance, on the other, can be relevant in certain contexts, such as determining whether a contempt sanction is criminal or civil in nature. *See Int'l Union, United Mine Workers of Amer. v. Bagwell*, 512 U.S. 821, 828-29 (1994). But it does not follow, as Twitter suggests, that a district court must blind itself to conduct prior to the show-cause hearing when

51

assessing the validity and persuasiveness of a contemnor's proffered good-faith defense.

Here, in seeking to prove good faith and substantial compliance, Twitter offered various justifications for why it failed to complete its production by the court-imposed deadline.   In assessing whether Twitter had carried its burden, the district court permissibly considered an array of factors, including: Twitter's representations at the February 7 hearing that it could and would comply by the deadline; Twitter's failure to address any concerns about purported ambiguities in the Warrant in a timely manner after receiving the Warrant; and the novelty of the legal justifications Twitter had relied on to refuse compliance with the Warrant in the first place.   JA387-88.   Nothing about the district court's assessment constituted reversible legal error.

This Court's decision in *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union, National Capital Local Division 689*, 531 F.2d 617 (D.C. Cir. 1976), on which Twitter relies (Br.51-53), does not aid its argument. There, without issuing any oral or written findings, the district court held a union in contempt for violating a restraining order that required the union to end a strike and restore transit service—even though union leaders urged members to return to work, resulting in a partial restoration of service.  531 F.2d at 618-20.  The district court applied the "mass action principle," under which a

union is responsible for the actions of all its members, and did not consider the defendants' good-faith and substantial compliance arguments, leading this Court to vacate the contempt finding and associated fine and direct the district court to consider the union's potential defenses (including good-faith substantial compliance) on remand. *Id.* at 621-22. This Court also reversed a fine entered against one of the union leaders on the ground that the district court failed to set a financial penalty "until long after the strike ended." *Id.* at 622.

Nothing in *Washington Metropolitan* illustrates a flaw in the proceedings below. Unlike the district court in that case, the district court here fully considered Twitter's good-faith substantial compliance defense, ultimately concluding that Twitter failed to carry its burden. And while Twitter correctly notes (Br.47) that this Court in *Washington Metropolitan* urged "[f]lexibility" in the face of "the complexity of the outstanding order, possible ambiguities, [and] the difficulties in arranging compliance and the extent of efforts to obey its terms," 531 F.2d at 622 (internal quotation marks omitted), Twitter entirely fails to explain how the difficulty in coordinating a return to work for a large-scale union in an era with communication unlike the present day resembles the straightforward, non-ambiguous order directing Twitter to produce data in its possession by a certain date and time, particularly where that deadline was based in part on Twitter's own representations about feasibility.

53

Finally, Twitter argues (Br.53-55) that the district court's contempt finding "*punished* Twitter for even trying to protect its constitutional rights." That argument misconstrues the district court's ruling. Twitter was—and remains—entirely free to pursue its First Amendment challenge to the NDO. Twitter was not, however, permitted to use its NDO challenge as an excuse not to comply with its independent obligation under the Warrant to produce responsive materials. That the district court declined to excuse Twitter's non-compliance with its production obligations on the basis of its First Amendment challenge to its nondisclosure obligations is not equivalent to punishing Twitter for raising such a claim in the first place.

## B.   The sanction was reasonable.

Twitter contends (Br.55-59) that a monetary sanction of $50,000, doubling each day, was unreasonably severe. The "imposition of coercive sanctions by way of fines is generally an area in which appellate courts must rely heavily on the informed exercise of the district court's discretion." *In re Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir. 1987); *see In re Grand Jury Subpoena Duces Tecum, 91-02922*, 955 F.2d at 673 (quoting and citing same); *see also Perfect Fit Indus., Inc. v. Acme Quilting Co.*, *Inc.*, 673 F.2d 53, 57 (2d Cir. 1982) ("[T]he overriding consideration is whether the coercive fine was reasonably set in relation to the

54

facts and was not arbitrary.").  The district court did not abuse its discretion in setting that sanction.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes[:] to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947).  A "per diem, coercive fine . . . is the epitome of a civil sanction" for contempt.  *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004).  "[F]ines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged."  *Bagwell*, 512 U.S. at 829.  Contempt sanctions "must be sufficiently hefty such that the contemnors are induced to comply and the Court 'must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'"  *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, Misc. Nos. 18-175, 18-176, 18-177, 2019 WL 2182436, at *4 (D.D.C. Apr. 10, 2019) (quoting *United Mine Workers of Am.*, 330 U.S. at 304).

To maximize the likelihood of obtaining Twitter's rapid compliance with the Show Cause Order, the district court reasonably imposed an escalating daily fine of $50,000.  *See Pigford*, 307 F. Supp. 2d at 54 (adopting escalating fines of

$1,000 per day for first month of contempt, $2,000 per day for the second month, and so on until the contempt was purged).  That sanction was commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay.  *See* JA214 (district court reasoning that "a hefty fine is appropriate here" because Twitter "was purchased for over $40 billion, and the sole owner is worth over $180 billion"); *see also, e.g.*, *NLRB v. Local 3, International Brotherhood of Elec. Workers*, 471 F.3d 399, 405 (2d Cir. 2006) (affirming a per-violation prospective compliance fine plus an additional $5,000 per day for each day that a violation continued); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 2019 WL 2182436, at *5 (explaining that a "[d]aily imposition of a $50,000 fine is fitting" for "multi-billion-dollar banks disregarding an order to produce records or a witness essential to an investigation into a state-sponsor of terrorism's proliferation of nuclear weapons"); *id.* ("Courts previously have approved the amount of $50,000 per day as an appropriate sanction for other well-resourced corporations and international banks.") (citing multiple cases in support); *see also Pigford*, 307 F. Supp. 2d at 54.

Twitter's counterarguments lack merit.  For example, simply because the sanction was designed to increase quickly to ensure compliance—as it eventually did—and *could* have exceeded Twitter's valuation within a month, it does not follow that the ultimate sanction—$350,000—was impermissibly

severe or onerous. For similar reasons, comparing the sanction imposed here to the fee schedules imposed on countries or other large companies offers little insight where the ultimate sanction was not unduly harsh. Finally, Twitter's contention (Br.58) that it "worked hard and in good faith to comply" beginning on February 7 reinforces the district court's conclusion that Twitter failed to operate in good faith by preparing the responsive information to comply with the deadline that Twitter itself promised to meet and that the contempt sanctions imposed on February 7 were necessary to spur Twitter to act. Even while Twitter's lawyers were litigating, its engineers could have taken the necessary steps to avoid any contempt finding at all.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's

order.

Respectfully submitted,

J.P. COONEY
Deputy Special Counsel

JACK SMITH
Special Counsel

RAYMOND N. HULSER
Counselor to the Special Counsel

THOMAS P. WINDOM
Senior Assistant Special Counsel

CECIL W. VANDEVENDER
JOHN M. PELLETTIERI
Assistant Special Counsels

JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530
(202) 705-9879
jip@usdoj.gov

April 21, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.      This brief contains 12,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced, 14-point serif typeface using Microsoft Word for Microsoft 365.

/S/ JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
(202) 705-9879
jip@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit on April 21, 2023. I certify that service will be accomplished by email to following counsel for Twitter:

ARI HOLTZBLATT
BENJAMIN POWELL
WHITNEY RUSSELL
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

GEORGE P. VARGHESE
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
(202) 526-6000

/S/ JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
(202) 705-9879
jip@usdoj.gov