**FILED UNDER SEAL**

**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2023**
**No. 23-5044**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

IN RE SEALED CASE

---

On Appeal from the United States District Court
for the District of Columbia, No. 1:23-SC-31-BAH
Before the Honorable Beryl A. Howell

---

**JOINT APPENDIX**
**VOLUME 1 OF 1 (JA1 – JA398)**

---

JAMES I. PEARCE (N.C. BAR No. 44691)
CECIL VANDEVENDER (TENN. BAR
  No. 029700)
THOMAS P. WINDOM (D.C. BAR
  No. 502131)
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 840-7000

ARI HOLTZBLATT (D.C. BAR No. 1009913)
BENJAMIN POWELL (D.C. BAR No. 464823)
WHITNEY RUSSELL (D.C. BAR No. 987238)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000

GEORGE P. VARGHESE (MASS. BAR
  No. 706861)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

March 31, 2023

**FILED UNDER SEAL**

# TABLE OF CONTENTS

Page

Non-Disclosure Order (Sealed) (D.D.C. Jan. 17, 2023),
ECF No. 3 .................................................................................JA1

Memorandum of Points and Authorities In Support of Motion
to Vacate or Modify Non-Disclosure Order Issued
Pursuant to 18 U.S.C § 2705(b) and Stay Twitter's
Compliance with Search Warrant (Sealed)
(D.D.C. Feb. 2, 2023)...............................................................JA3

Minute Order Granting Motion to Seal and Directing
Parties to Propose Briefing Schedule  (Sealed)
(D.D.C. Feb. 2, 2023)..............................................................JA21

Government's Motion for an Order to Show Cause Why
Twitter Inc. Should Not Be Held in Contempt for
Failure to Comply with a Search Warrant (Sealed)
(D.D.C. Feb. 2, 2023)..............................................................JA22

Proposed Order Regarding Government's Motion for an Order
to Show Cause Why Twitter Inc. Should Not Be Held in
Contempt for Failure to Comply with a Search Warrant
(Sealed) (D.D.C. Feb. 2, 2023) ..............................................JA26

Email from Gregory Bernstein to Chambers of Judge Howell
(Sealed) (Feb. 3, 2023)...........................................................JA28

Minute Order Issuing Scheduling Order (Sealed)
(D.D.C. Feb. 3, 2023).......................................................... JA30

Twitter's Opposition to Government's Motion for an Order to
Show Cause (Sealed) (D.D.C. Feb. 6, 2023) .......................JA33

Exhibit A to Twitter's Opposition to Government's Motion for
an Order to Show Cause: Declaration of ██████████
██████ (Sealed) (D.D.C. Feb. 6, 2023) ...............................JA49

Exhibit B to Twitter's Opposition to Government's Motion for
an Order to Show Cause (Sealed) (D.D.C. Feb. 6, 2023)....JA56

i

Government's Reply in Further Support of Motion for an Order
to Show Cause Why Twitter Inc. Should Not Be Held in
Contempt for Failure to Comply with a Search Warrant
(Sealed) (D.D.C. Feb. 6, 2023) ...........................................JA136

Transcript of Hearing Before Judge Howell (Sealed)
(D.D.C. Feb. 7, 2023).........................................................JA147

Minute Order Granting Order to Show Cause (Sealed)
(D.D.C. Feb. 7, 2023) ........................................................JA216

Letter from George P. Varghese to Judge Howell (Sealed)
(Feb. 8, 2023) ....................................................................JA217

Transcript of Hearing Before Judge Howell (Sealed)
(D.D.C. Feb. 9, 2023).........................................................JA223

Twitter's Notice Regarding Applicability of Sanctions (Sealed)
(D.D.C. Feb. 13, 2023).......................................................JA274

Government's Sealed Opposition to Twitter Inc.'s Motion to
Vacate or Modify Non-Disclosure Order and Stay
Twitter's Compliance with Search Warrant (Sealed)
(D.D.C. Feb. 16, 2023), ECF No. 21 .................................JA280

Exhibit A to Opposition to Motion to Vacate/Modify Non-
Disclosure Order and Stay Compliance: January 17, 2023
Warrant (Sealed) (D.D.C. Feb. 16, 2023),
ECF No. 21-1 ....................................................................JA294

Twitter's Reply in Support of Its Motion to Vacate or Modify
Non-Disclosure Order Issued Pursuant to 18 U.S.C. §
2705(b) and Stay Twitter's Compliance with Search
Warrant (Sealed) (D.D.C. Feb. 24, 2023) ..........................JA301

Exhibit B to Twitter's Reply in Support of Its Motion to Vacate
or Modify Non-Disclosure Order Issued Pursuant to
18 U.S.C. § 2705(b) and Stay Twitter's Compliance
with Search Warrant (Sealed) (D.D.C. Feb. 24, 2023) ..... JA325

**FILED UNDER SEAL**

Order Denying Twitter's Motion to Vacate or Modify Non-Disclosure Order Issued Pursuant to 18 U.S.C. § 2705(b) and Stay Twitter's Compliance with Search Warrant (Sealed) (D.D.C. Mar. 3, 2023), ECF No. 29 ....................JA354

Memorandum Opinion Regarding Order of the District Court Denying Twitter's Motion to Vacate or Modify Non-Disclosure Order Issued Pursuant to 18 U.S.C. § 2705(b) and Stay Twitter's Compliance with Search Warrant (Redacted) (Sealed) (D.D.C. Mar. 3, 2023), ECF No. 30.........................................................................JA356

Memorandum and Order Denying Twitter's Motion for a Stay Pending Appeal (Sealed) (D.D.C. Mar. 10, 2023), ECF No. 39.........................................................................JA391

Twitter's Notice of Payment (Sealed) (D.D.C. Mar. 27, 2023) ...JA396

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **SC No. 23-SC-31**<br><br>**<u>Under Seal</u>** |

**ORDER**

This matter having come before the Court pursuant to the application of the United States

to seal the above-captioned warrant and related documents, including the application and affidavit

in support thereof and all attachments thereto and other related materials (collectively the

"Warrant"), and to Twitter Inc. ("PROVIDER"), an electronic communication service provider

and/or a remote computing service provider located in San Francisco, California, not to disclose

the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b), and to authorize the

government to delay disclosure of the Warrant to the owners of the emails identified in Attachment

A, ("TARGET ACCOUNT(S)") pursuant to 18 U.S.C. § 3101(a).

The Court finds reasonable grounds to believe that such disclosure will result in destruction

of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the

investigation, as defined in 18 U.S.C. § 2705(b).

The Court further finds that the government has also provided facts giving good cause to

believe that providing immediate notification of the warrant may have an adverse result, as defined

in 18 U.S.C. § 2705(a)(2).  Specifically, the Court finds that immediate notification to the customer

or subscriber of the TARGET ACCOUNT(S) would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence,

change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. §

3103a(b)(1).

FILED UNDER SEAL

Case 1:23-sc-00031-BAH *SEALED*   Document 3   Filed 01/17/23   Page 2 of 2

The Court further finds that, because of such reasonable grounds to believe the disclosure will so impact the investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

1.    IT IS THEREFORE ORDERED that, pursuant to 18 U.S.C. § 2705(b), PROVIDER and its employees shall not disclose the existence or content of the Warrant to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice) for a period of 180 days (commencing on the date of this Order), unless the period of nondisclosure is later modified by the Court.

2.    IT IS FURTHER ORDERED that the application is hereby GRANTED, and that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant application to seal, and this Order are sealed until otherwise ordered by the Court.

3.    IT IS FURTHER ORDERED that the Clerk's office shall not make any entry on the public docket of the Warrant until further order of the Court.

Date:   January 17, 2023

_____
HON. BERYL A. HOWELL
CHIEF JUDGE

cc:    GREGORY BERNSTEIN
       Assistant Special Counsel

JA2

FILED UNDER SEAL

FILED UNDER SEAL

**RECEIVED**

FEB - 2 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31-BAH

**UNDER SEAL**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER
## ISSUED PURSUANT TO 18 U.S.C. § 2705(b)
## AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT

Twitter is the leading global platform dedicated to fostering and safeguarding

conversations among its users. To that end, Twitter's policy is to notify its users of any requests

from law enforcement for account information, particularly requests for contents of

communications, unless prohibited from doing so. On January 19, 2023, the government served

a search warrant (the "Warrant") on Twitter for data associated with the account

@realDonaldTrump (the "Target Account") accompanied with a non-disclosure order under 18

U.S.C. § 2705(b) (the "Non-Disclosure Order"), prohibiting Twitter from notifying the account

owner, or anyone else, other than counsel. The Warrant requests public and non-public data,

including private communications sent to or from the Target Account during the time period

when Donald J. Trump, the user of the Target Account, was serving as President of the United

States. The Non-Disclosure Order was issued by this Court based on an *ex parte* application,

which Twitter has not seen.

1

**FILED UNDER SEAL**

FILED UNDER SEAL

Because the Non-Disclosure Order constitutes a content-based prior restraint on Twitter's speech, the government was required to submit facts demonstrating that the Non-Disclosure Order was narrowly tailored to serve a compelling government interest. The Non-Disclosure Order lists several potential governmental interests in keeping the Warrant secret, including destruction or tampering of evidence, intimidation of potential witnesses, notifying confederates, and fleeing from prosecution. But none of these interests can satisfy strict scrutiny in light of the significant publicity surrounding the Department of Justice's criminal investigation of the former President, including detailed news accounts of presidential aides and allies testifying before the grand jury, seizures of aides' electronic devices, a search warrant executed at the former President's home, and the televised press conference by Attorney General Merrick Garland announcing the Special Counsel's appointment and mandate to investigate former President Trump.

The Non-Disclosure Order in this case is particularly significant given that the Warrant seeks the contents of private communications sent to or from the then-President of the United States that raise unique and complex issues of executive privilege. Allowing Twitter the opportunity to notify the account holder would afford the user—the principal party in interest for executive privilege—an opportunity to address the legal issues surrounding a demand for presidential communications in this unique context, and give this Court a full adversarial process in which to evaluate them.

In sum, because the Non-Disclosure Order violates Twitter's First Amendment rights to communicate with its user, cannot be justified by a compelling governmental interest, and is not narrowly tailored, Twitter respectfully requests that this Court vacate or modify the Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) and permit Twitter to notify the user of

2

FILED UNDER SEAL

the account, or, in the alternative, his authorized representatives.[1] Twitter also respectfully

requests this Court stay Twitter's compliance with the Warrant, pending the resolution of this

challenge to the Non-disclosure Order, to (1) prevent irreparable injury to Twitter's interests that

would occur if production under the Warrant were required prior to resolution, and (2) to

preserve the status quo as to the user's interest in potentially seeking to assert privilege or

otherwise curtail derivative use of potentially privileged communications. Finally, Twitter

requests a hearing on this motion.

## BACKGROUND ON TWITTER

Twitter operates a global social media platform that fosters public and private

conversations amongst its more than 450 million active monthly users. Twitter users may

communicate with one another through "tweets" which may be accessible to the general public

or visible only to the user's followers. Twitter also allows users to send private direct messages,

known as "DMs", to other Twitter users. *See e.g.*, *United States v. Sporn*, 2022 WL 656165, at

*1 (D. Kan. Mar. 4, 2022). Twitter values its ability to safeguard the privacy of its users.

Accordingly, Twitter's Privacy Policy makes clear to its users and to law enforcement that it will

notify users of any law enforcement requests for their communications or data unless legally

prohibited from doing so:

> For purposes of transparency and due process, Twitter's policy is to notify users
> (e.g., prior to disclosure of account information) of requests for their Twitter or
> Periscope account information, including a copy of the request, unless we are
> prohibited from doing so (e.g., an order under 18 U.S.C. § 2705(b)).[2]

---

[1] Twitter does not challenge the validity of the Warrant. Instead, Twitter brings this motion to
enable the user of the Target Account to assert his own rights and privileges if applicable, and
provide this Court with a full presentation on these issues.
[2] https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support

3

**JA5**

FILED UNDER SEAL

Twitter's ability to communicate with its customers about law enforcement's efforts to access their communications and data – rooted in its contractual promises and historical commitment to privacy and transparency – is essential to its business model and fostering trust with its user base. Given its vast and diverse community of users, Twitter is not in a position to identify and assert its users' rights and privileges with respect to every government demand for communications and data. Moreover, Twitter might lack standing to assert the rights and privileges of its users. Such rights and privileges could include communications between attorneys and clients, journalists and sources, medical professionals and patients, clergy and laity, spouses, or politicians communicating in ways that might be covered by Speech and Debate Clause, executive privilege, or other official privileges. By notifying its users of government demands for communications and data, Twitter serves a critical role in enabling its users to identify, evaluate, and assert for themselves those rights and privileges that could prohibit government search and seizure.

## PROCEDURAL HISTORY

On January 17, 2023, the Special Counsel's Office obtained a warrant, compelling Twitter to disclose communications and data related to the Target Account. The Target Account is the primary Twitter account of former President Donald J. Trump. Former President Trump routinely used the Target Account for presidential communications during this period. *See Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1222 (2021) (Thomas, J. concurring) ("Mr. Trump often used the account to speak in his official capacity."). Twitter has provided communications and data from the Target Account for the period of Mr.

4

FILED UNDER SEAL

Trump's presidency to the National Archives and Records Administration ("NARA").[3] The

Warrant seeks information from a period at the end of Mr. Trump's presidency, specifically from

October 2020 to January 2021.

The Warrant broadly seeks information, both public and private, content and non-content.

Significantly, the Warrant seeks "[a]ll content, records, and other information relating to

communications sent from or received by the SUBJECT ACCOUNT from October 2020 to

January 2021, including . . . The content of all direct messages sent from, received by, stored in

draft form in, or otherwise associated with the SUBJECT ACCOUNT," as well as "All other

content, records, and other information relating to all other interactions between the SUBJECT

ACCOUNT and other Twitter users from October 2020 to January 2021." (Warrant, at 5.)  The

Warrant requires production within 10 days of issuance of the Warrant.  (Warrant, at 6.)

The Warrant was accompanied by a Non-Disclosure Order issued pursuant to 18 U.S.C.

§ 2705(b), prohibiting Twitter from disclosing the "existence or content of the Warrant to any

other person (except attorneys for PROVIDER for the purpose of receiving legal advice)," for a

period of 180 days.  (Order, at 2.)  The  Non-Disclosure Order states that there were "reasonable

grounds to believe that such disclosure will result in destruction of or tampering with evidence,

intimidation of potential witnesses, and serious jeopardy to the investigation," and that

---

[3] Data associated with the account during the timeframe that Mr. Trump was president was
produced to and is maintained by the NARA in accordance with the Presidential Records Act.
44 U.S.C. §§ 2201 *et seq*., *See, e.g.,* NARA website, "The National Archives received records
from the Trump Administration, which ended on January 20, 2021. We are in the process of
preserving and providing access to these records, including all official Trump Administration
social media content and deleted posts from @realDonaldTrump and @POTUS." available at
https://www.archives.gov/foia/pra-trump-admin; *see also* Letter from NARA Archivist David S.
Ferriero to Hon. Carolyn B. Maloney, Chair of House Committee on Oversight and Reform (Feb.
18, 2022), noting that "Twitter provided us with a copy of the available account data [from
@realDonaldTrump]," available at: https://www.archives.gov/files/foia/ferriero-letter-to-
maloney-on-trump-presidential-records-on-social-media-platforms.02.18.2022.pdf.

5

FILED UNDER SEAL

"immediate notification to the customer or subscriber of the TARGET ACCOUNT(S) would

seriously jeopardize the ongoing investigation, as such a disclosure would give that person an

opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from

prosecution." (Order, at 1.)

Twitter has preserved communications and data from the Target Account available in its

standard production tooling used to handle law enforcement process. Twitter has also alerted the

Special Counsel's Office of its concerns related to the Non-Disclosure Order and the restriction

on its First Amendment rights in this case and the fact that much of the information sought in the

Warrant has been produced to NARA and is likely covered by the Presidential Records Act. The

Special Counsel's Office has declined to modify or withdraw the Non-Disclosure Order.

## APPLICABLE LAW

A non-disclosure order is a content-based prior restraint on speech – the "most serious

and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*,

427 U.S. 539, 559 (1976), which "comes to [a court] with a 'heavy presumption' against its

constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971);

*Matter of Subpoena 2018R00776*, 947 F.3d 148, 156 (3d Cir. 2020) (non-disclosure orders to

service providers are content-based prior restraints subject to strict scrutiny under the First

Amendment); *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d

876, 881-82 (S.D. Tex. 2008) (holding that § 2705(b) nondisclosure orders are content-based

prior restraints on speech); *Microsoft Corp. v. U.S. Dep't of Justice*, 233 F. Supp. 3d 887, 905

(W.D. Wash. 2017) (same). A non-disclosure order is therefore invalid unless the government

"can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling

government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchs. Ass'n*,

6

FILED UNDER SEAL

564 U.S. 786, 799 (2011); *Taucher v. Rainer*, 237 F. Supp. 2d 7, 13 (D.D.C. 2002) ("[T]he

Supreme Court has specifically and unequivocally demanded that the government show the most

compelling reason for *any* prior restraint on speech.") (emphasis in original).

Because a § 2705(b) non-disclosure order is a content-based prior restraint, two

consequences follow.  First, because the order operates as a prior restraint, it can be issued only

pursuant to the "procedural safeguards" that the Supreme Court described in *Freedman v.

Maryland*, 380 U.S. 51 (1965)—safeguards "that reduce the danger of suppressing

constitutionally protected speech," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559

(1975).  Specifically, "the censor must bear the burden of going to court to suppress the speech

and must bear the burden of proof once in court."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316,

321 (2002).  Second, because the order is both content-based and a prior restraint, the highest

level of judicial scrutiny applies.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)

(content-based laws must "satisfy strict scrutiny"); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58,

70 (1963) (prior restraint comes to court "bearing a heavy presumption against its constitutional

validity").  Accordingly, a non-disclosure order must be "narrowly tailored to serve compelling

state interests," *Reed*, 576 U.S. at 163, and there must be no "less restrictive alternatives [that]

would be at least as effective" as the non-disclosure order, *Reno v. ACLU*, 521 U.S. 844, 874

(1997).

## ARGUMENT

### I.    This Non-Disclosure Order Cannot Withstand Strict Scrutiny

The government cannot overcome strict scrutiny here: there is no compelling

governmental interest in maintaining the secrecy of this Warrant from everyone.  Moreover, even

if the government were able to make such a showing, the Non-Disclosure Order is not narrowly

tailored to the least restrictive means available to accommodate Twitter's First Amendment

7

FILED UNDER SEAL

interests in notifying its user and providing him an opportunity to raise the weighty and unique questions of law surrounding the privilege attached to private presidential communications.

### A.    Government Cannot Demonstrate a Compelling Interest in Secrecy

In this case, the government cannot credibly show that the Non-Disclosure Order prohibiting Twitter from disclosing information about the Warrant serves a compelling governmental interest. Given the voluminous publicly available information about the investigation of the former President (including, importantly, his statements and communications), the government lacks a compelling interest in maintaining the Non-disclosure Order here.

First, the Department of Justice's criminal investigation into former President Trump and his potential role in the efforts to overturn the 2020 presidential election and the January 6, 2021 attack on the United States Capitol, has been public for several months prior to the issuance of this Warrant. Specifically, the news media has reported extensively that presidential advisors, including White House counsel and senior staff, have been subpoenaed to testify before a federal grand jury investigating those events. *See e.g.*, Casey Gannon et al., *Former Trump White House Counsel and His Deputy Testify to Jan. 6 Criminal Grand Jury*, CNN (Dec. 2, 2022), *available at* https://www.cnn.com/2022/12/02/politics/pat-cipollone-district-courthouse/index.html; Katelyn Polantz & Hannah Rabinowitz, *First on CNN: Top Trump Advisor Stephen Miller Testifies to January 6 Federal Grand Jury*, CNN (Nov. 29, 2022), *available at* https://www.cnn.com/2022/11/29/politics/stephen-miller-testifies-january-6-federal-grand-jury-trump/index.html; Olivia Olander, *DOJ Sends Some 40 Subpoenas to Trump Aides*, POLITICO (Sept. 12, 2022) *available at* https://www.politico.com/news/2022/09/12/justice-subpoena-trump-aides-00056274; Bart Jansen, *Justice Department Subpoenas Dozens of Trump Aides in Apparent Escalation of Investigation, According to Reports*, USA Today (Sept. 12, 2022),

8

*available at* https://www.usatoday.com/story/news/politics/2022/09/12/trump-aides-subpoenaed-justice-department-jan-6-capitol-attack/10361875002/; Kyle Cheney, *Two Top Pence Aides Appear Before Jan. 6 Grand Jury*, POLITICO (Jul. 25, 2022), *available at* https://www.politico.com/news/2022/07/25/pence-chief-of-staff-january-6-00047772.

On November 18, 2022, the Department of Justice confirmed the criminal investigation into former President Trump in a televised press conference by Attorney General Merrick Garland. *See*, https://www.justice.gov/opa/pr/appointment-special-counsel-0. In the press conference, Attorney General Garland announced the appointment of a special counsel in "two ongoing criminal investigations that had received significant public attention" – the January 6th Capitol riot investigation and the former President's retention of classified documents. *Id.* Attorney General Garland noted that the appointment of a special counsel was necessary because of "the former President's announcement that he is a candidate for President in the next election." The Attorney General's statement made clear that the former President was a potential target of both criminal investigations.

It is also well known that, as part of its investigation, the Department of Justice is closely examining the private communications of people within the scope of its investigation, including the former president's aides and allies. Indeed, the Department of Justice has obtained search warrants for electronic devices of numerous close associates of former President Trump. *See e.g.*, Steve Benen, *DOJ Seizes Team Trump Phones as Part of Intensifying Jan. 6 Probe*, MSNBC (Sept. 13, 2022), *available at* https://www.msnbc.com/rachel-maddow-show/maddowblog/doj-seizes-team-trump-phones-part-intensifying-jan-6-probe-rcna47448; Ella Lee, *Pennsylvania Rep. Scott Perry, a Trump Ally, Says FBI Agents Seized His Cellphone*, USA TODAY (Aug. 10, 2022), *available at*

9

FILED UNDER SEAL

https://www.usatoday.com/story/news/politics/2022/08/10/scott-perry-fbi-seized-cellphone/10284599002/; Scott Gleeson, *MyPillow CEO, Trump Ally Mike Lindell Says FBI Issued Subpoena, Seized Phone at a Hardee's*, USA TODAY (Sept. 14, 2022), *available at https://www.usatoday.com/story/news/nation/2022/09/14/my-pillow-ceo-trump-ally-fbi-seized-phone/10375227002/*; Alan Feuer & Adam Goldman, *Federal Agents Seized Phone of John Eastman, Key Figure in Jan. 6 Plan*, N.Y. Times (Jun. 27, 2022), *available at* https://www.nytimes.com/2022/06/27/us/politics/john-eastman-jan-6.html. The Federal Bureau of Investigation ("FBI") has also executed a search warrant at the home of a Trump ally to seize electronic devices. *See e.g.* Alan Feuer at al., *Federal Authorities Search Home of Trump Justice Dept. Official*, N.Y. Times (Jun 23, 2022), *available at* https://www.nytimes.com/2022/06/23/us/politics/jeffrey-clark-trump-justice-dept.html.

Former President Trump is well aware of the existence of the Special Counsel's investigation. Indeed, the former President specifically addressed the appointment of a Special Counsel on the same day the Justice Department announced the appointment. *See, e.g.*, Former President Trump Statement on Special Counsel Appointment, available at https://www.c-span.org/video/?524379-1/president-trump-statement-special-counsel-appointment. Former President Trump is also keenly aware of the two investigations that were delegated to the Special Counsel – and the fact that those investigations included the execution of search warrants seeking evidence against him. On several occasions, he has publicly addressed his role in the January 6th Capitol riot and the August 2022 search warrant executed at his residence seeking classified documents.

In sum, public knowledge of the Department of Justice's criminal investigations of former President Trump and his allies in connection with the events of January 6, 2021 and the

10

FILED UNDER SEAL

retention of classified documents has been ubiquitous. Furthermore, it is well known that the

FBI has been seizing and examining the communications of those involved. These federal

investigations have been repeatedly acknowledged and addressed by the former President. The

government cannot credibly claim that secrecy of this Warrant is required to maintain the

integrity of the investigation when more than forty former presidential aides and allies have

already been served with grand jury subpoenas, senior advisors are known to have testified

before the grand jury, multiple search warrants have been executed for electronic devices, two

physical search warrants have been executed, including at the former President's home, and the

Attorney General has held a press conference publicly confirming the criminal investigations are

directed at the former President. It strains credulity to believe that the incremental disclosure of

this Warrant could somehow alter the current balance of public knowledge in any meaningful

way so as to cause some harm to the investigation.[4]

The government's proffered explanations for needing the Non-Disclosure Order appear to

be conclusory at best. There is no reason to believe that notification of this latest search warrant

in this investigation would suddenly cause former President Trump or any potential confederates

---

[4] Other investigations focusing on the former President and his associates are also publicly
known and widely reported in the media, including by the Select Committee to Investigate the
January 6th Attack on the United States Capitol, the Fulton County District Attorney's Office,
and the Manhattan District Attorney's Office. *See* Mary Clare Jalonick et al., *Jan. 6 Panel Urges
Trump Prosecution with Criminal Referral,* ASSOCIATED PRESS (Dec. 19, 2022), *available at*
https://apnews.com/article/january-6-final-hearing-investigation-wraps-
0bceb95826c1c836023d2810ccbeccca; Kyle Cheney, *'Decisions are Imminent': Georgia
Prosecutor Nears Charging Decisions in Trump Probe*, POLITICO (Jan. 24, 2023), *available at*
*https://www.politico.com/news/2023/01/24/decisions-are-imminent-georgia-prosecutor-nears-
charging-decisions-in-trump-probe-00079283*; William Rashburn et al., *Manhattan Prosecutors
Begin Presenting Trump Case to Grand Jury*, N.Y. TIMES (Jan. 30, 2023), *available at*
https://www.nytimes.com/2023/01/30/nyregion/trump-stormy-daniels-grand-jury.html. The
government cannot plausibly assert that these investigations in which the former President's
liberty is implicated pose less of an incentive to flee, tamper, or destroy evidence than
notification of the Warrant.

11

FILED UNDER SEAL

to destroy evidence, intimidate witnesses, or to flee prosecution.  First and foremost, the Warrant

does not provide any new information about the progress of criminal investigation and how the

government is seeking evidence; if they were so inclined, former President Trump and potential

confederates have had many months during which the government's investigation has been

widely known to try and interfere with it.  Second, the former President has announced that he is

running for re-election in 2024, which renders it highly implausible that he will attempt to flee

the country, and even more unlikely that such flight would be precipitated by this specific

Warrant.  Finally, with respect to this Warrant, Twitter has preserved communications and data

from the Target Account available in its standard production tooling used to handle law

enforcement process.  Therefore, disclosure of the existence of the Warrant to the former

President would not risk deletion of relevant communications or data preserved in its production

tooling.

In sum, the government cannot meet its burden of establishing a compelling

governmental interest necessary to restrain Twitter's First Amendment rights.  The government's

conclusory statements of investigative harm are insufficient to withstand strict scrutiny.  *See*

*John Doe, Inc. v. Mukasey*, 549 F.3d 861, 881 (2d Cir. 2008) (reviewing court cannot "uphold a

nondisclosure requirement on a conclusory assurance" that a statutory standard is satisfied).

Accordingly, the Non-Disclosure Order should be vacated.

  **B.**  **Unique and Important Executive Privilege Considerations Underlie Twitter's First Amendment Interest in Notifying its User**

Twitter's First Amendment interests in being able to notify its user in this case is

particularly important, where the Warrant calls for the production of, among other things, private

communications sent or received personally by the then-President of the United States.  No court

has ever addressed the issue of executive privilege in this context —including what limitations

12

FILED UNDER SEAL

FILED UNDER SEAL

might need to be imposed on derivative use of private presidential communications.[5]  Twitter

itself may not have standing to raise these issues, and takes no position on the applicability of

executive privilege to these communications in this circumstance.   Nonetheless, the disclosure of

these private presidential communications clearly affects other parties, including Twitter's user,

who was President of the United States at the time the materials sought were created, and may

retain the ability to assert that privilege now.  *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S.

425, 448-49 (1977).  As, the United States Supreme Court stated in *Nixon*:

> [u]nless he can give his advisers some assurance of confidentiality, a President
> could not expect to receive the full and frank submissions of facts and opinions
> upon which effective discharge of his duties depends.  The confidentiality
> necessary to this exchange cannot be measured by the few months or years
> between the submission of the information and the end of the President's tenure;
> the privilege is not for the benefit of the President as an individual, but for the
> benefit of the Republic.  Therefore the privilege survives the individual
> President's tenure.

*Id.* (*quoting* Appellee's Br. at 33).  Recently, the Supreme Court declined to answer the open

question of whether a former President can assert the privilege over his successor's objection,

stating that "[t]he questions whether an in what circumstances a former President may obtain a

court order preventing disclosure of privileged records from his tenure in office, in the face of a

determination by the incumbent President to waive the privilege, are unprecedented and raise

serious and substantial concerns.  *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Order Denying

Stay of Mandate and Injunction).

These are weighty and difficult questions that courts, including the Supreme Court, have

wrestled with, and should be resolved through a full adversarial process involving the real parties

in interest, not through an *ex parte* secret filing.  Twitter has a significant interest in being

---

[5] No court has addressed the core privilege issue in this context, and there is a separate and
critical issue of derivative use of those communications.  As noted in the introduction, it is in
part for the reasons that execution of the Warrant should be stayed to preserve the status quo.

13

**FILED UNDER SEAL**

FILED UNDER SEAL

permitted to notify its user—for whom there are no credible investigative reasons to bar

disclosure—of the existence of the Warrant, so that he may raise whatever concerns he has, if

any, for determination by this Court in a full adversarial proceeding.

### C.    The Order is Not Narrowly Tailored, as There are Less Restrictive Means Available that Would Preserve Twitter's Essential First Amendment Rights

Separately, even assuming *arguendo* that the government could make a showing of a

compelling governmental interest, strict scrutiny also requires the government to prove that a

non-disclosure order is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at

164.  Given the availability of less restrictive means however, the government cannot meet its

burden.

Here, the government cannot meet this burden because the Non-Disclosure Order is a

blanket prohibition preventing Twitter from notifying anyone about the Warrant and Non-

Disclosure Order.  Instead, this Court could modify the Non-Disclosure Order to permit Twitter

to notify just its user of the Warrant.  Such a modification to the Non-Disclosure Order would

permit Twitter to exercise its First Amendment interest in complying with its contractual promise

to its users about a law enforcement demand for communications and data.

Alternatively, if the government were concerned that even limited disclosure to the user

would jeopardize its widely publicized investigations, this Court could modify the Non-

Disclosure Order to authorize Twitter to notify a representative of the former President, perhaps

from among the list of representatives that former President Trump officially designated as "my

representatives in all respects that pertain to the records of my Presidency, and . . . each

representative may exercise all authority granted to me under Chapter 22 of title 44, United

14

FILED UNDER SEAL

FILED UNDER SEAL

States Code, or any other provision of law related to the records of my Presidency."[6]  The Court

could even appoint a Special Master, who could consider, raise, and assert any rights or

privileges, if any, on behalf of the former President.

Finally, the government has another, even less restrictive option that would not impede

Twitter's First Amendment interests at all.  The government could seek the data instead from the

Archivist at the NARA, who, consistent with the Presidential Records Act, maintains a copy of

the Target Account from the requested time period.  Such action would be in compliance with

the law governing presidential records passed by Congress and implemented by the Executive

Branch compared to this *ex parte* process sought by the Special Counsel that is proceeding

without regard to the procedures governing the Presidential Records Act.

In sum, because there are more narrowly tailored ways to craft the Non-Disclosure Order

that lessen the burden on Twitter's First Amendment rights, the Non-Disclosure Order cannot

stand.

### D.     Failure to Stay Twitter's Production Obligation Pending Resolution of this Motion Would Cause Irreparable Injury to Twitter's First Amendment Rights and Effectively Eliminate Any Potential Remedy for the User

Finally, although the Warrant requires production of requested information within 10

days of issuance, this Court should stay Twitter's obligation to comply until the Non-Disclosure

issue has been resolved.  Were Twitter obligated to produce the requested information, it would

vastly impede its ability to effect its First Amendment rights to provide meaningful notice to its

---

[6] Letter of Donald J. Trump to NARA Archivist David S. Ferriero (Jan. 19, 2021), designating "Mark R. Meadows, Pasquale A. Cipollone, John A. Eisenberg, Patrick F. Philbin, Scott F. Gast, Michael M. Purpura, and Steven A. Engel as my representatives in all respects that pertain to the records of my Presidency, and . . . each representative may exercise all authority granted to me under Chapter 22 of title 44, United States Code, or any other provision of law related to the records of my Presidency." Available at https://www.archives.gov/files/foia/wh-ltr-to-u.s.-archivist-trump-pra-rep-1.19.2021.pdf.

15

FILED UNDER SEAL

user. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) *citing New York Times Co. v. United States*, 403 U.S. 713 (1971). Twitter's First Amendment interests are myriad: it wishes to engage in the speech prohibited by the Non-Disclosure Order for a variety of reasons, including both its commitment to informing its customers about legal process related to their accounts but also because in this unique instance, the user may have a strong interest in challenging the Warrant or further use of the requested data – a challenge the user cannot bring unless he is informed of the Warrant before its execution. This concern is even more heightened when the Special Counsel apparently seeks to obtain communications and data that is already at NARA and access to which is subject to the procedures set forth in the Presidential Records Act.

Acknowledging the importance of First Amendment interests and the high judicial scrutiny that attends to prior restraint on speech, the Supreme Court has been clear that the status quo should be maintained pending a final judicial determination. *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) ("any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained"). Applying those principles here, the Court should stay any production obligation until the issues raised in this motion are resolved —and in the event the Non-Disclosure Order is quashed or modified and notice is permitted, for a 7 day period after such notice is given.

16

FILED UNDER SEAL

## CONCLUSION

The Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) is a blanket prohibition prohibiting Twitter from notifying anyone about the Warrant or Non-Disclosure Order, and cannot be justified by a compelling governmental interest. Accordingly, the Non-Disclosure Order impermissibly burdens Twitter's First Amendment rights, and must be vacated or modified to allow Twitter to notify its user of the government's demand. In addition, this Court should stay Twitter's compliance with the Warrant until resolution of these constitutional issues.

Dated: February 2, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
  *admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.*
  *admission pending)*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

George Varghese *(pro hac vice forthcoming)*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

*Counsel for Twitter, Inc.*

17

**FILED UNDER SEAL**

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of February 2023, I caused the foregoing motion to

be served by first class mail and email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt / D.C. Bar 1009913
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

18

FILED UNDER SEAL

| | |
|---|---|
| **From:** | Howell Chambers <Howell_Chambers@dcd.uscourts.gov> |
| **Sent:** | Thursday, February 2, 2023 4:53 PM |
| **To:** | MLD (JSPT); Holtzblatt, Ari |
| **Cc:** | JPC (JSPT); RNH (JSPT); GDB (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel |
| **Subject:** | 23-SC-31: Minute Order (February 2, 2023) |

**EXTERNAL SENDER**

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

## Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1 PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2, 2023. Counsel has been notified electronically.(lcbah4)**

FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |

## GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE
## WHY TWITTER INC. SHOULD NOT BE HELD IN CONTEMPT
## FOR FAILURE TO COMPLY WITH A SEARCH WARRANT

Twitter Inc. ("Twitter") refuses to comply with the search warrant issued by this Court pursuant to 18 U.S.C. § 2703 for information associated with the Twitter account "@realDonaldTrump." ECF No. 4 (the "Warrant"). Twitter asserts two grounds for its non-compliance. First, Twitter asserts that the non-disclosure order accompanying the warrant, ECF No. 3 (the "NDO"), issued by this Court pursuant to 18 U.S.C. § 2705(b), is unconstitutional. But the constitutionality of the non-disclosure order is unrelated to the validity of the Warrant, and Twitter's apparent desire to contest it does not excuse its non-compliance. Second, Twitter refuses to produce records in response to the Warrant until the account holder has an opportunity to litigate its validity. But neither the Warrant nor Section 2703 provide for such a procedure or excuse Twitter's non-compliance. Accordingly, the Government moves this Court to issue an order scheduling a hearing forthwith for Twitter to show cause why it should not be held in contempt for failing to comply with the Warrant's commands. Consistent with the Order sealing the Warrant and related materials, ECF No. 3, the Government also requests that the Court place this Motion, the accompanying Order, and any related materials under seal.

On January 17, 2023, the Government applied for the Warrant, as well as the accompanying NDO, which requires that Twitter not disclose the contents or existence of the Warrant for a period

- 1 -

of 180 days.  ECF Nos. 1, 2.  The Court issued the Warrant and the NDO the same day.  ECF Nos. 3, 4.  The Warrant required that Twitter disclose to the Government information responsive to the Warrant within 10 days of the Warrant's issuance.  ECF No. 4, Attachment B, ¶ 5.

Twice on January 17, 2023, the Government attempted to serve the Warrant and NDO on Twitter through its Legal Requests Submissions site but received an automated message indicating that the "page [was] down."  On January 19, 2023, the Government successfully served the Warrant and NDO through the site.

On January 25, 2023, the Government contacted counsel for Twitter to inquire as to the status of the Warrant.  Counsel for Twitter indicated she was not aware of the Warrant but would consider it a priority.  The same day, the Government separately provided Twitter's counsel with the signed warrant and NDO (previously served through Twitter's Legal Requests Submissions site).  On January 27, 2023, Twitter's counsel informed the Government that Twitter would not be able to comply with the Warrant by its deadline, but would provide an update on January 31, 2023.  On January 31, 2023, counsel for Twitter informed the Government that Twitter believes the NDO violates the First Amendment.  Going further, Twitter indicated that it would not comply with the Warrant promptly, even in the absence of an NDO, because it wishes to give the account holder an opportunity to challenge or otherwise object to the Warrant before the Government has the opportunity to review any responsive materials.  The Government requested that Twitter provide, by close of business on February 1, 2023, authority for its assertion that it can refuse to comply with the Warrant pending a challenge to the NDO.  Twitter provided no such authority, instead citing inapposite First Amendment case law while reiterating that Twitter "remain[s] unclear as to what remedy DOJ would propose in this unique situation in the event that the NDO is deemed invalid yet the materials have already been reviewed" by the Government.

- 2 -

The Government now moves for an Order to Show Cause why Twitter should not be held in contempt for its failure to timely comply with the Warrant's commands. The Warrant ordered Twitter to produce responsive information by January 27, 2023. More than five days have passed since the deadline, and Twitter has disclosed nothing to the Government, nor apparently taken the necessary steps to do so. Instead, Twitter proffers the possibility of litigation as to the NDO and the collateral aim of preventing the Government from reviewing responsive materials until such time as the account holder can challenge the Warrant. The Warrant does not countenance the indefiniteness and interference Twitter seeks.

First, the Warrant and NDO are different court orders, imposing different obligations. Twitter may not delay, to an unknown future date, compliance with the Warrant by challenging the NDO. The Government has an interest in prompt enforcement of the Warrant, regardless of any challenge to the NDO. *See, e.g., Google LLC v. United States*, 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020) (denying request to stay warrant deadline pending resolution of challenge to accompanying non-disclosure order, noting "any further delay . . . increases the risk that evidence will be lost or destroyed, heightens the chance that targets will learn of the investigation, and jeopardizes the Government's ability to bring any prosecution in a timely fashion"). Second, neither the Warrant itself nor Section 2703 provide for intervention by a third party before compliance with the Warrant is required. Twitter can point to no authority suggesting otherwise.

Under 18 U.S.C. § 401(3), this Court has the "power to punish by fine or imprisonment, or both, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." Given Twitter's failure to comply with the Warrant's commands, the Court should order Twitter to show cause, at a hearing forthwith, why it should not be held in contempt under Section 401(3). The Government further requests that the hearing be held forthwith, with personal appearance by

a company representative.

For the foregoing reasons, the Government asks this Court to issue an order to show cause why Twitter should not be held in contempt for its failure to comply with the Warrant.  A proposed Order is attached.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/ *Mary L. Dohrmann*     
Mary L. Dohrmann (N.Y. Bar No. 5443874)
Assistant Special Counsel
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
(202) 714-9376

- 4 -

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Under Seal** |

**[PROPOSED] ORDER**

Upon consideration of the Government's Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant, and the entire record herein, it is hereby

**ORDERED**, this _____ day of February, 2023, that the Government's Motion is GRANTED and a hearing shall be held forthwith; and it is further

**ORDERED** that, on February _____, 2023, a company representative (in addition to any outside counsel) of Twitter Inc. shall personally appear before the Court, and show cause why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant, ECF No. 4; and it is further

**ORDERED** that a copy of this Order shall be served on Twitter Inc. and the Government; and it is further

**ORDERED** that the Government's Motion, this Order, and any related materials are sealed until otherwise ordered by the Court.

**SO ORDERED.**

Date:

_____
CHIEF JUDGE BERYL A. HOWELL
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- 1 -

**JA26**

FILED UNDER SEAL

cc:    Mary L. Dohrmann
        Assistant Special Counsel
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530
        (202) 714-9376

| | |
|---|---|
| **From:** | GDB (JSPT) <GDB@usdoj.gov> |
| **Sent:** | Friday, February 3, 2023 11:58 AM |
| **To:** | Howell Chambers; MLD (JSPT); Holtzblatt, Ari; Varghese, George; Powell, Benjamin; Russell, Whitney D. |
| **Cc:** | JPC (JSPT); RNH (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel; TPW (JSPT) |
| **Subject:** | RE: 23-SC-31: Minute Order (February 2, 2023) |

---

**EXTERNAL SENDER**

---

Dear Chambers:

The parties submit this joint email in response to the minute order below. The parties did not reach an agreement on a joint briefing schedule. The government believes the order to show cause and NDO should be resolved on separate tracks, while Twitter believes the issues should be heard together. Our proposals are as follows:

### Government's proposed briefing schedule:

*Order to show cause briefing schedule*
1. Opposition:   February 6 at 12:00 p.m.
2. Reply:           February 7 at 10:00 a.m.
3. Hearing:        February 7 at 3 p.m.

*NDO briefing schedule*
1. Opposition:   February 16
2. Reply:           February 23
3. Hearing:        Available at the Court's discretion

### Twitter's proposed briefing schedule:

1. Oppositions: February 6 (end of day)
2. Replies:         February 8 (end of day)
3. Hearing:        February 9 (after 2 p.m.) or February 10 (whichever day is better for the Court)

Sincerely,

Gregory Bernstein
Assistant Special Counsel
202-705-4123 (cell)

---

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Thursday, February 2, 2023 4:53 PM
**To:** MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com

**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; GDB (JSPT) <GDB@usdoj.gov>; JIP (JSPT) <JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>
**Subject:** 23-SC-31: Minute Order (February 2, 2023)

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

## Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1 PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2, 2023. Counsel has been notified electronically.(lcbah4)**

| From: | Howell Chambers <Howell_Chambers@dcd.uscourts.gov> |
| Sent: | Friday, February 3, 2023 2:56 PM |
| To: | GDB (JSPT); MLD (JSPT); Holtzblatt, Ari; Varghese, George; Powell, Benjamin; Russell, Whitney D. |
| Cc: | JPC (JSPT); RNH (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel; TPW (JSPT) |
| Subject: | 23-SC-31: Minute Order (February 3, 2023) |

**EXTERNAL SENDER**

Counsel,

Good afternoon. Please see the Minute Order entered today in the above referenced matter. The Notice in the Minute Order refers to the email submitted by the government below. Thank you.

Best,
The Chambers of Chief Judge Howell

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 2/3/2023 at 2:35 PM EDT and filed on 2/3/2023

| Case Name: | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| Case Number: | 1:23-sc-00031-BAH *SEALED* |
| Filer: | |
| Document Number: | No document attached |

Docket Text:
**MINUTE ORDER (paperless) Upon consideration of the parties' proposed briefing schedules submitted by email by the government, *see* [8] NOTICE of Proposed Briefing Schedule, ISSUING the following SCHEDULING ORDER regarding the government's [5] Motion for Order to Show Cause:**

**(1) By February 6, 2023 at 10:00 AM, Twitter, Inc. shall file any opposition to the government's motion;**
**(2) By February 6, 2023 at 6:00 PM, the government shall file any reply;**
**(3) On February 7, 2023 at 1:30 PM, the parties are DIRECTED to appear in-person in Courtroom 22A for a sealed hearing on the government's motion; and**

**ISSUING the following SCHEDULING ORDER regarding Twitter, Inc.'s [7] Motion to Vacate or Modify Non-Disclosure Order:**

**(1) By February 16, 2023 at 4:00 PM, the government shall file any opposition to Twitter, Inc.'s motion;**
**(2) By February 23, 2023 at 4:00 PM, Twitter, Inc. shall file any reply; and**
**(3) A hearing, if necessary, will be scheduled at a later date.**

**Signed by Chief Judge Beryl A. Howell on February 3, 2023. Counsel has been notified electronically.(lcbah4)**

---

**From:** GDB (JSPT) <GDB@usdoj.gov>
**Sent:** Friday, February 3, 2023 11:58 AM
**To:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>; MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com; Varghese, George <George.Varghese@wilmerhale.com>; Powell, Benjamin <Benjamin.Powell@wilmerhale.com>; Russell, Whitney D. <Whitney.Russell@wilmerhale.com>
**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; JIP (JSPT) <JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>; TPW (JSPT) <TPW@usdoj.gov>
**Subject:** RE: 23-SC-31: Minute Order (February 2, 2023)

<mark>CAUTION - EXTERNAL:</mark>

Dear Chambers:

The parties submit this joint email in response to the minute order below. The parties did not reach an agreement on a joint briefing schedule. The government believes the order to show cause and NDO should be resolved on separate tracks, while Twitter believes the issues should be heard together. Our proposals are as follows:

**Government's proposed briefing schedule:**

*Order to show cause briefing schedule*
1. Opposition:   February 6 at 12:00 p.m.
2. Reply:       February 7 at 10:00 a.m.
3. Hearing:     February 7 at 3 p.m.

*NDO briefing schedule*
1. Opposition:  February 16
2. Reply:       February 23
3. Hearing:     Available at the Court's discretion

**Twitter's proposed briefing schedule:**

1. Oppositions: February 6 (end of day)
2. Replies:     February 8 (end of day)
3. Hearing:     February 9 (after 2 p.m.) or February 10 (whichever day is better for the Court)

Sincerely,

Gregory Bernstein
Assistant Special Counsel
202-705-4123 (cell)

---

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Thursday, February 2, 2023 4:53 PM
**To:** MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com
**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; GDB (JSPT) <GDB@usdoj.gov>; JIP (JSPT)
<JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>
**Subject:** 23-SC-31: Minute Order (February 2, 2023)

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please
submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to
Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

### Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and
DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1
PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause
and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for
hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2,
2023. Counsel has been notified electronically.(lcbah4)**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening
attachments or clicking on links.

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31 – BAH

**UNDER SEAL**

**TWITTER'S OPPOSITION TO**
**GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE**

Twitter is not refusing to comply with the Warrant in this case. Instead, Twitter sought a

negotiated resolution with the government with respect to the associated Non-Disclosure Order,

and when it reached an impasse, it immediately sought this Court's intervention. There is no

basis to hold Twitter in contempt.

Twitter's interest in notifying its user about the Warrant is well-founded: the issues

presented by the government's demand for private presidential communications without notice

are weighty and entirely without legal precedent. These executive privilege issues are distinct

from issues presented in a typical search warrant, where a Fourth Amendment violation or other

harm can be remedied by post-execution suppression. The executive privilege, and derivative

use concerns related to it, raise unique constitutional issues that cannot be remedied by any ex-

post action of a court. Twitter is not taking a position on the applicability of the privilege or the

validity of the Warrant, and it is certainly not contemptuous of the Warrant's dictates. Rather, it

is pointing out that every court, including the United States Supreme Court, has concluded these

are challenging and substantial issues, and Twitter's user has a significant interest in an

1

opportunity to raise these issues before the records are produced. Twitter has, through its filing

of its Motion to Vacate or Modify the Non-Disclosure Order ("Motion to Vacate or Modify"),

and its request for a stay of its production obligations until that Motion is resolved, sought this

Court's assistance to permit those issues to be considered deliberately with input from the real

parties in interest.

## I.    The Executive Privilege Issues Here Are Potentially Significant and Deserve Consideration of the Former President's Input Prior to Compliance

The Warrant demands the contents of private personal presidential communications,

without permitting notice or an opportunity for the interested party to raise any privilege

concerns.[1]  Though courts have acknowledged the gravity of executive privilege issues, *see*

*Trump v. Thompson*, 142 S. Ct. 680 (2022) (Order Denying Stay of Mandate and Injunction)

(noting that questions of executive privilege "raise serious and substantial concerns"), the

question of whether the former President whose communications are sought has a pre-execution

right to assert executive privilege interests has never been addressed – let alone resolved – by

any court.  The absence of any law on this issue highlights additional issues that are completely

without precedent: (1) no President or former President has ever been denied some advance

---

[1] The Supreme Court has recognized that a former President could potentially raise a claim of executive privilege. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448-49 (1977) (holding that "the privilege survives the individual President's tenure"). *See also Trump v. Thompson*, 142 S. Ct. 680 (2022) (Kavanaugh, J., respecting denial of application for stay) (observing "former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his presidency, even if the current President does not support the privilege claim"); *Trump v. Mazars USA, LLP*, 39 F.4th 774, 788 (D.C. Cir. 2022) ("The possibility that President Trump's ability to assert executive privilege may be unaffected by his status as a former President—even in the face of the sitting President's opposition—gives us all the more reason to conclude here that the test governing President Trump's challenge is unaffected by his departure from office during the litigation."); *Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury*, 45 F.4th 324, 342 n.3 (D.C. Cir. 2022) (Henderson, concurring).

2

FILED UNDER SEAL

notice of his potentially privileged communications being seized and examined; and (2) no

potentially privileged presidential communications have been held by or sought from a private,

non-governmental entity. These difficult and novel questions ought to be meaningfully

addressed by the real party in interest, particularly because there is no countervailing

governmental interest in keeping the Warrant secret from that party. The risk of irreparable harm

to Twitter's own and its user's interests resulting from Twitter's court-ordered silence provide

good faith reasons for it to request the Court to reexamine the Non-Disclosure Order and delay

compliance with the Warrant.

Twitter values its ability to safeguard the privacy of its users. Accordingly, Twitter's

Privacy Policy makes clear to its users and to law enforcement that it will notify users of any law

enforcement requests for their communications or data unless legally prohibited from doing so:

> For purposes of transparency and due process, Twitter's policy is to notify users
> (e.g., prior to disclosure of account information) of requests for their Twitter or
> Periscope account information, including a copy of the request, unless we are
> prohibited from doing so (e.g., an order under 18 U.S.C. § 2705(b)).[2]

Twitter's ability to communicate with its customers about law enforcement's efforts to

access their communications and data – rooted in its contractual promises and historical

commitment to privacy and transparency – is essential to its business model and fostering trust

with its user base. Given its vast and diverse community of users, Twitter is not in a position to

identify and assert its users' rights and privileges with respect to every government demand for

communications and data. Moreover, Twitter might lack standing to assert the rights and

privileges of its users. Such rights and privileges could include communications between

attorneys and clients, journalists and sources, medical professionals and patients, clergy and

---

[2] https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support

3

FILED UNDER SEAL

laity, spouses, or politicians communicating in ways that might be covered by the Speech or

Debate Clause, executive privilege, or other official privileges. By notifying its users of

government demands for communications and data, Twitter serves a critical role in enabling its

users to identify, evaluate, and assert for themselves those rights and privileges that could be

implicated by a government search and seizure.

The government argues that Twitter's interests in notifying its user are irrelevant to the

question of production, because the Warrant and Section 2703 do not provide for intervention by

a third party.[3] It is entirely unsurprising that the criminal rules and Section 2703 do not address

this unique situation—where potentially privileged presidential communications are sought from

a private non-governmental entity without notice to that President. But that does not eliminate

the significant and unresolved legal issues at play, nor does it address the former President's

interest in participating in their resolution (as *every* President before him has). Indeed, the

government's own statements underscore why the former President should be heard under these

unique circumstances. As discussed below, when counsel for Twitter alerted the government

that NARA already had the data it was seeking, counsel for the government responded that the

government did not want to seek these communications from NARA because it would trigger

notice to the former President under the Presidential Records Act. [4] This highlights two points

strongly in favor of pre-execution notice to Twitter's user and an opportunity for him to weigh

in: (1) the government is attempting an end-run around the statutory protections that Congress

put in place regarding presidential communications; and (2) the statutory regime in place never

---

[3] Gov't Motion at 1 and 3.

[4] Declaration of                , Exhibit A, at ¶ 12.

4

FILED UNDER SEAL

FILED UNDER SEAL

contemplated and does not account for the circumstances at play here: access (without notice to

a former President) to his potentially privileged presidential communications held by private,

non-governmental entities.

This case is emphatically not a run of the mill Fourth Amendment case that can be later

cured by suppression of the evidence. Executive privilege, even more than other privileges,

differs substantially from routine Fourth Amendment challenges because the privilege is injured

*at the time the communications are viewed by another party.*[5] *In re Sealed Case*, 121 F.3d 729,

744 (D.C. Cir. 1997) (*citing Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) for the

proposition that intrusion into the confidentiality of presidential communications occurred at the

time of screening of the materials by archivists). The party "remains injured as long as the

government retains its privileged documents." *Harbor Healthcare Systems, LP v. United States*,

5 F.4th 593, 600 (5th Cir. 2021). "It makes little sense to say that the Fourth Amendment can be

litigated only in a suppression motion when there are other types of harm arising from unlawful

searches and seizures." *Id.* at 601.

Accordingly, in such circumstances involving privileged materials, courts have permitted

pre-execution challenges to protect an individual's privilege because an injury that occurs at the

time of review cannot be wholly or adequately remedied post-execution. *See e.g. In re Search

Warrant Issued June 13, 2019*, 942 F.3d 159, 183 (4th Cir. 2019) (reversing district court's

denial of injunction on federal agents reviewing seized privileged materials obtained through

---

[5] The former special counsel's *Report on The Investigation Into Russian Interference In the 2016
Presidential Election* contains potentially privileged information, but that was not obtained
without notice and agreement. *See, e.g.,* Volume II at p 82 n. 546 (describing notice to White
House Counsel's Office in advance of interviews regarding statements by the President, "to give
the White House an opportunity to invoke executive privilege in advance of the interviews").

5

execution of a search warrant); *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3rd

Cir. 1984) (granting defendant's motion to return privileged material seized during execution of

search warrant); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (noting that

defendant opposed government's use of a filter team and sought return of records). As the

Eleventh Circuit has explained:

> The whole point of privilege is privacy. So the Intervenors' interests in preventing
> the government's wrongful review of their privileged materials lie in safeguarding
> their privacy. Once the government improperly reviews privileged materials, the
> damage to Intervenors' interests is definitive and complete.
>
> Contrary to the government's suggestion, suppression is not an adequate remedy
> for any violations. We cannot know whether criminal charges will be brought
> against the Intervenors. Yet suppression protects against only the procedural harm
> arising from the introduction at a criminal trial of unlawfully seized evidence. If
> the Intervenors are not charged, they will not have suppression available to them as
> a potential remedy. And even if they are charged and may seek suppression,
> suppression does not redress the government's intrusion into the Intervenors'
> personal and privileged affairs.

*In re Sealed Search Warrant and Application*, 11 F.4th 1235, 1247 (11th Cir. 2021) (internal

citations omitted). Any concern of delaying criminal proceedings "can be minimized by

expediting review of motions of this type." *Id.*; *see also In re Search Warrant*, 942 F.3d at 181-

82 (holding that "delay in the government's investigations here does not outweigh the harm" of

examining privileged materials).

Applying these well-founded legal principles to this case, Twitter respectfully submits

that this Court should delay compliance with the Warrant and vacate the Non-Disclosure Order

to allow Twitter to notify its user so that he may assert the privilege if he so chooses.

Investigative speed is not a sufficient justification to irreparably harm a bona fide privilege

claim.

6

Moreover, if such an executive privilege claim is asserted by the user, the D.C. Circuit has instructed what should happen next:

> the privilege is qualified, not absolute, and can be overcome by an adequate showing of need. If a court believes that an adequate showing of need has been demonstrated, it should proceed to review the documents *in camera* to excise non-relevant material. The remaining relevant material should be released. The President should be given an opportunity to raise more particularized claims of privilege if a court rules that the presidential communications privilege alone is not a sufficient basis on which to withhold the document.

*In re Sealed Case*, 121 F.3d at 745. This Court should follow the D.C. Circuit's holding and resolve the privilege issue prior to permitting "[f]ederal agents and prosecutors rummaging through" potentially privileged materials. *In re Search Warrant*, 942 F.3d at 183.

Further, seizure of privileged materials also raises thorny derivative use issues, such as the use of the privileged materials in furthering the investigation through additional warrant affidavits or witness questioning. As noted in Twitter's Motion to Vacate or Modify, no court has ever addressed the issue of executive privilege in this context — including what limitations might need to be imposed on derivative use of private presidential communications. The government should also have an interest in ensuring that its further investigative techniques are not undertaken in a manner that taints its ability to bring a successful prosecution at a future date.

As stated in its Motion to Vacate or Modify, Twitter takes no position on the applicability of executive privilege to these communications in this circumstance. Twitter does have a strong First Amendment interest in providing meaningful notice to its users. And it has an especially strong First Amendment interest in providing that notice *before* it produces the former President's account information—while he still has an opportunity to raise a meaningful privilege objection. *See Matter of Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990) ("It is axiomatic that the timing of speech is often crucial to its impact."); *Wood v. Ga.*, 370 U.S. 375,

7

FILED UNDER SEAL

392 (1962) ("Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed." ). The disclosure of private presidential communications clearly affects other parties, including Twitter's user, who was President of the United States at the time the materials sought were created, and who may retain the ability to assert that privilege now.

These are weighty and difficult questions that courts, including the Supreme Court, have wrestled with, and should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing. The government should want this issue resolved as well. "[P]rosecutors have a responsibility to not only see that justice is done, but to also ensure that justice *appears* to be done. Federal agents and prosecutors rummaging through [privileged materials] is at odds with the appearance of justice." *In re Search Warrant*, 942 F.3d at 183 (emphasis in original).

## II.    Twitter Has Acted in Good Faith and Promptly Sought Court Intervention

Twitter has promptly and expeditiously sought to comply with the Warrant in a manner that does not violate its fundamental rights to provide meaningful notice to its user. The government did not serve the Warrant until two days after obtaining it. (Gov't Mot. at 2.) Counsel for the government did not contact counsel for Twitter to alert it of the expedited nature of the Warrant until six days after serving the Warrant, which was only two days before the production deadline. (Gov't Mot. at 2.)

Upon learning of the Warrant on January 25th, counsel for Twitter immediately directed the preservation of responsive materials in Twitter's production tooling used to respond to law

8

FILED UNDER SEAL

FILED UNDER SEAL

enforcement process and began evaluating the request in good faith and with alacrity. (Declaration of ██████████ ("██ Declaration"), attached as Exhibit A, at ¶ 4.) Twitter corresponded and spoke with the government on at least 10 occasions over the week between becoming aware of the Warrant and Non-Disclosure Order and the government's filing of its Motion for an Order to Show Cause. (*Id.*) Throughout these conversations, Twitter made clear that its concerns centered on the Non-Disclosure Order limiting Twitter's ability to notify its user, and indicated throughout that Twitter had preserved data and did not intend to challenge the underlying Warrant. (*Id.*)

Specifically, as set forth in the ██████ Declaration, counsel for Twitter first learned of the Warrant and Non-Disclosure Order during a call from the government on Wednesday January 25. (*Id.*, at ¶ 2.) Counsel for Twitter attempted to call the government's counsel on January 26th but was unable to reach him. ██████ thus sent an email alerting the government that Twitter would not be able to provide a final answer to the government by the production deadline the following day, that Twitter was working on the Warrant, and that preservation of responsive data was in place. (*Id.*, at ¶ 5.) Counsel for Twitter spoke by phone with the government multiple times in an ongoing attempt to find negotiated resolution. (*Id.*, at ¶ 8.) During these calls, Twitter suggested an alternative means that it believed might satisfy both the government's interest in obtaining the data and Twitter's First Amendment interests in notifying its user if it were to produce the data. Specifically, Twitter suggested that the government could obtain the data it sought from the National Archives and Records Administration ("NARA"), which maintains a copy of the Target Account, including private presidential communications, in accordance with the Presidential Records Act. (*Id.*, at ¶ 10.)

9

FILED UNDER SEAL

The government declined Twitter's suggestion. Specifically, counsel for the government stated in a phone call the evening of January 31 that the government did not want to seek the communications from NARA, because making such a request would require notification to the former President under the Presidential Records Act. (*Id.*, at ¶ 12.) Despite Twitter's request and invitation, the government offered no suggestions of its own.

Recognizing that Court intervention would be necessary, Twitter prepared the Motion to Vacate or Modify. Outside counsel for Twitter called the government on the morning of February 2 to attempt to reach a resolution and, in the alternative, notify it that Twitter would be bringing the matter to the Court for assistance. During that call, the government rejected any entreaties and informed undersigned counsel that it was "about to file" a motion for an order to show cause and that there would be a hearing that afternoon or the following day that Twitter should attend.

To further demonstrate its good faith compliance with the Warrant while its First Amendment interests are resolved, on February 5, Twitter offered to the government to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until the Motion to Vacate or Modify is resolved. The government declined Twitter's offer.[6]

In sum, Twitter alerted the government to its concerns promptly, negotiated in good faith where it thought a resolution may be possible, sought prompt court intervention as soon as it

---

[6] In its email, the government noted: "We respectfully decline. The Chief Judge has already issued an order -- via a warrant Twitter does not challenge -- that directed Twitter to produce the records by January 27. This was a clear order from the District Court that Twitter received and is not challenging, and Twitter has deliberately chosen non-compliance. So while we appreciate the email offer, at Tuesday's hearing we intend to ask for a contempt sanction that will quickly bring Twitter into compliance with the warrant."

10

FILED UNDER SEAL

became clear that the parties were at an impasse, sought a stay of its production obligations from the Court during the resolution of its Motion to Vacate or Modify, and proposed an expedited briefing schedule to resolve its concerns at a speed that would not prejudice the government.

  Twitter respectfully submits that its actions fall well below any level of contempt:  they are precisely the steps that courts have found any responsible judicial officer ought to take.  *See, e.g., In re Search Warrant*, 942 F.3d at 182 ("We do not fault the Law Firm for seeking a negotiated resolution of these important disputes before requesting court intervention. And we will not reward the government for ignoring those efforts."); *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987) (describing a physician's motion for relief from execution of a search warrant that encompassed patient files as a "good faith" and "diligent[]" effort to "press[] the interests of his patients"); *United States v. Ritchey*, __ F. Supp. 3d __, 2022 WL 3023551, at *5 (S.D. Miss. June 3, 2022) (explaining that the government "typically" relies on "adversarial review" of proposed privilege-protection measures or "informal, good faith resolution with the targeted person to dispel "a certain level of suspicion" that otherwise attaches to the government's review of seized documents that likely contain privileged materials).

### III. **The Government's Reliance on *Google* is Misplaced**

  The government argues that Twitter's concerns regarding the Non-Disclosure Order cannot be resolved prior to production, relying on a single case in support of its position. Specifically, arguing that it has "an interest in prompt enforcement of the Warrant, regardless of any challenge to the NDO," (Motion, 3) the government cites *Google* for the proposition that the "request to stay warrant deadline pending resolution of challenge to accompanying non-disclosure order" should be denied, "noting any further delay . . . increases the risks that evidence will be lost or destroyed, heightens the chance that targets will learn of the

11

FILED UNDER SEAL

investigation, and jeopardizes the Government's ability to bring any prosecution in a timely

fashion." (*Id.*, *citing Google LLC v. United States*, 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020).)

But the government's reliance on *Google* is misplaced. Instead, the application of the factors

articulated in *Google* clearly support the relief that Twitter sought from this Court when it filed

its own Motion to Vacate or Modify.

As a threshold matter, the *Google* Court – in accordance with Twitter's position in its

Motion – applied strict scrutiny to the evaluation of the government's non-disclosure order

barring Google from notifying its users in that case.

The factors that the government cites from *Google* to argue that production must

immediately precede without waiting for resolution of Twitter's Motion to Vacate or Modify are

inapposite here. First, the "further delay" that the *Google* Court found so unappealing and that

the government cites in its brief is not comparable to the timeline here. In *Google*, the parties

had already fully litigated the validity of the non-disclosure order, delaying the government's

ability to obtain the materials it sought. Here, the Court has not yet had a chance to rule on the

non-disclosure order. And Twitter has moved swiftly to minimize any possible delays. Within

*days* of being notified of the Warrant and the Non-Disclosure Order, Twitter began discussions

with the government regarding how it could simultaneously comply with its production

obligations and maintain its First Amendment right to meaningfully notify its user. As soon as it

determined that the parties were at an impasse, which was within a *week* of being notified of the

existence of the Warrant, Twitter brought the issue before this Court for resolution. Twitter

proposed an expedited briefing schedule *of five days* to achieve a prompt resolution with no

prejudice to the government, which the government rejected. For the government to now claim

that Twitter's Motion is seeking "indefiniteness and interference" mischaracterizes the facts.

12

Twitter has not delayed nor acted with any contempt; Twitter has acted with all deliberate speed in promptly seeking Court assistance – including a stay of its production obligations while the Court addressed its concerns.

Second, unlike in the *Google* case, there is little risk that the evidence sought in this case will be "lost or destroyed" during the pendency of Twitter's Motion to Vacate or Modify, as Twitter has preserved the data in its system used for responding to law enforcement process. Moreover, a copy of the Target Account is also available at NARA, which is responsible for securing and maintaining Presidential records. The risk of spoliation of data that was arguably present in the *Google* case is wholly absent here.

Third, unlike the *Google* case, there is simply no credible risk that delaying production pending resolution of Twitter's Motion will "heighten the chance that targets will learn of the investigation" – because they already know. (Gov't. Mot. At 3.) As set forth extensively in Twitter's Motion to Vacate or Modify, unlike in the *Google* case, the publicity surrounding the investigations into former president Trump is widespread and unprecedented. (*See* Exhibit B, containing an appendix of news articles cited in Twitter's Motion to Vacate or Modify.) Additionally, other investigations have already publicly targeted the user's communications through the same Target Account. *See, e.g.,* Congressional Subpoena to President Trump from the Select Committee to Investigate the January 6th Attack on the United States Capital, Oct. 21, 2022 (requesting, among other documents, "communications sent or received . . . relating or referring in any way to any… tweet, or other social media post from November 3, 2020 to January 6, 2021."). This is wholly distinct from any typical covert law enforcement investigation where the targets are unaware of the government's activities, including the investigation at issue in the *Google* case. In this case, the Attorney General of the United States

13

FILED UNDER SEAL

held a nationally televised press conference to announce the appointment of the Special Counsel and his mandate to investigate the former President.

Finally, although the government argues that resolving Twitter's First Amendment concerns would "jeopardize the government's ability to bring any prosecution in a timely fashion," (Gov't. Mot. At 3), Twitter has moved with alacrity and proposed a briefing and hearing schedule that would have concurrently resolved the concerns of both the government and Twitter within days.

Rather than rely on *Google*, which is clearly inapposite, this Court should follow the Supreme Court's mandate that the status quo should be maintained pending a final judicial determination of the government's prior restraint on Twitter's speech. *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) ("any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained"). Applying those principles here, the Court should stay any production obligation until the issues raised in Twitter's Motion to Vacate or Modify are resolved.

As a continued demonstration of its good faith efforts to comply with this Court's orders while its First Amendment interests are resolved, Twitter continues to be willing to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until the Motion to Vacate or Modify is resolved — and in the event the non-disclosure order is quashed or modified and notice is permitted, until 7 days after such notice is given.

14

FILED UNDER SEAL

## CONCLUSION

For the foregoing reasons, Twitter respectfully requests that the government's Motion for

an Order to Show Cause be denied, and the Court stay compliance with the Warrant until Twitter's

Motion to Vacate or Modify is resolved.

Dated: February 6, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
*admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.*
*admission pending)*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

George P. Varghese *(pro hac vice pending)*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

*Counsel for Twitter, Inc.*

15

FILED UNDER SEAL

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February 2023, I caused the foregoing motion to be served by email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

16

FILED UNDER SEAL

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |

**EXHIBIT A**
**TO TWITTER'S OPPOSITION TO**
**GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE**

1

FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31 - BAH

**UNDER SEAL**

## DECLARATION OF ██████████

I, ████████████, declare as follows:

1.  I am the Senior Director of Legal for Twitter, Inc. ("Twitter"). Twitter is a global social media platform that fosters public and private conversations amongst its 450 million active monthly users. I make this Declaration based on my own personal knowledge and investigation, and if called as a witness to testify, I could and would testify competently to the following facts.

2.  On Wednesday, January 25, at 4:54pm I received an incoming call from Assistant Special Counsel Greg Bernstein. He informed me that the Special Counsel's Office had previously served a search warrant on Twitter for data associated with the account @realDonaldTrump ("Warrant"). I had not heard anything about this Warrant prior to the call, which I told him. I said that I would need to look into the matter and revert. He responded that they were looking for an on time production, in two days. I said that without knowing more or taking any position that would be a very tight turnaround for us.

2

3. Later that day, at 7:25pm, I received an email from Mr. Bernstein, forwarding an earlier email from 5:06pm from him addressed to his colleagues but intended for me that he had forgotten to copy me on, attaching copies of the Warrant and the Non-Disclosure Order.

4. I directed the preservation of data available in our production environment associated with the @realDonaldTrump account, and have confirmed that the available data was preserved.

5. On Thursday, January 26, I placed an outgoing call to Mr. Bernstein, but was unable to reach him.  I followed up with an email sent at 7:37pm, stating, "We are not going to be able to get back to you by tomorrow.  But, I can confirm that the warrant is working its way through our system, and preservation is in place."

6. At 7:49pm on Thursday, I missed an incoming call from Mr. Bernstein.  He did not leave a message.

7. At 10:06pm on Thursday, I received an email from Mr. Bernstein seeking to schedule a call for the following day.

8. On Friday, January 27, I called Mr. Bernstein and confirmed that the Warrant was being processed through the system but that we were not going to be able to respond by the 27th.  I explained that we needed time to consider the Warrant and Non-Disclosure Order and we would get back to them early next week with an update.  Mr. Bernstein pressed me for more information, and I assured him I was one of the most senior lawyers at the company, and the fact that I was attending to these questions underscored that the company was prioritizing the matter and taking it very seriously.  I reiterated that it was clearly a matter of great

3

importance and I had only had it for two days.  We agreed to talk again on

Tuesday after 5 pm ET due to Mr. Bernstein's schedule that day.

9.  At 5:02pm ET on Tuesday, January 31, I called Mr. Bernstein as arranged. He did

not answer.

10. At 5:07pm ET, Mr. Bernstein called me back.  I told him that I appreciated his

patience.  We had had a chance to review the warrant and NDO, consult outside

counsel, and also gather internal information potentially responsive to Attachment

B.  I explained that it is essential to Twitter's business model (including our

commitment to privacy, transparency, and neutrality) that we communicate with

users about law enforcement efforts to access their data.  I shared that on

occasion, we have challenged non-disclosure orders, whether in follow-up

conversations with prosecutors or government officials, or in court filings.  I

explained that we had reviewed the Non-Disclosure Order here, but we did not

see how it meets the factors outlined in § 2705(b), given the intense publicity

around the investigation.  I asked, recognizing that he may not be able to answer,

whether the Special Counsel had sought this information from the National

Archives Records Administration ("NARA"), since it maintains a copy of the

Target Account and have much of the information called for in the Warrant.  I

asked that he consider withdrawing the Non-Disclosure Order, given its

restriction on Twitter's First Amendment rights to communicate with its user.  I

told him that we felt that the investigation of the Former President could not be

more publicized.  I explained that respectfully, there did not appear to be a

legitimate compelling government interest that justifies restricting Twitter's First

4

Amendment rights to meaningfully communicate with its users. I raised specifically the claim in the Non-Disclosure Order that the former President was likely to flee from prosecution if the Non-Disclosure Order or Warrant was disclosed.  I told Mr. Bernstein that it seemed very unlikely that the former President presents a risk of flight because of a warrant for his Twitter data.  I explained that in our view, Twitter's First Amendment interests are particularly important here where the warrant could implicate issues of executive privilege. I told Mr. Bernstein that Twitter takes no position on these issues, as they are for the former President to assert, if at all. I offered to continue discussing the matter. I told him that I understood he had a job to do, and that I had also served as a federal prosecutor, and emphasized that my job was to protect Twitter's interests and our users' data while meeting our legal obligations. He responded that he understood, and appreciated my professionalism.

11.  At 6:58pm ET on January 31, I missed a call from Mr. Bernstein.  He followed up with an email at 7:05pm asking me to call him back, indicating that it was time sensitive.

12. At 9:08pm ET on January 31, I returned Mr. Bernstein's call.  He asked me to clarify our position, specifically on whether we viewed the Warrant and Non-Disclosure Order as linked or separate.  Mr. Bernstein stated that they did not want to obtain data from NARA, as it would require notification pursuant to the Presidential Records Act.  I told him that Twitter's position would be that we should not produce until we resolved our questions as to the NDO.  He asked whether I had any case law support for our position, and I said that I would collect

5

it and provide to him.  He asked that I provide it by end of the next day.  I told

Mr. Bernstein that I was traveling to San Francisco the next day, but would make

sure to get him support for our position.

13. On February 1, at 10:38am, I sent an email to Mr. Bernstein confirming that I

would send an email with support for Twitter's position later that evening.

14. On February 1, at 10:14pm, I sent the following email to Mr. Bernstein:  "As

discussed last night, I want to be clear that Twitter is not taking a position on the

underlying warrant. That said, we continue to believe that production of

responsive data prior to a resolution of Twitter's questions around the validity of

the non-disclosure order in this case would be inappropriate in light of clear

judicial directives that the status quo should be preserved pending final judicial

resolution of questions around the prior restraint of speech. *See Elrod v. Burns*,

427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury.") (*citing*

*New York Times Co. v. United States*, 403 U.S. 713 (1971)); *Freedman v. State of*

*Md.*, 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial

determination on the merits must similarly be limited to preservation of the status

quo for the shortest fixed period compatible with sound judicial resolution.");

*Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) ("any restraint prior to

judicial review can be imposed only for a specified brief period during which the

status quo must be maintained"). Although I understand your position that the

NDO and the warrant could be litigated separately, we remain unclear as to what

6

FILED UNDER SEAL

remedy DOJ would propose in this unique situation in the event that the NDO is

deemed invalid yet the materials have already been reviewed by your team. We

are open to discussing any suggestions you might have. Separately, we will want

to further discuss with you Attachment B and technical issues we will need to

work through in responding once this issue is resolved. I've also copied George

Varghese and Ben Powell of WilmerHale, who are assisting us in this matter."

In accordance with LCrR49(f)(5), I declare under penalty of perjury that the foregoing is true and correct. Executed on February 5, 2023.

Senior Director, Legal
Twitter, Inc.

7

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH <br><br> **UNDER SEAL** |

**EXHIBIT B**
**TO TWITTER'S OPPOSITION TO**
**GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE**



# POLITICO

**CONGRESS**

## 2 top Pence aides appear before Jan. 6 grand jury

Marc Short and Greg Jacob have both testified recently, according to two people familiar with the matter.



Marc Short, who served as chief of staff to former Vice President Mike Pence, is one of the most significant witnesses known to face grand jury questions related to Jan. 6. | Patrick Semansky/AP Photo

By **KYLE CHENEY**
07/25/2022 04:26 PM EDT

   

Two of former Vice President Mike Pence's top White House aides have testified recently to a federal grand jury investigating matters connected to the Jan. 6, 2021, attack on the Capitol, according to two people familiar with the matter.

Marc Short, Pence's former chief of staff, testified last week under subpoena, while Pence's former chief counsel Greg Jacob, also testified recently, though the timing and circumstances of his appearance were not immediately clear. Short was spotted by ABC cameras exiting the federal courthouse Friday, on the same day Donald Trump's ally Steve Bannon was convicted of contempt of Congress for defying a Jan. 6 select committee subpoena.

AD

Both Short and Jacob cooperated with the Jan. 6 select committee, testifying in January and February this year, respectively. Jacob was also a star witness for the panel, testifying at a public hearing in June about helping Pence fend off Donald Trump's effort to deputize the vice president to disrupt the transfer of power to Joe Biden.

Short and Jacob are two of the most significant witnesses known to face grand jury questions related to Jan. 6. Both were in key meetings on Jan. 4 and 5, 2021, as Trump attorney John Eastman worked to persuade Pence to adopt a fringe legal theory that would permit the then-vice president to single-handedly overturn the election certification on Jan. 6.

Trump was present for the Jan. 4 meeting, when Pence rejected his and Eastman's entreaties. Short and Jacob were also both with Pence on Jan. 6 as a

mob stormed the Capitol, sending them all fleeing for safety. Jacob's email exchanges with Eastman amid the chaos have become crucial pieces of evidence for Jan. 6 investigators, showing Eastman continuing to lean on Pence and Jacob even as violence raged.

Jacob's memos and notes, explaining why he viewed Eastman's effort as illegal, have proven significant documents for investigators. Among his conclusions: State legislatures had refused, as of Jan. 6, to certify alternate slates of electors, leaving the false slates assembled by pro-Trump activists in multiple states without any claim of authority.

Eastman had previously embraced that notion as well, according to emails and correspondence obtained by the Jan. 6 committee, but pushed ahead with Trump's plan anyway.

Short testified to the Jan. 6 select committee in January about Pence's efforts to convince Trump that he lacked the power to overturn the election, a message Pence relayed numerous times in the weeks before Jan. 6. But Trump, relying on a cadre of fringe attorneys, pushed a theory that Pence — who was charged by the Constitution with presiding over the count of electoral votes on Jan. 6 — could unilaterally refuse to count dozens of electors for Joe Biden, or postpone the count altogether.

Short's testimony was featured in the public hearings the House's Jan. 6 select committee has held over the last several weeks. Jacob testified publicly alongside former federal judge Michael Luttig, who helped Pence develop a

**FILED UNDER:** CONGRESS, MIKE PENCE, DONALD TRUMP, DONALD TRUMP 2020, 

The select committee has publicly expressed uncertainty about whether it will



2/3/23, 4:58 PM                                     2 top Pence aides appear before Jan. 6 grand jury - POLITICO

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

JA61

 An off c al webs te of the Un ted States government
Here's how you know


JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                        Friday, November 18, 2022

# Appointment of a Special Counsel

Attorney General Merrick B. Garland announced today the appointment of former career Justice Department prosecutor and former chief prosecutor for the special court in The Hague, Jack Smith, to serve as Special Counsel to oversee two ongoing criminal investigations. The first is the investigation, as described in court filings in the District of Columbia, into whether any person or entity unlawfully interfered with the transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021. The second is the ongoing investigation involving classified documents and other presidential records, as well as the possible obstruction of that investigation, referenced and described in court filings submitted in a pending matter in the Southern District of Florida.

"Based on recent developments, including the former President's announcement that he is a candidate for President in the next election, and the sitting President's stated intention to be a candidate as well, I have concluded that it is in the public interest to appoint a special counsel," said Attorney General Garland. "Such an appointment underscores the Department's commitment to both independence and accountability in particularly sensitive matters. It also allows prosecutors and agents to continue their work expeditiously, and to make decisions indisputably guided only by the facts and the law."

The Attorney General also stated, "Although the Special Counsel will not be subject to the day-to-day supervision of any official of the Department, he must comply with the regulations, procedures, and policies of the Department. I will ensure that the Special Counsel receives the resources to conduct this work quickly and completely. Given the work done to date and Mr. Smith's prosecutorial experience, I am confident that this appointment will not slow the completion of these investigations. The men and women who are pursuing these investigations are conducting themselves in accordance with the highest standards of professionalism. I could not be prouder of them. I strongly believe that the normal processes of this Department can handle all investigations with integrity. And I also believe that appointing a Special Counsel at this time is the right thing to do. The extraordinary circumstances presented here demand it. Mr. Smith is the right choice to complete these matters in an even-handed and urgent manner."

Special Counsel Smith has resigned as the chief prosecutor for the special court in The Hague charged with investigating and adjudicating war crimes in Kosovo.

---

**Attachment(s):**
Download 2022.11.18_order_5559-2022.pdf

**Component(s):**
Office of the Attorney General

**Press Release Number:**
22-1237

*Updated November 18, 2022*

# POLITICO



**LEGAL**

## 'Decisions are imminent': Georgia prosecutor nears charging decisions in Trump probe

Fulton County District Attorney Willis' remark came as she urged a judge to oppose calls to publicly release the findings of her yearlong investigation.



Fani Willis has spent the last year investigating Donald Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. | Drew Angerer/Getty Images

By **KYLE CHENEY**
01/24/2023 03:55 PM EST

   

The Atlanta-area district attorney investigating Donald Trump's effort to subvert the 2020 election indicated on Tuesday that decisions on whether to seek the indictment of the former president or his associates were "imminent."

"Decisions are imminent," Fulton County District Attorney Fani Willis said during a Tuesday court hearing called by the Georgia trial court judge overseeing the "special purpose grand jury" that Willis has used to gather evidence over the last year.

AD

Willis' remark came as she urged the judge, Robert McBurney, to oppose calls to publicly release the findings of her yearlong probe, which she conducted alongside the special grand jury to examine Trump and his inner circle.

Willis has spent the last year investigating Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. The special grand jury probed Trump's Jan. 2 phone call to Georgia Secretary of State Brad Raffensperger, asking him to "find" just enough votes to put him ahead of Joe Biden in the state. And it pursued evidence about Trump's broader national effort to subvert the election, calling top allies like his White House chief of staff Mark Meadows, former national security adviser Michael Flynn, attorney John Eastman and Sen. Lindsey Graham (R-S.C.).

The special grand jury concluded its investigation earlier this month, dissolving in early January, and recommended that its findings be released publicly. McBurney then called for a hearing to discuss whether to follow the panel's recommendation or maintain the secrecy of the report. Willis told the judge that making the report public could jeopardize impending prosecutions.

"In this case, the state understands the media's inquiry and the world's interest. But we have to be mindful of protecting future defendants' rights," Willis said, emphasizing that multiple people could face charges.

Tuesday's discussion was the result of Georgia's unusual grand jury law, which permits prosecutors to impanel a "special purpose grand jury" that has no power to make formal indictments but can help prosecutors gather evidence about a specific topic. If Willis opts to pursue charges against Trump or others, she needs to present her evidence to a traditional grand jury, which could then issue indictments.

Thomas Clyde, an attorney representing several media outlets supporting the release of the report, urged McBurney to side with the grand jurors rather than Willis.

"We believe the report should be released now and in its entirety," Clyde said.

He noted that findings in criminal investigations are often released publicly even while investigations and grand jury proceedings continue.

McBurney noted that Willis' probe has been accompanied by an extraordinary release of information and evidence by the House Jan. 6 select committee and from witnesses being called before a federal grand jury probing the same matters, none of which had derailed Willis' probe. He also noted that there was little to stop individual grand jurors from simply telling others about the findings in their report.

But McBurney said he wanted more time to consider the arguments and said any ruling he made would provide significant advance notice before the potential release of the report.

**FILED UNDER:** DONALD TRUMP, DONALD TRUMP 2020, GEORGIA, ATLANTA, VOTING ISSUES, ⋯



## Huddle
A play-by-play preview of the day's congressional news

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▼

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

_____

© 2023 POLITICO LLC

# MaddowBlog

From The Rachel Maddow Show

**ALL MADDOWBLOG POSTS     THE RACHEL MADDOW SHOW     FULL EPISODES     PODCASTS**

**< PREVIOUS POST**                                            **NEXT POST >**



   00:00 / 06:35                       CC

# DOJ seizes Team Trump phones as part of intensifying Jan. 6 probe

*If the Mar-a-Lago scandal weren't enough, the Justice Department's investigation into Jan. 6 is intensifying in ways that should make Team Trump nervous.*

   Sept. 13, 2022, 8:00 AM EDT

**By Steve Benen**

When it comes to the many ongoing scandals surrounding Trump World, it's tempting to think the Mar-a-Lago controversy is the most serious. After all, the former president stands accused of

stealing classified materials, refusing to give them back, and obstructing the retrieval process. There's an ongoing criminal investigation, and indictments are a distinct possibility.

But by some measures, the most dramatic scrutiny of Donald Trump and his team remains the Justice Department's criminal probe of the Jan. 6 attack and the Republicans' efforts to overturn the election results.

For months, there was ample speculation about whether investigators were moving forward with any vigor at all. As the latest New York Times reporting suggests, those questions continue to get answers.

> *Justice Department officials have seized the phones of two top advisers to former President Donald J. Trump and blanketed his aides with about 40 subpoenas in a substantial escalation of the investigation into his efforts to subvert the 2020 election, people familiar with the inquiry said on Monday. The seizure of the phones, coupled with a widening effort to obtain information from those around Mr. Trump after the 2020 election, represent some of the most aggressive steps the department has taken thus far in its criminal investigation into the actions that led to the Jan. 6, 2021, assault on the Capitol by a pro-Trump mob.*

According to the Times' reporting, much of which has been confirmed by NBC News, federal agents executed court-approved search warrants, taking the phones of at least two people – Trump lawyer Boris Epshteyn and campaign strategist Mike Roman – while also issuing subpoenas to a variety of figures, including Dan Scavino, Trump's former social media director, and Bernie Kerik.

The subpoenas, according to the Times, were related to the investigation into the fake electors scheme.

To quickly recap for those who might benefit from a refresher, let's revisit our earlier coverage and review how we arrived at this point. It was in March when the Times first reported that federal prosecutors "have substantially widened their Jan. 6 investigation to examine the possible culpability of a broad range of figures involved in former President Donald J. Trump's efforts to overturn the results of the 2020 election."

It raised a few eyebrows for a reason: The Justice Department hasn't made a lot of noise about its Jan. 6 probe, but the reporting suggested it was eyeing Team Trump, and not just rank-and-file

rioters who launched their assault in his name.

Around the same time, The Washington Post also reported that the federal grand jury had "issued subpoena requests to some officials in former president Donald Trump's orbit who assisted in planning, funding and executing the Jan. 6 rally."

## Recommended



MADDOWBLOG

**'Peaceful transition': Pompeo has a flawed memory of Jan. 6**



MADDOWBLOG

**McCarthy denounces 'turmoil' while imposing debt ceiling turmoil**

In the months that followed, the grand jury heard from top members of former Vice President Mike Pence's team. As part of the same probe, federal investigators descended on Jeffrey Clark's home; FBI agents executed a search warrant against Trump lawyer John Eastman; and Ali Alexander, the founder of the "Stop the Steal" group that organized a Jan. 6 rally, also testified.

We also learned a month ago that a grand jury subpoena made a sweeping demand for "all materials, in whatever form" that the National Archives had given to Congress' Jan. 6 committee, including "records from the files of Mr. Trump's top aides, his daily schedule and phone logs and a draft text of the president's speech that preceded the riot."

It's against this backdrop that federal law enforcement has seized some Trump advisers' phones and blanketed his aides with about 40 subpoenas.

It's unlikely that anyone would characterize the Justice Department's probe as swift or rushed, but let there be no doubt: This investigation exists and it's obviously intensifying.

For the former president and his political operation, this is not at all good news.

 Steve Benen

Steve Benen is a producer for "The Rachel Maddow Show," the editor of MaddowBlog and an MSNBC political contributor. He's also the bestselling author of "The Impostors: How Republicans Quit Governing and Seized American Politics."

---

< **PREVIOUS POST**

Monday's Mini-Report, 9.12.22

---

**NEXT POST** >

Trump lawyers: Mar-a-Lago scandal is a 'document storage dispute'

---

**LATEST POST**

'Peaceful transition': Pompeo has a flawed memory of Jan. 6

---

**Sponsored Stories**                                          by Taboola

FINITION

hotos] Hilarious Signs Employees Have Had To Deal With.

GHTY SCOOPS

e Oldest Stars Who Are Still Living in 2023.

---

SPONSORED / DICK'S SPORTING GOODS

## Nike Zoom Freak 4 Basketball Shoes, Women's

SPONSORED / MACY'S

# CeCe Sakura Delight Puff-Sleeve Dress

SPONSORED / DEFINITION

**[Photos] Hilarious Signs Employees Have Had To Deal With.**

SPONSORED / MIGHTY SCOOPS

**The Oldest Stars Who Are Still Living in 2023.**

SPONSORED / HOMEBUDDY

**Here's What New Walk-in Shower Should Cost You In 2023**

SPONSORED / HEALTHY BLOOD

**Diabetes Might Not Be From Sweets! Meet The Number One Enemy**

SPONSORED / DEFINITION

# M*A*S*H: 15 Hidden Details You Never Noticed

SPONSORED / HEALTH BENEFITS

# Dentists Are Surprised: BOSTON Man Relieves Tooth Decay With This Natural Ingredient

SPONSORED / THE MOTLEY FOOL

**A Slam Dunk if you Need a Balance Transfer (21 months)**

SPONSORED / TURBOTAX

**Claiming the Home Office Tax Deduction**

SPONSORED / RENUITY BATH EXPERTS

**Your Bathroom Will Never Look The Same Thanks To This 1-Day Transformation**

SPONSORED / BUZZDAILY WINNERS

JA73

**The Most Realistic PC Game of 2022**

SPONSORED / HEALTHY GURU

## New Weight Loss Delicacy Has Americans Dropping Pounds

SPONSORED / SUNVALUE

## Massachusetts: Gov Will Cover The Cost To Install Solar if You Live In These Zip Codes

| | |
|---|---|
| ABOUT | DO NOT SELL MY PERSONAL INFORMATION |
| CONTACT | CA NOTICE |
| HELP | TERMS OF SERVICE |
| CAREERS | MSNBC SITEMAP |
| MSNBC STORE | CLOSED CAPTIONING |
| AD CHOICES | ADVERTISE |
| PRIVACY POLICY | |

© 2023 NBC UNIVERSAL

NEWS        MSNBC        TODAY

# POLITICO



**LEGAL**

## DOJ sends some 40 subpoenas to Trump aides

The subpoenas are a step forward in the investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol.



Violent insurrectionists loyal to former President Donald Trump climb the west wall of the U.S. Capitol in Washington, D.C., on Jan. 6, 2021. | Jose Luis Magana/AP Photo

By **OLIVIA OLANDER**
**09/12/2022 10:26 PM EDT**

   

The Justice Department has issued some 40 subpoenas to aides of former President Donald Trump regarding Trump's efforts to overturn the 2020 presidential election, POLITICO confirmed Monday.

The subpoenas, first reported by The New York Times, are a major step forward in the ongoing investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol. They also come as Trump is dealing with a separate inquiry into his handling of presidential records and classified material that he took with him to his home in Florida after the end of his presidency. Trump's lawyers and the Justice Department are currently in a protracted legal battle over the custody of those records.

AD

Former Trump adviser Stephen Bannon was the first to discuss the recent batch of subpoenas, saying on his podcast last week that 35 had been issued. That number appears to have been a slight lowballing of the actual figure.

Among matters that investigators are reportedly looking into is Trump's post-election fundraising and his efforts to overturn the election by appointing false electors. As POLITICO previously reported, a grand jury issued subpoenas last week seeking information about Trump's Save America PAC.

On his show Monday night, Fox News host Tucker Carlson said he had obtained a copy of a subpoena that was issued and that it pertained to "any claim that the vice president and/or the president of the Senate had the

JA76

authority to reject or to choose not to count presidential electors." POLITICO

**FILED UNDER:** FOX NEWS, TUCKER CARLSON, DEPARTMENT OF JUSTICE, DONALD TRUMP, 

# Huddle

A play-by-play preview of the day's congressional news

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▼

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC



---

# Justice Department subpoenas dozens of Trump aides in apparent escalation of investigation, according to reports

*The investigation of Trump's effort to overturn the 2020 election and the Capitol attack on Jan. 6, 2021, is separate from the seizure of documents from Mar-a-Lago.*



**Bart Jansen**
USA TODAY

Published 7:43 p.m. ET Sept. 12, 2022 | **Updated 8:52 p.m. ET Sept. 12, 2022**

## Key Points

- The Justice Department subpoenaed dozens of Trump aides and seized at least two phones.

- Some subpoenas sought information from people who challenged the 2020 election results.

- Some subpoenas focused on Trump fundraisers and organizers of his rally before the Capitol riot.

---

WASHINGTON – The Justice Department issued dozens of subpoenas to Donald Trump's aides and associates for information about the 2020 election and the Capitol attack on Jan. 6, 2021, according to The New York Times and CNN.

The flurry of subpoenas suggested the investigation, which is separate from the seizure of Trump administration documents from Mar-a-Lago, is picking up pace.

At least two Trump aides, Boris Epshteyn and Mark Roman, had their phones seized as evidence, according to the Times. Epshteyn declined comment.

The subpoenas seek information about the Trump campaign's plan to organize alternate slates of electors in states President Joe Biden won. Epshteyn had copied on emails in late 2020 from Trump lawyer John Eastman, who developed the plan.

Eastman has already been subpoenaed and had his phone seized. Eastman earlier refused to answer questions from the House panel investigating the Capitol attack or a grand jury in

Georgia based on his Fifth Amendment right against self-incrimination.

Another subpoena recipient was Bernard Kerik, the former New York City police commissioner, who coordinated the investigation of claims of voter fraud with Trump lawyer Rudy Giuliani.

Kerik's lawyer, Timothy Parlatore, told USA TODAY that Kerik was willing to testify to federal investigators as he had already before the House committee. Kerik had already turned over examples of probable case of election fraud to the Justice Department for further investigation in late 2020, Parlatore said.

Former Attorney General Bill Barr has testified to the House panel that the department found no evidence to support the Trump campaign's claims of widespread fraud.

Parlatore said the department's latest subpoena read as if the current investigation had no focus and asked Kerik about names he didn't recognize.

"The normal DOJ subpoena looks like rifle shots," Parlatore said. "This looks like a whole bunch of scatter-shot shotgun blasts, almost like a spray-and-pray mindset."

The latest subpoenas included one to Dan Scavino, Trump's former social-media director, according to the Times. Trump promoted his fundraising to fight the results of the 2020 election and his rally the morning of Jan. 6 through social media. Scavino's lawyer, Stanley Woodward Jr., declined comment.

Others who were subpoenaed include former Trump campaign manager Bill Stepien and Sean Dollman, the campaign's chief financial officer, according to CNN.

The Justice Department declined comment on the subpoenas.

The investigation is separate from the seizure of Trump administration documents, which included dozens of classified records, from Mar-a-Lago. In that probe, federal investigators said they were looking for evidence of violations of the Espionage Act for mishandling national defense documents or of obstruction of justice.

**More:** Will Trump or his allies face charges over Jan. 6? Legal experts explain hurdles DOJ faces

The investigation is also separate, but overlaps with a local investigation in Fulton County, Georgia. District Attorney Fani Willis has convened a special grand jury to investigate fake

electors and other potential election fraud by Trump and his campaign. The grand jury has subpoenaed Eastman and Giuliani, among others.

The Justice Department earlier declined without explanation to press charges against Scavino or former White House chief of staff Mark Meadows over defying subpoenas from the House committee investigating the attack. But the department charged Trump political strategist Steve Bannon, who was convicted of contempt, and former trade adviser Peter Navarro, who awaits trial.

**The New York Times** | https://www.nytimes.com/2022/06/27/us/politics/john-eastman-jan-6.html

# Federal Agents Seized Phone of John Eastman, Key Figure in Jan. 6 Plan

The action suggests that the criminal inquiry is accelerating into the efforts to help overturn the results of the 2020 election.

**By Alan Feuer and Adam Goldman**

June 27, 2022

Federal agents armed with a search warrant have seized the phone of John Eastman, a lawyer who advised former President Donald J. Trump on key elements of the effort to overturn the results of the 2020 election, according to a court filing by Mr. Eastman on Monday.

The seizure of Mr. Eastman's phone is the latest evidence that the Justice Department is intensifying its sprawling criminal investigation into the various strands of Mr. Trump's efforts to remain in power after he was defeated for re-election.

In the past week alone, the department has delivered grand jury subpoenas to a variety of figures with roles in backing Mr. Trump's efforts and it carried out at least one other search of a key figure.

The filing by Mr. Eastman, a motion to recover property from the government, said that F.B.I. agents in New Mexico, acting on behalf of the Justice Department's Office of the Inspector General, stopped Mr. Eastman as he was leaving a restaurant last Wednesday and seized his iPhone.

A copy of the warrant included as an exhibit in Mr. Eastman's filing said that the phone would be taken to either the Justice Department or the inspector general's forensic lab in Northern Virginia.

According to the filing, the seizure of Mr. Eastman's phone came on the same day that federal agents raided the home and seized the electronic devices of Jeffrey Clark, a former Justice Department official who was central to Mr. Trump's attempts to coerce the department's leaders into backing his false claims of fraud in the election.

The inspector general's office, which has jurisdiction over investigations of Justice Department employees, also issued the warrant in the search of Mr. Clark's home, a person familiar with the investigation said. The warrant indicated that prosecutors are investigating Mr. Clark for charges that include conspiracy to obstruct the certification of the presidential election, the person familiar with the investigation said.

A spokesman for the U.S. attorney's office in Washington, which is overseeing the inquiry, declined to comment on Mr. Eastman's court filing.

With Mr. Eastman and Mr. Clark, the department is gathering information about two lawyers who were in close contact with Mr. Trump in the critical weeks before the Jan. 6, 2021, attack on the Capitol by a pro-Trump mob.

The advice they were giving Mr. Trump involved separate but apparently intersecting proposals to provide him with a means of averting his defeat, with Mr. Clark focused on using the power of the Justice Department on Mr. Trump's behalf and Mr. Eastman focused on disrupting the congressional certification of the election's outcome.



Jeffrey Clark at a news conference in October 2020.  Yuri Gripas/Reuters

The search warrant executed on Mr. Eastman by the inspector general's office may have been issued because of his connections to Mr. Clark, which were briefly touched on at a hearing by the House select committee on Jan. 6 last week, a day after the raids on the two men.

At the hearing, Representative Liz Cheney, Republican of Wyoming and the panel's vice chairwoman, said that Ken Klukowski, a Justice Department lawyer who was in contact with Mr. Eastman, also helped Mr. Clark draft a letter to Gov. Brian Kemp of Georgia stating falsely that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

————

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

Did you find this information helpful?                                    Yes      No

The letter further recommended that Mr. Kemp call a special session of the state legislature to create "a separate slate of electors supporting Donald J. Trump."

Mr. Klukowski, who briefly served under Mr. Clark at the Justice Department and had earlier worked at the White House budget office, also "worked with John Eastman," Ms. Cheney said during the hearing. She went on to describe Mr. Eastman as "one of the primary architects of President Trump's scheme to overturn the election."



Ken Klukowski, center, a Justice Department lawyer who was in contact with Mr. Eastman, arrived for a meeting with the Jan. 6 House select committee late last year.  Al Drago for The New York Times

The inspector general's office has the authority to look into any public corruption crimes committed by Justice Department personnel, said Michael R. Bromwich, a former department inspector general during the Clinton administration.

"Those investigations can lead to people and places outside the Justice Department," Mr. Bromwich said. "There must be a connection between Eastman and someone who worked at the department."

A former law professor in California, Mr. Eastman helped develop and promote a brazen plan to justify having Vice President Mike Pence single-handedly block or delay certification of the Electoral College results showing Joseph R. Biden Jr.'s victory in the 2020 election. In a series of meetings and phone calls, Mr. Trump and Mr. Eastman pressured Mr. Pence to put the plan into action when Mr. Pence presided over a joint session of Congress on Jan. 6, 2021.

Mr. Pence's refusal to go along helped fuel the violence that overwhelmed the Capitol that day and became a bloody symbol of Mr. Trump's efforts to subvert the outcome of the election. Earlier this year, a federal judge in California considering a civil suit concerning the release of Mr. Eastman's emails to the House select committee concluded that Mr. Eastman and Mr. Trump most likely committed two felonies — obstruction of a proceeding before Congress and a conspiracy to defraud the United States — for their joint role in the pressure campaign against Mr. Pence.

Mr. Eastman was also instrumental in advising Mr. Trump to create purported slates of electors backing Mr. Trump in key swing states won by Mr. Biden. These false pro-Trump electors were intended to give Mr. Pence a quasi-legal rationale for delaying or blocking the Electoral College certification on Jan. 6, or even trying to throw the election to the House of Representatives.

Last week, a federal grand jury in Washington issued subpoenas to several people who prosecutors believe may have information about the so-called fake elector plan. Among those who received subpoenas were top Republicans in key swing states who served as purported pro-Trump electors, including Kelli Ward, the chairwoman of the Arizona Republican Party, and David Shafer, the chairman of the Georgia Republican Party.

The subpoenas, some of which have been obtained by The New York Times, show that prosecutors are seeking information about lawyers like Mr. Eastman who were close to Mr. Trump during the chaotic postelection period. The subpoenas also seek information on other lawyers like Rudolph W. Giuliani, who oversaw Mr. Trump's election challenges in general, and Kenneth Chesebro, who wrote legal memos laying out the viability of the fake elector plan.

In Mr. Eastman's court papers, filed in Federal District Court in New Mexico, he says that the search warrant did not mention what underlying crime prosecutors were looking into by seizing his phone.

On Monday night, Mr. Eastman appeared on Tucker Carlson's Fox News show and discussed the seizure of his phone, repeating his complaint that the warrant never specified what violation of the law prosecutors were investigating.

"There was no indication of any crime this is connected to," he said.

**The New York Times** | https://www.nytimes.com/2022/06/23/us/politics/jeffrey-clark-trump-justice-dept.html

# Federal Authorities Search Home of Trump Justice Dept. Official

Investigators went to the suburban Washington home of Jeffrey Clark in connection with the sprawling inquiry into the Jan. 6 attack and the effort to overturn the 2020 election.

By Alan Feuer, Adam Goldman and Maggie Haberman

June 23, 2022

Federal investigators carried out an early-morning search on Wednesday at the home of Jeffrey Clark, a former Justice Department official, in connection with the department's sprawling criminal inquiry into efforts to overturn the 2020 election, people familiar with the matter and an associate of Mr. Clark said.

It remained unclear exactly what the investigators may have been looking for. But Mr. Clark was central to President Donald J. Trump's unsuccessful effort in late 2020 to strong-arm the nation's top prosecutors into supporting his claims of election fraud, and the search suggested that the criminal investigation could be moving closer to Mr. Trump.

The law enforcement action at Mr. Clark's home in suburban Virginia came just one day before the House committee investigating the Jan. 6, 2021, attack on the Capitol held a hearing setting out in vivid and powerful detail Mr. Trump's efforts to pressure the Justice Department to help him reverse his election defeat.

The committee explored Mr. Clark's role in particular in helping Mr. Trump try — ultimately unsuccessfully — to pressure the department into lending credence to his baseless assertions of election fraud and pressure officials in Georgia, a key swing state, into reconsidering their certification of Joseph R. Biden Jr.'s victory.

One of Mr. Clark's associates described the striking scene early Wednesday morning when a dozen federal law-enforcement officials raided the house, seized Mr. Clark's electronic devices and put him out on the street in his pajamas.

"All because Jeff saw fit to investigate voter fraud," said the associate, Russ Vought, who runs the Center for Renewing America, where Mr. Clark is a senior fellow. "This is not America, folks. The weaponization of government must end."

Mr. Clark told Tucker Carlson of Fox News on Thursday that he had been woken by agents banging on his door shortly before 7 a.m. on Wednesday. He said that "12 agents and two Fairfax County police officers went into my house, searched it for three and a half hours." The agents, he said, "took all of the electronics from my house."

Mr. Clark criticized the investigation as "highly politicized" and suggested that it was no coincidence that the raid took place just before the House committee's hearing. "We're living in an era I don't recognize," he said.

The search at Mr. Clark's home was a significant step in the Justice Department's many-tentacled inquiry into the efforts to subvert the democratic process after the 2020 election.

In the early spring, a separate strand of the investigation was revealed as grand jury subpoenas were issued seeking information on a wide cast of political organizers, White House aides and members of Congress connected in various ways to Mr. Trump's incendiary speech near the White House that directly preceded the storming of the Capitol.

Mr. Clark's involvement in the inquiry was also the latest sign that the department's investigation had nudged ever closer to Mr. Trump himself — and to some of his allies in Congress. Mr. Clark worked closely with Mr. Trump in the weeks leading up to the Jan. 6 attack on the Capitol, as Mr. Trump's options closed off, to use the Justice Department as a tool for achieving his political ends.

Encouraged by members of the far-right House Freedom Caucus, Mr. Trump considered and then abandoned a plan in the days just before the Jan. 6 attack to put Mr. Clark in charge of the Justice Department as acting attorney general.

At the time, Mr. Clark was proposing to send a letter to state officials in Georgia falsely stating that the department had evidence that could lead Georgia to rescind its certification of Mr. Biden's victory in that key swing state. The effort was cut short by his superiors in the department.

———

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

JA85

Did you find this information helpful?                                    Yes        No

Attorney General Merrick B. Garland has said little publicly about the criminal investigation other than that the Justice Department would follow the facts. But he has been under pressure from some Democrats, including members of the House select committee, to hold Mr. Trump and his allies to account for the effort to disrupt the peaceful transfer of power.

The developments regarding Mr. Clark came to light as a federal grand jury sitting in Washington continued to issue subpoenas to people involved in a related plan by Mr. Trump and his allies to overturn the election: an effort to subvert the normal workings of the electoral process by creating fake slates of pro-Trump electors in states that were actually won by Mr. Biden.

In the past two days, according to several people familiar with the matter, at least nine people in four different states have received subpoenas in connection with the fake-elector investigation. They were largely those who agreed to be electors for Mr. Trump themselves or were aides to Mr. Trump's campaign in states where the plan was carried out.

Among those who received subpoenas were Kelli Ward, the chairwoman of the Arizona Republican Party, and her husband, Michael, both of whom served as electors on Mr. Trump's purported slate in the state, according to a person familiar with the matter. Along with the Wards, subpoenas were issued to two other pro-Trump electors in Arizona, Nancy Cottle and Loraine B. Pellegrino, the person said.

Their lawyer, Alexander Kolodin, attacked the Justice Department's fake elector inquiry.

"This is an investigation based on allegations that our clients engaged in core First Amendment activity — petitioning Congress about grievances," Mr. Kolodin said.

On Wednesday evening, a local news outlet in Nevada reported yet another development in the fake-elector investigation: Federal agents armed with a search warrant had seized the phone of Michael McDonald, the chairman of the Nevada Republican Party who had served as pro-Trump elector in the state. A search warrant was also issued for the party's secretary, James DeGraffenreid, who had taken part in the scheme as an elector as well, the news outlet reported.

Lawyers for Mr. McDonald and Mr. DeGraffenreid did not return phone calls on Thursday seeking comment.

While several state officials and Trump campaign aides have received subpoenas in the fake-elector investigation, the inquiry is primarily focused on a group of lawyers who worked closely with Mr. Trump in devising the scheme. Those lawyers include Rudolph W. Giuliani, who oversaw Mr. Trump's challenges to the election in general, and John Eastman, who advised the former president on creating the fake electors, among other things.

Mr. Giuliani and Mr. Eastman have figured prominently in earlier hearings this month by the House select committee. The two men, the committee showed, were intimately involved in efforts to cajole state officials to throw the election to Mr. Trump and in pressuring Vice President Mike Pence to single-handedly grant Mr. Trump a victory in the Electoral College.

At the committee's last hearing, on Tuesday, investigators for the first time directly linked Mr. Trump to the fake elector plan. The committee introduced a recorded deposition from Ronna McDaniel, the chairwoman of the Republican National Committee, in which she recounted how Mr. Trump called her and put Mr. Eastman on the phone "to talk about the importance of the R.N.C. helping the campaign gather these contingent electors."

Mr. Clark's role in the efforts to subvert the election are arguably most closely related to the pressure campaign against state officials to create pro-Trump electors.

In late December 2020, Mr. Clark, while serving as the acting head of the Justice Department's civil division, helped to draft a letter to Gov. Brian Kemp of Georgia stating — without evidence — that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

The letter advised Mr. Kemp, a Republican, to call a special session of his state's General Assembly to create "a separate slate of electors supporting Donald J. Trump."

Mr. Clark pressured the acting attorney general at the time, Jeffrey A. Rosen, to sign and send the letter to Mr. Kemp, but Mr. Rosen refused.

Mr. Rosen was among the former Justice Department officials who testified about Mr. Clark before the House committee at its hearing on Thursday.

Katie Benner contributed reporting.



Archivist *of the*
United States

February 18, 2022

The Honorable Carolyn B. Maloney
Chairwoman
Committee on Oversight and Reform
U.S. House of Representatives
2157 Rayburn House Office Building
Washington, DC 20515

Dear Madam Chairwoman:

I write to you pursuant to my authority under section 2203(e) of the Presidential Records Act (PRA), as amended (44 U.S.C. §§ 2201-2209), which establishes that I may "request the advice" of the appropriate committees of the House and the Senate when I consider that a proposed disposal of Presidential records by the incumbent President "may be of special interest to the Congress" or that "consultation with the Congress regarding the disposal of these particular records is in the public interest." While this provision specifically applies to disposals proposed by the incumbent President, the National Archives and Records Administration (NARA) has always interpreted it to apply to disposals of Presidential records of which I was not informed.

Under the PRA, all Presidential records automatically transfer to NARA's legal custody when the President leaves office. With respect to the Trump Presidential records, the legal transfer took place on January 20, 2021. However, it is not uncommon for there to be a delay before NARA takes physical custody of all of the records. The complex technical work needed to transfer hundreds of terabytes of electronic records, coupled with a one-term transition, meant that the physical transfer could not be completed between the Presidential election and Inauguration Day. It took until November 2021 for NARA to receive all of the electronic Trump Presidential records.

Included among the Trump Presidential electronic records are those created on social media platforms. NARA recognizes that social media records are a relatively recent phenomenon, that capturing records on social media platforms is an evolving process, and that different platforms pose different issues with respect to how records are defined and managed.

By this letter, I am advising you that the Trump Administration did not fully capture, and therefore NARA did not receive, all of the Presidential records created by President Trump and White House staff that were posted on social media platforms, as summarized in more detail below:

DAVID S. FERRIERO  ·  T: 202.357.5900  ·  F: 202.357.5901  ·  *david.ferriero@nara.gov*

National Archives *and* Records Administration  ·  700 Pennsylvania Avenue, NW  ·  Washington, DC 20408  ·  *www.archives.gov*

- Early in the Trump Administration, questions were raised about President Trump's use of his personal Twitter account to conduct official government business and whether deleted tweets were being captured and preserved as Presidential records.  In March 2017, NARA advised the Trump Administration that it should capture and preserve as Presidential records all tweets that the President posts in the course of his official duties, whether on his personal @realDonaldTrump account or on the official @POTUS account, including those tweets that were subsequently deleted.  As I reported in a March 30, 2017, letter to Senators Claire McCaskill and Tom Carper, NARA was "informed by White House officials that they [were], in fact, doing so."

Since the end of the administration, we have learned that the White House initially used a manual process to capture tweets that were deleted from @realDonaldTrump and @POTUS by copying them from non-governmental organizations that were capturing them, such as Propublica and Factba.se.  The White House did not begin using the vendor ArchiveSocial to automate the capture of tweets and other social media records in real-time until January 2018. Moreover, @realDonaldTrump was not enrolled until August 2018 and the tool stopped capturing @realDonaldTrump in April 2020. The official @POTUS was enrolled in February 2018 and remained connected throughout the rest of the administration.

When properly implemented, ArchiveSocial captures all versions of content as it appears on the platforms, along with any changes, such as deleted or edited content, changes to an account profile, and direct or private messages. However, it cannot capture such changes retroactively.  If a social media account is not enrolled or subsequently becomes disconnected from ArchiveSocial, any changes, including deleted or modified posts, cannot be captured.

The Twitter account @realDonaldTrump was disconnected from ArchiveSocial in April 2020. A key feature of ArchiveSocial is that it sends automated alerts to the account owners/system administrators every three to five days to remind them to reconnect any disconnected accounts. The tool also displays information about the account status in the dashboard.  This account was not re-enrolled.

When White House officials brought this problem to our attention near the end of the administration, Twitter had permanently suspended @realDonaldTrump. NARA contacted Twitter directly to ask if it retained the account data between April 20th and the account's suspension. Twitter provided us with a copy of the available account data. However, it did not include previously deleted tweets, which are not retained by the company.  Accordingly, we were unable to obtain a complete set of these Presidential records from the Trump Administration or Twitter.  While we do have access to copies of deleted tweets collected by other non-governmental sources, we do not consider them as official Presidential records and cannot ensure the completeness of their captured account data.

- The Trump White House did not take any steps to capture deleted content from any Trump Administration social media account other than @realDonaldTrump or @POTUS prior to enrolling them with ArchiveSocial. As with @realDonaldTrump, many other Trump Administration social media accounts were not enrolled until the summer or fall of 2018, even though these accounts were active for over a year prior to enrollment, during which time deleted or modified Presidential record content was not captured. Other accounts were not enrolled until just prior to the end of the administration.

- The ArchiveSocial tool included the ability to capture direct messages that may have been used on the platforms, but the Trump Administration opted not to enable capture of direct messages, and was unable to report whether direct messaging was actually used on any of the platforms by the account holders.

- NARA identified seven Twitter accounts that we think contain presidential record information, but were not captured by the Trump Administration. These accounts belonged to Andrew Giuliani, Chad Gilmartin, Ivanka Trump, Kayleigh McEnany, Kellyanne Conway, Mark Meadows, and Peter Navarro. After the end of the administration, NARA obtained the publicly available tweets from these accounts in order to supplement its archival collection.

- In January 2021, administration officials advised NARA that two social media accounts they thought contained Presidential record content were not enrolled in ArchiveSocial and could not be retroactively enrolled as they had been suspended by the platforms. These accounts were Donald J. Trump on Facebook and @realDonaldTrump on Instagram. NARA endeavored to work with Facebook, which operates Instagram, to obtain access to the accounts, but Facebook was not able to provide access.

- SnapChat was used by the Trump Administration (@realdonaldtrump and @whitehouse), which advised NARA that it was capturing content posted to the platform. NARA has not yet been able to locate any SnapChat content in the records transferred to us. SnapChat ultimately banned President Trump from the platform, and it is not possible to see any previous content. SnapChat advised NARA that the Trump Administration used the @whitehouse account approximately five times during four years. However, the administration regularly used the @realdonaldtrump account. News reports indicate that the account had 1.5 million followers on the platform. We do not know whether direct messaging was enabled on the account. We are not able to determine to what extent @realdonaldtrump SnapChat contained unique Presidential records as compared to content duplicative from other platforms, or purely campaign related information, which would not have been a Presidential record.

Please let me or my staff know if you have questions or would like to discuss this issue further.

Sincerely,

DAVID S. FERRIERO
Archivist of the United States

cc:  The Honorable James Comer, Ranking Member

☰  **CNN** politics                                                              AudioLive TV

# First on CNN: Top Trump adviser Stephen Miller testifies to January 6 federal grand jury

By Katelyn Polantz and Hannah Rabinowitz, CNN

Updated 8:09 PM EST, Tue November 29, 2022



☐ Video Ad Feedback

What Stephen Miller's testimony tells legal analyst about Trump probe

01:18 - Source: CNN

**Washington (CNN)** — Former Trump adviser Stephen Miller testified on Tuesday to a federal grand jury in Washington, DC, as part of the January 6, 2021, investigation, CNN has learned, making him the first known witness to testify since the Justice Department appointed a special counsel to oversee the criminal investigations around the former president.

Miller was at the federal courthouse in downtown Washington for several hours throughout Tuesday, according to a person familiar with the investigation. January 6 lead prosecutor Thomas Windom was spotted at the same federal courthouse on Tuesday.

Windom is expected to join the newly created Special Counsel's Office led by longtime public corruption prosecutor Jack Smith and will continue leading the investigation into former President Donald Trump's role in efforts to impede the transfer of power following the 2020 election.

Federal investigators have for months sought information from Trump's inner circle in the White House, attempting to gather insight into Trump's state of mind before his supporters rioted on January 6.

Miller, a former White House speechwriter and senior adviser to Trump, could provide a firsthand account of the former president's preparations for his speech at the Ellipse in Washington on January 6, including how he wanted to inspire his supporters, many of whom went on to attack the Capitol and disrupt Congress.

Miller was first subpoenaed in the federal criminal investigation months ago.

In April, Miller testified virtually for roughly eight hours before the House select committee investigating January 6 – a completely separate probe from the criminal investigation being run by the Justice Department.

According to findings the committee presented at a public hearing in July, Miller spoke to Trump for several minutes on the morning of January 6 about his planned speech at the Ellipse. After talking with Miller, Trump added a line to his speech about then-Vice President Mike Pence, according to the committee's findings.

The committee said that Miller removed the lines about Pence after having a conversation with a White House lawyer, Eric Herschmann, who objected to the president's edits, according to testimony from Miller. Yet when Trump gave the speech, it included several references to Pence.

At the time, Trump and others were pressuring Pence to block certification of the election. Pence ultimately refused and told Trump and others he had no authority to do so. During the Capitol riot, Trump supporters chanted, "Hang Mike Pence" and broke into restricted areas of the complex, prompting Pence to be evacuated from the Senate chamber.

In recent months, the January 6 investigation team led by Windom has secured decisions ordering top Pence aides to testify to the grand jury about some of the most guarded conversations around Trump after the election. And a parade of top advisers to Trump have had their cell phones seized or received grand jury subpoenas for testimony and documents related to the effort to overturn Trump's electoral loss.

JA92

CNN's Kristen Holmes contributed to this report.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.



2/3/23, 5:04 PM
Former President Trump Statement on Special Counsel Appointment | C-SPAN.org

| ℹ️ **More information about** | | 🛒 **Purchase a Download** | |
| *Former President Trump Statement on Special Counsel Appointment* | ⌄ | *Former President Trump Statement on Special Counsel Appointment* | ⌄ |

⭐ **FEATURED CLIPS FROM THIS VIDEO**



8:34 PM

**Former President Trump Responds to the Appointment of a Special Counsel**

Former Pres dent Trump responds to the Department of Just ce's appo ntment of a spec a counse to nvest gate h m for...

**2 MINUTES | 6,289 VIEWS**

▶️ **RELATED VIDEO**

*See all on* **TRUMP, DONALD J.**    **JANUARY 6, 2021**



NOVEMBER 18, 2022

**Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations**

Attorney Genera Merr ck Gar and announced that h s was appo nt ng Jack Sm th as spec a counse to oversee nvest gat ons nvo v ng former Pres dent...



OCTOBER 22, 2022

**Bart Jansen on Subpoena of Former President Trump**

Bart Jansen, *USA Today* Just ce Department correspondent, ta ked about the January 6 Comm ttee's subpoena of former...



JUNE 23, 2022

**Rep. Schiff Speaks to Reporters After Fifth January 6 Hearing**

Rep. Adam Sch ff (D-CA) spoke w th reporters fo ow ng the f fth hear ng of the Se ect Comm ttee to nvest gate the...



JUNE 23, 2022

**Rep. Thompson Speaks to Reporters After Fifth January 6 Hearing**

Rep. Benn e Thompson (D-MS) spoke w th reporters fo ow ng the f fth hear ng of the Se ect Comm ttee to nvest gate the...

✂️ **USER CREATED CLIPS FROM THIS VIDEO**



NOVEMBER 18, 2022

**Former President Trump Responds to the Appointment of a Special Counsel**

**2 MINUTES | 6,289 VIEWS**



NOVEMBER 18, 2022

**User Clip: Election Manipulation?**

**27 SECONDS | 154 VIEWS**



NOVEMBER 18, 2022

**User Clip: Trump DOJ Special Counsel**

**9 MINUTES | 122 VIEWS**



NOVEMBER 18, 2022

**User Clip: Trump Gives Statement on Special Counsel Appointment**

**~1 SECONDS | 54 VIEWS**

## ABOUT C-SPAN

Our Mission

Our History

Cameras in The Court

Milestones

Leadership

Jobs

In The Community

Video Library

Viewer Guide

## RESOURCES

C-SPAN Classroom

Blog

Series A-Z

Press Center

FAQs

Contact Us

Shop

C-SPAN's Book Collection

World Legislatures

MyC-SPAN Login

**C-SPAN Now App**

 Download

 Download

 C-SPAN Podcasts

## FOLLOW C-SPAN

© 2023 National Cable Satellite Corporation    |   Copyrights and Licensing   |   Terms and Conditions   |   Privacy

≡   **CNN** politics                                                      AudioLive TV

---

# Former Trump White House counsel and his deputy testify to Jan. 6 criminal grand jury

By Casey Gannon, Katelyn Polantz and Kristen Holmes, CNN

Updated 5:42 PM EST, Fri December 2, 2022



Sarah Silbiger/Getty Images

---

**(CNN)** — Former Trump White House counsel Pat Cipollone and deputy counsel Patrick Philbin testified to a federal grand jury for several hours in Washington, DC, on Friday, indicating the Justice Department had compelled the men to answer more questions in the January 6, 2021, criminal investigation despite challenges from Donald Trump's legal team.

The January 6 grand jury activity is the latest indication the investigation – now led by special counsel Jack Smith – has pushed in recent months to unearth new details about direct conversations with the former president and advice given to him after the election.

Cipollone was first seen entering the grand jury area with his attorney, Michael Purpura, before 9 a.m., and he was there for more than five hours. Purpura has not responded to

before 9 a.m., and he was there for more than five hours." Purpura has not responded to requests for comment. The grand jury proceedings themselves are confidential.

Philbin, whom Purpura also represents, headed into the grand jury area just before the lunch hour on Friday, staying until about 4 p.m.

Thomas Windom and Mary Dohrmann, prosecutors in the January 6 investigation who are now to be led by Smith, were also seen walking in with Cipollone.

The investigators are looking at efforts to obstruct the transfer of power at the end of Trump's presidency and have obtained testimony from several administration advisers closest to the former president after the election and as the Capitol was attacked by his supporters.



**RELATED ARTICLE**
Trump's classic delay and divert legal strategy is running out of road

CNN previously reported that Chief Judge Beryl Howell of the DC District Court, who oversees the federal grand juries in Washington, ordered Cipollone and Philbin to provide additional grand jury testimony this month, following up on their testimony in the fall. The judge has repeatedly rejected Trump's privilege claims in the Justice Department's criminal investigation of efforts to overturn the 2020 election, according to people briefed on the matter.

Philbin and Cipollone were both key witnesses to Trump's actions in the last days of his presidency. Cipollone repeatedly pushed back on efforts to overturn the 2020 election, and according to a Senate Judiciary Committee report, he and Philbin opposed a proposal to replace the attorney general with someone willing to look into false claims of election fraud.

Previously, the Justice Department compelled top advisers from Vice President Mike Pence's office to testify to the grand jury. They had sought to protect Pence in January 2021 from Trump's pressure campaign to overturn the election.

Earlier this week, Trump White House official Stephen Miller, who worked with Trump on his speech at the Ellipse, had his own day before the grand jury.

On Thursday, another leg of Smith's special counsel investigation – into the handling of documents at Mar-a-Lago after the presidency – was active in the courthouse. At least one Mar-a-Lago prosecutor was working in the secret grand jury proceedings, as three aides

to Trump, Dan Scavino, William Russell and Beau Harrison, each appeared, according to sources familiar with them. Their attorney declined to comment.

*This story has been updated with additional details.*

**Paid Links**

---

Search CNN...



**Log In**

Live TV

Audio

US

World

Politics

Business

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More



**FOLLOW CNN POLITICS**

      

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

 **AP NEWS**



ADVERT SEMENT



**Farnoush Amiri**

Farnoush s a
congress ona reporter.

FarnoushAm r

fam r @ap.org

  

 C ck to copy

**RELATED TOPICS**

Cap to s ege

Po t cs

AP Top News

Dona d Trump

# Jan. 6 panel urges Trump prosecution with criminal referral

By MARY CLARE JALONICK, ERIC TUCKER and FARNOUSH AMIRI    December 19, 2022

ADVERT SEMENT

**You May Like**    Promoted

Amazon Hates When You Do This, But They Can't Stop You

Promoted: Online Shopping Tools

Massachusetts Gov Will Cover The Cost To Install Solar If You Own A Home In These Zip Codes

Promoted: EnergyBillCruncher

Electric Companies Will Hate You for Doing This, but They Can't Stop You

JA105



U.S. News    World New
Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

For By Medicare? (See How)
Learn More

40 Years Old
Promoted: BuzzDaily Winners

Finally Legal in Massachusetts, "You Gotta Try These THC Gummies!"
Promoted: Tommy Chong's CBD

by Taboola

ADVERT SEMENT



WASHINGTON (AP) — The House Jan. 6 committee urged the Justice Department on Monday to bring criminal charges against Donald Trump for the violent 2021 Capitol insurrection, calling for accountability for the former president and "a time of reflection and reckoning."

**AP NEWS**

congressional

panel's seven
Democrats and
two Republicans
are
recommending
criminal charges
against Trump
and associates
who helped him
launch a wide-
ranging pressure
campaign to try
to overturn his
2020 election
loss. The panel
also released a
lengthy
summary of its
final report, with
findings that
Trump engaged
in a "multi-part
conspiracy" to
thwart the will of
voters.

At a final
meeting Monday,
the committee
alleged
violations of four
criminal statutes
by Trump, in
both the run-up
to the riot and
during the
insurrection
itself, as it
recommended
the former

Department.
Among the

prosecution is
aiding an
insurrection —
an effort to hold
him directly
accountable for
his supporters
who stormed the
Capitol that day.

The committee
also voted to
refer
conservative
lawyer John
Eastman, who
devised dubious
legal maneuvers
aimed at keeping
Trump in power,
for prosecution
on two of the
same statutes as
Trump:
conspiracy to
defraud the
United States
and obstructing
an official
proceeding.

While a criminal
referral is mostly
symbolic, with
the Justice
Department
ultimately
deciding
whether to
prosecute
Trump or others,

almost singular

U.S. News    World New
Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

start.

Chairman Bennie Thompson, D-Miss., said Trump "broke the faith" that people have when they cast ballots in a democracy and that the criminal referrals could provide a "roadmap to justice" by using the committee's work.

"I believe nearly two years later, this is still a time of reflection and reckoning," Thompson said. "If we are to survive as a nation of laws and democracy, this can never happen again."

ADVERT SEMENT

Wyoming Rep. Liz Cheney, the panel's

that every

U.S. News    World New

Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

has defended the orderly transfer of power, "except one."

The committee also voted 9-0 to approve its final report, which will include findings, interview transcripts and legislative recommendations. The full report is expected to be released on Wednesday.

The report's 154-page summary, made public as the hearing ended, found that Trump engaged in a "multi-part conspiracy" to overturn the election. While the majority of the report's main findings are not new, it altogether represents one of the most damning portraits of an American

**AP NEWS**

great detail

overturn his own
defeat and what
the lawmakers
say is his direct
responsibility for
the insurrection
of his
supporters.

The panel, which
will dissolve on
Jan. 3 with the
new Republican-
led House, has
conducted more
than 1,000
interviews, held
10 well-watched
public hearings
and collected
more than a
million
documents since
it launched in
July 2021. As it
has gathered the
massive trove of
evidence, the
members have
become
emboldened in
declaring that
Trump, a
Republican, is to
blame for the
violent attack on
the Capitol by
his supporters
almost two years
ago.

**JA111**

AP NEWS

After beating

U.S. News    World New

Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

many of them,
the Jan. 6 rioters
stormed the
Capitol and
interrupted the
certification of
Biden's
presidential
election win,
echoing Trump's
lies about
widespread
election fraud
and sending
lawmakers and
others running
for their lives.

The attack came
after weeks of
Trump's efforts
to overturn his
defeat — a
campaign that
was extensively
detailed by the
committee in its
multiple public
hearings, and
laid out again by
lawmakers on
the panel at
Monday's
meeting. Many
of Trump's
former aides
testified about
his
unprecedented
pressure on

to Biden's win.

The committee

great detail how Trump riled up the crowd at a rally that morning and then did little to stop his supporters for several hours as he watched the violence unfold on television.

ADVERT SEMENT

The panel aired some new evidence at the meeting, including a recent interview with longtime Trump aide Hope Hicks. Describing a conversation she had with Trump around that time, she said he told her that no one would care about his legacy if he lost the election.

Hicks told the committee that Trump told her,

respond to a request for comment, but the former president slammed members of the committee Sunday as "thugs and scoundrels" as he has continued to falsely dispute his 2020 loss.

While a so-called criminal referral has no real legal standing, it is a forceful statement by the committee and adds to political pressure already on Attorney General Merrick Garland and special counsel Jack Smith, who is conducting an investigation into Jan. 6 and Trump's actions.

ADVERT SEMENT

On the recommendation

**JA114**

committee said

U.S. News    World New

Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

the former
president "was
directly
responsible for
summoning
what became a
violent mob"
and refused
repeated
entreaties from
his aides to
condemn the
rioters or to
encourage them
to leave.

For obstructing
an official
proceeding, the
committee cites
Trump's
relentless
badgering of
Vice President
Mike Pence and
others to
prevent the
certification of
the election
results on Jan. 6.
And his repeated
lies about the
election and
efforts to undo
the results open
him up to a
charge of
conspiracy to
defraud the
United States,

FILED UNDER SEAL

**AP NEWS**

by the panel is

statement, citing the scheme by Trump and his allies to put forward slates of fake electors in battleground states won by President Joe Biden.

Among the other charges contemplated, but not approved, by the committee was seditious conspiracy, the same allegation Justice Department prosecutors have used to target a subset of rioters belonging to far-right groups like the Oath Keepers and Proud Boys.

Thompson said after the hearing that the seditious conspiracy charge is "something that the committee didn't come to agreement on."

after Senate

U.S. News    World New

Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

formation of what would have been a bipartisan, independent commission to investigate the insurrection. When that effort failed, the Democratic-controlled House formed an investigative committee of its own.

ADVERT SEMENT

House Republican leader Kevin McCarthy of California, a Trump ally, decided not to participate after House Speaker Nancy Pelosi rejected some of his appointments. That left an opening for two anti-Trump Republicans in the House —

of Illinois — to join seven

unusually unified panel in the divided Congress.

Rep. Liz C

Rep. Liz Chene

McCarthy was one of four House Republicans who ignored congressional subpoenas from the panel and were referred to the House Ethics Committee on Monday for their non-compliance.

The Republican leader, who is hoping to become speaker of the House when his party takes the majority in January, has acknowledged he spoke with Trump on Jan. 6. The committee also referred Reps. Jim Jordan of Ohio, Scott Perry of Pennsylvania and Andy Biggs

Trump or the

leading up to the attack.

While the committee's mission was to take a comprehensive accounting of the insurrection and educate the public about what happened, they've also aimed their work at an audience of one: the attorney general. Lawmakers on the panel have openly pressured Garland to investigate Trump's actions, and last month he appointed a special counsel, Smith, to oversee two probes related to Trump, including those related to the insurrection and the presence of classified documents at Trump's Florida estate.

The committee

**AP NEWS**

can only be

system.

"No one should
get a pass," said
Rep. Adam
Schiff, D-Calif.

——

Associated Press
writers Lisa
Mascaro, Jill
Colvin and Kevin
Freking
contributed to
this report.

——

For full coverage
of the Jan. 6
hearings, go to
https://www.apnews.cc
siege.

**You
May Like**    by Taboola

s

**AP NEWS**

U.S. News    World New

Trend ng News    U.S. w nter storms    Grammy Awards    Super Bow    Russ a-Ukra ne war

Amazon Left
Scrambling As...

Online Shopping Tools

Massachusetts:
Say Bye To Your
Power Bill If Yo...

EnergyBillCruncher

Gronk's Favorite
"Dressy" Shoes...

Wolf & Shepherd

If You Have
Toenail Fungus...

Healthy Guru

This New Sleep
Patch...

Zleep    Learn More

Seniors Under 85
Yrs Old Get $50K
In Life Insuranc...

Finance Daily

## Ad Content

Experts
Surprised: If
You Have Mol...
Promoted: Healthy Living24

This New CPA...
Promoted: The Easy Blog by
EasyBreathe.com

5.5% High
Interest Savings
Accounts. Fin...
Promoted: StuffAnswered

**JA121**

## AP NEWS

WAS

**U.S. News**   **World New**

Trend ng News     U.S. w nter storms     Grammy Awards     Super Bow     Russ a-Ukra ne war

today

## Ad Content

---

**Protect Your Brain: The...**

Ageless    [ Learn More ]

Mind

**Volkswagen has done it again....**

Volkswagen    [ Search Now ]

Deals | Top

**Unsold Never-Used Laptops...**

Tech    [ Learn More ]

Savings

**Empty Alaska Cruise Cabins...**

Alaska Cruise Deals |

sponsored searches

**Your Bathroom Will Never Look The Same Than...**

Renuity Bath Experts

**These travel vans have done it...**

Camper    [ Search Now ]

Van Deals |

## Ad Content

---

**Military Jobs For Seniors...**

Promoted: Military Jobs |

Search Ads

[ ... ]

**Look for any high school...**

Promoted: Classmates.com

**Your Memory Is Excellent If You**

FILED UNDER SEAL

**AP NEWS**

US

U.S. News     World News
Trend ng News     U.S. w nter storms     Grammy Awards     Super Bow      Russ a-Ukra ne war

H1N...

yesterda
y

  



**AP NEWS**

Top Stor es

V deo

Contact Us

Access b   ty Statement

Cookie Settings

**DOWNLOAD AP NEWS**

Connect w th the defin t ve source for g oba  and  oca  news

**MORE FROM AP**

ap.org

AP Ins ghts

AP Defin t ve Source B og

AP Images Spot  ght

AP Exp ore

AP Books

AP Sty ebook

**FOLLOW AP**

THE ASSOCIATED PRESS

About     Contact     Customer Support     Careers     Terms & Cond t ons     Pr vacy

A   contents © copyr ght 2023 The Assoc ated Press. A   r ghts reserved.

*The New York Times*  | https://www.nytimes.com/2023/01/30/nyregion/trump-stormy-daniels-grand-jury.html

# Manhattan Prosecutors Begin Presenting Trump Case to Grand Jury

The Manhattan district attorney's decision represents a dramatic escalation of the inquiry, and potentially sets the case on a path toward criminal charges against the former president.

**By William K. Rashbaum, Ben Protess, Jonah E. Bromwich and Hurubie Meko**

Jan. 30, 2023                                                                                         7 MIN READ

The Manhattan district attorney's office on Monday began presenting evidence to a grand jury about Donald J. Trump's role in paying hush money to a porn star during his 2016 presidential campaign, laying the groundwork for potential criminal charges against the former president in the coming months, according to people with knowledge of the matter.

The grand jury was recently impaneled, and the beginning of witness testimony represents a clear signal that the district attorney, Alvin L. Bragg, is nearing a decision about whether to charge Mr. Trump.

On Monday, one of the witnesses was seen with his lawyer entering the building in Lower Manhattan where the grand jury is sitting. The witness, David Pecker, is the former publisher of The National Enquirer, the tabloid that helped broker the deal with the porn star, Stormy Daniels.

As prosecutors prepare to reconstruct the events surrounding the payment for grand jurors, they have sought to interview several witnesses, including the tabloid's former editor, Dylan Howard, and two employees at Mr. Trump's company, the people said. Mr. Howard and the Trump Organization employees, Jeffrey McConney and Deborah Tarasoff, have not yet testified before the grand jury.

The prosecutors have also begun contacting officials from Mr. Trump's 2016 campaign, one of the people said. And in a sign that they want to corroborate these witness accounts, the prosecutors recently subpoenaed phone records and other documents that might shed light on the episode.

A conviction is not a sure thing, in part because a case could hinge on showing that Mr. Trump and his company falsified records to hide the payout from voters days before the 2016 election, a low-level felony charge that would be based on a largely untested legal theory. The case would also rely on the testimony of Michael D. Cohen, Mr. Trump's former fixer who made the payment and who himself pleaded guilty to federal charges related to the hush money in 2018.

Still, the developments compound Mr. Trump's legal woes as he mounts a third presidential campaign. A district attorney in Georgia could seek to indict him for his efforts to overturn his 2020 election loss in the state, and he faces a special counsel investigation into his removal of sensitive documents from the White House as well as his actions during the attack on the Capitol on Jan. 6, 2021.

Mr. Bragg's decision to impanel a grand jury focused on the hush money — supercharging the longest-running criminal investigation into Mr. Trump — represents a dramatic escalation in an inquiry that once appeared to have reached a dead end.

Under Mr. Bragg's predecessor, Cyrus R. Vance Jr., the district attorney's office had begun presenting evidence to an earlier grand jury about a case focused on Mr. Trump's business practices, including whether he fraudulently inflated the value of his assets to secure favorable loans and other benefits. Yet in the early weeks of his tenure last year, Mr. Bragg developed concerns about the strength of that case and decided to abandon the grand jury presentation, prompting the resignations of the two senior prosecutors leading the investigation.

One of them, Mark F. Pomerantz, was highly critical of Mr. Bragg's decision and has written a book that is scheduled to be published next week, "People vs. Donald Trump," detailing his account of the inquiry. Mr. Bragg's office recently wrote to Mr. Pomerantz's publisher, Simon & Schuster, expressing concern that the book might disclose grand jury information or interfere with the investigation.

JA124

District Attorney Alvin L. Bragg, center right, jump-started the inquiry last summer into
Mr. Trump's role in the hush money paid to the porn star Stormy Daniels.  Karsten Moran
for The New York Times

Although he balked at charging Mr. Trump over the asset valuations, this is a different case, and Mr. Bragg is now a bolder prosecutor. He has ramped up the hush money inquiry in the weeks since his prosecutors convicted Mr. Trump's company in an unrelated tax case, a far cry from his unsteady early days in office, when Mr. Bragg was under fire from all quarters for unveiling a host of policies designed to put fewer people behind bars.

For his part, Mr. Trump has denied all wrongdoing and chalked up the scrutiny to a partisan witch hunt against him. He has also denied having an affair with Ms. Daniels. If Mr. Trump were ultimately convicted, he would face a maximum sentence of four years, though prison time would not be mandatory.

"This is just the latest act by the Manhattan D.A. in their never-ending, politically motivated witch hunt," the Trump Organization said in a statement, adding that reviving the case under what it called a "dubious legal theory" was "simply reprehensible and vindictive."

A spokeswoman for Mr. Bragg's office declined to comment. Mr. Pecker's lawyer, Elkan Abramowitz, did not immediately respond to a request for comment. A lawyer for Mr. McConney and Ms. Tarasoff declined to comment.

The panel hearing evidence is likely what's known as a special grand jury. Like regular grand juries, it is made up of 23 Manhattan residents chosen at random. But its members are sworn in to serve for six months to hear complex cases, rather than for 30 days, as is the case with panels that review evidence and vote on whether to bring charges in more routine matters.

The investigation, which has unfolded in fits and starts for more than four years, began with an examination of the hush money deal before expanding to include Mr. Trump's property valuations. Last summer, Mr. Bragg's prosecutors returned to the hush money anew, seeking to jump-start the inquiry after the departures of Mr. Pomerantz and Carey R. Dunne, the other senior prosecutor in the investigation.

**Sign up for the New York Today Newsletter**  Each morning, get the latest on New York businesses, arts, sports, dining, style and more. Get it sent to your inbox.

The district attorney's office, working with the New York attorney general, Letitia James, is also continuing to scrutinize the way that the former president valued his assets, the people with knowledge of the matter said.

Over the course of the investigation into Mr. Trump, the hush money payment was discussed within the district attorney's office with such regularity that prosecutors came to refer to it as the "zombie theory" — an idea that just won't die.

The first visible sign of progress for Mr. Bragg came this month when Mr. Cohen appeared at the district attorney's office to meet with prosecutors for the first time in more than a year. He is expected to return for at least one additional interview in February, one of the people said.

The lawyer who represented Ms. Daniels in the hush money deal, Keith Davidson, is also expected to meet with prosecutors.

Mr. Trump's company was instrumental in the deal, court records from Mr. Cohen's federal case show.

Although Mr. McConney and Ms. Tarasoff were not central players, they helped arrange for Mr. Cohen to be reimbursed for the $130,000 he paid Ms. Daniels, whose real name is Stephanie Clifford.

Allen H. Weisselberg, the company's former chief financial officer, was also involved in reimbursing Mr. Cohen. And, according to Mr. Cohen, Mr. Weisselberg was involved in a discussion with Mr. Trump about whether to pay Ms. Daniels.

Mr. Weisselberg is serving jail time after pleading guilty to a tax fraud scheme unrelated to the hush money deal, a case that also led to the conviction of the Trump Organization in December. Although he was the star witness for the district attorney's office in that case, Mr. Weisselberg has never implicated Mr. Trump in any wrongdoing.

Without his cooperation, prosecutors could struggle to link Mr. Trump directly to the misconduct.

In 2018, when Mr. Cohen pleaded guilty to federal campaign finance charges stemming from his role in the hush money payments, he pointed the finger at Mr. Trump, saying the payout was done "in coordination with, and at the direction of" the president. Federal prosecutors agreed that Mr. Trump was behind the deal but never charged him or his company with a crime.

The cooperation of Allen H. Weisselberg, the Trump Organization's former chief financial officer, will be key to the prosecution's case against Mr. Trump.  Jefferson Siegel for The New York Times

There is some circumstantial evidence suggesting that Mr. Trump was involved: He and Mr. Cohen spoke by phone twice the day before Mr. Cohen wired the payment to Ms. Daniels's lawyer, according to records in the federal case.

For prosecutors, the core of any possible case is the way in which Mr. Trump reimbursed Mr. Cohen for the $130,000 he paid Ms. Daniels and how the company recorded that payment. According to court papers in Mr. Cohen's federal case, Mr. Trump's company falsely identified the reimbursements as legal expenses.

The district attorney's office now appears to be focusing on whether erroneously classifying the payments to Mr. Cohen as a legal expense ran afoul of a New York law that prohibits the falsifying of business records.

Violations of that law can be charged as a misdemeanor. To make it a felony, prosecutors would need to show that Mr. Trump falsified the records to help commit or conceal a second crime — in this case, violating a New York State election law, according to a person with knowledge of the matter. That second aspect has largely gone untested, and would therefore make for a risky legal case against any defendant, let alone the former president.

Defense lawyers might also argue that Mr. Trump, who was a first-time presidential candidate, did not know that the payments violated election law. And they could take aim at Mr. Cohen, arguing that he is a convicted criminal who has an ax to grind against Mr. Trump.

In its statement, the Trump Organization noted that "the narrow issue of whether payments to Michael Cohen were properly recorded in a personal accounting ledger back in 2017 was thoroughly examined" by the federal prosecutors who charged Mr. Cohen and concluded he had engaged in a "pattern of deception."

Mr. Pecker's testimony, however, could bolster the prosecution's contention that Mr. Trump was involved in planning the hush money payment. A longtime ally of Mr. Trump, the publisher agreed to look out for potentially damaging stories about Mr. Trump during the 2016 campaign. He agreed to this at a meeting in Mr. Trump's office.

In October 2016, Ms. Daniels's agent and lawyer discussed the possibility of selling exclusive rights to her story to The National Enquirer, which would then never publish it, a practice known as "catch and kill."

But Mr. Pecker balked at the deal. He and the tabloid's editor, Mr. Howard, agreed that Mr. Cohen would have to deal with Ms. Daniels's team directly.

When Mr. Cohen was slow to pay, Mr. Howard pressed him to get the deal done, lest Ms. Daniels reveal their discussions about suppressing her story. "We have to coordinate something," Mr. Howard texted Mr. Cohen in late October 2016, "or it could look awfully bad for everyone."

Two days later, Mr. Cohen transferred the $130,000 to an account held by Ms. Daniels's attorney.

Michael Rothfeld contributed reporting.

2/3/23, 5:00 PM                           MyPillow CEO, Trump ally M ke Lindell says FBI seized phone



# MyPillow CEO, Trump ally Mike Lindell says FBI issued subpoena, seized phone at a Hardee's



**Scott Gleeson**
USA TODAY

Published 9:00 a.m. ET Sept. 14, 2022 | **Updated 2:36 p.m. ET Sept. 14, 2022**

MyPillow CEO Mike Lindell, a prominent Donald Trump supporter, said the FBI seized his cellphone and he was handed a subpoena from a Colorado grand jury Tuesday while he was in a Hardee's parking lot in Minnesota.

Lindell, who founded MyPillow in 2004, has been a key ally for Trump and has continued to protest the 2020 election by pushing baseless claims and conspiracy theories. In May, he was been banned from Twitter for a second time after trying to use a new account. Lindell's original account was permanently banned earlier in the year after he continued to perpetuate claims that Trump won.

On his podcast, "Frank Speech: The Lindell Report," Lindell detailed how he was issued the subpoena while waiting for his food and was questioned about a Colorado clerk, Tina Peters, who is being charged in what prosecutors say was a "deceptive scheme" to breach voting system technology used across the country. Lindell said the papers he was served labeled it an "official criminal investigation of a suspected felony" with the use of a federal grand jury.

**Anti-vaxxer, election denier:** And, in Michigan, perhaps secretary of state

**Critics call it intimidation:** Virginia's GOP attorney general sets up 'election integrity unit.'

Lindell said he also was questioned about his connection to Doug Frank, an Ohio educator who claims voting machines have been manipulated.

Lindell said on the podcast: "Cars pulled up in front of us, to the side of us and behind us, and I said, 'These are either bad guys or the FBI.' Well, it turns out they were the FBI. … I want to say this for the record: They were pretty nice guys. None of them had an attitude."

In a separate interview with ABC News, Lindell said three cars with federal agents pulled in front of his vehicle while he was parked at the fast-food restaurant and handed him the search warrant for his cellphone. "I've been to many jails," Lindell told the outlet. "I'm not scared to go to jail. I'm trying to save my country."

"Without commenting on this specific matter, I can confirm that the FBI was at that location executing a search warrant authorized by a federal judge," FBI spokeswoman Vikki Migoya told The Associated Press.

*Contributing: The Associated Press*

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    Page 133 of 403
FILED UNDER SEAL

2/3/23, 4:52 PM    Records Released In Response to Presidential Records Act (PRA) questions under the Trump Administration | National Archives

 NATIONAL ARCHIVES

# Records Released In Response to Presidential Records Act (PRA) questions under the Trump Administration

NARA officials are often consulted about the management of presidential and federal records. The Presidential Records Act governs access to records after the end of an administration.

The National Archives received records from the Trump Administration, which ended on January 20, 2021. We are in the process of preserving and providing access to these records, including all official Trump Administration social media content and deleted posts from @realDonaldTrump and @POTUS. As records are made available online, they may be accessed through the trumplibrary.gov website, which is part of NARA. The Trump Library will begin accepting FOIA requests on January 20, 2026, in accordance with the PRA.

Below are documents concerning records management-related inquiries about the Trump Administration's presidential records.

| Document Title | Document Date |
|---|---|
| White House letter to the Archivist of the United States   : Trump PRA Designation | February 16, 2017 |
| White House memo    to all personnel re PRA obligations (attached to Oct. 2 Compliance Reminder email) | February 22, 2017 |
| Letter   from Sens. McCaskill and Carper to Archivist David S. Ferriero | March 7, 2017 |
| Archivist's response   to Sens. McCaskill and Carper | March 30, 2017 |

| Document Title | Document Date |
|---|---|
| Attachments to March 30, 2017 letter:<br>• Briefing on the PRA<br>• Background on the PRA<br>• Guidance on Presidential Records   (publication)<br>• Presidential Records, 44 U.S.C. Chapter 22<br>• Proposed rule on Presidential Records (note: now a final rule)<br>• Notification Procedures<br>• Approved Requests   for Waiver of Incumbent President Privilege Review<br>• Approved Requests   for Disposal of Incumbent Presidential Records<br>• NSC memo   , Feb. 6, 2009 on procedure for access to PRA records of previous administration<br>• Archivist's memo ⬈   to Senior Agency Officials for Records Management on Records Management Priorities for 2017<br>• Records Express Blog on Records Management of Social Media and Electronic Records | |
| White House email: Compliance Reminder   PRA | October 2, 2017 |
| White House email: Monthly Legal Compliance   and Ethics Training reminder | October 2, 2017 |
| American Oversight letter   : Presidential Advisory Commission on Election Integrity and potential alienation of records | January 18, 2018 |
| NARA response letter   to American Oversight: Presidential Advisory Commission on Election Integrity and potential alienation of records | January 25, 2018 |
| White House letter   to the Archivist of the United States: Updated Trump Designation of PRA Representatives | January 19, 2021 |
| Letter   from House Committee on Oversight and Reform regarding recovery of Trump PRA records | February 9, 2022 |
| Archivist's response   to House Committee on Oversight and Reform regarding recovery of Trump PRA records<br>• NARA letter   to Stefan Passantino, Deputy Counsel to the President regarding  destruction of records, June 14, 2018 | February 18, 2022 |

**JA130**

| Document Title | Document Date |
|---|---|
| Archivist's letter   to House Committee on Oversight and Reform regarding Trump social media records | February 18, 2022 |
| Archivist's letter   to Senate Committee on Homeland Security and Governmental Affairs regarding Trump social media records | February 18, 2022 |
| Acting Archivist's Letter   to Evan Corcoran regarding Trump boxes | May 10,2022 |
| Former President Trump's Letter   to the Acting Archivist of the United States, Designating PRA Representatives | June 19 2022 |
| U.S. House of Representatives Permanent Select Committee on Intelligence (HPSCI) Ranking Member Michael R. Turner Letter   to Acting Archivist | August 9, 2022 |
| Acting Archivist's Response Letter   to August 9, 2022, Letter from HPSCI Ranking Member Michael Turner | August 16, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight and Reform, James Comer Letter   to Acting Archivist | August 10, 2022 |
| Acting Archivist's Response Letter   to August 10, 2022, Letter from House Committee on Oversight and Reform Ranking Member James Comer | August 16, 2022 |
| NARA Notice from Acting Archivist to All NARA Employees   Update on Trump Administration Presidential Records | August 24, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight Reform, James Comer Letter   to Acting Archivist | August 30, 2022 |
| Acting Archivist's Response Letter   to August 30, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | September 22, 2022 |
| U.S. Committee on Oversight and Reform Chairwoman, Carolyn B. Maloney Letter   to Acting Archivist | September 13, 2022 |
| Acting Archivist's Response Letter   to September 13, 2022, Letter from U.S. Committee on Oversight and Reform Chairwoman Carolyn B. Maloney | September 30, 2022 |
| U.S. House of Representatives Committee on Oversight Reform,  Ranking Member James Comer Letter   to Acting Archivist | October 4, 2022 |
| Acting Archivist's Response Letter   to October 4, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | October 7, 2022 |

JA131

USCA Case #23-5044      Document #2017106          Filed: 09/15/2023      Page 136 of 403

FILED UNDER SEAL

2/3/23, 4:52 PM          Records Released In Response to Presidential Records Act (PRA) questions under the Trump Administration | National Archives

| Document Title | Document Date |
|---|---|
| U.S. House of Representatives Committee on Oversight Reform, Ranking Member James Comer and Committee on the Judiciary Ranking Member Jim Jordan Letter    to Acting Archivist | October 14, 2022 |
| Acting Archivist's Response Letter    to October 14, 2022, Letter from House Committee on Oversight Reform Ranking Member and Committee on the Judiciary Ranking Member | October 25, 2022 |

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272



POLITICS              Scott Perry (politician)      Add Topic

# Pennsylvania Rep. Scott Perry, a Trump ally, says FBI agents seized his cellphone



**Ella Lee**
USA TODAY

Published 9:08 a.m. ET Aug. 10, 2022

WASHINGTON — U.S. Rep. Scott Perry, R-Pa., said in a statement that while traveling Thursday morning with his family, his cellphone was confiscated by three FBI agents carrying a search warrant.

He compared the action to the Monday search of former President Donald Trump's Mar-a-Lago home, describing it as "banana republic tactics."

"They made no attempt to contact my lawyer, who would have made arrangements for them to have my phone if that was their wish," Perry said. "I'm outraged — though not surprised — that the FBI under the direction of Merrick Garland's DOJ, would seize the phone of a sitting Member of Congress."

The circumstances surrounding the seizure were not immediately known. The FBI declined to comment on the matter. USA TODAY requested comment from Perry's office.

Perry is one of a handful of House Republicans who allegedly helped the former president in his efforts to overturn the 2020 election.

**Jan. 6 committee:** Scott Perry, GOP congressman, refuses to cooperate with Jan. 6 investigation committee

**Presidential pardons:** At least 5 House Republicans sought pardons after Jan. 6, including Brooks, Gaetz, testimony reveals

The Pennsylvania lawmaker said in January 2021 that he introduced Trump and Department of Justice lawyer Jeffrey Clark, a top Justice official who was pushing Trump's baseless claims of election fraud. Clark drafted a letter urging officials in six states won by Biden to

submit a different group of electors who supported Trump, according to evidence shown by the Jan. 6 committee.

Former senior Justice Department officials have testified that Perry had "an important role" in Trump's effort to try to install Clark as the acting attorney general. Other administration lawyers rejected the idea as "asinine" and potentially criminal, and Trump relented only after top Justice Department and White House lawyers threatened to resign in protest.

Perry was one of five Congress members to request a pardon from the former president after the Jan. 6 Capitol attack, according to testimony from former White House officials during the Jan. 6 hearings.

Fox News first reported the seizure of Scott's cellphone.

*Contributing: Associated Press*

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    Page 139 of 403

**THE WHITE HOUSE**

WASHINGTON

January 19, 2021

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Avenue, N.W.
Washington, D.C. 20408

Dear Mr. Ferriero:

In a letter dated February 16, 2017, I designated pursuant to 44 U.S.C. § 2204(d) three persons to act as my representatives with respect to exercising discretion or authority granted to me for the protection and disposition of the Presidential Records of my Presidency. I hereby revoke those designations.

With this letter, I hereby designate Mark R. Meadows, Pasquale A. Cipollone, John A. Eisenberg, Patrick F. Philbin, Scott F. Gast, Michael M. Purpura, and Steven A. Engel as my representatives in all respects that pertain to the records of my Presidency and, upon my death or disability, each representative may exercise all authority granted to me under chapter 22 of title 44, United States Code, or any other provision of law related to the records of my Presidency.

Sincerely,



FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |

**GOVERNMENT'S REPLY IN FURTHER SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE WHY TWITTER INC. SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH A SEARCH WARRANT**

Twitter Inc. ("Twitter") declined to comply with a clear order issued by this Court: a search warrant requiring Twitter to provide information associated with the Twitter account "@realDonaldTrump." ECF No. 4 (the "Warrant"). Twitter acknowledges the Warrant's validity but nonetheless refuses to comply unless it is first permitted to disclose the Warrant to former President Donald J. Trump and the former President is provided with an opportunity to challenge it. Indeed, Twitter claims that it will refuse to execute the Warrant *even were* the government to retract the Non-Disclosure Order ("NDO")—which the government will not do. The Court should require Twitter to comply with this Warrant just like any other. Twitter should not be permitted to dictate a special protocol.

## I.  Legal Standard

"A civil contempt action is characterized as remedial in nature, used to obtain compliance with a court order or to compensate for damages sustained as a result from noncompliance." *United States v. Shelton*, 539 F. Supp. 2d 259, 262 (D.D.C. 2008) (citing *Evans v. Williams*, 206 F.3d 1292, 1294-95 (D.C. Cir. 2000)). The party seeking the finding of contempt has the burden of establishing by clear and convincing evidence that "(1) there was a clear and unambiguous court order in place; (2) that order required certain conduct" by Respondent; and (3) Respondent "failed

FILED UNDER SEAL

to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30

(D.D.C. 2014); *see also Food Lion, Inc. v. United Food and Commercial Workers*, 103 F.3d 1007,

1016 (D.C. Cir. 1997) (rejecting argument that movant must demonstrate bad faith by contemnor);

*Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). "[A litigant's]

intent in failing to comply . . . is irrelevant." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d

22, 26 (D.D.C. 2015).

If the party seeking contempt sanctions makes the above *prima facie* showing, the burden

shifts to the putative contemnor to produce evidence justifying noncompliance either because of

an inability to comply or good faith and substantial compliance. *MasTec Advanced Technologies*

*v. National Labor Relations Board*, No. 1:20-mc-0022, 2021 WL 4935618, at *3 (D.D.C. June 3,

2021). Both good faith and substantial compliance "must be accompanied by adequate detailed

proof." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass*

*LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010). "To prove good faith substantial compliance, the

contemnor must show that it 'took all reasonable steps within [its] power to comply.'" *SEIU Nat'l*

*Indus. Pension Fund v. Artharee*, 48 F. Supp. 3d 25, 30 (D.D.C. 2014) (alteration in original)

(quoting *Int'l Painters*, 736 F. Supp. 2d at 40). A party's good faith may be a factor in determining

whether substantial compliance occurred, and may be considered in mitigation of damages, but

good faith alone is not sufficient to excuse contempt. *Food Lion, Inc.*, 103 F.3d at 1017-18.

**II.     The Requirements for Holding Twitter in Civil Contempt Are Satisfied Here**

**A.       Twitter Has Failed to Comply with a Clear and Unambiguous Order**

The Warrant issued by this Court unambiguously requires Twitter to produce the records

delineated in Attachment B. Twitter knows full well what it must do to comply with the Warrant.

Indeed, on February 5, 2023, Twitter informed the government that it is fully prepared and able to

"produce data responsive to the Warrant." Email from George Varghese, Feb. 5, 2023; *see* Opp. 10. But Twitter states it will comply with the Warrant and provide the data only if the government agrees not to review that data until this Court decides Twitter's motion to vacate or modify the separate NDO. In short, Twitter refuses to comply because it has purportedly decided to "safeguard the privacy" of a particular user.  Opp. 3.

**B.    Twitter Does Not and Cannot Demonstrate an Inability to Comply or Good Faith Substantial Compliance**

Twitter offers no technical obstacle to complying with the Warrant.  Indeed, as noted above, it appears Twitter has already gathered the responsive information.  Instead, Twitter claims that legal obstacles prevent it from complying with this Court's order.  But Twitter can avail and has availed itself of an independent legal avenue to challenge the NDO.  It has entirely failed to comply with the Warrant, let alone substantially comply.  And even if it had substantially complied, its invocation of an unfounded executive privilege claim belies its purported good faith.

**1.    Twitter Cannot Refuse to Comply Based on Potential Privileges Possessed by Third Parties**

Twitter does not dispute that no legal authority permits a third party served with a search warrant to contest that warrant before it is executed. *See* Opp. 4; Gov. Mot. at 1, 3. Twitter instead contends (Opp. 4) that the absence of any legal mechanism to press such a challenge is "entirely unsurprising" given the "unique situation" implicating "significant and unresolved legal issues" that the Warrant presents. But the potential for a legal challenge to information obtained through a search warrant, whether "unique" or not, provides no basis for the recipient of a search warrant to refuse, on behalf of a third party, to execute it.

The practical consequences of adopting Twitter's amorphous standard are momentous. As Twitter observes (Opp. 3-4), Twitter users on whose accounts a search warrant has been executed

could potentially advance any number of legal arguments, including privilege claims (such as attorney-client, clergy-penitent, Speech or Debate) and suppression claims under the Fourth Amendment. Twitter correctly acknowledges (Opp.3) that it lacks standing to assert its users' "rights and privileges" but nonetheless proceeds to advocate an approach that would permit Twitter not to comply with a court order directing it to execute a search warrant any time Twitter deems the situation "unique" (Opp. 4) or determines that the warrant presents "challenging and substantial issues" (Opp.1). Neither legal authority nor an overarching interest in protecting the privacy of its users permits Twitter to arrogate such power to itself. *See Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 56 (2d Cir. 2017) (Carney, J, concurring in the order denying rehearing en banc) (noting that a warrant "issued by a neutral magistrate judge upon a showing of probable cause . . . satisfied the most stringent privacy protections our legal system affords"). Here, Twitter seeks to deploy that power to characterize the Warrant as "unique" and, in contravention of the court's order, unilaterally impose heightened requirements for execution of a search warrant where a high-profile client is involved. The government merely seeks evenhanded application of established legal principles.

Furthermore, the potential for collateral litigation around search warrants under Twitter's approach is significant. Every time Twitter deems a case—or a user—"unique," it could intervene in a case to delay a criminal investigation. But even Twitter recognizes that that is not how the law works because it is not permitted to notify users of law enforcement requests where "legally prohibited from doing so." Opp. 3. Here, such a prohibition exists, yet Twitter nonetheless seeks special treatment for this user.

None of the cases that Twitter cites supports its novel approach. *See* Opp. 5-6. For one, none of those cases involved a potential executive privilege claim—a claim that lacks merit. *See*

- 4 -

*infra* at 6-9. Additionally, none of those cases involved a pre-enforcement challenge brought by a third party that held no cognizable privilege in the materials to be seized under the warrant. *See, e.g. In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, 11 F.4th 1235, 1238-39 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022) (challenge brought by attorneys "assert[ing] attorney-client and work-product privilege over at least some of [the] documents"); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 164-65 (4th Cir. 2019) (challenge brought by law firm invoking attorney-client and work-product privilege over materials); *Klitzman, Klitzman & Gallager v. Krut*, 744 F.2d 955, 956 (11th Cir. 1984) (post-search challenge brought by defendant, an attorney, whose materials were seized); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (pre-enforcement challenge to procedure for review of potentially privileged materials brought by the defendant); *United States v. Ritchey*, No. 21-cr-6, 2022 WL 3023551, at *1-*2 (S.D. Ohio June 3, 2022) (post-search challenge to filter protocol).[1] In each of those cases, moreover, the search warrant was executed, and the parties then litigated whether any right or privilege precluded full government access to them. In short, Twitter can point to no case approving its course of action here: refusing to execute a valid search warrant given the potential for a privilege claim.

Nor does Twitter's attack (Opp. 11-14) on *Google LLC v. United States*, 443 F. Supp. 3d 447 (S.D.N.Y. 2020), aid its argument. As relevant here, *Google* stands for the uncontroversial principle—borne out by the briefing schedule this Court has now adopted—that the Warrant and

---

[1] The Third Circuit's decision in *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987), which involved a physician seeking to protect the privacy rights of his patients, is nothing like Twitter's relationship to its users—as Twitter itself recognizes. *See* Opp. 3 (recognizing the "medical professional and patients" privilege); *see also United States v. Westinghouse Elec. Corp.*, 638 F.3d 570, 572 (3d Cir. 1980) (similar approach involving "privacy interests of employees in their medical records").

the NDO do not travel together.  *Id.* at 455.  Twitter criticizes *Google*'s reasoning with respect to the decision to deny the movant's efforts—similar to Twitter's here—to vacate or modify the NDO.  Whatever the merits of that reasoning, Twitter's obligation to comply with a clear court order does not turn on it.  To be sure, the court in *Google* relied largely on its analysis rejecting the motion to vacate the NDO, which in turn mooted Google's motion to stay execution of the warrant.  But even if Twitter succeeded on its NDO challenge, Twitter identifies no case for the proposition that enjoining execution of the Warrant would also be appropriate.[2]

### 2.    In Any Event, Executive Privilege Provides No Basis for Twitter to Refuse Compliance

Even if Twitter could rely on a third party's potential privilege claims as a basis to refuse compliance with a search warrant, it fails to demonstrate a colorable claim of executive privilege here that could justify such non-compliance.  The executive-privilege claims that Twitter speculates might be available to the former President are entirely without merit.

The former President would have no basis to challenge the government's access to his Twitter account based on executive privilege because the warrant requires access to the materials by the Executive Branch itself.  Executive privilege is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. at 708, and it "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. Gen. Servs. Admin.*, 433 U.S. 424, 447 (1977). The privilege exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449. Consistent with the privilege's function of protecting the Executive Branch as an institution, it may be invoked in

---

[2] Twitter's reliance on two First Amendment prior restraint cases (Opp. 14) is inapposite.  Among other things, neither case involved an ongoing criminal investigation where, as here, the government had obtained a search warrant.

appropriate cases to prevent the sharing of materials outside the Executive Branch—*i.e.*, with Congress, the courts, or the public. *Cf. Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (per curiam) (noting unresolved questions about whether and under what circumstances a former President can invoke the privilege to prevent such "disclosure"—there, to Congress). But the separation-of-powers principles that form the basis for executive privilege provide no justification to prevent the Executive Branch itself from accessing the materials.

Twitter cites no case in which executive privilege has been successfully invoked to prohibit the sharing of documents within the Executive Branch, and the government is aware of none. To the contrary, in what appears to be the only case in which such an assertion has ever been made, *Nixon v. GSA*, the Supreme Court rejected former President Nixon's assertion that a statute requiring the General Services Administration to take custody of and review recordings and documents created during his presidency violated either the separation of powers or executive privilege. 433 U.S. at 433-36. Addressing the separation of powers, the Court emphasized that the Administrator of the GSA "is himself an official of the Executive Branch," and that the GSA's "career archivists" are likewise "Executive Branch employees." *Id.* at 441. The Court rejected the former President's invocation of privilege against the statutorily required review by the GSA, describing it as an "assertion of a privilege against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. The Court explained that the relevant question was whether review by Executive Branch officials within the GSA would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451. And it held that the question was "readily resolved" because the review in question was "a very limited intrusion by personnel in the Executive Branch sensitive to executive branch concerns." *Id.*

Indeed, when the former President previously sought to prevent the Department of Justice

FILED UNDER SEAL

from accessing documents from his presidency on the basis of executive privilege, the United States National Archives and Records Administration ("NARA") flatly rejected that attempt.[3] After NARA found documents with classified markings within 15 boxes of presidential documents that the former President provided to NARA and notified the Department of Justice, the former President sought to prevent the Department of Justice from accessing the materials on the basis of executive privilege. *See* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022) at 1, *available at* https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf. NARA rejected those efforts, noting that with respect to the former President's attempt to assert executive privilege to prevent others within the Executive Branch from reviewing the documents, its decision was "not a close one." *Id.* at 3.

The issue here is similarly not close, and Twitter's speculation is even further afield given the extreme unlikelihood that the former President's Twitter account will contain confidential communications subject to executive privilege. The presidential-communications privilege, which appears to be the only form of executive privilege to which Twitter refers in its brief, applies to communications involving the President and his immediate White House advisers (and their staff) that "reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege applies only to "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *GSA*, 433 U.S. at 449 (internal citation and quotation omitted). Twitter provides no basis to conclude that the former President used his Twitter account—rather than face-to-face conversations, written memoranda, or even electronic

---

[3] At the time *Nixon v. GSA* was litigated, the National Archives was a part of the General Services Administration. In 1985, Congress created the National Archives and Records Administration as a separate agency.

communications through government accounts—to communicate confidentially with his advisors about presidential matters. Indeed, as the former President has acknowledged, he used the account during his presidency "as a channel for communicating and interacting with the *public* about his administration." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021) (emphasis added). Twitter's supposed concern about potential executive-privilege issues provides no basis to refuse compliance with the valid warrant here.

**III.    The Court Should Enter an Order Imposing Monetary Sanctions Until Twitter Complies with the Warrant**

Twitter's failure to comply with a clear and unambiguous order warrants a finding of contempt and coercive sanctions.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947) (citation omitted). A "per diem, coercive fine . . . is the epitome of a civil sanction" for contempt. *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004). "[F]ines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994). Contempt sanctions "must be sufficiently hefty such that the contemnors are induced to comply and the Court 'must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, Misc. Nos. 18-175, 18-176, 18-177 (D.D.C.

Apr. 10, 2019) (BAH), 2019 WL 2182436, at *4 (quoting *United Mine Workers of Am.*, 330 U.S. at 304).

To maximize the likelihood of obtaining Twitter's rapid compliance with this Court's decision, the government respectfully requests that the Court impose escalating daily fines. *See Pigford*, 307 F. Supp. 2d at 54 (adopting fine of $1,000 per day for first month of contempt, increasing by $1,000 for each subsequent month the contempt continued unpurged). The amount of any fine should be commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay.[4] *See, e.g.*, *NLRB v. Local 3, International Brotherhood of Elec. Workers*, 471 F.3d 399, 405 (2d Cir. 2006) (affirming a per-violation prospective compliance fine plus an additional $5,000 per day for each day that a violation continues); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 2019 WL 2182436, at *5 (explaining that a "[d]aily imposition of a $50,000 fine is fitting" for "multi-billion-dollar banks disregarding an order to produce records or a witness essential to an investigation into a state-sponsor of terrorism's proliferation of nuclear weapons"); *id.* ("Courts previously have approved the amount of $50,000 per day as an appropriate sanction for other well-resourced corporations and international banks.") (citing multiple cases in support); *see also Pigford*, 307 F. Supp. 2d at 54.

---

[4] As of October 2022, Twitter was valued at over $40 billion. *See* Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, New York Times (Oct. 27, 2022); *available at* https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

- 10 -

Respectfully submitted,

JACK SMITH
Special Counsel

By:   /s/ *Mary L. Dohrmann*
      Mary L. Dohrmann (N.Y. Bar No. 5443874)
      Gregory Bernstein (California Bar 299204)
      Assistant Special Counsels
      950 Pennsylvania Avenue, N.W.
      Washington, D.C. 20530
      (202) 714-9376

- 11 -

* * * * * SEALED * * * * *

* THIS PAGE LEFT INTENTIONALLY BLANK *

SEALED MATTER ENCLOSED

FOR AUTHORIZED PERSONS ONLY

* * * * * SEALED * * * * *

—— * * * * * SEALED * * * * *——

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
In the Matter of The Search of    ) Case No. 23-SC-31
Information That is Stored         )
at Premises Controlled by          )
Twitter, Inc.                      )
                                   )
UNITED STATES OF AMERICA,          ) February 7, 2023
          Interested Party,        ) 1:32 p.m.
                                   ) Washington, D.C.
TWITTER,                           )
          Interested Party.        )
* * * * * * * * * * * * * * * *

**SEALED**
**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES**:

FOR THE UNITED STATES:
                    GREGORY BERNSTEIN
                    JAMES PEARCE
                    THOMAS WINDOM
                    MARY DOHRMANN
                    Office of Special Counsel
                    950 Pennsylvania Avenue NW
                    Washington, DC 20530
                    (202) 804-7000


FOR TWITTER:        GEORGE P. VARGHESE
                    ARI HOLTZBLATT
                    WHITNEY RUSSELL
                    BENJAMIN A. POWELL
                    WilmerHale
                    2100 Pennsylvania Avenue NW
                    Washington, DC 20037 USA
                    (202) 663-6964


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.
——* * * * * SEALED  * * * * *——

* * * * * **SEALED** * * * * *

1                    **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3      Case No. 23-SC-31, In the matter of the search of

4      information that is stored at premises controlled by

5      Twitter, Inc.  Interested parties:  United States of America

6      and Twitter, Inc.

7              Counsel, please come forward and state your names

8      for the record, starting with the government.

9              MR. BERNSTEIN:  Good afternoon, Your Honor.

10     Greg Bernstein, Thomas Windom, Mary Dohrmann, and

11     James Pearce for the United States.

12             THE COURT:  All right.  Just so you all know, if

13     you are feeling okay today, and you are fully vaccinated,

14     when you are speaking you can remove your masks so we can

15     all hear you better.

16             During the pandemic, I guess, it was nice that I

17     have so much strong air conditioning in my courtroom, but it

18     does create a lot of white noise.  It's a lot easier to

19     understand you if you are speaking without your mask.

20             For Twitter.

21             MR. VARGHESE:  Good afternoon, Your Honor.

22     My name is George Varghese on behalf of Twitter.  I am

23     joined today by my colleagues, Ari Holtzblatt, Ben Powell --

24             THE COURT:  Okay, wait.  Slow down.

25             So you are Mr. Varghese.  Are you going to be

* * * * * **SEALED**  * * * * *

———— * * * * * SEALED * * * * * ————

```
1    mostly speaking today, Mr. Varghese.

2              MR. VARGHESE:  Yes, Your Honor.

3              THE COURT:  Who else is there?

4              MR. VARGHESE:  Ari Holtzblatt.

5              THE COURT:  Ari Holtzblatt.  Which one of you is

6    that?

7              MR. HOLTZBLATT:  I am, Your Honor.

8              MR. VARGHESE:  Ben Powell.

9              THE COURT:  Ben Powell.  P -- Powell with a "P"?

10             MR. POWELL:  Yes, Your Honor.

11             THE COURT:  Got it.

12             MR. VARGHESE:  And Whitney Russell.

13             THE COURT:  All right.  Who is the personal

14   representative from Twitter?

15             MR. VARGHESE:  We don't have a personal

16   representative from Twitter.

17             THE COURT:  I thought my order directed that there

18   be a personal representative from Twitter here.

19             MR. VARGHESE:  I don't believe the minute order

20   did, Your Honor.

21             THE COURT:  Okay.  Maybe the government wanted a

22   personal representative?

23             MR. VARGHESE:  That's correct, Your Honor.  I

24   believe their draft order did.  But, in the minute order,

25   the Court did not --
```

———— * * * * * SEALED  * * * * * ————

———— * * * * * SEALED * * * * *————

1        THE COURT:  Okay.  So I only have the attorneys --

2    outside counsel attorneys for Twitter sitting at counsel

3    table?

4        MR. VARGHESE:  Yes, Your Honor.

5        THE COURT:  Okay.  Just so I know who is who.

6        All right.  So we're here, first, on the

7    government's motion for issuance of the order to show cause

8    why Twitter should not be held in contempt; although, I know

9    that we have this other pending motion filed by Twitter, and

10   some of the conversation today will probably address both.

11       And even though I gave briefing -- a briefing

12   schedule for the First Amendment challenge to the NDO, that

13   doesn't require briefing to be done until the end of

14   February -- towards the end of February.  So I would like to

15   focus on the order to show cause for contempt first;

16   although, there is not that much difference between a motion

17   for an order to show cause why a party should be held in

18   contempt and a contempt hearing itself.

19       So let me just point out that under our local

20   Criminal Rule 6.1:  All hearings affecting a grand jury

21   proceeding shall be closed, except for contempt proceedings

22   in which the alleged contemnor requests a public hearing.

23       I am confident the government is not requesting a

24   public hearing.

25       Is Twitter requesting a public hearing today?

———— * * * * * SEALED  * * * * *————

**JA151**

────── * * * * * SEALED * * * * * ──────

1          MR. VARGHESE:  No, Your Honor.

2          THE COURT:  Okay.  Perfect.  Because that would

3     have been denied, but that saves me time.

4          All right.  So let me just put on the table some

5     of the issues that I want to discuss today so you all --

6     we're all lawyers.  None of us like to be surprised.  Let me

7     just tell you the things that I am puzzling over, generally.

8          The precise deadline for the search warrant's

9     compliance given the back and forth between the parties, the

10    formal or informal extensions that the government gave.

11         Second, I need to be clear about what Twitter has

12    seen of the warrant package.  I don't know how many of you

13    at Twitter's table have ever been prosecutors; but you know

14    the warrant is a very thin little part -- important part,

15    critical part, it is a court order -- a thin part of a

16    warrant package.  I am not clear from this record what

17    Twitter has seen and what it hasn't.  It doesn't know very

18    much at all, although it thinks it does, about the

19    government's investigation; but it certainly doesn't know, I

20    don't think, very much about the warrant that I signed and

21    all of its parts.  But I need to be clear about what it does

22    and doesn't know about that.

23         Third, Twitter's thrown up "NARA," and I need to

24    know where there is an overlap or not between what the

25    search warrant is demanding and requiring Twitter to turn

────── * * * * * SEALED  * * * * * ──────

1   over, and what NARA holds now or potentially in the future.

2   Not that that's all relevant here.  But I actually want to

3   be clear in my own mind in addressing, if not today, with

4   respect to the NDO challenge -- the merits of Twitter's

5   arguments.

6           Fourth, Twitter's standing here to raise any

7   issues as to the NDO or the warrant and the account user's

8   privileges, and whether those concerns -- even if Twitter

9   doesn't have standing -- warrant, on consideration, a

10  rewrite of the Court order, which is what Twitter is

11  actually demanding here, which is a rewrite of the warrant.

12          And then, finally, whether Twitter has acted in

13  good faith, and what is necessary for enforcement and

14  compliance with the Court ordered warrant.

15          Those are, generally, the topics I plan to

16  discuss.

17          Who is arguing on behalf of the government?

18          MR. BERNSTEIN:  Greg Bernstein, Your Honor.

19          THE COURT:  Okay.  Mr. Bernstein, step forward to

20  the podium.

21          Okay.  So the warrant, by its terms, is pretty

22  explicit about saying that the warrant issued on

23  January 17th gave ten days for the warrant returns to be

24  delivered to the government, which brings us to -- if my

25  math is right, and I am a mere J.D., January 27th -- which

——— * * * * * SEALED * * * * *———

1  is -- again, if my math is right -- about ten days ago; ten

2  days --

3          MR. BERNSTEIN:  Yes, Your Honor.

4          THE COURT:  -- in a matter of national importance

5  pending before the special counsel's office.

6          MR. BERNSTEIN:  Yes, Your Honor.

7          THE COURT:  Okay.  But then, when I look at these

8  negotiations going back and forth between Twitter and the

9  government -- I guess it was you on the other end of the

10  communications with the Twitter general counsel or counsel?

11          MR. BERNSTEIN:  Yes, Your Honor.  I was the one

12  speaking with ███████████████ who identified █████ as the

13  most senior counsel for Twitter.

14          THE COURT:  Okay.  By my review back and forth of

15  this, you gave Twitter an extension -- almost until

16  February 1 -- for Twitter to provide authority, I guess, for

17  refusing to comply with the warrant on a timely basis.  But

18  it seemed like the government was giving little extensions

19  back and forth.

20          So when is it that the government expected this

21  warrant, given that back and forth with Twitter's counsel --

22  when did the government expect Twitter to comply?

23          MR. BERNSTEIN:  So, Your Honor, just to be clear,

24  the order itself, which I don't think the government has any

25  authority to modify unilaterally -- just as Twitter

——— * * * * * SEALED  * * * * *———

─── * * * * * SEALED * * * * * ───

1    doesn't -- ordered the production of these records by

2    January 27th.  The negotiations to which Your Honor

3    refers --

4              THE COURT:  Yes.  But in terms of fairness and

5    equity and bad-faith measurements, I am looking at

6    compliance here, in terms of and assessing what the contempt

7    penalty should be; I look at the amount of the delay.

8              MR. BERNSTEIN:  Yes, Your Honor.

9              THE COURT:  Ten days is a long time.  But I am not

10   sure that ten days is the right assessment of that delay.

11             MR. BERNSTEIN:  I can give Your Honor a timeline

12   of the discussions --

13             THE COURT:  Don't.  Don't.  The back and forth is

14   ridiculous.  What's the government -- I mean, I don't have

15   time for that, and I have read it -- between the declaration

16   and the government's papers, and the back and forth.

17             What is the bottom line?  When did the government

18   expect, as a final drop dead date, for the warrant returns

19   to be put in your hands?

20             MR. BERNSTEIN:  It's January 27th.

21             And the request for authority by February 1 was

22   not to say:  We are extending the deadline of the warrant

23   which, of course, is Your Honor's order.  It was to say:

24   Give us authority for your position by this time or we

25   intend to pursue court intervention.

─── * * * * * SEALED  * * * * * ───

————— * * * * * SEALED * * * * * —————

1          THE COURT:  All right.  Now let's turn to the

2    warrant package.  Okay.

3          So the warrant package consisted of an incredibly

4    lengthy affidavit, the warrant itself.  The warrant itself

5    had Attachment A, property to be searched; it had

6    Attachment B, particular things to be searched; and

7    Attachment B had different parts.

8          Now, certainly, Twitter hasn't seen the

9    application part of the package; it hasn't seen the

10   affidavit part of the package.  Is that right?

11         MR. BERNSTEIN:  Yes, Your Honor.

12         THE COURT:  That's correct?

13         MR. BERNSTEIN:  That's correct, Your Honor.

14         THE COURT:  Certainly, Twitter has seen the

15   warrant and Attachment A; is that correct?

16         MR. BERNSTEIN:  That's correct, Your Honor.

17         THE COURT:  And out of Attachment B, has Twitter

18   seen any part other than Part 1?

19         MR. BERNSTEIN:  No, Your Honor.

20         THE COURT:  Okay.  Well, that's sort of what I

21   thought, but I wanted to make sure.

22         So Twitter, as it sits here, has zero idea and

23   zero affirmation about whatever filter protocol or procedure

24   there is attached to this warrant in terms of processing any

25   warrant returns; is that correct?

————— * * * * * SEALED  * * * * * —————

——— * * * * * SEALED * * * * * ———

1        MR. BERNSTEIN:  That's correct, Your Honor.

2        THE COURT:  And if they know, it's not from the

3    government.

4        MR. BERNSTEIN:  I'm sorry.  Can you repeat the

5    question, Your Honor?

6        THE COURT:  They wouldn't know from the

7    government.

8        MR. BERNSTEIN:  They would not know from the

9    government, Your Honor, that's correct.

10       THE COURT:  All right.  So to the extent that

11   Twitter is standing here, as I understand their position,

12   trying to protect any privilege of the account user with

13   this solution of providing prior notice to the account user,

14   they are taking no account because they can't -- because

15   they haven't seen it and they don't know anything about any

16   filter protocol that might be attached to this warrant.

17       MR. BERNSTEIN:  That's correct, Your Honor.  They

18   do not know about any filter protocol that could or could

19   not be attached to the warrant.

20       THE COURT:  Got it.  Okay.

21       I just want to make it clear, when providers step

22   in here and take up my time on what should be a simple

23   processing of a warrant, exactly how much in the dark they

24   are.  Okay.

25       Now let's turn to what came up in your discussions

——— * * * * * SEALED  * * * * * ———

**JA157**

* * * * * **SEALED** * * * * *

1    with the Twitter lawyer, in-house lawyer, and was also put

2    in the lawyer's declaration.  I also saw in Twitter's

3    papers, here, that Twitter believes that the government

4    could obtain all of the information it's seeking in the

5    search warrant from NARA, the good old archivist of the

6    United States.

7         So does the government know whether NARA has all

8    of the information sought by this search warrant directly

9    from Twitter?

10        MR. BERNSTEIN:  We have spoken to NARA after we

11   had these communications with Twitter.  And they represented

12   to us that there is not complete overlap between the

13   Attachment B and the records in their possession.

14        THE COURT:  Okay.  Do you know what they have

15   versus what the warrant is seeking?

16        MR. BERNSTEIN:  Could I have one moment to confirm

17   with co-counsel, Your Honor?

18        THE COURT:  Yes.

19        And let me just say, it may be that Twitter has

20   better information on that because Twitter supposedly

21   provided the information to NARA.  But go ahead.

22        (Whereupon, government counsel confer.)

23        MR. BERNSTEIN:  Thank you, Your Honor.

24        So, in the preliminary conversation we had with

25   counsel for NARA, their representation was more, on a

* * * * * **SEALED** * * * * *

—— * * * * * **SEALED** * * * * * ——

1   general level, that the data that NARA had in its possession

2   was not a complete overlap with what we would have in the

3   Attachment B.  And I believe that Twitter's opposition also

4   makes reference to much of the data being in there as --

5           THE COURT:  I know.  I am going to talk to them

6   about that.  I saw that too.  It was pretty clear.  Not a

7   complete overlap -- not the briefing.  The briefing was a

8   little bit more vague about that but, certainly, the

9   declaration was more precise; that they said much of the

10  information required under the warrant was turned over to

11  NARA without saying a complete overlap.

12          MR. BERNSTEIN:  That's correct, Your Honor.

13          THE COURT:  But do you know what is missing from

14  NARA?

15          MR. BERNSTEIN:  We are not in a position

16  ourselves, at this moment, to make a representation --

17          THE COURT:  So, Twitter, you be ready to answer

18  that.

19          Okay.  So, now, the Presidential Records Act -- I

20  am going to read you part of this -- provides, in relevant

21  part, quote:  When the archivist determines under this

22  chapter to make available to the public any presidential

23  record that has not previously been made available to the

24  public, the Archivist shall promptly provide notice of such

25  determination to the former President during whose term of

—— * * * * * **SEALED** * * * * * ——

* * * * * SEALED * * * * *

1    office the record was created.  That's at 44 U.S.C. Section

2    2208(a)(1)(A)(i).

3         Is that provision the basis for the government's

4    belief -- and I think you made the representation to the

5    Twitter counsel -- that the government would have to inform

6    the former President before they were able to get this

7    information from NARA?  You couldn't do it covertly.

8         Is that the specific provision that you are

9    relying on?

10        MR. BERNSTEIN:  I am not sure that's the specific

11   provision.  But I do know that -- having spoken to NARA

12   counsel, they have made it clear to us that there will be

13   notice to the President if we attempt to obtain this

14   evidence from them directly.

15        THE COURT:  And you heard that from whom?

16        MR. BERNSTEIN:  That's Gary Stern, the general

17   counsel of NARA, Your Honor.

18        THE COURT:  But you didn't find out from

19   Gary Stern what provision of the Presidential Records Act he

20   was relying on, and whether it was this one in particular?

21        MR. BERNSTEIN:  No, Your Honor.

22        THE COURT:  Well, I mean, Gary Stern is a great

23   lawyer, but I would still ask him for a citation.

24        Because, if it's this provision, I really am

25   puzzled -- when there is a request to NARA on a covert basis

* * * * * SEALED * * * * *

─── * * * * * SEALED * * * * * ───

1   pursuant to a warrant or a subpoena to produce information,

2   that's not producing it to the public.  So I am not sure why

3   that would require notice -- an advance notice to the

4   privilege -- to the former President, whose records they are.

5            MR. BERNSTEIN:  We will go back with Gary Stern

6   and hash that out, Your Honor.

7            As a practical matter, that has been the process

8   thus far; that, when we have made these requests for

9   information in the possession of NARA, that there's been

10  notification, and the President has had -- the former

11  President's had some opportunity to challenge that process.

12           THE COURT:  Okay.  Even when the government is

13  serving a subpoena?  So not for public dissemination?

14           MR. BERNSTEIN:  Yes, Your Honor.

15           THE COURT:  All right.  Well, I am sort of

16  curious.  Maybe, when you are litigating the rest of this,

17  you can talk to Mr. Stern who knows the Presidential Records

18  Act, I know, inside and out.  He can educate all of us

19  because, as I look at the PRA, I am not sure where he is

20  getting that.

21           MR. BERNSTEIN:  We'll find out, Your Honor.

22           THE COURT:  Okay.  But neither here nor there, in

23  some ways.

24           But -- and also, I actually have a question about

25  whether this Twitter account used by the former President

─── * * * * * SEALED   * * * * * ───

1    and his staff, I guess, is even subject to the Presidential

2    Records Act.

3         I mean, the Presidential Records Act says:  The

4    President may not create or send a presidential record using

5    a nonofficial electronic message account unless the

6    President copies an official electronic messaging account of

7    the President, in the original creation or transmission of

8    the presidential record; or forwards a complete copy of the

9    presidential record to an official electronic messaging

10   account of the President not later than 20 days after the

11   original creation or transmission of the presidential

12   record.  That's under 44 U.S.C. Section 2209(a)(1) through (2).

13        So if that provision of the Presidential Records

14   Act wasn't complied with by the former President with

15   respect to his Twitter account activity, does this mean that

16   this Twitter account activity falls outside the protection

17   of the Presidential Records Act, doesn't even qualify as a

18   presidential record, which, of course, would also have an

19   impact on any assessment of whether any contents of his

20   Twitter account are entitled to any executive privilege.

21        So have you conferred with NARA about whether the

22   Twitter account is even subject to the Presidential Records

23   Act?

24        MR. BERNSTEIN:  I can confirm with co-counsel

25   whether we have had conversations with NARA about that.

———— * * * * * SEALED * * * * * ————

1          The representation that we received from

2    Twitter -- and they can speak more about this -- is that --

3    I believe is that the White House made some effort to

4    designate part or all of the Twitter account as a

5    presidential record and turn it over to NARA.  But I think

6    that counsel for Twitter might be in a better position to

7    talk about what happened with respect to the President's --

8    the former President's Twitter account and how it ended up

9    going into the possession of NARA.

10          THE COURT:  Let me step back for a minute.

11          What constitutes a presidential record subject to

12    the PRA is pretty defined.  And that's helpful when you're

13    defining what a presidential record is and it's, certainly,

14    helpful when you are making an assessment of a presidential

15    privilege.

16          So do you think this is a rabbit hole or worth

17    inquiring about?

18          MR. BERNSTEIN:  Well, I wouldn't necessarily

19    characterize it as a "rabbit hole."  But I think, for

20    purposes of today's hearing, whether there was an

21    alternative route for the government to obtain these

22    records, yes or no --

23          THE COURT:  Is beside the point, I agree.

24          But as I said, part of this hearing is going to

25    be -- as you saw in my scheduling order, I am only going to

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1    have a hearing on the NDO if it's necessary; and I am trying

2    to make it not necessary by doing that hearing now.  And

3    actually, you know, in some ways, it's a constructive way to

4    hold a hearing; have the hearing so you can see what I am

5    puzzling over so you can address it in your briefing.

6         MR. BERNSTEIN:  Then that's fair, Your Honor.

7    I think for the purpose of today -- perhaps beside the

8    point.  For the purpose of the NDO briefing, it's helpful to

9    hear Your Honor's thoughts on this so that we can address

10   them before that hearing actually comes up.

11        THE COURT:  And you are welcome to tell me in your

12   briefing that this is a rabbit hole, not relevant, or

13   whatever.  But, I mean, I am just looking at this and

14   puzzling over how the PRA serves as any kind of valid

15   defense to compliance with a search warrant and trying to

16   figure out what the basis of that is at all when, you know,

17   I am not confident that the PRA -- that whatever was turned

18   over to NARA is what is being called for in the warrant.  I

19   am not confident that the Twitter account is even subject to

20   the PRA, let alone is a presidential record.  So I'd just

21   invite the government to help me figure that out.  Maybe you

22   will do it in your briefing.

23        Okay.  So now let's turn to more specific

24   executive privilege concerns, which is why Twitter wants to

25   rewrite the warrant to turn it from a covert warrant to an

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    advance notice warrant and, basically, not disclose any

2    information to the government until, I guess, the former

3    President's had an opportunity -- or the account user's had

4    an opportunity to decide whether he wants to challenge the

5    warrant and then, if so, to challenge the warrant, and then

6    assert whatever privileges he has.

7            Part of the reason Twitter says they're doing that

8    here is because -- they call the issues concerning executive

9    privilege difficult and novel questions.

10           Does the government find these issues difficult

11    and novel or is that just Twitter's take on these questions,

12    because it hasn't been living with them for as long as the

13    government has been?

14           MR. BERNSTEIN:  I have a few responses to that,

15    Your Honor, and I will be succinct here.

16           First -- one factual, one legal.  First, for

17    factual context, Twitter has proffered no evidence -- and I

18    don't think the government is aware of any evidence -- that

19    the former President used his private Twitter account to

20    engage in communications with his senior advisors about

21    matters that were vital to presidential decisionmaking.

22           There is no evidence in the record whatsoever --

23    and I don't think Twitter is going to proffer any

24    evidence -- to show that there is a serious possibility that

25    we are going to find executive privileged communications on

* * * * * SEALED * * * * *

———— * * * * * SEALED * * * * *————

1   his private Twitter account.

2           As a legal matter, the case law -- and I am

3   referring to *GSA versus Nixon* right now -- makes it clear

4   that it's not the same as, say, an attorney-client issue

5   where communications that are protected by the

6   attorney-client privilege don't belong to the government or

7   don't belong to the executive branch.  In this case, the

8   assertion here is that these are communications that are

9   privileged that belong to the executive branch.  Of course,

10  we are the executive branch.  So there can't be any unlawful

11  disclosure of communications that are protected by the

12  executive privilege to the executive branch itself.

13          That aside, Your Honor -- again, I think this is

14  what Your Honor was alluding to at the beginning of the

15  hearing.  The issuing judge, which is Your Honor, the Chief

16  Judge in this district already considered these issues,

17  already hashed these issues out when Your Honor issued a

18  warrant, a clear order to Twitter to produce the

19  Attachment B records within ten days.

20          THE COURT:  A clear order.  They haven't seen the

21  full order.  They haven't seen the full order but --

22          MR. BERNSTEIN:  But they have seen the order to

23  produce the records --

24          THE COURT:  Correct.

25          MR. BERNSTEIN:  -- the unambiguous order to

———— * * * * * SEALED  * * * * *————

——— * * * * * SEALED * * * * * ———

1    produce the records.

2          THE COURT:  They have seen the only part of it for

3    which they're responsible?

4          MR. BERNSTEIN:  That's correct.

5          And the response to that has been, "Thank you, no

6    thank you."  We have decided, on our own timetable, one that

7    we are -- seem to be implementing for what they consider to

8    be a quote-unquote unique client.

9          THE COURT:  Right.  Well, it's my view, just so,

10   Twitter, you are clear:  You may think these are difficult

11   and novel issues.  For the others of us in this room, they

12   are not.

13         All right.  On your last point, that it's hard to

14   imagine -- to paraphrase you -- it's hard to imagine that

15   the President would use a Twitter account to engage in the

16   types of confidential presidential decisionmaking issues

17   that are subject to executive privilege.

18         But Twitter apparently has these communications

19   mechanisms for direct messaging, and so on.  So is it

20   remotely possible that the former President could have

21   communicated with his closest advisors about presidential

22   decisionmaking on Twitter?

23         MR. BERNSTEIN:  Is it theoretically possible that

24   the President sent a direct message to, say, National

25   Security Advisor Robert O'Brien about invading Iran over a

——— * * * * * SEALED  * * * * * ———

**JA167**

——— * * * * * SEALED * * * * * ———

1    direct message over Twitter?  It's theoretically possibly.

2    I am aware of no evidence in the record or from the

3    investigation that would even remotely support that

4    assertion.

5         THE COURT:  So it's your view that should -- that

6    the mere fact that these were presidential communications on

7    Twitter, which -- from Twitter's perspective means:  Hey, it

8    could be subject to executive privilege.  From the

9    government's perspective means:  You have got to be kidding;

10   it's most likely nothing there is executive privilege.

11        MR. BERNSTEIN:  That would --

12        THE COURT:  We just have two different

13   perspectives on how important the Twitter activity was to

14   the conduct of presidential decisionmaking.

15        MR. BERNSTEIN:  That there were communications

16   between the President and senior advisors that were vital to

17   presidential decision-making, that was our reaction.

18        And, again, Twitter has this data in its

19   possession, and they haven't made any kind of representation

20   that they have specifically seen a communication that would

21   fit that bill.

22        THE COURT:  Although it would be pretty ironic,

23   isn't it, if Twitter, which is trying to stand up and

24   protect the privacy and executive privilege of a former

25   President, went scouring through it to find that evidence?

——— * * * * * SEALED  * * * * * ———

———— * * * * * SEALED * * * * * ————

1    But I guess it could, which also is something that one could

2    take into account --

3              MR. BERNSTEIN:  Well, Your Honor --

4              THE COURT:  -- in assessing the viability of an

5    executive privilege defense on Twitter's part to delay in

6    executing a warrant.

7              MR. BERNSTEIN:  Well, that is true.  But, Your

8    Honor, they have inserted themselves in this process in

9    contravention of Your Honor's order.

10             They have decided that they will not comply with

11   the order even though they understand it and they are not

12   challenging the validity of the warrant itself.  And they

13   have come to this argument without any ammunition to suggest

14   that there is any potential for this Twitter account to

15   contain communications that are protected by the executive

16   privilege.  That is the problem here, that this is an order

17   to show cause.  And they are not coming forth with any

18   evidence to show that they are unable to comply, that they

19   have substantially complied, or that the foundation of their

20   argument for why they're not complying has any basis, in

21   fact, whatsoever.

22             THE COURT:  Twitter has also raised what they

23   call -- and I quote:  The issue of executive privilege in

24   this context, including what limitations might need to be

25   imposed on derivative use of private presidential

———— * * * * * SEALED  * * * * * ————

**JA169**

—— * * * * * SEALED * * * * * ——

1    communications.  That's in the Twitter motion, at 12 through

2    13.

3            What does the government make of this term

4    "derivative use" and this whole argument?

5            MR. BERNSTEIN:  I think what they're trying to say

6    is that from their point of view -- and there is no citation

7    to authority for this.  But, from their point of view,

8    communications covered by the executive privilege are the

9    same as communications covered by something like

10   attorney-client privilege, where you could actually have

11   prosecutors being tainted off the prosecution team so that

12   no derivative use could be made of those communications.

13           My understanding of the case law surrounding

14   executive privilege is that is distinctly not the case.

15   There is no executive privilege, for example -- or no case

16   that says that -- one, there is no case that says that the

17   executive branch or another part of the executive branch

18   can't be exposed to these communications.  And there is

19   certainly no case to my knowledge that says that if another

20   part of the executive branch were exposed to the

21   communications then, all of a sudden, the prosecutors and

22   agents would be tainted off because of the mere possibility

23   of derivative use.

24           So, in other words, I think they're saying that

25   communications in the possession of the Department of

—— * * * * * SEALED * * * * * ——

———— * * * * * **SEALED** * * * * * ————

1    Justice that potentially could be covered by executive

2    privilege carry with them the same concerns as

3    attorney-client privilege communications; but there is no

4    authority for that proposition, Your Honor, and they have

5    not cited any.

6          THE COURT:  So, interestingly, having lived

7    through Special Counsel Robert Mueller's investigation as

8    chief judge -- it was interesting to me to see that Twitter

9    cites Special Counsel Mueller's report on the investigation

10   into Russian interference in the 2020 election and uses that

11   as -- cites an example where it says:  The White House was

12   given notice in advance of interviews regarding statements

13   made by the President, quote:  To give the White House an

14   opportunity to invoke the executive privilege in advance of

15   the interviews.

16          And it is certainly the practice, often, that a

17   privilege holder is given notice of a motion to compel

18   testimony, as the example from the Mueller report indicates,

19   from another person about potentially privileged

20   communications.  But that same advance notice to a privilege

21   holder is not given before the government obtains covertly

22   potentially privileged records because, obviously, obtaining

23   testimony from a person is not covert.  And if that

24   testimony is obtained from a person before the grand jury,

25   grand jury secrecy rules, under Federal Rule of Criminal

———— * * * * * **SEALED** * * * * * ————

———— * * * * * SEALED * * * * *————

1    Procedure 6(e), expressly do not subject a grand jury

2    witness to grand jury secrecy.

3         So having -- Twitter having pointed out what are,

4    to most of us -- not novel, not difficult -- but obvious

5    differences between the Mueller report example of giving

6    advance notice to a privilege holder before obtaining

7    potentially privileged testimony from a third person before

8    the grand jury because that's not going to be -- it's not

9    going to be covert.  That grand jury witness can go talk

10   about it to the privilege holder; compared to the obvious

11   difference, as I said, of a covert warrant.

12        Does the government have any other reasons for the

13   difference in procedures between giving advance notice to a

14   privilege holder before obtaining potentially privileged

15   testimony from a person, third party, and not giving such

16   advance notice in connection with covertly obtaining a

17   privilege holder's records pursuant to a Stored

18   Communications Act warrant?

19        MR. BERNSTEIN:  Well, it's just that, Your Honor.

20   It's the fact that if we speak to a witness, that's not a

21   covert step.  Again, the witness can go speak with the

22   President himself or herself, and that often can be the

23   case.  In this case, we're asking for Twitter to simply

24   comply with the unambiguous order that this order issued to

25   produce these records; "these records," being communications

———— * * * * * SEALED * * * * *————

———— * * * * * SEALED * * * * * ————

1    and materials related to the former President, that there is

2    no legal bar to us possessing it in the first place.

3         THE COURT:  Well, are there other reasons for not

4    giving advance notice in connection with a covert warrant to

5    a potential privilege holder that might be incorporated into

6    a nondisclosure order?

7         MR. BERNSTEIN:  In this case, the specific reasons

8    for why we sought the nondisclosure order -- I think if we

9    get into the granular facts, that will be part of an

10   *ex parte* submission.  But I can say now that we expect to

11   prevail on the litigation related to the NDO.  And the basis

12   for that -- there actually are concrete cognizable reasons

13   to think that:  If the former President had notice of these

14   covert investigative steps, there would be actual harm and

15   concern for the investigation, for the witnesses going

16   forward.

17        THE COURT:  And that's based on your own

18   investigation here, and not Volume II -- Volume II of the

19   Mueller report which lays out, in hundreds of pages, the

20   number of obstructive actions taken by the same person who

21   was the user of the account at issue?

22        MR. BERNSTEIN:  So, Your Honor, yes.

23        In our *ex parte* submission, we intend to lay out a

24   number of validated concrete facts independent of what is in

25   the Mueller report that make out a relatively clear case of

———— * * * * * SEALED * * * * * ————

**JA173**

——— * * * * * SEALED * * * * * ———

1    the President being someone who will take obstructive action

2    if he is notified of this warrant.

3        THE COURT:  All right.  So Twitter says that

4    producing the warrant returns prior to allowing the company

5    to alert the former President of the warrant would

6    irreparably injure its First Amendment rights, eliminate any

7    potential remedy for the former President.  And the

8    government's response is to turn to *Google* -- the *Google*

9    case from the Southern District of New York from 2020, as

10   standing for the uncontroversial principle that the warrant

11   and NDO do not travel together.

12       So is the government construing Twitter's First

13   Amendment concerns as tied only to the NDO and not to both

14   the NDO and the warrant?

15       MR. BERNSTEIN:  Yes, Your Honor.  And they are

16   construing it the same way, their First Amendment

17   challenge -- the only remedy they are seeking is to an

18   entirely separate order.  They are seeking, under the First

19   Amendment, to modify or vacate the nondisclosure order.

20       Nothing they do under the First Amendment will

21   alter the validity of the warrant itself or negate any

22   element of contempt.

23       If Your Honor can give me 30 seconds to make

24   another point here.  The citation of the First Amendment is,

25   to a certain degree, disingenuous for this reason:  If the

——— * * * * * SEALED  * * * * * ———

**JA174**

———— * * * * * SEALED * * * * *————

1  government -- and Twitter has represented this to the

2  government.  But if the government were to withdraw the NDO

3  today -- which we are not doing, but if we did -- Twitter

4  would have all the speech it wanted.  It would have no more

5  restrictions on speech; the First Amendment issue would be

6  gone, I think everybody agrees with that.

7          Even then they have represented that they will not

8  produce the records to the government.  They will continue

9  to violate the order because they have decided that they

10  will give this special account holder the opportunity to

11  litigate pre-indictment motions related to executive

12  privilege.

13          So, again, Your Honor, has ordered Twitter to

14  produce these records within ten days; they have said, "No,

15  thank you."  We are going to -- whether there is a First

16  Amendment issue or not, we are going to set a different

17  timetable, a special protocol; and we will give this account

18  holder the opportunity to litigate these motions about

19  executive privilege which, again, are frivolous considering

20  that there is no indication in the record that there will be

21  executive privilege communications on this account in the

22  first place.  And even if there were, we are the executive,

23  Your Honor.

24          THE COURT:  Okay.  So Twitter, in its opposition,

25  had, like, I don't know, I counted like 80 pages of an

———— * * * * * SEALED * * * * *————

* * * * * SEALED * * * * *

1    exhibit of all these press reports about the special counsel

2    investigation; I didn't look at it in detail.

3         But, in sum, Twitter's argument is:  Hey, the

4    government's interest in maintaining the NDO isn't

5    compelling because look at all this press.  Lots of people

6    know about this investigation going on.  The Attorney

7    General has an order on the DOJ website saying:  I have

8    appointed the special counsel to look at the following

9    issues.

10        Twitter goes on to say that the press has been

11   doing its job, thankfully.  And so, as a consequence, we all

12   know that, you know, the government, in aggressively

13   pursuing this investigation, has been looking at the

14   communications of a number of people.

15        So it sums up by saying:  It strains credulity to

16   believe that the incremental disclosures of this warrant

17   could somehow alter the current balance of public knowledge

18   in any meaningful way so as to cause harm to the

19   investigation.

20        So just like Twitter doesn't know much about the

21   warrant here at all, and has only seen a small sliver of the

22   entire warrant package, do you think that it strains

23   credulity to believe the incremental disclosure of this

24   order would somehow alter the current balance of public

25   knowledge in any meaningful way?

* * * * * SEALED  * * * * *

———— * * * * * SEALED * * * * * ————

1          MR. BERNSTEIN:  Absolutely not, Your Honor.

2          There is an incredible difference between the

3    public knowing about the existence of the investigation and

4    the account holder in this case knowing about a concrete,

5    investigative step that the government has taken.

6          And, again, I have to be careful about what I say

7    in this setting because I don't want to disclose information

8    that's covered by 6(e) or that otherwise would compromise

9    the investigation.  With that said, Your Honor, I think when

10   Your Honor gets our *ex parte* filing with respect to the NDO,

11   I think Your Honor will wholeheartedly reject the assertion

12   that it strains credulity to think that there could be

13   serious adverse consequences from the President finding out

14   about this search warrant.

15          THE COURT:  And Twitter goes on -- focusing on the

16   NDO -- that the government's proffered explanations for

17   needing the NDO appear conclusory and that there is no

18   reason to believe that notification of the warrant would

19   suddenly cause former President Trump or potential

20   confederates to destroy evidence, intimidate witnesses, or

21   flee prosecution, particularly since the former President

22   has announced that he is running in 2024.

23          And I did look at the NDO just to see is that

24   language just as specific as that, and it is.  It doesn't

25   have to be.  Under 2705(b), it's not just by the account

———— * * * * * SEALED * * * * * ————

**JA177**

— * * * * * SEALED * * * * * —

1    holder, it's by any other person who might flee, might

2    obstruct.  And this NDO was written fairly narrowly, to say

3    the least.

4         I think one thing that I hope the government takes

5    away from this interlude with Twitter is that the

6    boilerplate NDOs -- although in the applications are fairly

7    more detailed, and clearly and broadly -- the orders

8    themselves, you probably need to look at the more

9    boilerplate orders in the NDOs to make it as broad as the

10   application is requesting.

11        So do you want to respond to that? -- to Twitter's

12   comment that there is no reason to believe notification

13   would suddenly cause Trump or potential confederates to

14   destroy evidence, intimidate witnesses, or to flee

15   prosecution, or are you waiting on that for an *ex parte*

16   submission?

17        MR. BERNSTEIN:  We are waiting.  But I can give

18   Your Honor two responses in the meantime.

19        First, they don't know anything.  I mean, they

20   know some stuff.  They know what they have read in the

21   newspapers.  But they're making these confident factual

22   assertions without knowing the actual facts of the

23   investigation.

24        Number two, they have cited a number of news

25   articles.  They seem to have a robust understanding of what

— * * * * * SEALED  * * * * * —

—— * * * * * SEALED * * * * *——

1    is in the public record.  They seem to be ignoring the fact

2    that there is an entirely separate public investigation into

3    the former President for doing just that, for taking

4    obstructive efforts with respect to NARA's request to

5    retrieve classified documents, and then the government --

6    the grand jury's request to subpoena classified documents

7    from the former President, and the steps that he took to

8    obstruct those efforts.  So there will be considerably more

9    detail about the basis for the NDO when we brief this issue.

10          For now, though, the assertion that they're

11    making, one, is not based on any factual foundation that

12    they could possibly be aware of; and then, second, to the

13    extent that they are able to ascertain details from the

14    public record, they seem to be ignoring those details.

15          THE COURT:  Okay.  So let me just let me turn to

16    compliance since it's been ten days of delay.  I think if

17    Twitter can comply with production by 5 p.m. today -- is

18    that what the government is looking for, or are you looking

19    for some other time period?

20          MR. BERNSTEIN:  We are looking for compliance as

21    soon as possible.  And we understand that they're prepared

22    to comply, they are just choosing not to.

23          THE COURT:  And the government -- consistent with

24    past situations like this, the government has been coy about

25    setting out precisely what it's asking for, in terms of an

—— * * * * * SEALED * * * * *——

————— * * * * * SEALED * * * * * —————

1    incentive to comply within the time frame of 5 p.m. today of

2    the penalty, given the fact that I am looking at a company

3    that was bought for $44 billion; and the CEO, sole owner of

4    Twitter, is worth -- according to some news reports, I

5    guess -- over 180 billion.

6              What is the government asking for in terms of a

7    fine, for failure to comply by 5 p.m. today?

8              MR. BERNSTEIN:  So the marching orders I have,

9    Your Honor, are to take into account -- once discussed

10   today, we will go back to the special counsel's office,

11   discuss with the special counsel what actual number and

12   schedule we think is appropriate; and then we can file that

13   by 5 p.m. today.

14             THE COURT:  That's not on my time frame.  You need

15   to come prepared for that.  $25,000, $50,000 a day, for

16   failure to comply?  What's the number?

17             MR. BERNSTEIN:  Could I have 30 seconds to speak

18   with co-counsel?

19             THE COURT:  You can have like ten.

20             (Whereupon, government counsel confer.)

21             MR. BERNSTEIN:  Your Honor, we're asking for

22   $50,000, and then to double each day thereafter.

23             THE COURT:  All right.  Okay.  Thank you.

24             Anything further?

25             MR. BERNSTEIN:  No, Your Honor.  Thank you.

————— * * * * * SEALED  * * * * * —————

———— * * * * * SEALED * * * * * ————

1          THE COURT:  All right.

2          MR. VARGHESE:  Good afternoon, Your Honor.

3          THE COURT:  Mr. Varghese.

4          Twitter says in its opposition that -- in its

5    defense, that its ability to communicate with its customers

6    about law enforcement's efforts to access their

7    communications and data is essential to its business model

8    in fostering trust with its user base.

9          But, clearly, Twitter does not run to court, as it

10   is here today, in response to court orders for information

11   about Twitter users.  So even though a lot of Twitter users

12   probably have potential privileges -- marital, priest,

13   clergy, executive, attorney-client -- so what is it -- is it

14   just lucky me, you know, that you are here?

15         What is it about this case?  The government

16   suggests it's because you are giving special attention to

17   this particular user.

18         MR. VARGHESE:  No.  No, Your Honor.

19         THE COURT:  Why are you here?

20         MR. VARGHESE:  Thank you, Your Honor.

21         So Twitter receives thousands of legal requests

22   every year from law enforcement.

23         THE COURT:  I hope you have your website working

24   better than it was working here.

25         MR. VARGHESE:  I don't know.  I think that might

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1   have been on them, Your Honor.  I don't know what the

2   details were about the legal process, but it worked --

3            THE COURT:  I thought legal counsel said:  Oh,

4   yeah, our website for handling this was down for a couple of

5   days, or something.

6            MR. VARGHESE:  I don't know the answer for that,

7   Your Honor.  I don't know.

8            THE COURT:  Well, that should be a focus for

9   Twitter, rather than trying to delay --

10            MR. VARGHESE:  Your Honor, if I may.

11            THE COURT:  -- warrant returns in a case of such

12   national importance as this.

13            MR. VARGHESE:  Your Honor, if I may.

14            Twitter reviews thousands of pieces in the legal

15   process, including the nondisclosure orders that goes with

16   it; that's what this issue is about.  It's about Twitter's

17   First Amendment rights.

18            When this legal process came in with this

19   nondisclosure order, as this Court noted, it is boilerplate.

20            THE COURT:  Come on.  Let's just cut through this.

21            Twitter gets NDOs a lot --

22            MR. VARGHESE:  Yes, Your Honor.

23            THE COURT:  -- so it has to pick and choose:  This

24   is where we're going to stand up for our First Amendment

25   rights and challenge a gag order on these particular cases,

——— * * * * * SEALED  * * * * * ———

**JA182**

———— * * * * * **SEALED** * * * * * ————

1    and on these particular cases we're not.

2              So what is the criteria that Twitter uses?

3              MR. VARGHESE:  It's whether or not they're

4    facially valid, Your Honor.

5              THE COURT:  Is it because the CEO wants to cozy up

6    with the former President, and that's why you are here?

7              MR. VARGHESE:  No, Your Honor.  It's whether or

8    not they are facially valid.

9              In this case, one of the arguments was flee from

10   prosecution.  As this Court has already noted, the former

11   President of the United States, who has announced that he is

12   rerunning for President, is not at flight from prosecution.

13   Presumably, with his security detail, he is not fleeing.

14             Second, Your Honor --

15             THE COURT:  And you didn't accept the other

16   reasons?

17             MR. VARGHESE:  The other reason is destruction of

18   evidence, Your Honor.  What we know about destruction of

19   evidence in notifying Confederates is that this is the most

20   publicly announced criminal investigation.  The Attorney

21   General of the United States had a press conference to

22   announce Mr. Smith's appointment, as well as his mandate

23   with respect to investigating the former President.  It just

24   doesn't ring true, Your Honor.

25             THE COURT:  So the -- Twitter's in-house counsel

———— * * * * * **SEALED**  * * * * * ————

**JA183**

———— * * * * * SEALED * * * * * ————

1   states that:  On occasion, we, Twitter, have challenged

2   nondisclosure order orders whether in follow-up

3   conversations with prosecutors or government officials or in

4   court filings.

5           On how many occasions has Twitter challenged NDOs

6   in court?

7           MR. VARGHESE:  I don't know the exact number, Your

8   Honor.

9           THE COURT:  Does somebody at your table know?

10          MR. VARGHESE:  I don't believe we have the exact

11  number, Your Honor.

12          THE COURT:  Okay.  By 5 p.m. today, can you

13  provide that list to me?

14          I want to know how often Twitter has challenged

15  NDOs in court.  I want case cites and docket numbers.  If

16  those orders are under seal, I would like you to tell me

17  that; and I want to know the results.

18          MR. VARGHESE:  Your Honor, if I may, I personally

19  have called on behalf of Twitter two prosecutors and raised

20  concerns about this.

21          THE COURT:  I am not asking about whether you have

22  had informal conversations.  I am asking about court

23  filings.

24          MR. VARGHESE:  Yes, Your Honor.

25          THE COURT:  Okay.  So I just want to know

———— * * * * * SEALED  * * * * ————

———— * * * * * SEALED * * * * * ————

1  because -- based on those court filings -- perhaps I will be

2  able to see what criteria Twitter is using to assert the

3  rights of its users in court.

4       MR. VARGHESE:  If I may, Your Honor.

5       So we have made informal calls where we had

6  concerns about NDOs.  And, oftentimes, prosecutors have

7  agreed either to withdraw the NDO or to modify the NDO.

8  Your Honor, that is the process that we go through.

9       THE COURT:  What modifications did you want here?

10       As I understand it, your modification was to take

11  out of the NDO "potential risk of flight by the President,"

12  although he does have properties overseas that would be

13  probative.

14       What your demand of the government here was, was

15  to provide advance notice of an otherwise covert warrant.

16       MR. VARGHESE:  Your Honor, if I may, either to the

17  user or to the user's representative, a representative of

18  the user who could assert the user's interest in this issue.

19  And Your Honor --

20       THE COURT:  What user representative, when you are

21  dealing with an individual and not a company, doesn't report

22  directly to the user?

23       MR. VARGHESE:  Well, the former --

24       THE COURT:  So what are you talking about

25  Mr. Varghese?

———— * * * * * SEALED   * * * * * ————

————— * * * * * SEALED * * * * * —————

1          MR. VARGHESE:  The former President has designated

2    certain individuals to act in his capacity with respect to

3    his presidential records.

4          THE COURT:  And they are lawyers who report

5    directly to him, if they're still -- to the extent that he

6    designated any, if they're still working for him.

7          MR. VARGHESE:  And so, for example, Your Honor --

8          THE COURT:  There have been a lot of changes.

9          MR. VARGHESE:  For example, Your Honor, this issue

10   came up with Google and a warrant with respect to *The*

11   *New York Times*.  In that case, there was an accommodation

12   made that allowed -- that allowed Google to notify *The*

13   *New York Times* general counsel but not the reporter whose

14   records were being sought.

15         THE COURT:  Because that was a company context

16   here.  We're dealing with an individual.

17         So how is that workable here?

18         MR. VARGHESE:  Well, Your Honor, we would submit

19   that the former President has identified certain individuals

20   in his capacity for the office of the presidency.

21         THE COURT:  Do you know if all of those people who

22   were designated back on January -- January 2021, are still

23   working as his representatives vis-à-vis NARA?

24         MR. VARGHESE:  Your Honor, I believe some of them

25   are.  There was an updated list that was provided to NARA

————— * * * * * SEALED  * * * * * —————

─── * * * * * SEALED * * * * * ───

1    for people who could represent him, Your Honor.  We can

2    check on their exact employment status, but --

3         THE COURT:  And you think that you could

4    communicate with them, unlike company counsel, who could

5    preserve secrecy that these are individuals designated by

6    the former President who could preserve secrecy from the

7    former president?

8              MR. VARGHESE:  Well, if this Court ordered that --

9         THE COURT:  And you have confidence, and you think

10   the government should have confidence in that?

11             MR. VARGHESE:  Well, if this Court ordered that

12   representative -- like what happened in the Google-New York

13   Times case, if this Court ordered that representative not to

14   disclose the existence of the warrant, but simply to assert

15   whether or not any executive privilege would be at issue, I

16   think it is a workable solution, yes, Your Honor.

17        THE COURT:  Okay.  Well, I would like the

18   government to be prepared to respond to that potential

19   alternative.

20             MR. VARGHESE:  And, Your Honor, I have -- I

21   apologize.

22        THE COURT:  So let's go to what Twitter's in-house

23   counsel said, in the ███████ declaration at paragraph 10,

24   that NARA has a copy of the target account and much of the

25   information called for in the warrant.  So, of course, "much

─── * * * * * SEALED  * * * * * ───

**JA187**

——— * * * * * **SEALED** * * * * * ———

1   of" is not all of the information called for in the warrant.

2          MR. VARGHESE:  Yes, Your Honor.

3          THE COURT:  So what is it that Twitter sent to

4   NARA that -- well, has Twitter sent information to NARA

5   already?

6          MR. VARGHESE:  Yes, Your Honor.  But --

7          THE COURT:  Okay.  And what information is

8   covered -- required to be produced in the warrant that has

9   not been produced to NARA?

10         MR. VARGHESE:  Thank you, Your Honor.

11         The big difference between what is in Attachment B

12   and what NARA has --

13         THE COURT:  Attachment B, Part 1 --

14         MR. VARGHESE:  Part 1.

15         THE COURT:  -- of multiple parts that you have no

16   idea about.

17         MR. VARGHESE:  Yes, Your Honor.

18         -- and what is being held by NARA currently and

19   safely -- the big difference is business records.

20         So Attachment B asked for the communications with

21   Twitter about any service interruptions.  It asked for

22   communications -- logs of service, length of service --

23   these kinds of business records that Twitter has; that's not

24   what is being held at NARA.

25         What is being held at NARA is the user's profile,

——— * * * * * **SEALED**  * * * * * ———

* * * * * SEALED * * * * *

1    his tweets, including deleted tweets, images, videos, gifts

2    attached to those tweets, his list of followers, direct

3    messages, moments, mentions, replies; there is extensive

4    information.  And I will point out, Your Honor, what NARA is

5    holding is from January 17th through January 2021 [sic], a

6    far longer time period than what the special counsel is

7    offering.

8            In fact, the volume of information that is being

9    held at NARA is much more significant than what is being

10   requested in Attachment B.  But the distinction, Your Honor,

11   to be clear, are those Twitter business records, such as IP

12   records, length of service records, credit card

13   information -- those kinds of business records.  That's not

14   what NARA was interested in, and that was not what was

15   provided to NARA as part of the records collection, Your

16   Honor.

17           If I may also take a step back and answer a

18   question --

19           THE COURT:  So you have already produced all of

20   the user names, the date and time each user name was active,

21   all associated accounts including those linked by machine,

22   cookie, IP address, email address, or any of their account

23   or device, records or information about connections with

24   third-party websites and mobile app s whether active,

25   expired, or removed?

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1          MR. VARGHESE:  No, Your Honor.

2          Actually, Twitter doesn't maintain that

3     information.

4          THE COURT:  And in terms of information about

5     devices used to log in or access the account?

6          MR. VARGHESE:  That would not be at NARA, no, Your

7     Honor.

8          THE COURT:  Okay.  And internet protocol addresses

9     used to create, log in, or use the account, including dates,

10    times, and port numbers?

11         MR. VARGHESE:  No, Your Honor.  That would have

12    been -- those are Twitter business records that would not

13    have been produced to --

14         THE COURT:  And privacy account settings,

15    including change history?

16         MR. VARGHESE:  No, Your Honor.

17         THE COURT:  Communications between Twitter and any

18    person regarding the account, including context with support

19    services and records of actions taken?

20         MR. VARGHESE:  No.  That would be situations where

21    you would report:  My IP is not working, my access is not --

22         THE COURT:  Okay.  So in Attachment B, Part 1,

23    nothing in paragraph 1 has been turned over by Twitter to

24    NARA?

25         MR. VARGHESE:  That's not what NARA requested, no,

* * * * * SEALED  * * * * *

———— * * * * * SEALED * * * * * ————

1    Your Honor.

2                  THE COURT:  Got it.

3                  And then paragraph 2 is:  All content, records,

4    and other information relating to communications, including

5    the content of all tweets created, drafted, favorited,

6    liked, or re-tweeted.

7                  MR. VARGHESE:  Yes, Your Honor.  I believe most of

8    that information would have been produced to NARA.

9                  THE COURT:  Most, or all?

10                 MR. VARGHESE:  Well, Your Honor --

11                 THE COURT:  If you don't know, you can just let me

12   know, Mr. Varghese.

13                 MR. VARGHESE:  I don't know precisely if they're a

14   complete overlap.  But that is the type of information that

15   was produced to NARA, so I just don't know if it's 100

16   percent accurate -- complete, Your Honor.

17                 THE COURT:  So you don't know, okay.

18                 We have got all of paragraph 1.  We have got

19   paragraph 2A, not necessarily produced to NARA.

20                 And then, B:  Content of all direct messages sent

21   from, received by, stored in draft form in, or otherwise

22   associated with the subject account including all

23   attachments, multimedia, header information, metadata, and

24   logs.

25                 MR. VARGHESE:  Again, Your Honor, direct messages

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1    were provided to NARA.

2              THE COURT:  And that means drafts also?

3              MR. VARGHESE:  I don't know, Your Honor.

4              THE COURT:  Okay.  Well, somebody behind you

5    knows.

6              (Whereupon, Twitter counsel confer.)

7              MR. VARGHESE:  Everything that Twitter had in

8    January of 2021 was provided to NARA with respect to the

9    draft message.

10             THE COURT:  Yes.  But that's not my question.

11             My question was:  Was everything --

12             MR. VARGHESE:  I think to the extent --

13             THE COURT:  -- covered in paragraph 2B produced to

14   NARA?

15             MR. VARGHESE:  To the extent that Twitter had it,

16   it was produced to NARA.

17             THE COURT:  All right.  In your briefing -- I am

18   not going to waste more time going up and down through this

19   whole thing.  But, clearly, I think the point has already

20   been established that everything Twitter produced to NARA is

21   not covered -- it's not a complete overlap with what was

22   demanded in the warrant.

23             Okay.  So even if it's correct, although I am not

24   persuaded that the Presidential Records Act would require

25   notice to the former President if the government did seek

* * * * * SEALED  * * * * *

——— * * * * * **SEALED** * * * * * ———

1    from NARA all of this Twitter account information, why

2    should Twitter be able to dictate to the government where it

3    gets information for its investigation?

4         MR. VARGHESE:  To be clear, Your Honor, Twitter is

5    not trying to dictate to the government where it should get

6    that information.

7         Twitter engaged in good-faith negotiations with

8    the special counsel's office about the nondisclosure order

9    in Twitter's own First Amendment rights.  And as we were

10   having discussions with Mr. Bernstein, we offered an

11   alternative; that was the context in which NARA was raised.

12   It was not saying go somewhere else.

13        THE COURT:  Okay.  So let's go right to that.

14        Twitter concedes it has no standing whatsoever to

15   assert any privilege on behalf of the user of this account,

16   correct?

17        MR. VARGHESE:  That's correct, Your Honor.

18        THE COURT:  All right.  And so -- but you are

19   saying that you do have standing to assert a First Amendment

20   right here under the --

21        MR. VARGHESE:  That's correct.

22        THE COURT:  -- nondisclosure order?

23        MR. VARGHESE:  That's correct, Your Honor.  And

24   it's an important First Amendment right.  It's the right to

25   communicate with our users that's being restrained by the

——— * * * * * **SEALED**  * * * * * ———

—— * * * * * SEALED * * * * * ——

1    special counsel's office, and that was the basis for

2    reaching out to them, Your Honor.

3            THE COURT:  But you want to exercise that First

4    Amendment right here, the reason -- what is animating your

5    assertion of the First Amendment right here is because you

6    believe that there are these unique constitutional issues

7    associated with this user and this user account because of

8    what Twitter perceives to be an executive privilege,

9    difficult and challenging issue.

10           So what is it about the executive privilege issues

11   that Twitter sees here that Twitter believes differentiates

12   it from other privileges that any Twitter user might have?

13           I mean, the government has made what I think is a

14   very accurate statement, that this is -- Twitter's

15   intervention here is quite momentous, I think is the word

16   the government used.

17           So why isn't it momentous if Twitter can pop up --

18   take up all of my time, and every district court judge

19   across the country's time -- to intervene, to stop

20   compliance -- not just with warrants in investigations of

21   this significance, but even in a request for subscriber

22   information or any other use of Stored Communications Act

23   authorities to say:  Whoops, there might be a privilege

24   there, we want to alert the user of that account that we're

25   about to turn over information about the account user to the

—— * * * * * SEALED  * * * * * ——

1    government so that they can have an opportunity to step in?

2              You are not doing that for everybody.

3              MR. VARGHESE:  No, Your Honor.

4              THE COURT:  And you are not doing it for every

5    privilege.

6              MR. VARGHESE:  No, Your Honor.

7              THE COURT:  So what is it about executive

8    privilege or this user or this user account that makes

9    Twitter stand before me today?

10             MR. VARGHESE:  Your Honor, there's two things that

11   make this case unusual, which is what brought us here.

12   First, we had a facially invalid NDO in our view based on

13   the way that we read it and what we know about this

14   investigation.

15             THE COURT:  Which is not much, to be honest.  You

16   don't even know the half about the very warrant you are

17   coming in here to delay execution of.

18             MR. VARGHESE:  Understood, Your Honor.  However,

19   we also know --

20             THE COURT:  I hope you do understand.

21             MR. VARGHESE:  Of course, Your Honor.  But what we

22   also know is saying:  Risk of flight for a former President

23   of the United States doesn't make a lot of sense.

24             Second, Your Honor --

25             THE COURT:  I would agree with that.

1          MR. VARGHESE:  Thank you, Your Honor.  That raises

2     concerns for us.

3          Then, when we looked at the underlying substantive

4     issue, Your Honor, this is the first time in our knowledge

5     that private presidential communications held by a third

6     party were being demanded by the government through a

7     warrant without any notice to that former occupant.  We were

8     not aware of another time ever where that has happened.

9          THE COURT:  Well, you did not read the Mueller

10    report very carefully.

11         MR. VARGHESE:  Yes, Your Honor.

12         THE COURT:  Because the Mueller report talks about

13    the hundreds of Stored Communications Act -- let me quote.

14    Let's see.

15         The Mueller report states that:  As part of its

16    investigation, they issued more than 2800 subpoenas under

17    the auspices of the grand jury in the District of Columbia.

18    They executed nearly 500 search and seizure warrants,

19    obtained more than 230 orders for communications records

20    under 18 U.S.C. Section 2703(d); and then it goes on and on

21    and on for all of the other things they did.

22         And some of those communications included the

23    former President's private and public messages to General

24    Flynn, encouraging him to "Stay strong," and conveying that

25    the President still cared about him, before he began to

* * * * * SEALED * * * * *

1    cooperate with the government.

2            So what makes Twitter think that, before the

3    government obtained and reviewed those Trump-Flynn

4    communications, the government provided prior notice to the

5    former President so that he can assert executive privilege?

6            MR. VARGHESE:  My understanding, Your Honor, is

7    that the Mueller investigators were in contact with the

8    White House counsel's office about executive privilege

9    concerns.

10           THE COURT:  You quoted the one part that said

11   that, and that was for testimony, testimony, where it was

12   not covert.

13           MR. VARGHESE:  Yes, Your Honor.

14           THE COURT:  You need to read the Mueller report a

15   little bit more carefully.

16           MR. VARGHESE:  Yes, Your Honor.  Our --

17           THE COURT:  You think that for 230 orders, 2800

18   subpoenas, and 500 search and seizure warrants the Mueller

19   team gave advance notice to the former President of what

20   they were about?

21           MR. VARGHESE:  I don't know that, Your Honor.

22           THE COURT:  You do not know that.

23           MR. VARGHESE:  But what I believe was that there

24   was consultation with the White House about the scope of

25   executive privilege, that's my understanding.

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1          THE COURT:  When it came to testimony for the

2     obvious reason, that that was not covert.

3          MR. VARGHESE:  Yes, Your Honor.

4          THE COURT:  All right.

5          MR. VARGHESE:  So if I may finish your question,

6     though, Your Honor.

7          THE COURT:  Do you understand --

8          MR. VARGHESE:  Yes, Your Honor.

9          THE COURT:  -- that it is only with respect to the

10    speech and debate clause privilege that the D.C. Circuit,

11    alone, of all of the circuits, has said that there is a

12    nondisclosure component to that privilege that requires the

13    privilege holder to have the opportunity to review the

14    materials before it is reviewed by prosecutors?

15         MR. VARGHESE:  Yes, Your Honor.

16         THE COURT:  And no such nondisclosure attribute

17    has ever, as government counsel said, been attached to the

18    exercise of executive privilege.

19         And do you know why it is that the D.C. Circuit in

20    *Rayburn* said that there was a nondisclosure aspect to the

21    speech or debate clause privilege?

22         MR. VARGHESE:  No, Your Honor.

23         THE COURT:  Well, let me advise you.

24         It was because of separation of powers concerns;

25    Congress being investigated by the executive branch.  So

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1    that before prosecutors sitting in the executive branch

2    could see potentially privileged under speech or debate

3    clause material, they had to give the privilege holder the

4    opportunity to review it all because of separation of powers

5    concerns.  And here I have the executive branch looking at

6    executive branch materials; it is not the same thing.

7                MR. VARGHESE:  Your Honor --

8                THE COURT:  So I don't know how it is that you

9    think that the same nondisclosure, advance notice to the

10   privilege holder requirement applies here.  It is not

11   looking at the full scope of privilege law as it has

12   developed in this circuit.

13               And I find it very ironic you are relying on *Nixon v*

14   *Administrator of General Services*, this 1977 Supreme Court

15   case.  But in that case, didn't the Supreme Court -- to the

16   point that I was talking about in terms of speech or debate

17   clause and its differences with executive privilege -- hold

18   that the GSA administrator could take custody of and review

19   recordings and documents created by President Nixon?

20               MR. VARGHESE:  It did, Your Honor.  But it did not

21   accept that principle that:  Oh, this is all within the

22   executive branch; that was not the basis for that decision.

23   It was a multifactored fact-intensive inquiry.  What they

24   said was that we feel comfortable that the archivist can

25   review this material.

* * * * * SEALED * * * * *

———— * * * * * SEALED * * * * * ————

1          THE COURT:  Yes.  Because GSA is himself an

2     official of the executive branch, and that GSA's career

3     archivists are, likewise, executive branch employees.

4          MR. VARGHESE:  But that was not the end of the

5     inquiry, Your Honor.  That is a 45-year-old opinion that the

6     special counsel's office is holding on to to make a

7     bright-line rule that says that they are allowed to look at

8     everything in the executive branch, and that is simply --

9          THE COURT:  What Twitter's position here is that

10    the same separation of powers concerns that animated the

11    nondisclosure aspect to the speech or debate clause, meaning

12    the privilege holder needed to obtain advance notice, should

13    apply here --

14          MR. VARGHESE:  No, Your Honor.

15          THE COURT:  -- to assertion of executive

16    privilege?  And all Twitter is doing here is it's holding up

17    what it views should be the state of the law for executive

18    privilege?

19          MR. VARGHESE:  No, Your Honor.

20          Twitter does not take a position on what the scope

21    and the contours of executive privilege are.  But note that

22    that is not a well-defined space.  And all we are asking

23    for --

24          THE COURT:  It's much better defined than you

25    think.

———— * * * * SEALED  * * * * ————

─── * * * * * SEALED * * * * * ───

```
 1          MR. VARGHESE:  Your Honor, if I may, one of the

 2     things that we don't know about is derivative use.  What if

 3     the special counsel's office uses that --

 4          THE COURT:  What are you talking about with

 5     "derivative use"?

 6          MR. VARGHESE:  I can explain, Your Honor.

 7          THE COURT:  I read that, and I really wanted to

 8     know what you are talking about.

 9          MR. VARGHESE:  I can explain, Your Honor.

10          THE COURT:  Sure.

11          MR. VARGHESE:  If, for example -- assuming for a

12     second there is executive privilege materials in the

13     account --

14          THE COURT:  Which, of course, you have zero idea

15     about.

16          MR. VARGHESE:  I can come back to that question,

17     Your Honor.

18          THE COURT:  No.  Deal with it right now.

19          You have zero idea about executive privilege

20     communications in this Twitter account.

21          MR. VARGHESE:  Twitter does not review the

22     contents of its users' accounts.

23          THE COURT:  You have no idea?

24          MR. VARGHESE:  But I can say there are

25     confidential communications associated with the account.
```

─── * * * * * SEALED  * * * * * ───

———— * * * * * SEALED * * * * * ————

1          THE COURT:  And how do you know that?

2          MR. VARGHESE:  So, Your Honor, we went back --

3    because this was an important issue for us to compare,

4    whether or not there were potentially confidential

5    communications in the account, and we were able to confirm

6    that.

7          THE COURT:  How?

8          MR. VARGHESE:  So, Your Honor, there was a way

9    that we compared the size of what a storage would be for DMs

10   empty versus the size of storage if there were DMs in the

11   account.  And we were able to determine that there was some

12   volume in that for this account.  So there are confidential

13   communications.  We don't know the context of it, we don't

14   know --

15         THE COURT:  They are direct messages.  What makes

16   you think -- do you think that everything that a President

17   says, which is generically a presidential communication, is

18   subject to the presidential communications privilege?

19         MR. VARGHESE:  No, Your Honor.

20         THE COURT:  Is that the basis of this?  You have a

21   total misunderstanding of what the presidential

22   communications privilege is?

23         MR. VARGHESE:  No, Your Honor.  No, Your Honor,

24   that's not my understanding.

25         THE COURT:  So what -- I don't understand your

———— * * * * * SEALED  * * * * * ————

**JA202**

─────── * * * * * SEALED * * * * * ───────

1    argument, Mr. Varghese.

2          MR. VARGHESE:  My argument simply, Your Honor, is

3    the user may have an interest in these communications, and

4    asserting that privilege.  It's not Twitter's interest.

5          THE COURT:  Having an interest is a very different

6    thing from saying something is privileged --

7          MR. VARGHESE:  It might be.

8          THE COURT:  -- under the executive privilege or

9    the presidential communications privilege.  Would you

10   concede that?

11         MR. VARGHESE:  Yes, Your Honor.  But it's not my

12   privilege to assert.  It's not Twitter's privilege to

13   assert.  All we're simply trying to do is exercise our First

14   Amendment rights to notify the user so the user may assert

15   that privilege if he chooses.

16         But getting back to the derivative point, Your

17   Honor, if I may.

18         THE COURT:  Yes.

19         MR. VARGHESE:  The point of the derivative

20   argument is if -- the special counsel's office is using

21   these materials before the grand jury, which is an organ of

22   this court, or using them in warrant affidavits --

23         THE COURT:  Well, actually, grand jury is a,

24   actually, a totally independent body from any branch of

25   government.

─────── * * * * * SEALED  * * * * * ───────

——— * * * * * **SEALED** * * * * * ———

1          MR. VARGHESE:  But certainly not the executive

2    branch, Your Honor.  Also, we would say --

3          THE COURT:  The grand jury is independent of --

4          MR. VARGHESE:  That's right, Your Honor.

5          THE COURT:  -- of every branch of government,

6    including the executive branch.

7          MR. VARGHESE:  Yes, Your Honor.  And that's

8    precisely why the executive privilege wouldn't be protected

9    in that case, or if the material is put into an affidavit

10   and shown before a judge to get another warrant, that would

11   also vitiate the privilege it would seem.  Also, if it was

12   being used in interviews with witnesses --

13         THE COURT:  So what is it about -- so this is the

14   confusion here, Mr. Varghese.

15         MR. VARGHESE:  Yes, Your Honor.

16         THE COURT:  That you want to treat the executive

17   privilege like the speech or debate clause without any of

18   the same foundational predicates for that because material

19   obtained covertly by the government that is potentially

20   privileged is, typically, subject to a filter review

21   protocol to identify that and get judicial rulings on that;

22   and that's how it's normally dealt with, use of a filter

23   team.

24         But what you are saying is executive privilege

25   can't be dealt with that way; it has to, instead, use a

——— * * * * * **SEALED**  * * * * * ———

**JA204**

———— * * * * * SEALED * * * * * ————

1    protocol similar to that required by the D.C. Circuit in my

2    reading.  But the D.C. Circuit is going to consider that, I

3    would hope, and say that advance notice has to be given to

4    the privilege holder to debate it.

5              MR. VARGHESE:  No, Your Honor, that is not my

6    position.

7              THE COURT:  That is exactly what you are saying.

8    Why are you fighting that?

9              MR. VARGHESE:  Because, Your Honor, I am not

10   saying what the right way is for executive privilege to be

11   treated.

12             THE COURT:  Aren't you saying that advance notice

13   has to be given to the user of the account here?  I thought

14   that was the whole reason we're here.

15             MR. VARGHESE:  Your Honor, if I may, what I am

16   trying to say is that it is ill defined.  The contours of

17   how executive privilege works is ill defined.  The only case

18   the special counsel's office is looking to is a 45-year-old

19   Supreme Court case.

20             THE COURT:  And, as a consequence, isn't it

21   Twitter's position, yes or no, that advance notice to a

22   privilege holder of the executive privilege must be given

23   before Twitter can turn over the warrant returns?

24             MR. VARGHESE:  Your Honor, our position --

25             THE COURT:  Yes or no?  Is that your position or

———— * * * * * SEALED  * * * * *————

**JA205**

———— * * * * * SEALED * * * * * ————

1    not?

2              MR. VARGHESE:  We would like to notify the user as

3    per our First Amendment rights.

4              THE COURT:  So, yes, that's your position?

5              MR. VARGHESE:  We would like to notify the user

6    per our First Amendment rights.

7              THE COURT:  I am interpreting that as a "yes."  I

8    don't know why you can't say "yes," it's a puzzle to me.

9              MR. VARGHESE:  Yes, Your Honor.

10             THE COURT:  It's very frustrating.

11             MR. VARGHESE:  I apologize, Your Honor.

12             THE COURT:  I try to be direct, and I don't

13    understand why you are not being direct.  But -- yes.

14             And I am telling you -- why, for the executive

15    privilege, does Twitter believe that such advance notice is

16    required when, for every other privilege except speech or

17    debate clause, it is not?

18             MR. VARGHESE:  It's because it is ill defined.

19    There is no controlling law in this area, and we believe the

20    user has the right to litigate this issue; that's it, Your

21    Honor.

22             We have a First Amendment right to notify --

23             THE COURT:  Even though the entire Mueller report,

24    with hundreds of search warrants, thousands of subpoenas --

25    the only time the two-volume Mueller report ever talks about

———— * * * * * SEALED  * * * * * ————

**JA206**

———— * * * * * SEALED * * * * * ————

1    ever alerting the White House counsel is where it wasn't

2    covert it was overt, because they were seeking potentially

3    privileged information from a grand jury witness.  But,

4    nonetheless, you think it's never been done before?

5         MR. VARGHESE:  There is no published opinion, Your

6    Honor, that lays out the contours of executive privilege

7    beyond this 45-year-old opinion, which we do not necessarily

8    think is on point.

9         THE COURT:  Okay.  It couldn't be that Twitter is

10   trying to make up for the fact that it kicked Donald Trump

11   off Twitter for some period of time that it now is standing

12   up to protect First Amendment rights here, is it?

13        MR. VARGHESE:  No, Your Honor.

14        THE COURT:  Because it's a little bit of an ironic

15   position, don't you think?

16        MR. VARGHESE:  No, Your Honor.  This is based on

17   the facially invalid NDO.

18        THE COURT:  Is this to make Donald Trump feel like

19   he is a particularly welcomed new renewed user of Twitter

20   here?

21        MR. VARGHESE:  Twitter has no interest other than

22   litigating its constitutional rights, Your Honor.

23        THE COURT:  And how does requiring compliance with

24   the search warrant here actually implicate Twitter's First

25   Amendment rights which are only at issue with the gag order?

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1          MR. VARGHESE:  Your Honor, the issue is about

2     whether or not that speech is meaningful.

3          We have a right to speak.  There is a

4     difference -- and timing of that speech is critical, and so

5     we would like to provide meaningful notice to the user prior

6     to the review by the government.

7          We still have a First Amendment right, to be

8     clear, to speak to the user afterwards; but we think that

9     that message is stronger and more meaningful if we have an

10    opportunity to convey that message beforehand.

11         THE COURT:  So I didn't see it, but this has been

12    on a fairly quick turnaround given the ten-day delay already

13    in compliance with the warrant.  But has Twitter found any

14    court decision in which a third-party company, like Twitter,

15    has successfully stayed compliance with a search warrant

16    pending a First Amendment challenge to a nondisclosure

17    order?

18         MR. VARGHESE:  No, Your Honor, not an NDO.

19         THE COURT:  And would Twitter acknowledge that

20    there is an ongoing harm to the government and the public by

21    continued failure to comply with the search warrant?  And if

22    Twitter had its way, that would -- there would be no

23    execution of this search warrant until after completion of

24    briefing and resolution of its challenge to the NDO.  Would

25    you acknowledge that that delay would take us, wow, for a

——— * * * * * SEALED  * * * * * ———

—————— * * * * * SEALED * * * * *——————

1   month?

2          MR. VARGHESE:  No, Your Honor.

3          We proposed a briefing schedule that was five

4   days.  We were having a briefing schedule that would be done

5   by the end of this week -- by the end of next -- next week,

6   I believe.  And, therefore, Your Honor, we tried to

7   accommodate the government's concerns.  It has never been

8   Twitter's position that we are seeking to delay the

9   government's investigation.

10          We are trying to vindicate our First Amendment

11   right; that is all.  So we tried to work around the

12   government's expedited schedule.

13          I should also note, Your Honor -- you mentioned

14   the ten-day delay.  Let me just address that for a second.

15          When Mr. Bernstein talked to ███████, counsel,

16   on January 27th, he acknowledged that we were wrestling

17   through these issues.  He said:  Can we please talk about

18   realistic dates for completion, for execution?  He

19   recognized that we were going through these issues.  We

20   thought we were having a good-faith discussion.  And to say

21   that we have just been sitting on this and trying to upset

22   both the court and the special counsel's office is factually

23   inaccurate, Your Honor.

24          We were trying to work through these issues.  We

25   have talked to Mr. Bernstein --

—————— * * * * * SEALED  * * * * *——————

—— * * * * * SEALED * * * * * ——

```
1          THE COURT:  Let me just be clear.  I really -- I
2    take offense when lawyers try and attribute to me certain
3    feelings --
4          MR. VARGHESE:  I apologize, Your Honor.
5          THE COURT:  -- that are totally -- totally off
6    course.  So I am not upset.
7          I am trying to puzzle over the arguments to make
8    sense of them when there is zero case law and support of
9    Twitter's arguments.
10         MR. VARGHESE:  I apologize, Your Honor.  I didn't
11   mean upsetting in the emotion sense.  I meant upsetting the
12   Court's deadline or the special counsel's investigation;
13   that is not our goal, Your Honor.
14         Our goal was to engage in good-faith negotiations,
15   which we thought we were doing with Mr. Bernstein.
16         THE COURT:  Okay.  Can Twitter produce the warrant
17   returns by 5 p.m. today?
18         MR. VARGHESE:  I believe we are prepared to do
19   that.  Yes, Your Honor.
20         THE COURT:  Good.  Anything further?
21         MR. VARGHESE:  Your Honor, we have a draft -- we
22   have an order that was issued in the Google case, if you
23   want to observe how they did it, allowing *The New York*
24   *Times* --
25         THE COURT:  I don't need to look and see what the
```

—— * * * * * SEALED  * * * * * ——

———— * * * * * SEALED * * * * *————

1    Southern District of New York judge did.

2            MR. VARGHESE:  Thank you, Your Honor.

3            I have nothing further.

4            THE COURT:  Any reply?

5            MR. BERNSTEIN:  No, Your Honor.

6            THE COURT:  All right.  I am going to grant the

7    government's motion for an order to show cause why Twitter

8    should not be held in contempt.  I am just going to

9    summarize my reasons here.

10           When I deal with the nondisclosure order challenge

11   I may elaborate on these reasons more fulsomely.  But given

12   the fact that Twitter will have until 5:00 p.m. today to

13   produce the warrant returns to the government, I think I am

14   going to keep my remarks fairly brief.

15           As an initial matter, the government has satisfied

16   all three requirements for finding contempt here.  There was

17   a clear and unambiguous court order in place; that order

18   required certain conduct by the respondent, the respondent

19   failed to comply with the order.  See *U.S. v Latney's*

20   *Funeral Home*, 41 F. Supp. 3d 24, jump cite 30, D.D.C. from

21   2014.

22           The search warrant was issued on January 17, 2023.

23   It was an unambiguous court order requiring Twitter to

24   comply with production of the specified records in

25   Attachment B, Part 1, by January 7, 2023.  Twitter did not

———— * * * * * SEALED  * * * * *————

——— * * * * * SEALED * * * * * ———

1    comply.

2          Twitter doesn't contest those findings in its

3    opposition.  Instead, it asserts that it has promptly and

4    expeditiously sought to comply with the warrant and has

5    acted in good faith and with alacrity.  But Twitter's good

6    faith does not matter for the purpose of finding it in

7    contempt because a finding of bad faith on the part of the

8    contemnor is not required.  See *Food Lion, Inc. v United*

9    *Food and Commercial Workers*, a D.C. Circuit case from 1997.

10          Twitter's defense is that producing the requested

11    information prior to allowing it the opportunity to alert

12    the former President would irreparably injure its First

13    Amendment rights and eliminate any potential remedy for the

14    former President.  If accepted, Twitter's argument would

15    invite intervention by Twitter -- let alone every other

16    electronic communications provider -- to delay execution of

17    any order, let alone warrants, issued under the Stored

18    Communications Act based on the provider's belief, knowing

19    slivers, slivers of what is required for execution of the

20    warrant -- slivers of knowledge of the scope of an

21    investigation.  But they would, nonetheless, step forward to

22    frustrate execution of orders across the country based on

23    their perceived view that their user's potential privilege

24    rights at issue.

25          The government calls the practical consequences of

——— * * * * * SEALED * * * * * ———

———— * * * * * SEALED * * * * * ————

1  adopted Twitter's amorphous standards "momentous," and I

2  agree.  There is simply no support for Twitter's position.

3        Twitter concedes it doesn't have standing to

4  assert President Trump's claims of executive privilege.  And

5  any merit to the former President's potential executive

6  privilege claims need not be addressed here because Twitter

7  lacks standing to assert them or fully brief them.  Twitter

8  has no defense for its failure to comply with the search

9  warrant.

10       As the Southern District of New York explained in

11  *Google v United States*, any challenge to a NDO is separate

12  from a challenge to a search warrant because any further

13  delay on the production of the materials responsive to the

14  warrant increases the risk that evidence will be lost or

15  destroyed, heightens the chance the targets will learn of

16  the investigation, and jeopardizes the government's ability

17  to bring any prosecution in a timely fashion.  The public

18  interest is served by prompt compliance with the warrant,

19  443 F. Supp. 3d 447, 455, SDNY, 2020.

20       Twitter's insistence that its First Amendment

21  challenge to the NDO must be resolved prior to its

22  compliance with the search warrant are rejected.

23       Twitter is directed to comply with the warrant by

24  5 p.m. today.  Should Twitter fail to comply, I agree with

25  the government that escalating daily fines are appropriate.

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1    If Twitter fails to comply, the fines are civil, designed to

2    ensure Twitter complies with the search warrant.  They are

3    not punitive to punish Twitter for its failure thus far to

4    comply.

5        Considering that Twitter was purchased for over

6    $40 billion, and the sole owner is worth over $180 billion,

7    a hefty fine is appropriate here.  If Twitter does not

8    comply with the warrant by 5 p.m. today, it will be fined

9    $50,000, and that fine will double every day thereafter.

10        So accordingly -- and part of my consideration for

11    the size of the fine and the need to get this moving is

12    because Twitter is delaying a special counsel investigation

13    into whether any person or entity violated the law in

14    connection with efforts to interfere with the lawful

15    transfer of power following the 2020 presidential election

16    or the certification of the Electoral College vote held on

17    January 6, 2021, and other matters of vital national

18    importance.  This delay is going to stop now.

19        Upon consideration of the government's motion for

20    an order to show cause, docketed at ECF No. 5 in the record

21    herein, it's hereby ordered that the government's motion is

22    granted.

23        It is further ordered that Twitter comply with the

24    search and seizure warrant, which itself required compliance

25    by January 27, 2023, by today at 5 p.m.

——— * * * * * SEALED  * * * * * ———

**JA214**

————— * * * * * SEALED * * * * * —————

1         It is further ordered that Twitter shall be held

2    in contempt if it fails to comply with this order by 5 p.m.

3    today.

4         It is further ordered that Twitter shall be fined

5    $50,000 each day; a fine amount that shall double every day

6    for failure to comply with the order, with that fine payable

7    to the Clerk of this court.

8         Is there anything further today since we already

9    have a schedule for further briefing on the NDO?

10         MR. BERNSTEIN:  No, Your Honor.

11         THE COURT:  From Twitter?

12         MR. VARGHESE:  No, Your Honor.  Thank you.

13         THE COURT:  You are all excused.

14         (Whereupon, the proceeding concludes, 3:03 p.m.)

15                * * * * *

16                **<u>CERTIFICATE</u>**

17         I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate

18    transcript of my stenographic notes, and is a full, true,
and complete transcript of the proceedings to the best of my

19    ability.

20         This certificate shall be considered null and void
if the transcript is disassembled and/or photocopied in any

21    manner by any party without authorization of the signatory
below.

22

23    Dated this 11th day of February, 2023.

24    /s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

25

————— * * * * * SEALED  * * * * * —————

| | |
|---|---|
| **From:** | Howell Chambers |
| **To:** | GDB (JSPT); JMP (JSPT); MLD (JSPT); Holtzblatt, Ari; Varghese, George; TPW (JSPT); JIP (JSPT); Russell, Whitney D.; Powell, Benjamin |
| **Cc:** | Teresa Gumiel |
| **Subject:** | 23-sc-31: Minute Order (February 7, 2023) |
| **Date:** | Tuesday, February 7, 2023 3:58:00 PM |

**EXTERNAL SENDER**

Counsel,

Please see the below Minute Order entered today in the above referenced matter. Thank you.

Best,
The Chambers of Chief Judge Howell

# U.S. District Court

## District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 2/7/2023 at 3:53 PM EDT and filed on 2/7/2023

**Case Name:** IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A

**Case Number:** 1:23-sc-00031-BAH *SEALED*

**Filer:**

**Document Number:** No document attached

**Docket Text:**

**MINUTE ORDER (paperless) GRANTING the government's [5] Motion for Order to Show Cause; DIRECTING that Twitter, Inc.: (1) By February 7, 2023 at 5:00 PM, comply with the [4] Search and Seizure Warrant, which itself required compliance by January 27, 2023; and (2) by February 8, 2023 at 5 PM, submit a list of each case in which Twitter, Inc. has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the court's resolution of that challenge; and further ORDERING that Twitter, Inc. shall be held in contempt if it fails to comply with the [4] Search and Seizure Warrant by February 7, 2023 at 5:00 PM, and that Twitter, Inc. shall be fined $50,000, a fine amount that shall double every day, for failing to comply with this Order, payable to the Clerk of this Court. Signed by Chief Judge Beryl A. Howell on February 7, 2023. Counsel has been notified electronically.(lcbah4)**

WILMERHALE

February 8, 2023

**UNDER SEAL**

George P. Varghese

+1 617 526 6524 (t)
+1 617 526 5000 (f)
george.varghese@wilmerhale.com

**By Email**

Honorable Beryl A. Howell, Chief Judge
U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Chief Judge Howell:

On February 7, 2023, during the Court's hearing on the government's Motion for an
Order to Show Cause, and in the Court's subsequent Minute Order, the Court ordered Twitter to
"submit a list of each case in which Twitter has filed a challenge to a non-disclosure order,
issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the courts resolution of that
challenge."

Below is a list of cases in which Twitter has identified that it filed or asserted a challenge
to a non-disclosure order. This list was compiled based on a review of Twitter's available
records, and may not be exhaustive. Due to the nature of these challenges, these cases were
under seal at the time Twitter challenged the non-disclosure order. Where Twitter has been able
to confirm that the case is no longer under seal, we have included the case number. Where
Twitter has not been able to confirm that the case is no longer under seal, we have included only
the date, jurisdiction, type of legal process, and outcome.

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|------|-------------|-------------|-----------------|---------|
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | (not public) | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Beijing    Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

WILMERHALE

February 8, 2023
Page 2

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Dec. 13, 2022 (asserted) | State of Ohio | Not public | Warrant for Electronic Consumer Data and Information | NDO amended and reissued |
| Sept. 12, 2022 (asserted) | State of Mississippi | Not public | Search Warrant and Order for Non-Disclosure on Search Warrant | NDO amended and reissued |

WILMERHALE

February 8, 2023
Page 3

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|------|-------------|-------------|-----------------|---------|
| Sept. 8, 2022 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and 2705 non-disclosure order | (pending LE response) |
| Sept. 8, 2022 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and 2705 non-disclosure order | (pending LE response) |
| March 10, 2021 (filed) | District Court for the District of Columbia | 1:20-03082 | Grand jury subpoena and section 2705 non-disclosure order | NDO withdrawn |
| March 9, 2021 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Feb. 23, 2021 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and section 2705 non-disclosure order | Subpoena withdrawn after NDO challenge |
| 2020 (asserted) | District Court for the Southern District of New York | Not public | Grand jury subpoena and non-disclosure order | Subpoena withdrawn after NDO challenge |
| Oct. 30, 2020 (filed) | District Court for the Eastern District of California | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO amended |

ActiveUS 197958179v.1

**JA219**

WILMERHALE

February 8, 2023
Page 4

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|------|-------------|-------------|-----------------|---------|
| Apr. 26, 2019 (filed) | District Court for the Southern District of New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Oct. 19 2017 (decided) | District Court for the Northern District of Texas | 3:17-mc-40-M-BN, 2017 WL 9287146 adopted by 2017 WL 9287147 | Grand jury subpoena and section 2705 non-disclosure order | NDO vacated |
| 2017 (filed) | District Court for the Western District of Texas | Not public | National Security Letter and NDO | NDO upheld |
| June 15, 2016 (filed) | Ninth Circuit Court of Appeals | 16-16067 | National Security Letter and NDO | NDO upheld |
| 2016 (asserted) | District Court for the District of Columbia | 16-518 | National Security Letter and NDO | NDO upheld |
| June 2015 (asserted) | State of Iowa | N/A | Subpoena duces tecum and NDO | NDO amended |

WILMERHALE

February 8, 2023
Page 5

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|------|-------------|-------------|-----------------|---------|
| December 2015 (asserted) | State of Minnesota | N/A | Administrative subpoena and NDO | Subpoena withdrawn after NDO challenge |
| 2015 (filed) | Supreme Court of Richmond County, New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO amended |
| 2015 (filed) | District Court for the District of Massachusetts | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Oct. 7, 2014 (filed) | District Court for the Northern District of California | 4:14-cv-04480 | National Security Letter and NDO | NDO upheld |
| July 2015 (asserted) | State of Ohio | Not public | Grand jury subpoena and NDO | NDO amended |
| 2014 (filed) | Supreme Court of New York County, New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO vacated |
| 2013 (decided) | Fourth Circuit Court of Appeals | 11-5151 (*see also United States v. Appelbaum*, 707 F.3d | 2703(d) order and section 2705 non-disclosure order | NDO lifted |

ActiveUS 197958179v.1

WILMERHALE

February 8, 2023
Page 6

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|------|-------------|-------------|-----------------|---------|
| | | 283 (4th Cir. 2013) | | |
| 2013 (filed) | District Court for the Northern District of California | Not public | National Security Letter and NDO | NDO upheld |
| Apr. 5, 2013 (asserted) | State of New York | Not public | Administrative subpoena and NDO | NDO upheld |
| May 2012 (asserted) | State of Arizona | Not public | Grand jury subpoena and statutory gag | Gag lifted |
| 2011 (asserted) | District Court for the District of Connecticut | Not public | Grand jury subpoena and NDO | Subpoena withdrawn after NDO challenge |

Sincerely,

George P. Varghese

* * * * * **SEALED** * * * * *

* **THIS PAGE LEFT INTENTIONALLY BLANK** *


**SEALED MATTER ENCLOSED**


**FOR AUTHORIZED PERSONS ONLY**

* * * * * **SEALED** * * * * *

—— * * * * * SEALED * * * * *——

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
In the Matter of the Search of     ) Case No. 23-SC-31
Information That is Stored          )
at Premises Controlled by          )
Twitter, Inc.                       )
                                    )
UNITED STATES OF AMERICA,           ) February 9, 2023
          Interested Party,         ) 11:10 a.m.
                                    ) Washington, D.C.
TWITTER,                            )
          Interested Party.         )
* * * * * * * * * * * * * * * *

**SEALED**

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES:**

FOR THE UNITED STATES:
                    THOMAS WINDOM
                    MARY DOHRMANN
                    Office of Special Counsel
                    950 Pennsylvania Avenue NW
                    Washington, DC 20530
                    (202) 804-7000


FOR TWITTER:
                    ARI HOLTZBLATT
                    WHITNEY RUSSELL
                    BENJAMIN A. POWELL
                    WilmerHale
                    2100 Pennsylvania Avenue NW
                    Washington, DC 20037 USA
                    (202) 663-6964


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

——— * * * * * SEALED  * * * * *———

* * * * * **SEALED** * * * * *

**P R O C E E D I N G S**

1
2          THE COURTROOM DEPUTY:  Matter before the Court,
3   Case No. 23-SC-31, In the matter of the search of
4   information that is stored at premises controlled by
5   Twitter, Inc.  Interested parties, United States of America
6   and Twitter, Inc.
7          Counsel, please come forward and state your names
8   for the record, starting with the government.
9          MR. WINDOM:  Good morning, Your Honor.
10  Thomas Windom and Mary Dohrmann for the United States.
11         THE COURT:  Yes.  Good morning.
12         MR. HOLTZBLATT:  Your Honor, Ari Holtzblatt for
13  Twitter.
14         THE COURT:  All right.  Who else is with you at
15  counsel table, if you would just introduce them again.
16         MR. HOLTZBLATT:  I'm sorry.  Ben Powell and
17  Whitney Russell.
18         THE COURT:  And Mr. Varghese, as I understand, is
19  on his way.
20         MR. HOLTZBLATT:  Mr. Varghese is in an interview
21  that could not be rescheduled.  So I will be --
22         THE COURT:  Okay.  I thought we were waiting for
23  somebody.
24         MR. HOLTZBLATT:  I'm sorry.  Yes.  Mr. Aaron
25  Zebley entered an appearance this morning and is on his way.

* * * * * **SEALED**  * * * * *

— * * * * * SEALED * * * * * —

1   He is actually outside the building.  He will be joining

2   very shortly.

3        THE COURT:  So we're not waiting for anybody?

4        MR. HOLTZBLATT:  He is trying to get up here.  But

5   we don't need to wait for him; I will be presenting.

6        THE COURT:  I'm sorry.  I had gotten a message

7   that the person who was supposed to be arguing today was

8   delayed, but to begin without him.  I just want to make sure

9   the record is correct.  I presumed it was Mr. Varghese since

10  that was the person who argued the last time we were here

11  earlier this week.  But perhaps I misunderstood.

12       MR. HOLTZBLATT:  I think something may have been

13  lost in communication.  I will be presenting for Twitter

14  today.  My colleague Aaron Zebley is on his way, and will be

15  here shortly.

16       THE COURT:  Okay.  Fine.  Got it.  Fine.  Because

17  we're not waiting.

18       Okay.  So as I look at this and look at the time

19  of the warrant issuance, I look at how far out we are from

20  compliance with the warrant, the representation by Twitter's

21  counsel when we met earlier this week that they could comply

22  by 5 p.m. on the 7th; and there was some compliance, I

23  think, by the deadline.

24       But I understand from the government's email to

25  chambers, with a copy to Twitter's counsel, that there has

— * * * * * SEALED  * * * * * —

———— * * * * * SEALED * * * * * ————

1    not been full compliance with the warrant.  I want to just

2    find out today what happened, and where are we on compliance

3    with the warrant.  Twitter has had quite some time to comply

4    with the warrant and have everything prepared to turn over,

5    so I am a little bit concerned about where we are.

6         Let me find out first from the government, since

7    we're here at the government's request, what is the

8    government expecting to happen today --

9         MR. WINDOM:  Thank you, Your Honor.

10         THE COURT:  -- other than counting up the amount

11    of the penalty?

12         MR. WINDOM:  Yes, ma'am.  A few things.

13         First of all, the government wanted to raise this

14    with Your Honor since it was inconsistent with what was

15    represented in court by Twitter counsel two days ago.

16         Second of all, we want compliance; that's the

17    entire purpose of these repeated proceedings and

18    conversations with counsel, is to get the information that

19    the Court ordered them to produce 13 days ago.

20         Each time we have received an email or had a

21    conversation with counsel over the last 48 hours, we have

22    not been left with any confidence that they have produced

23    everything, that they have a time frame to produce

24    everything, or that they even know the scope of the

25    repositories of information.

———— * * * * * SEALED  * * * * * ————

————— * * * * * SEALED * * * * *—————

1        Even this morning, when we had a phone call with

2   them, it seemed as if they were attempting to cabin one of

3   the requests in the warrant.  The only way to describe the

4   end of the phone call after it concluded, I had felt like I

5   had been getting nickle-and-dimed for the prior 20 minutes

6   of conversation.  We need the material.  We need it now.  We

7   needed it 13 days ago.

8        The purpose of this hearing is to impress upon

9   counsel in a way that apparently the government cannot, that

10   the meter is running.  $50,000 accrued at five o'clock two

11   days ago; $100,000 yesterday; $200,000 so far today.  It

12   will continue to run until Twitter completely complies with

13   the warrant.

14        THE COURT:  All right.  So let's hear from you,

15   Mr. Holtzblatt.

16        MR. HOLTZBLATT:  Thank you, Your Honor.

17        I would like to address three things that counsel

18   for the government just said:  First, what we understood we

19   were producing at five o'clock on Tuesday; second, what we

20   have done since then -- actually, four things -- what

21   remains.  And the final item that counsel for the government

22   mentioned about the single category where we discovered this

23   morning that we had a different understanding about what

24   that category represents, and I think it may be -- I

25   ultimately would like --

————— * * * * * SEALED  * * * * *—————

──────── * * * * * SEALED * * * * * ────────

```
1          THE COURT:  Well, I am looking at Attachment B,

2    Part 1.  We're just going to go through it line by line,

3    something tediously -- I tried to avoid at the last hearing;

4    but it seems like that kind of supervision of Twitter is

5    necessary here.

6          Do you have that in front of you, Mr. Holtzblatt?

7          MR. HOLTZBLATT:  I do, Your Honor.

8          THE COURT:  Let's start with number 1.

9          All business records and subscriber information in

10   any form kept pertaining to the subject account starting

11   with:  A, identity and contact information, past and

12   current, including full name, email address, physical

13   address, date of birth, phone number, gender, and other

14   personal identifiers.

15         Has that been turned over?

16         MR. HOLTZBLATT:  Your Honor, I was prepared to

17   identify for you the items that we understand are not yet

18   turned over --

19         THE COURT:  Well, it's the same way of doing it.

20   What have you turned over?  What is missing?

21         So everything in "A" turned over?

22         MR. HOLTZBLATT:  The one item that I know that is

23   not yet turned over but is about to be turned over is the

24   information regarding gender.

25         THE COURT:  Which you are still determining
```

──────── * * * * * SEALED  * * * * * ────────

———— * * * * * SEALED * * * * * ————

1    whether you have or not?

2              MR. HOLTZBLATT:  No.  We have determined that we

3    have the gender information.  We spoke to the government

4    about the gender information yesterday.

5              The email communication from the government

6    suggested that the gender field was not necessarily the most

7    pressing of information, but we have gathered it.  And, I

8    think, as we speak are producing the gender field

9    information.

10             THE COURT:  And everything else in "A," I am

11   understanding from what you said, has been turned over.

12             Is that a correct understanding?

13             MR. HOLTZBLATT:  That is my understanding.

14             THE COURT:  All right.  B.  Do I have to read it

15   to you or can you read it yourself?

16             Has everything in B been turned over?

17             MR. HOLTZBLATT:  Your Honor.  Can you bear with me

18   for one second?

19             (Whereupon, Twitter counsel confer.)

20             MR. HOLTZBLATT:  Your Honor, we have turned over

21   information in all categories in B with one exception that

22   we are -- we don't possess in the manner in which it is

23   described in B, and so we're attempting to turn over what we

24   do have.

25             THE COURT:  What is that precisely?

———— * * * * * SEALED  * * * * * ————

———— * * * * * SEALED * * * * * ————

1          MR. HOLTZBLATT:  All associated accounts,

2     parentheses, including those linked by machine, cookie, IP

3     address, email address, or any other account or device

4     identifier, that's not -- "associated accounts," as I

5     understand it, is not a category of information that exists

6     in that term within our systems.  And so we are attempting

7     to gather a proxy for that, but it's not --

8          THE COURT:  What is the proxy you are gathering

9     for that?

10          (Whereupon, Twitter counsel confer.)

11          MR. HOLTZBLATT:  We are --

12          THE COURT:  Is there a reason why Ms. Russell just

13     has to just sit there as opposed to speaking, since she

14     seems to be the person with the answers?

15          MR. HOLTZBLATT:  No, Your Honor.  We have

16     collectively gathered the information about the answers.  So

17     before I make a representation to you I wanted to confirm

18     that information because I don't want to make an incorrect

19     representation to Your Honor.

20          THE COURT:  Of course not.  We have already been

21     through that.

22          Okay.  So you are still figuring out all of the

23     associated account information in 1B.

24          How long will it take you to figure that out,

25     produce it, collect it, and produce it?

———— * * * * * SEALED  * * * * * ————

—— * * * * * SEALED * * * * * ——

1          MR. HOLTZBLATT:  Well, Your Honor, we don't -- the

2     issue, Your Honor -- there isn't a category of "associated

3     account information"; that's not information that Twitter

4     stores.

5          What we are doing right now is manually attempting

6     to ascertain links between accounts.  But the ascertainment

7     of links between accounts on the basis of machine, cookie,

8     IP address, email address, or other account or device

9     identifier is not information that Twitter possesses, it

10    would be information that Twitter needs to create.  So

11    that's the reason why we had not previously produced it

12    because it's not a category of information that we actually

13    possess.

14          So what we are trying to do is be -- I would

15    say -- because it's not information --

16          THE COURT:  Okay.  I am going to do this in a way

17    that makes sense on the record as we're talking about

18    things.

19          Mr. Windom, with respect to the "all associated

20    accounts," have you obtained -- has the government obtained

21    information like that before from Twitter, if you know?

22          MR. WINDOM:  I can't make that representation with

23    respect to Twitter.

24          With any number of other electronic communication

25    providers, they keep that information in a consistent form.

—— * * * * * SEALED  * * * * * ——

———— * * * * * SEALED * * * * * ————

1          To the extent that Twitter does not, it should be

2     a simple process.  You have cookies associated with an

3     account; you have the email for the subscriber information;

4     perhaps you have the phone number; you definitely have the

5     IP addresses.  Control F that through your system to see

6     what other accounts have come from those IP addresses, are

7     linked to that email address, are linked to the phone

8     number, are linked to the same cookies.

9          I don't profess to be a technological wizard, but

10    it does not seem to be a complex issue.

11          THE COURT:  And all associated --

12          MR. HOLTZBLATT:  Your Honor.

13          THE COURT:  Excuse me.  Mr. Windom, you escaped

14    too fast.

15          MR. WINDOM:  Sorry, ma'am.

16          THE COURT:  "All associated accounts" information

17    is helpful and useful for what reason?

18          MR. WINDOM:  It is, as explained more fully in the

19    warrant -- but for these purposes, it is a useful tool in

20    identifying what other accounts are being used by the same

21    user or by the same device that has access to the account.

22          As oftentimes in any number of cases, user

23    attribution is important.  And if there are other accounts

24    that a user is using, that is very important to the

25    government's investigation.

———— * * * * * SEALED  * * * * * ————

—— * * * * * SEALED * * * * * ——

```
1            THE COURT:  All right.

2            MR. HOLTZBLATT:  So, Your Honor, all providers are

3    not the same.  And it is -- I believe it is correct that

4    other providers possess this information in this form.

5            The warrant, in Section 1 of the warrant, is a BSI

6    request for basic subscriber information.  It, therefore, is

7    asking for information that exists, not information that

8    needs to be created.

9            What I understand the government to be asking --

10   and we are -- we were trying to be cooperative, and our

11   communications with the government have aimed at attempting

12   to assist the government -- is for us to create information

13   that does not exist, as opposed to produce information that

14   does exist.  We are trying to work with the government.  But

15   in terms of compliance with the warrant, the creation of BSI

16   that does not exist, I think, is beyond the scope of the

17   warrant.

18           THE COURT:  Well, it's business records and

19   subscriber information in any form kept.  You are saying

20   because of the word "kept" you don't have that information

21   as a business record that you maintain?

22           MR. HOLTZBLATT:  That's right.  If the records --

23   if the linkage between accounts, which is what we understand

24   this category to be referring to, is not itself a piece of

25   information that we keep, then it's not a business record
```

—— * * * * * SEALED  * * * * * ——

— * * * * * SEALED * * * * * —

1    that we would ordinarily produce.

2            What I understand the government to be asking is

3    for us to analyze our data, as opposed to produce existing

4    data.  And we are trying to work with the government in that

5    respect, but that is the reason that it is not something

6    that -- that is a different category of information.

7            THE COURT:  All right.  1C, length of service, has

8    that been produced?

9            MR. HOLTZBLATT:  We have produced length of

10   service including start date; and I don't know the answer to

11   the rest of 1C.

12           THE COURT:  Ms. Russell, do you know the answer?

13           (Whereupon, Twitter counsel confer.)

14           MR. HOLTZBLATT:  We have produced everything, but

15   there is no credit card or bank account number information

16   associated with the account.

17           THE COURT:  Really?  Then how did somebody pay for

18   that account at all, or --

19           MR. HOLTZBLATT:  The Twitter services --

20           THE COURT:  -- or identify themselves -- that's

21   just one way to identify yourselves as an account user?  You

22   don't have to provider that information to use a Twitter

23   account?

24           MR. HOLTZBLATT:  That's correct, Your Honor.  The

25   Twitter service is free.

— * * * * * SEALED  * * * * * —

* * * * * SEALED * * * * *

```
1          THE COURT:  All right.  D?

2          MR. HOLTZBLATT:  Yes.  We have produced that

3     information.

4          THE COURT:  E?

5          MR. HOLTZBLATT:  We have produced that information.

6          THE COURT:  And F?

7          MR. HOLTZBLATT:  We have produced that information.

8          THE COURT:  G?

9          MR. HOLTZBLATT:  We have produced that information.

10         THE COURT:  H?

11         MR. HOLTZBLATT:  This is the source of our

12    divergence of understanding with the government that we

13    discussed with the government this morning.  Until we had

14    this discussion this morning, we did not understand how --

15    we had a different understanding of what 1H refers to.  And

16    if Your Honor will permit, I can explain --

17         THE COURT:  Well, for purposes of the record, H

18    is:  Communications between Twitter and any person regarding

19    the account including contacts with support services and

20    records of actions taken.

21         It seems pretty plain on its face.

22         Have you reached an understanding now with the

23    government as to the scope?

24         MR. HOLTZBLATT:  No.  We have attempted and would

25    like to continue to attempt to reach an understanding with
```

* * * * * SEALED  * * * * *

———— * * * * * SEALED * * * * * ————

1    the government as to the scope if Your Honor would permit.

2              THE COURT:  I am going to dictate the scope right

3    now:  All communications that Twitter had with any person

4    regarding this account including any contacts with support

5    services and records of actions taken.  Is that clear?

6              MR. HOLTZBLATT:  Well, Your Honor --

7              THE COURT:  What don't you understand about what I

8    just said?

9              MR. HOLTZBLATT:  We understand 1H to refer to

10   basic subscriber information because it appears in Section 1

11   of the warrant.

12             THE COURT:  I think it speaks for itself, and it

13   is not just "basic subscriber information," it is what it

14   says.

15             So have there been communications between Twitter

16   and any person regarding this account -- and given the fact

17   that it was turned off at one point and then turned back on

18   again -- one would think that there would be a lot of

19   communications; and all of those communications would be

20   included.

21             Where are you puzzled as a company?

22             MR. HOLTZBLATT:  This is where we are puzzled,

23   Your Honor.  1H appears in Section 1 of the warrant which

24   otherwise refers -- every other category in Section 1 refers

25   to basic subscriber information.

———— * * * * * SEALED  * * * * * ————

**JA237**

1  THE COURT:  Forget -- forget what you think this

2  category is.

3  It's all business records and subscriber

4  information in any form kept pertaining to the subject

5  account.

6  So any communications between Twitter and anybody

7  else regarding the account -- if it's kept, it's

8  communications regarding the account and subject to that

9  paragraph.

10  MR. HOLTZBLATT:  We had understood this category

11  to be defined by the including clause here, which says:

12  Contacts with support services and records of actions taken.

13  We have searched for that information, and are in

14  the process of producing just, I think, two records.  What

15  the government explained --

16  THE COURT:  Well, that's just including contacts.

17  "Including" does not mean only limited to.  "Including"

18  means including that but any other communications as well.

19  MR. HOLTZBLATT:  We understand that is how the

20  government communicated to us their understanding of this

21  clause today because it appears in the basic subscriber

22  information section.

23  THE COURT:  So the government agrees with what I

24  have just read to you, that that is what the scope is?

25  MR. HOLTZBLATT:  So we have done -- we have

———— * * * * * **SEALED** * * * * * ————

1    attempted to conduct searches today, in light of the

2    conversation we had this morning with the government, to

3    understand the scope of this.  What we have found is --

4    based on certain types of searches -- we are talking about

5    millions of emails that include, for example,

6    realDonaldTrump.  That is a dramatically broader scope of

7    information than we had understood would be covered by this

8    category.  And what we said to the government --

9              THE COURT:  Why don't you explain that more.

10             MR. HOLTZBLATT:  Why don't I explain what we

11   understood it to mean or what we --

12             THE COURT:  No.  I understand you thought it was

13   limited to two records with support services; and that's

14   clearly not the full scope of what is covered in H.

15             So based on what the plain text of H means, and

16   you just mentioned -- made reference to millions of emails,

17   what would the response mean to the plain text of this?

18             MR. HOLTZBLATT:  So what -- if what the government

19   believes we need to produce for this category -- and we are

20   prepared to be as cooperative as we can be with the

21   government in doing that.

22             The government this morning communicated to us

23   that they were most interested in communications between

24   government officials and Twitter regarding the subject

25   account as captured by this.

———— * * * * * **SEALED** * * * * * ————

* * * * * SEALED * * * * *

1              If that is what we are to produce, which is not

2     what we had understood was covered by this category until

3     the conversation this morning, then, what we would normally

4     do for that kind of a communication production would be to

5     meet and confer with the government or -- if we were in

6     civil litigation with the opposing party -- identify search

7     terms and, potentially, custodians that would produce a

8     reasonable set of records that we can review and then

9     produce in order to produce a manageable amount of

10    information.  That's what we proposed to the government this

11    morning, is that we meet and confer, try to understand what

12    search terms would be effective at narrowing down the

13    search.

14            As I said, when we did a search for -- simply the

15    keyword search of @realDonaldTrump on emails within the

16    Twitter system, it produced millions of hits.  I think there

17    are other ways of constructing a search that would produce

18    an appropriate scoped search for this category.

19            THE COURT:  And those millions of hits consist of

20    people concerned about Twitter turning off the account, is

21    that why it was millions?  Why would it be millions?

22            MR. HOLTZBLATT:  Well, that's with only the search

23    term @realDonaldTrump, so that's obviously broader than what

24    Your Honor just said.

25            H says:  Communications between Twitter and any

* * * * * SEALED * * * * *

FILED UNDER SEAL

—— * * * * * SEALED * * * * * ——

1    person regarding the account.  To give meaning to that in --

2    to be responsive to the government about what they are most

3    interested in with respect to this category, we proposed --

4    and would still propose -- that we meet and confer,

5    understand what a set of search terms would be that would

6    obtain the kind of information that the government is trying

7    to obtain under this category --

8             THE COURT:  Mr. Holtzblatt, why are -- are there a

9    million emails?  Why are there a million emails?  From whom?

10            MR. HOLTZBLATT:  Within the Twitter email system.

11   It's not limited to emails -- between people outside the

12   Twitter set of employees and Twitter itself.

13            So we -- so, for example, one way of addressing

14   this category would be to limit our search to -- that was

15   from 2006 to the present.  So there is no date limitation

16   within Category 1, which is another reason we understood it

17   to be BSI information.

18            So what would help to narrow this down would be to

19   impose a date limitation, which is not currently within

20   Category 1; to, perhaps, add a set of to/from or bcc, or cc

21   recipients.  For example, if the government is interested in

22   specifically communications from government officials, then

23   we can do a:  To/from .gov.

24            THE COURT:  Okay.  Please sit down.

25            Mr. Windom, do you really need that from 2006 to

—— * * * * * SEALED  * * * * * ——

———— * * * * * SEALED * * * * * ————

1    the present on H?

2          MR. WINDOM:  This is the first time I have heard a

3    complaint about a date limitation on 1H.  The answer is no.

4    I don't need it from 2006 forward.

5          If we were to pick a date right now, I would say

6    October 1st of 2020 through January 20th of 2021, which is

7    consistent with 1F.

8          But this information about, you know, what it is

9    that we say that we're most specifically interested in, I

10   did not represent that we were most interested in

11   communications between government officials and Twitter

12   regarding the account.

13         We did point out that -- much as Your Honor did

14   just now -- it seemed beyond comprehension that there

15   weren't communications regarding the account when it was

16   suspended and terminated, but that doesn't mean government

17   officials at least cabined to that.  It can mean campaign

18   officials.  It can be anybody acting on behalf of the user

19   of the account, or the user of the account himself.

20         THE COURT:  So any person regarding the account is

21   broader than what you just said, though, Mr. Windom.

22         "Any person regarding the account" is quite broad.

23   It could be all the complaints of all of the Trump

24   supporters out in the world saying:  What are you doing,

25   Twitter?

———— * * * * * SEALED  * * * * * ————

JA242

———— * * * * * SEALED * * * * *————

1    So I take it, from what you just said, that you

2    are interested only in -- rather than "any person," a person

3    who was the subscriber or user of the account or on behalf

4    of that person regarding the account?

5        MR. WINDOM:  Yes, ma'am.  An agent thereof.

6        THE COURT:  All right.  How long -- with that

7    clarification, Mr. Holtzblatt, how long will it take Twitter

8    between -- with the date limitation and the limitation on

9    any person, to produce records?

10       MR. HOLTZBLATT:  Your Honor, I just want to make

11   sure I understand the limitation.

12       There are two additional limitations that are

13   being placed on 1H, one is -- is that it be limited by date,

14   from October 1st, 2020, to January 20th, 2021, is that

15   correct, or the end of January --

16       THE COURT:  January 20th, 2021.

17       MR. HOLTZBLATT:  -- January 20th, 2021, and that

18   the individuals covered would be only the owner of the

19   account or an agent of the owner of the account for

20   communications?

21       I will need to talk to my client about how long it

22   will take.  But what I can represent to the Court is that,

23   within an hour of today's hearing, I will be able to provide

24   an estimate.  And my hope would be that I will be able to

25   produce today that information, but I don't feel like I can

———— * * * * * SEALED * * * * *————

——— * * * * * SEALED * * * * * ———

1   make a representation without first talking to my client

2   about it.

3          THE COURT:  All right.  Is that sufficient,

4   subscriber or agent of the user of the account?

5          MR. WINDOM:  Yes, ma'am, with the qualification

6   that I can't know the universe of who those agents or

7   putative agents may be.

8          THE COURT:  Well, how is Twitter going to know

9   that?

10          MR. WINDOM:  It would be beyond all comprehension

11   to imagine that, with this account, there is not a file

12   known within the general counsel's office or some other

13   liaison office within Twitter regarding the account with

14   everything that transpired during the relevant time period.

15          THE COURT:  We'll see how that goes because

16   hopefully -- I don't want to see you all here again.  I am

17   sure none of you want to be here again.

18          All right.  So now we're on to 2, which is --

19          MR. HOLTZBLATT:  Just on one -- on the agents,

20   Your Honor, one category that I could propose is the

21   representatives of -- that subject to the account assigned

22   to be responsible for all presidential records with respect

23   to the archivist, so there are a limited -- a defined and

24   limited set of individuals who were assigned to be

25   responsible for presidential records.  And as we have talked

——— * * * * * SEALED  * * * * * ———

**JA244**

* * * * * **SEALED** * * * * *

1    about before, at least during the relevant time period, both

2    the archivist and Twitter understood these to be

3    presidential records.  Whether or not -- I know Your Honor

4    has some questions about that.  But in terms of the

5    contemporaneous understanding of the parties, that's how

6    Twitter understood the records --

7                THE COURT:  Well, when this account was set up,

8    was there a communication from the person or persons who set

9    up the account with Twitter as to who could access it and

10   who could communicate regarding the functionality and any

11   other concerns about the account?

12               MR. HOLTZBLATT:  The account was set up in 2006,

13   Your Honor.  A great deal transpired between 2006 and 2020

14   with respect to the individual who is the owner of the

15   account.  So I don't -- there is obviously -- there is

16   sign-in information with the account, but you don't need to

17   provide very much information to open a Twitter account.  So

18   it's -- it may be surprising to the government or to the

19   Court, but there is not a -- we don't keep dossiers on users

20   in that sense.

21               I can represent to Your Honor that the current

22   email -- we have a name of an individual who is the current

23   email contact for the account, and that is a person who is a

24   credible --

25               THE COURT:  What is that name?

* * * * * **SEALED** * * * * *

———— * * * * * SEALED * * * * * ————

```
1           MR. HOLTZBLATT:  ████████████.  So I think we can
2   certainly look at the NARA -- the individuals who are
3   assigned to be agents for the account --
4           THE COURT:  And expand it beyond ██████████ to
5   include those people as well?
6           MR. HOLTZBLATT:  That's correct, Your Honor.
7           THE COURT:  Right.
8           Mr. Windom, I am not sure what else they can do.
9           MR. WINDOM:  Your Honor, that's a starting point.
10  We can add names to the extent we think appropriate.
11          I will say this, the letter that they're talking
12  about was signed on January 19th and includes the sitting
13  Assistant Attorney General for the Office of Legal Counsel.
14  I highly doubt that that person is having communications
15  with Twitter in the relevant time period about this account.
16  I would not cabin it to that --
17          THE COURT:  Well, I know the NARA representatives
18  are -- limiting it to them would be useless, generally
19  useless.
20          MR. WINDOM:  Yes, ma'am.
21          THE COURT:  I am fully aware of that.  But ████
22  ████████ would not be.
23          MR. WINDOM:  ████████████ is one person I can
24  consult, and add additional names to the extent that their
25  list is not robust.
```

———— * * * * * SEALED  * * * * * ————

———— * * * * * SEALED * * * * *————

```
 1          THE COURT:  All right.  Well, you can provide the

 2     list of names to them.

 3          MR. WINDOM:  Thank you, Judge.

 4          THE COURT:  All right.  We're on to 2A,

 5     Mr. Holtzblatt.

 6          MR. HOLTZBLATT:  Thank you, Your Honor.

 7          THE COURT:  And for purposes of the record, so

 8     we're all clear, 2 states that the warrant demands:  All

 9     content, records, and other information relating to

10     communications sent from or received by the subject account

11     from October 2020 to January 2021 including but not limited

12     to:  A, content of all tweets created, drafted, favorited,

13     liked, or re-tweeted by the subject account including all

14     such deleted tweets, and all associated multimedia,

15     metadata, and logs.

16          Has that been produced?

17          MR. HOLTZBLATT:  Yes, Your Honor.  We have --

18          THE COURT:  You can stop at "yes," if it's all

19     been produced.  If there is an exception --

20          MR. HOLTZBLATT:  It's more complicated, so I was

21     going to explain.

22          THE COURT:  Okay.  That's unfortunate.

23          MR. HOLTZBLATT:  At 5 p.m. on February 7th, I

24     think that was our day, we produced all data in this

25     category that was in the standard production tools of
```

———— * * * * * SEALED  * * * * *————

* * * * * SEALED * * * * *

1    Twitter.

2              We communicated with the government on

3    February 8th that there were prior preservations of the

4    subject account that are not within Twitter's standard

5    production tools and that would, therefore, require

6    engineering to obtain information.  And we asked the

7    government whether it wished us to undertake that effort,

8    and the government confirmed that it did.

9              And we have since then -- when we produced on

10   February 7, we indicated to the government in our production

11   letter that there was potentially deleted data that might

12   exist, which is what would be found in prior preservations,

13   but that it would require additional engineering efforts.

14             At 2 a.m. last night, or this morning, Twitter

15   produced additional information from those prior

16   preservations that falls within category 2A.  There are --

17             THE COURT:  When you say "prior preservations"

18   what are you talking about?

19             Prior litigation holds of some kind or that you

20   had a stash or a cache of preserved data sitting in

21   different places?  What are you talking about?

22             MR. HOLTZBLATT:  I am referring -- with respect to

23   this particular account, I am referring to preservations

24   from two specific dates.

25             There is a preservation that was made that

* * * * * SEALED  * * * * *

FILED UNDER SEAL

* * * * * SEALED * * * * *

1    includes the subject account covering January 3rd to 9th,

2    2021.  There is a second preservation of this that includes

3    this account that covers January 11 to 12, 2021.

4         Those are collections of data that -- they are

5    not -- it's not coterminous with the categories that would

6    exist in the active account right now and -- and that's data

7    that does not exist within a production environment.  So

8    it's not data that you can just click -- we have a system to

9    just click a button and produce, which is why we indicated

10   that further engineering efforts might be necessary.

11        We asked the government if they wished us to

12   undertake those efforts.  We had an engineer working through

13   the night, after the government asked us to, to undertake

14   those efforts.  At 2 a.m. in the morning we produced

15   additional information that came from those preservations.

16        There are two categories of information that --

17   actually, I'm sorry, three categories of information that we

18   are still working to produce because of the engineering

19   challenges associated.

20        One of those categories is the list of -- I am not

21   sure this is from 2A.  But I think, for purposes of

22   coherence, it would be helpful for me to describe it now

23   because it connects to this preservation; that is,

24   followers -- a list of followers for this account that were

25   contained within the January 11 through 12th prior

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    preservation.  We have segregated that information.  It is a

2    complicated and large set of information.  And we are unable

3    to deliver it in the manner that we normally deliver

4    information to law enforcement, which is to send a token.

5    We believe right now it would require physical media to put

6    that information on and to hand it over to the government.

7         This morning we indicated to the government:  If

8    there is a mechanism, like an FTP site or something, that

9    you have that you can work with us, we would like to work

10   with you on this.  We have it.  We have segregated it.  We

11   just don't currently have a tool that allows us to produce

12   it to you.  So that --

13        THE COURT:  This is really just a list of

14   followers attached to the preserved account from January 11

15   through 12, 2021?

16        MR. HOLTZBLATT:  That's this particular -- there

17   are two others that I need to address, but that's this

18   particular one that I am addressing.  That's correct, Your

19   Honor.

20        THE COURT:  Okay.  Category two of the three.

21        MR. HOLTZBLATT:  As I mentioned, Your Honor, there

22   were two prior preservations, and then there is the current

23   production tools.  In two of the three of those sets, the

24   January 3 through 9 and the current one, we have produced

25   the tweets and related tweet information for the account.

* * * * * SEALED * * * * *

—— * * * * * SEALED * * * * * ——

1          In the January 11 to 12th prior preservation, the

2     way that the tweet and tweet-related information is stored,

3     it goes all the way back to 2006.  We don't have a

4     warrant -- that is contents of user communications.  We

5     don't have a warrant that would permit us to produce the

6     entirety of that information.  So what we have is a tool

7     that -- what we refer to as a redaction [sic] tool or a

8     trimming tool.  Because this is not a production

9     environment, a human being has to go in and manually trim

10    the information to isolate the date range.  That, as I think

11    Your Honor can understand, is a laborious process, including

12    for this particular account, given the time frame; and we

13    need to isolate it, I think, over a three-month, four-month

14    period, I'm sorry, Your Honor.  So we are undertaking it.

15         We are underway on that effort, but the second

16    piece of information that we are working on producing but

17    have not yet produced is the tweets for the January 11 to

18    12th prior preservation for the subject account as we

19    undergo the trimming process.

20         THE COURT:  Okay.  And how long will it take you

21    to produce -- do that trimming process?

22         MR. HOLTZBLATT:  I am hopeful that we will be able

23    to finish it today.  I don't know that we will be able to

24    finish it today.  What I would propose to the government --

25    what we have proposed and what we would propose again is

—— * * * * * SEALED  * * * * * ——

————— * * * * * SEALED * * * * * —————

1    that we provide updates this afternoon on where we are with

2    that engineering process.

3         We are working as, I think, evidenced by having an

4    engineer come in overnight and work with this tool through

5    the night.  We are working very diligently to try to produce

6    this information.  We have produced this category of

7    information for two of the three repositories where this

8    type of information is held, and we are working on this last

9    one --

10         THE COURT:  And these tweets in the preserved data

11    set from January 11 through 12, 2021, are different from in

12    the current -- your current status of the account?

13         MR. HOLTZBLATT:  That's a great question, Your

14    Honor.

15         So they are probably not different and they are

16    certainly not, in any large sense, different.  It is

17    possible that between when the account was suspended on

18    January 8th, which is before this preservation occurred, and

19    then it was reinstated recently -- it is conceivable that,

20    after it was reinstated, someone that has access to the

21    account deleted some of the tweets.  If that happened, they

22    would be present in the January 11th and 12th, but not in

23    the current one.  I don't know.  It may be -- I don't know.

24         THE COURT:  Okay.  I understand.

25         The third category of information that you are

————— * * * * * SEALED  * * * * * —————

———— * * * * * SEALED * * * * * ————

1    still working on.

2              MR. HOLTZBLATT:  The third category is something

3    called fleets with an "F."  I will be honest with you, Your

4    Honor, until this morning I didn't know that that was a

5    content category that existed.  I am a Twitter user and have

6    worked with Twitter a long time; that was not something that

7    I was aware of.

8              But we are collecting that from the January 11th

9    through 12th production set, and only that set; and it

10   presents, I believe, a similar problem, of having to trim it

11   down.  We're working on that well.

12             THE COURT:  What precisely is fleets?

13             MR. HOLTZBLATT:  It is similar to tweets, and I

14   don't know more than that, Your Honor.

15             THE COURT:  You don't use "fleets."

16             MR. HOLTZBLATT:  I had not heard of fleets until

17   this morning.

18             THE COURT:  And was fleet used on this account?

19             MR. HOLTZBLATT:  It is a vanishing tweet.

20             THE COURT:  A vanishing tweet.

21             MR. HOLTZBLATT:  I guess fleet -- that makes

22   sense, fleeting.

23             THE COURT:  Okay.  So it's a vanishing tweet.  And

24   do you know whether that vanishing tweet or fleet

25   functionality was active on this account?  And are you able

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1    to tell that?

2            MR. HOLTZBLATT:  I don't, as I stand here now,

3    know whether it was.  If there is data -- if there is fleet

4    data in the prior preservation from January 11 and 12th,

5    then that would be -- it would have been active, and that

6    would correspond to it, and that's what we're working to

7    obtain.

8            THE COURT:  Okay.  So let me interrupt you for a

9    second.

10            Mr. Windom, of these three categories is the

11    government particularly interested in Category No. 1, this

12    list of followers for the account from January 11

13    through 12, 2021?

14            MR. WINDOM:  Yes, Your Honor.

15            The answer is going to be yes for all three.  I

16    have some additional information that may be of assistance.

17            This is a perfect example of why it was imperative

18    that we come before Your Honor.  Twitter counsel has just

19    mentioned two things that we have never heard of before in

20    our calls.

21            What we were told was that there was one

22    preservation done of the entire history of the account on

23    January 11th.  This is the first time we are hearing about

24    another preservation between January 3rd and January 9.

25            Second, I have never heard of "fleets" in part of

——— * * * * * SEALED   * * * * * ———

— * * * * * SEALED * * * * * —

1    any discussion that we have had.  I don't know if that is

2    information in this account; it may or may not be.  It still

3    will be relevant, it still will be responsive.

4          THE COURT:  Well, it seems to me that that's a

5    functionality that you would probably understand from the --

6    1C, types of services utilized.

7          MR. WINDOM:  Yes, ma'am.

8          THE COURT:  But perhaps people -- representatives

9    of Twitter can explain why that's just not indicated in 1C,

10   which is:  Functionality uses of the account?

11         MR. WINDOM:  I can't speak to that given our

12   review of the material at this point.  I do want to point

13   out, though, Your Honor, what Twitter counsel told us, in

14   terms of the preservations, they said that according to

15   Twitter's policies, if the user deletes tweets or direct

16   messages Twitter, nonetheless, retains that information for

17   14 days.  These two prior preservations could have deleted

18   tweets, could have deleted direct messages that are not part

19   of the instant production from this year.

20         We know with certainty that there were deleted

21   tweets on January 6th.  Twitter said that the President had

22   to delete those tweets in order to reinstate his account

23   from suspension.  We do not know if those deleted tweets are

24   part of what we got from this year's preservation versus

25   either of those two prior preservations.  That is one of the

— * * * * * SEALED  * * * * * —

**JA255**

———— * * * * * SEALED * * * * * ————

1    reasons it is very concerning to us.

2        I will also point out that the introductory

3    paragraph in the warrant for Part 1 specifically says

4    anything in their holdings -- it mentions including any

5    preservations that were made pursuant to 18 U.S.C. -- I

6    think it is 2703.

7        It is not clear to us whether these preservations

8    were made pursuant to a federal order or just for internal

9    reasons.  But, in any event, that opening paragraph of

10   Part 1 clearly covered all of these things.  And all of the

11   problems that they say they're encountering and redacting,

12   and going back and looking at things, we're 23 days from the

13   date that the Court entered an order and they're just

14   starting to learn about things now.

15       THE COURT:  Okay.  So were these -- I mean, I

16   didn't pursue the preservation orders and why they were in

17   place, presuming that they were government orders and you

18   might already know about those.  But were these government

19   preservation requests under the Stored Communications Act?

20       MR. HOLTZBLATT:  So we don't believe they were,

21   but the individuals who would know definitively are no

22   longer employed with Twitter.  But we don't believe that

23   these are 2703; and one of the two is definitely not.

24       That's what I thought, yes.

25       One of the two is certainly not, and the second

———— * * * * * SEALED * * * * * ————

* * * * * SEALED * * * * *

```
 1    one we don't know the answer.

 2            THE COURT:  Doesn't Twitter keep track of why

 3    they're preserving data?

 4            MR. HOLTZBLATT:  Your Honor, this particular time

 5    frame --

 6            THE COURT:  Like, which order, for how long, and

 7    so on?

 8            MR. HOLTZBLATT:  So I don't know -- yes.

 9            THE COURT:  Does Twitter keep track of why it's

10    preserving data and pursuant to which order?

11            MR. HOLTZBLATT:  So I don't know -- I have two

12    answers, Your Honor.  As a general matter, I don't know the

13    answer to your question.

14            In this particular instance, we do not have a

15    record of a government request that corresponds to either of

16    these two preservations.

17            THE COURT:  Interesting.  Okay.

18            MR. HOLTZBLATT:  So if a negative pregnant is to

19    be followed, then it would suggest that these were done not

20    pursuant to a preservation order.  But I cannot -- I do not

21    wanted to stand up here and make a representation to Your

22    Honor that I don't know to be true.

23            So I can tell you we do not have a record.  I know

24    that one of the two was not; and I don't know the answer as

25    to the other one.
```

* * * * * SEALED  * * * * *

1          THE COURT:  Okay.  All right.  And for the -- let

2    me just go back for one second just to make sure my notes

3    are complete.

4          For Category 1, the list of followers, did you

5    tell me when you think that is going to be produced?

6          MR. HOLTZBLATT:  We need the government's help

7    with this.  We have it ready to go, it's simply a question

8    of how to do it --

9          THE COURT:  He just needs to know where to do it.

10         MR. HOLTZBLATT:  If the government would like us

11   to deliver a hard drive to the FBI office in San Francisco,

12   we can do it today.  If they would like us to do it to an

13   FTP site and they can provide us an FTP link, we can do it

14   today.  We stand ready to produce that as soon as we have a

15   mechanism to do it.

16         THE COURT:  Okay.  Mr. Windom, on that issue?

17         MR. WINDOM:  I am advised that there is an FTP

18   link in their email in-box now.

19         MR. HOLTZBLATT:  Great.

20         THE COURT:  Okay.  So that can start now.

21         With respect to 2, the time frame is possibly

22   today, possibly tomorrow; no promises on that.  But you are

23   going to keep the government updated on the status of two.

24         And for the fleets, what is your time frame?

25         MR. HOLTZBLATT:  So the fleets is only as to one

* * * * * SEALED * * * * *

1    of the three repositories we're talking about, January 11

2    through 12.

3                THE COURT:  Right.

4                MR. HOLTZBLATT:  That's in the same category as

5    the tweets for January 11 and 12.  I am hopeful that we will

6    have it today.  I can commit to having -- to providing an

7    update to the government this afternoon about where we stand

8    with that effort; and we are working around the clock.

9                THE COURT:  Okay.  So you are going to give

10   Mr. Windom and Ms. Dohrmann an update on both 2 and 3, let's

11   say, by 4 p.m. today if you haven't delivered everything by

12   then.

13               MR. HOLTZBLATT:  Yes, Your Honor.

14               THE COURT:  Okay.  Let's move on to B, the content

15   of all direct messages, the DMs:  Sent from, received by,

16   stored in draft form, in or otherwise associated with the

17   subject account including attachments, multimedia, header

18   information, metadata, and logs.

19               Am I understanding correctly, Mr. Holtzblatt, that

20   that has been produced, to the extent it's subject to your

21   standard production tool, but to the extent that this data

22   falls in the two preserved caches --

23               MR. HOLTZBLATT:  We have also produced --

24               THE COURT:  You have also produced it?

25               MR. HOLTZBLATT:  That is -- happily, that was one

* * * * * SEALED * * * * *

JA259

————— * * * * * SEALED * * * * * —————

1     of the things our engineers were able to pull at 2 in the

2     morning; and that included deleted direct messages and not

3     just nondeleted, but also deleted direct messages.

4          THE COURT:  And then 3, content which -- for the

5     record's clarity, 3 asked for:  All content records and

6     other information relating to all other interactions between

7     the subject account and other Twitter users from

8     October 20th to January 20, 2021 including but not limited

9     to -- this is where we get into the, A, users the subject

10    account has followed, unfollowed, muted, unmuted, blocked or

11    unblocked, and all users who have followed, unfollowed,

12    muted, unmuted, blocked or unblocked the subject account.

13         Do you want to give me the status of that?

14         MR. HOLTZBLATT:  So I -- the one category that is

15    not produced from that is this physical media, this

16    production that we need to do, I guess, through an FTP site

17    that's in my email box or George's, Mr. Varghese's --

18         THE COURT:  Which is the Category 1 that you have

19    referred to before; and you are ready to produce that today?

20         MR. HOLTZBLATT:  We are ready to produce that

21    today.

22         THE COURT:  Got it.  Via the FTP site or mechanism.

23         B, all information from the connect or

24    notifications tab for the account including all lists of

25    Twitter users who have favorited or re-tweeted tweets posted

————— * * * * * SEALED  * * * * * —————

**JA260**

———— * * * * * SEALED * * * * * ————

1    by the accounts, as well as all tweets that include the user

2    name associated with the account, i.e., mentions or replies.

3         MR. HOLTZBLATT:  So, Your Honor, this is a

4    category we have not produced, and I want to explain why.

5         The items in 3 are all date limited.  This is not

6    a category of information that was -- is contained within

7    the prior preservation, so it's not saying we can go back to

8    January of 2021 and collect to fit it within the time frame.

9         All we have that could conceivably fall within

10   this category is information that is there today.  This is

11   dynamic information, so it's information that changes.  And

12   so the information that would be contained in this today is

13   a mix of information that might have been responsive to this

14   category and information that is definitely not.  Because it

15   is contents of communications, we don't believe we can

16   produce without a warrant the information that's available

17   in this category on our systems today because it is -- it

18   includes a category of information that goes beyond the

19   scope of the warrant.  So we don't have a way of

20   disaggregating this information --

21        THE COURT:  Meaning, you don't have a way to put a

22   time frame on it?

23        MR. HOLTZBLATT:  That's correct, Your Honor.

24        It is information that -- because it's dynamic --

25   whatever is in the account today is not what was in the

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1     account at the time -- at the relevant time frame.

2                    THE COURT:  I see.

3                    MR. HOLTZBLATT:  And I don't -- so I don't know if

4     this is important to the government or not.  If it is, we

5     have to come up with a different solution.  I don't think we

6     actually can -- I don't think we are permitted to produce

7     what we have today.

8                    THE COURT:  Okay.  Well, let me just --

9     Mr. Windom, do you want to think about that or do you want

10    to respond?

11                   Do you think Mr. Zebley is standing outside the

12    locked door?

13                   MR. HOLTZBLATT:  I think there is a chance.

14                   THE COURT:  Could you check?  Poor Mr. Zebley.

15                   MR. WINDOM:  Should I wait, Your Honor, or

16    proceed?

17                   THE COURT:  Proceed.  In my chambers we wait for

18    no man.

19                   MR. WINDOM:  Thank you.

20                   Your Honor, I mean, the short answer is of course

21    it's important to us.  Just by PC -- for it to be in the

22    warrant, and Your Honor signed a warrant with this in it, I

23    don't understand -- I just don't understand the explanation

24    that was given as to what exists or does not exist.

25                   It sounds like they have more information than is

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    responsive and so there can be an overproduction of

2    material.  Honestly, I am not clear what they're saying; nor

3    do I understand if the two preservations that they have

4    identified today would somehow ameliorate the problem that

5    they have just raised at the podium.

6           I don't understand the technology behind it.  If

7    they would like to explain further or if they would like to

8    talk to me offline, that is fine.  The bottom-line --

9           THE COURT:  I am going to let you-all talk about

10    this offline.

11           MR. WINDOM:  Thank you, Your Honor.

12           THE COURT:  Because I think -- what I am

13    understanding from Twitter is that -- I am not a Twitter

14    user; most judges are not.

15           The connector notifications tab -- I am not

16    exactly sure what that is.  But I do understand lists of

17    Twitter used who have favorited or re-tweeted tweets posted

18    by the account.

19           As I understand what Twitter is saying, that is

20    just a mass of data that is not segregated or segregable by

21    date frame -- by a time frame.  And so I think that they are

22    having trouble figuring out how to do that.

23           And then, the last part of this is:  All tweets

24    that include the user name associated with the account.

25    That could be a lot of data.  So I think you need to talk to

* * * * * SEALED * * * * *

———— * * * * * SEALED * * * * * ————

1    them about how to refine that.  Okay.

2              MR. HOLTZBLATT:  Thank you, Your Honor.

3              THE COURT:  C, all contacts and related sync

4    information, produced?

5              MR. HOLTZBLATT:  Yes.

6              THE COURT:  Okay.  All associated logs and

7    metadata, produced?

8              MR. HOLTZBLATT:  Yes.

9              THE COURT:  4, for the record, reads:  All other

10   content records and other information relating to the use of

11   the subject account including but not limited to:  A, All

12   data and information associated with the profile page

13   including photographs, bios, and profile backgrounds and

14   themes.

15             Has that been produced?

16             MR. HOLTZBLATT:  Yes.

17             THE COURT:  B, multimedia uploaded to or otherwise

18   associated with the subject account.

19             Has that been produced?

20             MR. HOLTZBLATT:  With one exception, yes.

21             The one exception is that there is tweet media

22   which are associated with the tweets.  And so in the

23   January 11th through 12th repository that we are trimming --

24   that requires the trimming -- that one of the things that

25   has to be trimmed down to includes the tweet media.  Other

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1    than that, we have produced for this category.

2         THE COURT:  Okay.  C, all records of searches

3    performed by the subject account from October 20th to

4    January 20, 2021.

5         Has that been produced, Mr. Holtzblatt?

6         MR. HOLTZBLATT:  We have produced saved searches;

7    and we are in the process of producing actual search

8    queries, which can be produced today.

9         THE COURT:  Today.

10        MR. HOLTZBLATT:  It may have been included in the

11   earlier production, I don't know the answer to that.  We are

12   producing additional information of actual search queries

13   today.

14        THE COURT:  Okay.  D, all location information

15   including all location data collected by any plug-ins,

16   widgets or the quote-unquote tweet with location service

17   from October 20th to January 20, 2021.

18        MR. HOLTZBLATT:  Yes.  We have produced what we

19   have.  It is not something we normally have, so it may be a

20   small or null set.  But to the extent we have it, we have

21   produced it.

22        THE COURT:  Okay.  E, information about the

23   subject account's use of Twitter's link service including

24   all longer website links that were shortened by the service,

25   all resulting shortened links or information about the

——— * * * * * SEALED  * * * * * ———

* * * * * SEALED * * * * *

1    number of times that link posted while the subject account

2    was clicked, which is a lot of information in there.

3              MR. HOLTZBLATT:  Yes.  We have not -- we have not

4    produced this information.  We're struggling to understand

5    what would be responsive, and it's one we're continuing to

6    work on and would like to be able to continue to talk with

7    the government to make sure we understand what they

8    understand would fall in this category, so we're working on

9    it.

10             THE COURT:  Can I just ask why is it that when

11   there are questions about the scope, and so on -- to be

12   quite honest, we are J.D.s, we are not IT professionals.  So

13   it's oftentimes the case that, when we lawyers look at

14   language, we have to confer with IT to find out what is

15   feasible, what they have, how much longer it is, does it

16   exist, and so on.

17             So why is it on February 9th you-all are just

18   starting to have that conversation?

19             MR. HOLTZBLATT:  Well, Your Honor --

20             THE COURT:  When I do take, at face value,

21   Twitter's representation in connection with its motion

22   challenging the NDO, that it was perfectly prepared to

23   comply with this warrant?

24             MR. HOLTZBLATT:  So I would like to explain that,

25   Your Honor.

* * * * * SEALED  * * * * *

—— * * * * * SEALED * * * * * ——

```
1          THE COURT:  It's a puzzle from where I sit.

2          MR. HOLTZBLATT:  I'm sorry, Your Honor.

3          In  ██████████  communication with the government

4   prior to any filing in this case, one of the things that ██

5   said to the government was:  Once these issues, by which ██

6   meant what was the subject of our -- what is still the

7   subject of our pending motion -- what was the subject of the

8   government's motion are resolved, which we understood to be

9   the big question -- there are some technical issues that we

10  will need to discuss with respect to this account.  These

11  are the kinds of things  ████████  was referring to, about

12  the need to talk about technical information.

13          That's everything from:  We have a standard

14  production tool, which is how -- for thousands of warrants

15  we produce information --

16          THE COURT:  So ██ was putting the cart before the

17  horse.  ██ should have been working on getting the warrant

18  production ready to go while she litigated whatever else

19  Twitter wanted to litigate.

20          Okay.  Well, that's been clear from the process

21  here.

22          Okay.  So let's break down E.

23          So information about use of Twitter's link

24  service, which is shortening longer website links.  Does

25  Twitter maintain that information, when a Twitter user
```

—— * * * * * SEALED  * * * * * ——

———— * * * * * SEALED * * * * * ————

1    accesses and uses the link service?

2            You can tell me you don't know if you don't know.

3            MR. HOLTZBLATT:  I think the safest thing for me

4    to say to Your Honor would be that I don't know the answer.

5    It is something that, I think, we are trying to produce

6    today; but it is also something that there was some

7    confusion about what it is.  To the extent there remains

8    confusion, we will speak with the government and continue

9    speaking with the government until we have eliminated that

10   confusion.

11           And if it is available -- I think I am saying that

12   it is not hard to produce.  We will endeavor to produce it

13   today.  And if not, we will provide an update and explain

14   why we have not at the end of this afternoon, at four

15   o'clock.

16           THE COURT:  This may be why the government keeps

17   insisting at each of these meetings that a personal

18   representative from Twitter be sitting at the table to

19   answer more technical questions.  I am not sure why they

20   keep asking for a personal representative, but perhaps

21   that's one reason.

22           You are going to find that out.  It will be

23   produced today if Twitter maintains it?

24           MR. HOLTZBLATT:  It will be produced today if we

25   maintain it.  And with the only caveat that if, for some

———— * * * * * SEALED   * * * * * ————

1    reason, there is an engineering challenge that we cannot

2    overcome today, I will give an update to the government at

3    four o'clock and explain that.

4             THE COURT:  Okay.  And then -- so if the account

5    user used the link service.  And then, the second part of

6    this is:  All resulting shortened links.  And then, the

7    third part of it is:  The number of times that a link posted

8    by the subject account was clicked.

9             Do you understand what that means by "clicked"?

10            MR. HOLTZBLATT:  I understand what it would mean

11   to click a link.  I don't know if that is information that

12   Twitter maintains, the information about the clicking of

13   links that have been shortened through any link service.  I

14   don't know the answer to that.

15            THE COURT:  Because, certainly, the source link

16   might maintain the number of clicks on its link.  But does

17   Twitter maintain information about those number of clicks

18   for links accessed via Twitter?

19            MR. HOLTZBLATT:  I don't know.  That is not

20   standard information that Twitter produces.  I have some

21   doubt about whether this is information that Twitter

22   maintains, but I am not going to make a representation to

23   the Court when I don't know.

24            THE COURT:  Mr. Windom.

25            Let's get clarity right now on what is being

* * * * * **SEALED** * * * * *

 1    requested in 4E.

 2         Just reading the English here, I think it reads --

 3    but you can correct me if I'm wrong -- it's requesting three

 4    things, the number of times the user of this account

 5    accessed and used Twitter's link service which shortens

 6    links -- so far so good?

 7         MR. WINDOM:  Yes, ma'am.

 8         THE COURT:  And then the second thing is what were

 9    the shortened links.

10         MR. WINDOM:  Yes, ma'am.

11         THE COURT:  Is that right?

12         MR. WINDOM:  Yes, ma'am.

13         THE COURT:  And then, finally, any information

14    that Twitter has about the number of times that a link

15    posted by the subject account was actually clicked, which

16    is, basically, clicking on the tweet -- clicking on a link

17    embedded in a tweet.

18         Is it the government's information that this is

19    information that can be preserved, maintained, collected by

20    an electronic communications provider like Twitter.

21         MR. WINDOM:  Yes, ma'am.  And there is some

22    reference to this in the affidavit I will read briefly.

23    Twitter tracks --

24         THE COURT:  In the affidavit?

25         MR. WINDOM:  Ma'am?

* * * * * **SEALED** * * * * *

———— * * * * * SEALED * * * * * ————

1          THE COURT:  In the affidavit?

2          MR. WINDOM:  Yes, ma'am.

3          THE COURT:  Which is currently sealed, and Twitter

4     hasn't seen it?

5          MR. WINDOM:  This is a line that is a statement of

6     fact responsive to your question.

7          THE COURT:  What a privilege to --

8          MR. WINDOM:  "According to the government's

9     information, Twitter tracks how many times these shortened

10    links are clicked."  Period, full stop.

11         THE COURT:  Well, we'll find out if that

12    representation in the affidavit is correct, but that is

13    certainly information that the government has.

14         The government has been living and working and

15    obtaining information from Twitter since its existence,

16    probably, so they have experience before they put that in

17    their affidavit.  Perhaps that can help counsel in

18    communicating with Twitter.

19         MR. HOLTZBLATT:  Thank you, Your Honor.  I

20    appreciate that.

21         THE COURT:  Okay.  All right.  So E, 4 p.m. update

22    to the government today, Mr. Holtzblatt, about how much of

23    that you can produce, and when.

24         MR. HOLTZBLATT:  Yes, Your Honor.

25         THE COURT:  All right.  I think that's it for what

———— * * * * * SEALED  * * * * * ————

——— * * * * * SEALED * * * * * ———

1    hasn't been produced, and a time frame for production.

2           It's clear to me that Twitter didn't comport or

3    comply with the deadline by 5 p.m. on February 7th and is

4    working hard to do so now.  So that's good news.

5           When production is complete, I will expect the

6    government to let me know and what the government's

7    calculation is at that point because I am not keeping count

8    of the penalty, but I am sure the government will.  I will

9    enter an order at that time for the amount.  And, hopefully,

10   the government will confer with Twitter that everybody is

11   counting the days the same way and doing the math the same

12   way.  But $50,000 a day is a pretty big -- easy to calculate

13   round number even for us J.D.s.  Hopefully, this production

14   will get wrapped up promptly.

15           Is there anything further today, Mr. Windom?

16           MR. WINDOM:  No, ma'am.  Thank you, Your Honor.

17           THE COURT:  Anything further from Twitter?

18           MR. HOLTZBLATT:  No, Your Honor.

19           THE COURT:  All right.  Hopefully, I won't see you

20   all again.  You will be able to work this out.

21           I will just wait for your submissions on Twitter's

22   motion, and then we'll proceed from there.  As I said, I was

23   hoping that the hearing we had on Tuesday pretty much covers

24   most of the issues that I might be concerned about with both

25   motions that were pending in front of me.  But, as I said,

——— * * * * * SEALED * * * * * ———

——— * * * * * SEALED * * * * * ———

1    if something comes up in the briefing where I think I

2    need -- another hearing is necessary on Twitter's motion,

3    we'll hold it then.

4            All right.  If there is nothing else, you are

5    excused.

6            MR. HOLTZBLATT:  Thank you, Your Honor.

7            MR. WINDOM:  Thank you, Your Honor.

8            (Whereupon, the proceeding concludes, 12:15 p.m.)

9                        * * * * *

10                      **CERTIFICATE**

11

12            I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

13    certify that the foregoing constitutes a true and accurate

14    transcript of my stenographic notes, and is a full, true,

15    and complete transcript of the proceedings to the best of my

16    ability.

17            This certificate shall be considered null and void

18    if the transcript is disassembled and/or photocopied in any

19    manner by any party without authorization of the signatory

20    below.

21        Dated this 11th day of February, 2023.

22        /s/ Elizabeth Saint-Loth, RPR, FCRR
          Official Court Reporter

23

24

25

——— * * * * * SEALED  * * * * * ———

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31 – BAH

**UNDER SEAL**

**TWITTER'S NOTICE REGARDING APPLICABILITY OF SANCTIONS**

Twitter, Inc. writes to set forth its position on the extent of any penalty that should be imposed on Twitter pursuant to the Court's February 7 order compelling Twitter to comply with the government's warrant.

Twitter does not believe any accrued penalty is appropriate. "[S]ubstantial compliance … is a complete defense in a civil contempt proceeding." *Brotherton v. Lehman*, 1984 WL 66 (D.D.C. 1984); *see also Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9-10 (D.D.C. 1999) ("To rebut a prima facie showing of civil contempt, the contemnor may assert the defense of 'good faith substantial compliance.'"). Here, Twitter at all times acted in good faith and had substantially complied with the warrant by 5:00 pm on February 7, 2023 by using its standard tools for responding to law enforcement requests. Twitter's February 7 production included 39 data sets containing over 100 data fields, folders, or JSON files.

Twitter produced supplemental data after 5:00 pm on February 7, 2023 but Twitter submits that this supplemental production does not warrant imposition of any penalty, and in all events, it does not warrant imposition of the $350,000 penalty that the government seeks.

1

Twitter's supplemental production resulted from two issues that Twitter had sought to raise with the government prior to the Court's February 7 hearing and that were ultimately resolved only after subsequent conferrals with the government and the Court's hearing on February 9.[1]  Twitter swiftly completed production once it had received necessary guidance from the government and the Court.

**The Government's Non-Standard Requests**

The first issue on which Twitter needed guidance concerned the technical and operational challenges of responding to certain non-standard requests in the warrant.  These requests fell outside the ordinary categories of information captured by the tools that Twitter uses to respond to the thousands of warrants, 2703(d) orders, and subpoenas it receives each year.  Given the challenges and technical issues of responding to such non-standard requests, Twitter sought to raise this issue with the government prior to the February 7th hearing without success.  *See supra* n.1.  Following the hearing, Twitter contacted the government on February 8 at 11:56 am to determine whether the government wished Twitter to take the extraordinary efforts that would be required to collect and produce this non-standard data, which in several instances would be challenging even to locate within the company's systems.

Counsel for Twitter and the government met and conferred at February 8 at 5:30 pm.  At 8:51 pm on February 8, the government confirmed that it did indeed wish Twitter to collect and

---

[1] Prior to any hearing before the Court, on February 1, 2023, Twitter conveyed to the government that "we will want to further discuss with you Attachment B and technical issues we will need to work through in responding," separate and apart from Twitter's position that compliance with the warrant should be delayed until the resolution of its motion to quash the non-disclosure order.  ▮▮▮▮ Decl. ¶ 14.  The government declined Twitter's request to discuss these issues with Twitter at that time and instead moved the Court for an order to show cause why Twitter should not be held in contempt.

produce non-standard data.  Twitter accordingly worked through the night and the next day to overcome the technical challenges presented by the government's request.  Twitter produced certain supplemental data at around 2:00 am ET in the morning of February 9 (approximately five hours after the government confirmed it wanted Twitter to go outside its standard law enforcement tools) and completed its supplemental production of non-standard data by 8:06 pm ET on February 9,[2]  less than 24 hours after the government had confirmed that it wished Twitter to undertake these efforts.

**Guidance Regarding Certain Requests**

The second issue on which Twitter needed guidance from the government and the Court concerned the scope of certain requests in the warrant.  Request 1(h) seeks "communications between Twitter and any person regarding the account, including contacts with support services and records of actions taken."  This request could potentially have been read to encompass all communications with any party and an employee at Twitter regarding the subject account from 2006 until the present, a potentially vast scope of data.  During the February 9 call, the government would not provide any further guidance on this request.

At the hearing on February 9, however, the Court recognized the need for guidance given the breadth of Request 1(h) and consequently defined the scope of the Request to communications between October 1, 2020 and January 20, 2021 with 8 identified individuals regarding the subject account, and permitted the government to meet and confer with Twitter to

---

[2] We believe the government incorrectly labeled this production as occurring at 5:03pm Eastern (Gov't Notice at 1) because its FTP site may have date/time stamped the upload using Pacific time.  For the reasons stated below, the government's claim that a purported three-minute delinquency requires a $200,000 penalty is equally unreasonable even with the correct time.

3

potentially identify additional agents who the government believed might have communicated

with Twitter about the subject account on behalf of the accountholder during that time period.

(Transcript of Hearing, February 9, 2023, 13:10-24:3.)   The government provided Twitter a list

of additional email addresses that it wished Twitter to search at 3:52 pm ET on February 9, 2023.

Although Twitter believed that the government's list was overbroad, Twitter nonetheless

completed a search using the government's list and included the identified communications in its

final production at 8:06 pm ET on February 9.

### The Government's Calculation Is Unreasonable

Prior to the first hearing before the Court on February 7, Twitter attempted to confer with

the government about the technical and operational challenges of responding to its requests.  In

addition, Twitter had a good faith, legal disagreement about whether production should have

been stayed pending resolution of its challenge to the non-disclosure order.  Once the Court

rejected Twitter's position, Twitter moved swiftly that same day to comply—not only by

substantially completing production using its standard production tools before 5:00 pm on

February 7, but also by working around the clock and overcoming significant technical issues to

produce supplemental data shortly thereafter.  In light of Twitter's diligence, substantial

compliance, and good faith, Twitter believes that no penalty is warranted here.

In all events, however, Twitter objects to the incremental $200,000 that the government

seeks to impose for the period after 5:00 pm on February 9, 2023.  As set forth above, Twitter

was still receiving clarification on the government's position regarding the scope of the warrant

up until 3:52 pm on February 9—just 68 minutes before the government believes this final

$200,000 penalty was triggered.  Twitter then completed its production—including with respect

4

to the new search terms provided by the government at 3:52 pm—within a matter of hours. And

the final production came just hours after a hearing in which the court had provided direction on

how Twitter was to comply. Twitter does not believe that such a short period of delay justifies

imposition of such an extraordinary sanction.

Dated: February 13, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.
    admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.
    admission pending)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

*Counsel for Twitter, Inc.*

5

FILED UNDER SEAL

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of February 2023, I caused the foregoing motion to be served by email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

6

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31** <br><br> **Filed Under Seal** |

### GOVERNMENT'S SEALED OPPOSITION TO TWITTER INC.'S MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT

For what appears to be the first time in its history, Twitter Inc. ("Twitter") has filed a motion to vacate or modify an order that it not disclose the existence of a search warrant. ECF No. 7. Twitter takes this extraordinary action only for the account subject to the warrant: @realDonaldTrump ("Account"), used by former president Donald J. Trump. For the reasons stated in the application in support of the non-disclosure order ("NDO") and expanded upon here, there is reason to believe notification to the former president, a sophisticated actor with an expansive platform, would result in a statutorily cognizable harm. Yet Twitter, using the First Amendment as pretense, apparently wants the Court to place Twitter's economic interests over the Court's findings in the NDO—and the integrity of the Government's ongoing investigation. The Court should deny Twitter's Motion.

### BACKGROUND

Twitter is an electronic service provider that enables account holders to share and interact with content and to send and receive communications with other users, publicly or privately. The former president, from the Account, used Twitter in ways described in the Government's *ex parte* submission.

- 1 -

**JA280**

I.    **The Warrant**

On January 17, 2023, based on an affidavit establishing probable cause, this Court authorized a warrant (the "Warrant") to search the Account.  ECF No. 4, Affidavit in Support of Application for a Search Warrant (the "Affidavit"), at ¶ 8.  The Warrant incorporates by reference two attachments—describing the "Property to Be Searched" (Attachment A) and the "Particular Things to Be Seized" (Attachment B)—but not the warrant application or the probable cause Affidavit.  ECF No. 4, at 2.  In other words, of the extensive application, the Warrant itself (as served on Twitter) comprises only six pages.  *See* Exhibit A.  Nevertheless, those six pages reflect (1) the existence of the Warrant; (2) the Court and Judge from which the Warrant was obtained; (3) the date and time of the Warrant's issuance; (4) the specific account subject to the Warrant; (5) the specific categories of information sought by the Government, including certain content, subject areas, and persons of interest; and (6) the name, title, and official address of the agent with the Federal Bureau of Investigation ("FBI") to whom responsive information should be disclosed.  *Id.*

II.    **The Non-Disclosure Order**

When it authorized the Warrant, the Court also issued an order sealing the Warrant and related materials and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days.  ECF No. 3.[1]  The NDO was granted based on facts showing that notifying the former president would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to an investigation or

---

[1] The Government's NDO application was based on § 2705(b)(3)-(5), ECF No. 3, ¶ 10, but its proposed non-disclosure order erroneously included language from § 3103a(b), which applies to delayed-notice Rule 41 warrants (not ECPA warrants) and which errantly included flight from prosecution as a predicate.  The Government now seeks to strike from the NDO this language, which can be found at the bottom of page two of the NDO.

- 2 -

JA281

delaying of trial.  *See* 18 U.S.C. § 2705(b)(3)-(5); NDO at 1.  Facts supporting the NDO are detailed in the Government's *ex parte* submission.

### III.    Procedural History

The Warrant commanded that Twitter disclose responsive information to the Government within ten days of its issuance, that is, by January 27, 2023.  ECF No. 4, Attachment B.I, ¶ 5. Twitter was served with the Warrant, including Attachment A and Attachment B.I, *see* Exhibit A, and the accompanying NDO, but refused to comply with the Warrant's deadline.  Consequently, on February 2, 2023, the Government filed a Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant.  ECF No. 5. Later that same day, asserting in part that its "ability to communicate with its customers about law enforcement's efforts to access their communications and data . . . is essential to its business model," Twitter filed a motion to vacate or modify the NDO now pending before the Court.  ECF No. 7; ECF No. 7-1, Twitter Inc.'s Memorandum of Points and Authorities in Support of Motion to Vacate or Modify Non-Disclosure Order Issued Pursuant to 18 U.S.C. § 2705(b) and Stay Twitter's Compliance with Search Warrant ("Twitter's Mem."), at 4.

After a hearing on February 7, 2023, the Court granted the Government's Motion and ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant. *See* Min. Order, dated Feb. 7, 2023.  While Twitter made a production before 5:00 p.m. on February 7, it was not complete.  Following multiple further conferences between the Government and Twitter, as well as a hearing before the Court on February 9, 2023, Twitter finally asserted compliance with the search warrant on February 9, 2023, at 8:28 p.m.  Accordingly, Twitter was in contempt until at least February 9, 2023, at 8:28 p.m. and should be subject to a $350,000 fine

- 3 -

**JA282**

as a result.  *See* ECF No. 19.

At the February 7 hearing, Twitter acknowledged that it had not "found any court decision in which a third-party company, like Twitter, has successfully stayed compliance with a search warrant pending a First Amendment challenge to a non-disclosure order."  Sealed Hr'g Tr. (Feb. 7, 2023) at 61.  The Court ordered Twitter to "submit a list of each case in which Twitter, Inc. has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the court's resolution of that challenge."  Min. Order, dated Feb. 7, 2023.  Twitter included in its response cases not involving § 2705(b), and even cases where Twitter simply "asserted," in Twitter's parlance, an informal—*i.e.*, not "filed"—challenge to the NDO.  ECF No. 14.  Twitter's list reveals that Twitter has *never before*, in its sixteen years of operating, filed a challenge to an NDO issued pursuant to § 2705(b) for a warrant.

The Government now opposes Twitter's Motion.

## ARGUMENT

### I.  The Non-Disclosure Order is constitutional under the First Amendment.

#### A.  Statutory background

Congress enacted the Stored Communications Act (the "SCA") in 1986, as part of the Electronic Communications Privacy Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986).  In pertinent part, the SCA regulates the Government's access to electronic communications and information stored by electronic communications service providers and remote computing providers, like Twitter.  Within the SCA, Section 2703 defines how the Government obtains records and information pertaining to the users of electronic services.  *See generally* 18 U.S.C. § 2703(a)-(c).  Section 2703 provides for different means of obtaining the evidence—including grand jury subpoenas, court orders under Section 2703(d), and search warrants—and different levels of privacy protection depending on the type of evidence sought.  *See* § 2703(c)(2).

- 4 -

Section 2705(b) complements Section 2703 by authorizing the Government to seek a court order to prevent an electronic communications service provider from disclosing the fact that it has received Section 2703 process regarding a user. *See* 18 U.S.C. § 2705(b); *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 208 (D.D.C. 2018). At the Government's request, a court may issue a non-disclosure order "for such period as the court deems appropriate," based upon an independent judicial determination that "there is reason to believe that notification of the existence of the [legal process pursuant to Section 2703] will result" in (1) endangerment of a person's life or physical safety; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) seriously jeopardizing an investigation or unduly delaying a trial. 18 U.S.C. § 2705(b). The SCA's statutory scheme thus requires that, once a court has found that the Government has demonstrated a "reason to believe" that disclosure would result in one or more of the listed harms, the court must issue an order prohibiting the service provider to whom the Section 2703 process is directed from notifying "any other person" of the legal process for a period of time that the court deems appropriate. *Id.*[2]

Section 2703 process, and related Section 2705(b) orders, are employed in a wide array of contexts, often involving grand jury investigations that are not yet public or where only some aspects of the investigation are publicly known. The Government may seek basic subscriber

---

[2] Section 2705(b) is far from the only statute limiting disclosure of information related to government investigations. *See, e.g.*, 18 U.S.C. § 3420 (providing that "[n]o officer, director, partner, employee, or shareholder of, or agent or attorney for, a financial institutional shall, directly or indirectly, notify any person named in a grand jury subpoena served on such an institution in connection with an investigation . . ."); 18 U.S.C. § 2511 (governing disclosures of wiretap surveillance; 18 U.S.C. § 3123 (governing disclosures of pen registers and trap-and-trace devices); *see also Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (observing that "even in a suit for damages based on disclosures allegedly made in a [suspicious activity report ("SAR")], a financial institution cannot reveal what disclosures it made in a SAR, or even whether it filed a SAR at all").

information at an early stage of an investigation, when investigators know nothing more than an IP or email address used in connection with a potential crime, and the identity of the individual is unknown.  And the Government may seek a court order under Section 2703(d) to gather further information, such as identifying information about individuals with whom a suspect is communicating as an investigation progresses.  Where, as here, probable cause exists to believe that the contents of an electronic account include evidence of a crime, warrants are sought to obtain such evidence.

In all of these situations, absent the limited secrecy provided for under the SCA, the ability of grand juries and government investigators to accumulate evidence and identify wrongdoers would be seriously undermined by an electronic communications service provider's decision to inform the target of legal process, or other potentially involved third parties, about the existence of, or steps taken in, a grand jury investigation.  In recognition of the evolving nature of investigations, the U.S. Department of Justice policy regarding applications for orders pursuant to Section 2705(b) notes that "[w]hen applying for a § 2705(b) order to accompany a subpoena seeking basic subscriber information in an ongoing investigation that is not public or known to the subject(s) of the investigation, stating the reasons for the protection from disclosure under § 2705(b) . . . usually will suffice."  U.S. Dep't of Justice, *Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 n.2 (Oct. 19, 2017).  "At a later stage of the investigation," the policy notes, such as "when a search warrant is being sought, the prosecutors should include more specific facts, as available, in support of the protective order."  *Id.*; *see also* U.S. Dep't of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 (May 27, 2022) (noting the prosecutors "must provide a court with

sufficient facts to permit the court to conduct" a "case- and fact-specific analysis," including by "identify[ing] which of the pertinent factors apply").

**B. The Non-Disclosure Order survives strict scrutiny.**

Twitter contends that the NDO cannot withstand strict scrutiny.[3]  Twitter's Mem. 7–15. Under strict scrutiny, the challenged NDO is valid if it is "narrowly tailored to serve compelling state interests," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and there are no "less restrictive alternatives [that] would be at least as effective in achieving the [NDO's] legitimate purpose," *Reno v. ACLU*, 521 U.S. 844, 874 (1997).  The NDO at issue here satisfies strict scrutiny.  *See Matter of Subpoena 2018R00776*, 947 F.3d 148, 159 (3d Cir. 2020) (*Matter of Subpoena*) (applying strict scrutiny and affirming district court order denying challenge to a non-disclosure order under Section 2705(b)); *Matter of the Search of Information Associated with E-mail Accounts*, 468 F. Supp. 3d 556, 560–63 (E.D.N.Y. 2020) (*E-mail Accounts*) (applying strict scrutiny and denying Microsoft Corporation's challenge to a non-disclosure order under Section 2705); *Google LLC v. United States*, 443 F. Supp. 3d 447, 452–55 (S.D.N.Y. 2020) (same for challenge brought by Google);  *cf. In re National Security Letter*, 33 F.4th 1058, 1063 (9th Cir. 2022) (applying strict scrutiny and affirming a non-disclosure order obtained in connection with a national security letter issued under 18 U.S.C. § 2709(c)).

---

[3] No precedent from this Court or the D.C. Circuit has concluded that strict scrutiny applies when an electronic service provider challenges a non-disclosure order, and there are good reasons *not* to apply such "exacting" review to a non-disclosure order that "is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 877–78 (2d Cir. 2008).  Because the NDO here nonetheless survives strict scrutiny, the Court can assume without deciding that it applies.  *See Google LLC v. United States*, 443 F. Supp. 3d 447, 452 (S.D.N.Y. 2020) (adopting that approach).

####        i.        The Non-Disclosure Order serves a compelling interest.

The compelling government interests at stake include preserving the integrity and secrecy of an ongoing investigation.  "Maintaining the integrity of an ongoing criminal investigation is a compelling government interest."  *E-mail Accounts*, 468 F. Supp. at 560 (citation omitted).  The interest is particularly "acute" where, as here, the investigation remains ongoing.  *Matter of Subpoena*, 947 F.3d at 156.  And that interest is all the more compelling for the reasons described in the *ex parte* submission.  *Cf. Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation.") (quotation omitted).

Closely linked to the compelling interest in maintaining the integrity of an investigation is protecting its secrecy, which in turns facilitates its "proper functioning."  *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979).  Relatedly, erosion of grand jury secrecy "substantially increase[s] the ability of persons who have something to hide to impede legitimate investigations."  *SEC v. Jerry T. O'Brien*, 467 U.S. 735, 750 (1984).  Such secrecy also furthers several additional governmental interests, including (1) "prevent[ing] the escape" of individuals who may be indicted; (2) ensuring free deliberations by the grand jury, while "prevent[ing] persons subject to indictment or their friends from importuning the grand jurors"; (3) forestalling efforts to suborn perjury or tamper with witnesses; and (4) "encourag[ing] free and untrammeled disclosures by persons who have information with respect to the commission of crimes."  *Matter of Subpoena*, 947 F.3d at 157 (citing *Douglas Oil Co.*, 441 U.S. at 291 n.10).  Although articulated in the context of grand jury investigations, those factors parallel similar considerations described in Section 2705(b), including destroying or tampering with evidence, intimidating witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial."  18 U.S.C. § 2705(b)(3)-(5).

- 8 -

For the reasons explained in the Government's *ex parte* submission, the NDO serves a compelling governmental interest.

Twitter offers (Twitter's Mem. 8–14) two unpersuasive arguments to the contrary. First, Twitter contends (*id.* at 8–12) that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the former president will "alter the current balance of public knowledge in any meaningful way" because such a disclosure would be merely "incremental." *Id.* at 11. That contention is flawed in several respects. Although the investigation's existence is no longer secret, it does not follow that the specific ongoing investigative steps the Government is pursuing are therefore publicly known. Many of the media accounts that Twitter cites (*id.* at 8–10) attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses.[4] Whatever the effect of those accounts on the "current balance of public knowledge," *id.* at 11, they provide nowhere close to the detail supplied in the Warrant. Providing the Warrant to the former president at this point in the investigation would thus far exceed some mere "incremental" step in informing the former president, as described in the *ex parte* submission.

Second, Twitter argues (Twitter's Mem. 12–14) that "[u]nique and [i]mportant" (*id.* at 12) executive privilege issues support the relief it seeks. That argument is also wanting. For one, Twitter does not explain the relevance of a putatively "unique" or "important" issue to strict scrutiny analysis, which asks whether the NDO sought under Section 2705(b) is narrowly tailored to serve a compelling governmental interest. *See In re National Security Letter*, 33 F.4th at 1072. A Twitter user's potential ability to challenge the legal process at issue—here, the Warrant—is

---

[4] The same is true of the 80 pages of articles and other documents that Twitter submitted as an exhibit to its opposition to the Government's Motion to Show Cause. *See* Twitter's Opposition to Government's Motion for an Order to Show Cause, Exhibit B (filed Feb. 6, 2023).

entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO.  *See, e.g.*, Twitter's Mem. 3 n.1 (Twitter not challenging the Warrant's validity); *id.* at 4 (Twitter acknowledging it "might lack standing to assert the rights and privileges of its users," and acknowledging many potentially privileged communications in which its users could engage).  But even if the executive privilege claim that Twitter postulates bore some relevance to the NDO, that claim lacks merit for the reasons given in the Government's briefing in the show cause litigation.  *See* Government's Reply in Further Support of Motion for an Order to Show Cause Why Twitter Inc. Should Not be Held in Contempt for Failure to Comply with a Search Warrant, at 6–9 (filed Feb. 6, 2023).

### ii.    The Non-Disclosure Order is narrowly tailored.

The NDO is narrowly tailored to serve the Government's compelling interest because any restriction on Twitter is the least restrictive means of advancing governmental interests.  *See Matter of Subpoena*, 947 F.3d at 157–58.  The NDO restricts Twitter from disclosing only discrete investigation-related information—information that is in Twitter's hands only because it received legal process in connection with the investigation.  And the NDO is limited in duration.

The scope of speech regulated by the NDO is extremely narrow.  The NDO prohibits Twitter from disclosing the existence or contents of the Warrant.  The NDO does not purport to regulate Twitter's ability to speak about any other topic, such as the issue of non-disclosure orders generally or any information Twitter has obtained independent of its interactions with the Government (or the grand jury) in this case.  *See Matter of Subpoena*, 947 F.3d at 158 (finding a non-disclosure order narrowly tailored where it permitted the service provider to "discuss[] the government's requests abstractly, as service providers have done by disclosing the number of data requests and NDOs they receive in public docket civil complaints").  Thus, "[b]y any measure,

[the NDO] restricts a narrow slice of speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 452 (2015). That approach is entirely consistent with cases permitting a protective order in civil litigation that prohibited disclosure of information obtained in discovery because "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times v. Rhinehart*, 467 U.S. 20, 33 (1984); *see Butterworth v. Smith*, 494 U.S. 624, 632 (1990) (extending *Rhinehart* to government investigations by striking down a provision that limited a witness from disclosing his own testimony but not addressing "information which he may have obtained as a result of his participation in the proceedings").

The NDO is further narrowly tailored because it does not apply indefinitely but rather is limited to 180 days. The presence of a "temporal limitation" in a non-disclosure requirement is an "important" consideration in assessing "the balance of government versus free speech interests." *John Doe, Inc.*, 549 F.3d at 877. Courts have upheld as narrowly tailored non-disclosure orders that lasted up to a year. *See Matter of Subpoena*, 947 F.3d at 159; *E-mail Accounts*, 468 F. Supp. 3d at 563. Here, the 180-day order appropriately balances the need for investigative secrecy and any speech interests.

Rather than dispute these straightforward factors, Twitter posits (Twitter's Mem. 14–16) three less restrictive means that it claims would preserve its "[e]ssential First Amendment [r]ights." *Id.* at 14. First, it suggests (*id.* at 14) notifying "just its user"—that is, the former president. That suggestion is a fallacy and a non-starter for all the reasons discussed above and in the Government's *ex parte* submission. Second, Twitter speculates (*id.* at 14–15) that one of the former president's "representative[s]" might fit the bill, perhaps even a representative under the Presidential Records Act ("PRA"), 22 U.S.C. § 2201 *et seq.* These "alternatives are untenable"

- 11 -

because they are "impractical," "would be ineffective in maintaining . . . secrecy," risk "undermin[ing] the government's interest in maintaining the confidentiality of an ongoing investigation," and require a court to "assess the trustworthiness of a would-be confidante chosen by a service provider." *Matter of Subpoena*, 947 F.3d at 158–59.  In short, this Court should "'decline to wade into this swamp' of unworkable line drawing." *Id.* at 159 (quoting *Williams-Yulee*, 575 U.S. at 454).[5]

Twitter's final proposal (Twitter's Mem. 15) that the Government obtain the data in question from NARA fares no better.  As an initial matter, this proposal is moot in light of Twitter's representation that it has fully complied with the warrant.  But more so, even Twitter acknowledges that NARA *does not possess* the full universe of responsive documents required under the Warrant. *See id.* at 6 (suggesting that "much"—though not all—"of the information sought in the Warrant has been produced to NARA"); Sealed Hr'g Tr. (Feb. 7, 2023) at 41–46 (discussing entire categories of information required by the Warrant that are not in NARA's possession).  Moreover, Twitter's purported inability to comply with the Court's order and fully execute the Warrant calls into question the credibility of Twitter's representations concerning what it has produced to NARA, since it took days after the Court held Twitter in contempt for Twitter to work through various "challenges and technical issues" and "take the extraordinary efforts" to meet the Warrant's requirements.  ECF No. 18, Notice of Twitter's Position on Sanctions, at 2 (filed Feb.

---

[5] Twitter does not expand on why it thinks this approach would be workable.  Presumably, Twitter would want to notify the PRA representative in an effort to permit the former president to litigate any executive privilege concerns.  But the PRA representative would not have standing or authority to pursue such litigation, absent telling the former president of the Warrant and gaining the former president's consent to file suit.

- 12 -

13, 2023).[6]  Finally, Twitter identifies no authority for the proposition that a narrow-tailoring

analysis under Section 2705(b) constrains the Government's choice of investigative tools.

## II.    Twitter's meritless stay motion is moot.

Twitter's motion to vacate or modify the NDO includes a request to stay execution of the

Warrant, Twitter's Mem. 15–16—relief that Twitter acknowledges no court has ever granted, *see*

*supra* 4.  The Court's granting of the Government's separately filed Motion to Show Cause and

ordering Twitter to comply by executing the Warrant necessarily mooted that stay request.  In any

event, the request lacked merit.  The first two steps for obtaining a stay under *Nken v. Holder*, 556

U.S. 418 (2009), require that Twitter make "a strong showing" that it is "likely to succeed on the

merits" and demonstrate that it "will be irreparably injured absent a stay."  *Id.* at 434.  Twitter

makes no showing, let alone a "strong showing," that it is likely to succeed on its claim that the

NDO cannot withstand strict scrutiny.  Consistent with the weight of recent case law and for the

reasons described above and in the Government's *ex parte* submission, Twitter's challenge to the

NDO fails, which in turns demonstrates that it cannot satisfy the first stay showing of a strong

likelihood of success on the merits.  *See Google LLC*, 443 F. Supp. 3d at 455 (denying service

provider's motion to stay execution of a search warrant after concluding that the non-disclosure

order satisfied strict scrutiny).  Twitter suggests that its loss of First Amendment "freedoms"

necessarily amounts to irreparable injury, but this case is a far cry from the case that Twitter cites

---

[6] The Government does not take a position on whether the Account information held at NARA
would necessarily qualify as "presidential records" as that term is defined in 44 U.S.C. § 2201(2),
in part because it is unknown the extent to which the former president may have used any private
settings in his Twitter account to create "personal records," *see* § 2201(3), which, while outside
the ambit of the PRA, may nonetheless be relevant and probative evidence in an investigation.  It
is unclear whether the Government could obtain any previously undisclosed presidential records
without triggering the PRA regulation and related executive order that requires notification to the
former president.  *See* 36 C.F.R. § 1270.44(a)(1) and (c); Executive Order 13489.

- 13 -

for that proposition—*Elrod v. Burns*, 427 U.S. 347 (1976), which involved claims by civil servants that they were discharged or threatened with discharge on account of their political affiliation or nonaffiliation, *see id.* at 349—or other similar situations where more than a "narrow slice of speech" is at issue.  *See Williams-Yulee*, 575 U.S. at 452.[7]

## CONCLUSION

For the foregoing reasons, the Court should deny Twitter's motion to vacate or modify the non-disclosure order.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/ *Mary L. Dohrmann*
Mary L. Dohrmann (N.Y. Bar No. 5443874)
James I. Pearce (N.C. Bar No. 44691)
Assistant Special Counsels
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

---

[7] Twitter's invocation (Twitter's Mem. 16) of *Freedman v. State of Md.*, 380 U.S. 51 (1965), is misplaced.  The "procedural safeguards" that *Freedman* requires, 380 U.S. at 58, and on which Twitter relies (Twitter's Mem. 7, 16), apply to cases involving "government censorship and licensing schemes," not to a law that prohibits disclosure of government-requested information sought "to assist in an investigation."  *In re National Security Letter*, 33 F.4th at 1077.

- 14 -

# Exhibit A

**Filed Under Seal**

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  23-SC-31 |
| INFORMATION THAT IS STORED AT | ) |
| PREMISES CONTROLLED BY TWITTER INC. | ) |
| IDENTIFIED IN ATTACHMENT A | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____January 31, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Chief Judge Beryl A. Howell_____ .
*(United States Chief Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      _____1/17/2023___ at 1:31 PM          _Beryl A. Howell_
                                                                                          *Chief Judge's signature*

City and state:          _____Washington, D.C._____          Chief Judge Beryl A. Howell
                                                                                         United States Chief Judge

**JA295**

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br><br>23-SC-31 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information associated with the Twitter account "@realDonaldTrump" ("**SUBJECT ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Twitter Inc. ("Twitter"), a company headquartered at 1355 Market Street, Suite 900, San Francisco, California.

## ATTACHMENT B
### Particular Things to be Seized

**I.    Information to be disclosed by Twitter Inc. ("Twitter" or the "provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Twitter, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the Government for each account or identifier listed in Attachment A:

1.    All business records and subscriber information, in any form kept, pertaining to the **SUBJECT ACCOUNT**, including:

    a.    Identity and contact information (past and current), including full name, e-mail address, physical address, date of birth, phone number, gender, and other personal identifiers,

    b.    All usernames (past and current) and the date and time each username was active, all associated accounts (including those linked by machine cookie, IP address, email address, or any other account or device identifier), and all records or other information about connections with third-party websites and mobile apps (whether active, expired, or removed),

    c.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records,

    d.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers,

      e.      All advertising information, including advertising IDs, ad activity, and ad topic preferences,

      f.      Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from October 2020 to January 2021,

      g.      Privacy and account settings, including change history, and

      h.      Communications between Twitter and any person regarding the account, including contacts with support services and records of actions taken,

2.      All content, records, and other information relating to communications sent from or received by the **SUBJECT ACCOUNT** from October 2020 to January 2021 including but not limited to:

      a.      The content of all tweets created, drafted, favorited/liked, or retweeted by the **SUBJECT ACCOUNT** (including all such deleted tweets), and all associated multimedia, metadata, and logs,

      b.      The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the **SUBJECT ACCOUNT**, including all attachments, multimedia, header information, metadata, and logs,

3.      All other content, records, and other information relating to all other interactions between the **SUBJECT ACCOUNT** and other Twitter users from October 2020 to January 2021, including but not limited to:

      a.      All users the **SUBJECT ACCOUNT** has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the **SUBJECT ACCOUNT**,

      b.     All information from the "Connect" or "Notifications" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies"),

      c.     All contacts and related sync information, and

      d.     All associated logs and metadata,

4.     All other content, records, and other information relating to the use of the **SUBJECT ACCOUNT**, including but not limited to:

      a.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes,

      b.     All multimedia uploaded to, or otherwise associated with, the **SUBJECT ACCOUNT**,

      c.     All records of searches performed by the **SUBJECT ACCOUNT** from October 2020 to January 2021,

      d.     All location information, including all location data collected by any plugins, widgets, or the "tweet With Location" service, from October 2020 to January 2021, and

      e.     All information about the **SUBJECT ACCOUNT**'s use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the **SUBJECT ACCOUNT** was clicked.

5.     Twitter is ordered to disclose the above information to the government within 10 days of issuance of this warrant to:

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31 - BAH

**UNDER SEAL**

## TWITTER'S REPLY IN SUPPORT OF ITS
## MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER
## ISSUED PURSUANT TO 18 U.S.C. § 2705(b)
## AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT

In its opposition, the government does not seriously contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that the Non-Disclosure Order operates as a prior restraint on such speech and is therefore subject to strict scrutiny. Instead, it asserts that disclosure of the Warrant in this case would undermine "the integrity and secrecy of an ongoing investigation." Opp. 8. But those vague and generalized interests are insufficient to justify the prior restraint in this case. Both the statute and the First Amendment require the government to establish that silencing Twitter is necessary to address the narrower and more concrete objectives that the government identified when it first obtained the order: preventing "destruction of or tampering with evidence," "intimidation of potential witnesses," and "serious jeopardy to the investigation."[1]

---

[1] In its opposition brief, the government abandons the first rationale (flight from prosecution) on which it relied, conceding it was included in error. Opp. 2 n.1. The government states that the errant language "can be found at the bottom of page two of the NDO," but it appears that the government instead means to refer to language found at the bottom of page one.

1

The government has not met and cannot meet that burden.  The government's opposition does not even attempt to account for the unique and unparalleled level of publicity surrounding this investigation.  It is undisputed that the public knows the government is seizing electronic communications in this (publicly-announced) criminal investigation, including from people who communicated directly with the Twitter user at issue in the Warrant.  When an investigation's existence and details about the specific investigative technique at issue in a warrant are widely known, as here, secrecy alone cannot justify a gag order covering a warrant that any reasonable observer would expect the Special Counsel to obtain.  Nor can the government claim to be concerned that the Twitter user might destroy the evidence sought, given that the government has now obtained that evidence from Twitter pursuant to the Warrant.  And it cannot be credibly said that disclosing the Warrant would provide a particular reason for witness intimidation in view of all the prior reporting that this type of warrant has already been used to seize this type of communications.

Even if the government could establish that the Non-Disclosure Order furthered a compelling (and statutorily identified) interest, it still could not demonstrate that it is the least restrictive means of advancing that interest.  The government cursorily dismisses Twitter's proposed alternatives as "untenable" or "impractical," but the Constitution demands more than that.  The government may not just assert that proposed alternatives "do not work," or that its "chosen route is easier"—it "must demonstrate that alternative measures … would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 494-495 (2014) (applying intermediate scrutiny).  The government has not done so here.  It could prevent whatever investigative danger it fears by, for instance, permitting Twitter to disclose only the warrant form and Attachment A (and the relevant date range) to a representative of Mr. Trump who has

2

already been authorized to act on his behalf "in all respects that pertain to the records of [his] Presidency."[2]  Or it could disclose just the fact of the Warrant, but not its contents or attachments.

As a result, the government has failed to carry its burden of justifying the Non-Disclosure Order in this case.  The court should accordingly vacate or at least modify that order.

**I.    The Government's Asserted Interests Cannot Justify the Non-Disclosure Order**

Both the SCA and the Constitution require the government to make specific showings to justify a non-disclosure order.  But the highly public nature of the government's investigation and use of this investigative tool means that it cannot make the required showing.  Indeed, the government's opposition brief makes little effort to do so—instead, it appears to apply a different—and lesser—legal standard than the one mandated by the statute and the Constitution.

1.    The Government Cannot Satisfy the Proper Standard for Obtaining a Section 2705(b) Order

Strict scrutiny requires the government to "specifically identify an 'actual problem' in need of solving," and explain why the Non-Disclosure Order is "actually necessary to the solution."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).  The government cannot satisfy that burden here for the three statutorily-authorized rationales that remain in the Non-Disclosure Order.

**Destruction or Tampering With Evidence.**  The government cannot demonstrate a meaningful risk that the evidence at issue will be destroyed or tampered with, because Twitter has now produced the evidence from the Target Account that the government requested.  If

_____

[2] Letter of Donald J. Trump to NARA Archivist David S. Ferriero (Jan. 19, 2021), available at https://www.archives.gov/files/foia/wh-ltr-to-u.s.-archivist-trump-pra-rep-1.19.2021.pdf (hereinafter "NARA Designation").

3

disclosure of the Warrant ever risked the destruction of the evidence it sought, it cannot do so now that the evidence is within the government's control.

Nor is it reasonable to conclude that disclosure of the Warrant could prompt the destruction of *other* evidence. As explained in Twitter's opening brief, the Special Counsel has made its investigations into Mr. Trump public. Mot. 8-12. These investigations are likely the most widely known and widely reported on criminal investigations in the Nation. The Department of Justice has itself confirmed the investigations' existence and scope, and has issued scores of subpoenas (now public) encompassing subjects' telephones, personal communications, and sensitive testimony (including that of aides who worked directly for the former President). Mot. at 9-11. As a result, everyone—including Mr. Trump—knows the following:

- The investigations target Mr. Trump and his associates;

- The investigations focus on, among other things, Mr. Trump's involvement in and responsibility for interference with Congress's certification of the presidential election on January 6;

- The government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and

- The investigations encompass Mr. Trump's personal communications, including communications stored electronically.

In short, Mr. Trump is at least constructively aware that the government has done or is doing what the Warrant does.

Adding the limited information reflected in the Warrant—that the government seeks information from the Target Account—to that vast body of public knowledge cannot constitute a reason to believe that anyone will destroy evidence (or, if notice were limited to Mr. Trump, that he will destroy evidence). If Mr. Trump or a witness were inclined to destroy evidence, they

4

already have ample reason to do so in view of the numerous public reports that the government

has taken the specific investigative step at issue here in this very case—seizing electronic

communications.  The statute and the Constitution require the government to draw a specific link

between disclosure of this Warrant and that act of destroying evidence—and the government

cannot do so.[3]

Indeed, since this court initially issued the Non-Disclosure Order, the rationale for it has

grown weaker, not stronger.  In just the past few weeks, the government has taken several highly

publicized investigatory steps[4]: the Special Counsel has subpoenaed the former President's

daughter and advisor Ivanka Trump and her husband and former presidential advisor Jared

Kushner[5]; subpoenaed former Vice President Mike Pence[6]; subpoenaed Mark Meadows, Mr.

Trump's last Chief of Staff[7]; required two of Mr. Trump's lawyers to appear before a grand

---

[3] Mr. Trump may be unique in this regard for this investigative step.  Because he was announced
as a principal subject of investigation and because the public reporting has focused
on investigative actions directed at him, he may have a unique level of knowledge about
investigative actions regarding him—even relative to other investigations of him that were
conducted with far less public awareness.

[4] The news articles Twitter cited its initial motion are attached here as Exhibit A.  The articles
cited in this Reply are attached as Exhibit B.

[5] Maggie Haberman & Michael S. Schmidt, *Jared Kushner and Ivanka Trump Subpoenaed in
Jan. 6 Investigation*, N.Y. TIMES (Feb. 22, 2023), available at
https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html.

[6] Maggie Haberman & Glenn Thrush, *Pence Gets Subpoena From Special Counsel in Jan. 6
Investigation*, N.Y. TIMES (Feb. 9, 2023), available at
https://www.nytimes.com/2023/02/09/us/politics/pence-subpoena-trump.html.

[7] C. Ryan Barber & Sadie Gurman, *Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by
Grand Jury*, WALL STREET JOURNAL (Feb. 15, 2023), available at
https://www.wsj.com/articles/mark-meadows-trumps-last-chief-of-staff-subpoenaed-by-grand-
jury-8c7ad44e?mod=Searchresults_pos2&page=1.

5

jury[8]; attempted to force one of those lawyers to provide "answers about direct conversations" he had with Mr. Trump[9]; "moved aggressively with subpoenas to associates of Mr. Trump and requests for prompt productions of documents"[10]; and subpoenaed state legislative leaders to acquire their communications with Mr. Trump and other Trump campaign officials.[11]  If there was any public uncertainty before (and there was not), there is now no hiding that the Special Counsel is investigating Mr. Trump and his associates, and that his investigative steps include obtaining the contents of direct communications between Mr. Trump and his associates.  The disclosure of the Warrant does not meaningfully add anything to that public knowledge.[12]

---

[8] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023), available at https://www.wsj.com/articles/trump-lawyers-appeared-before-grand-jury-as-part-of-classified-documents-probe-3d1c8040?mod=Searchresults_pos5&page=1.

[9] Katelyn Polantz et al., *Special counsel is locked in at least 8 secret court battles in Trump investigations*, CNN (Feb. 16, 2023), available at https://www.cnn.com/2023/02/16/politics/secret-grand-jury-special-counsel-trump/index.html.

[10] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023).

[11] Jim Small, *GOP Arizona legislators, including leaders of the house and senate, subpoenaed to testify in special counsel probe of Trump*, Arizona Mirror (Feb. 17, 2023), available at https://www.azmirror.com/blog/gop-arizona-legislators-including-leaders-of-the-house-and-senate-subpoenaed-to-testify-in-special-counsel-probe-of-trump/.

[12] Significant media coverage of an investigation may have different legal consequences in the context of grand jury sealing than in the context of Section 2705(b) non-disclosure orders.  *See In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *10 (D.D.C. Feb. 23, 2023) ("[M]aterials from grand jury matters of intense public interest … may have to remain entirely sealed in the name of grand jury secrecy.").  Rule 6(e) asks only whether sealing is required "to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e).  Section 2705(b), by contrast, requires the government to make a showing that specific adverse consequences may flow from disclosure.  Even if media publicity arguably lowers the bar for establishing a potential breach of grand jury secrecy (as relevant for Rule 6(e)), it can sometimes raise the bar for proving that a particular breach of secrecy will lead to specific adverse consequences for an investigation—as Twitter's motion and this reply have explained.

6

**Intimidation of Potential Witnesses.**  Nor is it reasonable to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications.  Just as with the destruction of evidence factor, any would-be intimidators, including Mr. Trump himself, have already had more than sufficient reason and opportunity to try to intimidate witnesses in this investigation.  Learning of this Warrant would add nothing meaningful to the mix of information already available.  And unlike the dozens of subpoenas that are already public, the Warrant here does not involve a witness at all—only data stored on Twitter's servers.  The types of revelations that would be logically tied to potential witness intimidation—the disclosure of an investigation's existence or the name of a potential witness—are not implicated by the limited disclosure of this Warrant.  And indeed, those categories of information have already been revealed, dozens of times over.

**Serious Jeopardy to an Investigation.**  For similar reasons, the government cannot show that disclosure would "seriously jeopardiz[e]" its already highly public investigation.  18 U.S.C. § 2705(b)(5).  Importantly, this factor cannot be satisfied merely by showing some vague impact on the "integrity" of the government's investigation.  *Contra* Opp. 8.  Only "serious[] jeopard[y]" to the investigation can justify restricting Twitter's First Amendment rights.

In a typical case, the government might demonstrate a risk of "serious[] jeopardiz[ation]" by observing that disclosure would "alert the targets to [an] ongoing investigation" of which they would otherwise be unaware.  *In re Grand Jury Subpoena Subpoena to Facebook*, 2016 WL 9274455, at *2 (E.D.N.Y. May 12, 2016); *see also, e.g.*, *In the Matter of the Application of the U.S. for a Warrant Authorizing, [Redacted]*, 2015 WL 667923 (D. Kan. Feb. 13, 2015), at *1 ("[T]he government contends such [serious] jeopardy 'would result from notifying a major target

7

of these investigations that he is under current scrutiny by law enforcement personnel.'").  But

that cannot justify the government's approach here—where the Attorney General of the United

States held a nationally televised press conference and confirmed the investigation, its scope, and

the identity of the target.  Once again, this Warrant adds nothing to the public knowledge of the

investigation's existence or targets.  *See In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017

WL 9287146, at *6 (N.D. Tex. Sept. 22, 2017) (vacating a non-disclosure order after indictment

was unsealed, because the resulting public knowledge meant that "ongoing restriction on

Twitter's communication with its subscriber[]" did "little to conceal that [its subscriber]—and,

thus, his associates—are under investigation … ."), report and recommendation adopted, No.

3:17-MC-40-M-BN, 2017 WL 9287147 (N.D. Tex. Oct. 19, 2017).

**Past Conduct.**  That Mr. Trump may have previously engaged in obstructive behavior

towards known cooperating witnesses (or potentially cooperating witnesses) with respect to other

investigations or inquiries does not suffice.  Twitter does not question that such past behavior

would justify concern that Mr. Trump might attempt to obstruct this investigation.  But that alone

cannot justify restricting Twitter from speaking because the Warrant reveals little that is not

already public and provides no new reason for Mr. Trump to engage in obstructive activity.  To

silence Twitter the government must show that "there is reason to believe that notification of the

existence of the" Warrant *here*—as opposed to all of the government's other public efforts—

would prompt obstruction.  18 U.S.C. § 2705(b).  And for the reasons already described, the

particular sorts of obstruction that could actually endanger the government's investigation—like

the destruction of evidence or intimidation of witnesses—are not realistically likely to follow

from the Warrant's disclosure.

8

2.    The Government's Counter-Arguments Cannot Justify The Non-Disclosure Order

In its opposition, the government offers two counter-arguments for why disclosure of the Warrant is nonetheless likely to damage its investigations. First, it argues that much of the public knowledge of its investigations stems from media accounts that "attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses." Opp. 9. But a significant portion of the public information about the investigations has, in fact, come from the government itself. As explained in Twitter's opening brief, the Department of Justice confirmed the criminal investigations into Mr. Trump in a televised press conference. Mot. 9. It has issued scores of subpoenas to extremely high-profile witnesses who are close to the target of its investigations. And the government "has supported the partial unsealing of two judicial decisions resolving filter team motions" that confirmed it has seized and is reviewing the email accounts of Mr. Trump's associates as part of the investigations. *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *15 (D.D.C. Feb. 23, 2023) (citing *In re Search of Info. Associated with Two Accounts Stored at Premises Controlled by Google LLC*, 2022 U.S. Dist. LEXIS 237972 (D.D.C. Dec. 15, 2022)). In any event, it is largely irrelevant whether the public's existing knowledge of the investigations arises from deliberate disclosures by the Special Counsel, or instead from investigative reporting. Either way, the public— including Mr. Trump—has become aware of the investigation's existence, scope, and methods (including the Warrant's method and the Warrant's target type of material). Regardless of how that came about, it means that disclosure of the Warrant is unlikely to substantially alter the balance of public knowledge about the investigations.

The government's second argument, that the public's knowledge is more general than what the Warrant reveals, fares no better. In particular, the government argues that while "the

9

investigation's existence is no longer secret," the "specific ongoing investigative steps the Government is pursuing" are. Opp. 9. But as explained above, the public knows of far more than just "the investigations' existence." The public knows that the investigations target Mr. Trump and a wide range of his associates; that the investigations focus on, among other things, Mr. Trump's involvement in the events of January 6; that the government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and that the investigations encompass Mr. Trump's personal communications, including those stored electronically. The government cannot point to any piece of information in the Warrant that would meaningfully reveal something beyond that broad set of already-public facts.

3.     <u>The Government Misstates the Legal Standard for Obtaining a Section 2705(b) Order</u>

The SCA provides that a court may issue a non-disclosure order under 18 U.S.C. § 2705(b) only if "there is reason to believe that notification of the existence of the warrant … will result in" one of several specific adverse outcomes. Those include the grounds on which the non-disclosure order in this case now relies: "destruction of or tampering with evidence," "intimidation of potential witnesses," and "otherwise seriously jeopardizing an investigation." 18 U.S.C. § 2705(b)(3)-(5). The government's opposition, however, largely ignores these statutory requirements. Instead, the government suggests an entirely separate rationale for non-disclosure: "preserving the integrity and secrecy of an ongoing investigation." Opp. 8.

Contrary to what the government suggests, it cannot justify the non-disclosure order simply because there is a related grand jury proceeding. *See* Opp. 8. Grand jury secrecy rules do not speak to disclosure of a warrant, Fed. R. Crim. P. 6(e)(2)(B), and the fact of a search warrant

10

does not in and of itself reveal "a matter occurring before the grand jury."[13]  *See In re*

*Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *4 n.6 ("Search

warrants … are not subject to Rule 6(e), even when the warrant is issued to obtain evidence as

part of an ongoing grand jury investigation[.]").  Indeed, a warrant, unlike a grand jury subpoena,

can be issued in the absence of a grand jury, such as post-indictment.  And given the level of

public knowledge concerning the Special Counsel's investigations (discussed above), the

Warrant in this case has far more in common with a post-indictment warrant, where maintaining

secrecy is not an issue, than a pre-indictment grand jury subpoena issued in total secrecy.

Moreover, the existence of a grand jury investigation does not cloak every related government

action in grand jury secrecy.  *See Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 73 (D.C. Cir.

2018) ("Rule 6(e) does not … draw a veil of secrecy over all matters occurring in the world that

happen to be investigated by a grand jury." (quotation marks and alteration omitted)).  Even the

governing federal rule in the grand jury context begins with a presumption against secrecy, *see*

Fed. R. Crim. P. 6(e)(2)(A) ("No obligation of secrecy may be imposed on any person except in

accordance with [this rule]."), and courts that have upheld non-disclosure orders in the grand jury

context have limited those orders to "exceptional cases," *see, e.g.*, *In re Grand Jury Proceedings*,

814 F.2d 61, 69 (1st Cir. 1987).

Moreover, the secrecy of a criminal investigation alone does not, "without more, provide

a statutory basis for a nondisclosure order under Section 2705(b)."  *In re Grand Jury Subpoena*

*Issued to Twitter*, Inc., 2017 WL 9287146, at *6.  Neither "secrecy" nor "integrity," as an end

unto itself, appear in the statute.  Rather, the law spells out that a desire for secrecy justifies non-

---

[13] Were it otherwise, a non-disclosure order would be required for every search warrant to protect grand jury secrecy.

11

disclosure only where the government establishes a specific, factual link to the particular harms Congress has identified. "[S]ecrecy" and "integrity" could be invoked to justify any speech restriction about any investigative step. But both the First Amendment and the statute preclude the government from asserting an interest that is "too broad … to serve as an effective constraint on law enforcement decisions that may infringe First Amendment rights." *Doe v. Harris*, 772 F.3d 563, 580 (9th Cir. 2014).

As explained above (and in Twitter's opening motion), the government cannot satisfy the specific and concrete interests enumerated in Section 2705(b)(3)-(5). To the extent that the government's *ex parte* filing relies on some other interest, it should be required to disclose that interest to Twitter. That is particularly so in this case, where the government has already conceded that it committed a substantive error in its initial *ex parte* filing to obtain the Non-Disclosure Order. Revealing the nature of the government's interest—as opposed to the facts establishing a risk to that interest—is unlikely to disclose anything that could endanger the government's investigation. And keeping it secret (if that is what the government has done) deprives Twitter of a meaningful opportunity to contest the Non-Disclosure Order by explaining why that interest would not be endangered by limited disclosure. "*Ex parte* communications generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quotation marks omitted). For that reason, particularly where an *in camera*, *ex parte* filing is "dispositive," the government should at least make "available to both sides … the general purport of the [*ex parte*] argument and evidence such that the other side will have an opportunity to respond to the general tenor of the proposed submission," and "explain[] why more detail

12

should not be made available." *Ibrahim v. Dep't of Homeland Sec.*, 2012 WL 6652362, at *6 (N.D. Cal. Dec. 20, 2012); *see also United States v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007) ("If *ex parte* communications are to be allowed at all, they must continue no further than the extent to which they are absolutely necessary to protect the state's compelling interest.").

If the government is relying on a secret rationale for the Non-Disclosure Order, that also raises the possibility that it has shifted its rationale since it first sought the order.  But because prior restraints are constitutionally suspect, such a restraint cannot be defended based on "*post hoc* rationalizations" or the use of "shifting … criteria," which too easily enable censors to "permit[] favorable, and suppress[] unfavorable, expression." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).  The government was required to make the requisite showing *prior to* the Non-Disclosure Order being signed.  The Court should not countenance any post-hoc rationalizations that were not offered at the time the government first sought the Non-Disclosure Order.

## II.    The Government Has Not Demonstrated That the NDO is Narrowly Tailored; Nor Has It Meaningfully Addressed Twitter's Proposed Less Restrictive Alternatives

A speech restriction is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Boardley v. U.S. Dep't. of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).  As Twitter explained in its Motion, there are several ways that the Court could more narrowly tailor the Non-Disclosure Order to achieve the government's asserted interests and minimize infringement on Twitter's First Amendment rights.  Rather than seriously consider these less restrictive measures, the government dismisses them with two paragraphs of cursory analysis.  But the government may not just assert, as it does here, that the proposed alternatives simply "do not work." *McCullen*, 573 U.S. at 494 (applying intermediate scrutiny).  It must instead "show[] that

13

it seriously undertook to address the problem with less intrusive tools readily available to it,"

"that it considered different methods that other jurisdictions have found effective," and,

ultimately, "that alternative measures that burden substantially less speech would fail to achieve

the government's interests." *Id*. at 494-495*; see also Billups v. City of Charleston, S.C.*, 961

F.3d 673, 688 (4th Cir. 2020) ("testimony from [government] officials regarding the predicted

ineffectiveness of … suggested alternatives[,] … without more, is not sufficient to satisfy" even

intermediate scrutiny). Because the government fails to meaningfully respond to Twitter's

proposals for a less restrictive alternative or itself demonstrate that alternative measures are

insufficient, it has not shown that its Non-Disclosure Order is narrowly tailored to achieve its

stated interests.

    1.    <u>The Government has not Demonstrated an Absence of Less Restrictive Means</u>

    First, the Court could partially modify the Non-Disclosure Order to permit Twitter to

notify the user of the Target Account to the existence of the Warrant without disclosing the

contents of Attachment B. The government's articulation of its interest presupposes that Twitter

would be "[p]roviding the Warrant to the former president" or otherwise providing to him "the

detail supplied in the Warrant." (Opp. 9.) But the government makes no attempt to tailor its

interest to mere disclosure of the Warrant's existence, and in fact makes several concessions

suggesting that such a disclosure would not significantly impact its interest: For example, the

government acknowledges that its "investigation's existence is no longer secret." (Opp. 9.) Nor

does it contest that the public is aware of the investigation's scope—in particular, that the

investigation encompasses the sensitive personal communications of Mr. Trump and his

associates. *See supra* 4-6. Instead, the government warns that "[p]roviding the Warrant to the

former president at this point in the investigation" would "exceed some mere 'incremental' step,"

14

but instead impair its investigation.  Opp. 9.  Even accepting the government's argument, no such impairment would take place absent provision of the Warrant and attachments.  Similarly, to the extent that the risks to the government's interest arise from the user's confederates, and not from the user himself, then disclosure of the Warrant to the user alone would be sufficient.

Alternatively, the Court could permit Twitter to alert one of the former President's representatives authorized to assert his privileges in this case—for example, the former President's attorney, or the several designated "representatives in all respects that pertain to the records of my Presidency" on file with the National Archives and Records Administration (NARA).  NARA Designation.  As other courts in this District have done in similar cases, the Court could then order those individuals not to disclose the existence of the Warrant.  *See, e.g.*, Order, ECF No. 4 at 1, *In re Application of USA for 2703(d) Order for Six Email Accounts Serviced by Google LLC for Investigation of Violation of 18 U.S.C. §§ 641 and 793* [hereinafter "*In re Application re: Six Email Accounts*"], SC No. 20-sc-3361 (D.D.C. Mar. 3, 2021) (modifying gag order to permit disclosure to target's counsel but to no other entities); Order, ECF No. 6 at 1, *In re Application re: Six Email Accounts* (Mar. 8, 2021) (similar); Order, ECF No. 8 at 1, *In re Application re: Six Email Accounts* (Mar. 22, 2021) (similar); *see also In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 180 (D.D.C. 2004) (permitting attorney review of sensitive evidence through issuance of a protective order and prohibiting counsel from "disclos[ing] classified information not provided by [their client] to [their client]").

The government does not dispute this latter alternative would minimize the infringement on Twitter's speech while avoiding the harms set forth in their *ex parte* submission.  (Opp. 12.)  Instead, the government asserts that it would be "untenable" or "impractical" to assess a representative's trustworthiness, and that such a representative would lack the ability to vindicate

15

Mr. Trump's interests without informing him of the Warrant. (Opp. 11-12.) But the government

nowhere explains why extending the Non-Disclosure Order to cover the representatives—as

other courts in this District have done—would not address any concerns about a representative's

trustworthiness. *See* ECF Nos. 4, 6, 8, *In re Application re: Six Email Accounts*. And courts

frequently assess the trustworthiness and discretion of representatives in many contexts,

including protective orders and conservatorships. *See, e.g., In re Guantanamo Detainee Cases*,

344 F. Supp. 2d 174. In any event, that disclosing to a representative would be less expedient for

the government than the blanket Non-Disclosure Order imposed on Twitter is not a permissible

reason to dismiss it: "[T]he prime objective of the First Amendment is not efficiency."

*McCullen*, 573 U.S. at 495.

Nor is there merit to the government's unsupported assertion that a designated

representative would not have standing or authority to vindicate the former President's legal

interests in this case. The NARA grant of authority is sweeping and unconditional, designating

seven identified individuals as "representatives in *all* respects that pertain to the records of my

presidency." NARA Designation (emphasis added). The letter essentially grants power of

attorney to the named individuals within the specified domain. Litigation of privileges related to

those records fall within that broad ambit, and a lawfully designated representative asserting a

pertinent privilege is a circumstance in which "federal courts routinely entertain suits which will

result in relief for parties that are not themselves directly bringing suit." *Sprint Commc'ns Co.,

L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287-288 (2008) (noting also that "[t]rustees bring suits

to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to

benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates;

executors bring suit to benefit testator estates; and so forth").

16

2.     The Non-Disclosure Order is not Narrowly Tailored in Light of Twitter's
        Significant First Amendment Rights at Stake

Instead of meaningfully addressing these less restrictive alternatives, the government

asserts that "any restriction on Twitter is the least restrictive means of advancing governmental

interests." (Opp. 10.) It then offers two reasons why its non-disclosure order is narrowly

tailored: it is limited in duration to 180 days, and it restricts Twitter from disclosing only the

existence or contents of the Warrant itself. (Opp. 10-11.)

As to the former, the government asserts that the mere presence of a "temporal limitation

… balances the need for investigative secrecy and any speech interests." (Opp. 11.) But even

the case it cites acknowledges that "a temporal limitation alone may not be enough to satisfy

strict scrutiny." *Matter of Subpoena 2018R00776*, 947 F.3d 148, 157 (3d Cir. 2020); *Nebraska*

*Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (noting that "the burden on the Government" of

justifying a prior restraint "is not reduced by [its] temporary nature[.]"). Twitter's First

Amendment interest is in notifying its user of the Warrant at a time when that information would

be meaningful to the user—here, when the user could assert his potential privilege before it has

been invaded. Though Twitter is not privy to the government's investigative timeline, 180 days

is likely too late for the user to assert the privilege in a timely manner. As courts routinely

recognize, "[i]t is axiomatic that the timing of speech is often crucial to its impact." *Matter of*

*Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990) (emphasis added); *see also White*

*House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (protest restriction

upheld because it left "unaffected a multitude of possibilities for meaningful" speech) (emphasis

added); *Wood v. Ga.*, 370 U.S. 375, 392 (1962) ("Consistent suppression of discussion likely to

affect pending investigations would mean that some continuing public grievances could never be

discussed at all, or at least not at the moment when public discussion is most needed.").

17

The government also argues that the Non-Disclosure Order is narrowly tailored because it impedes only a narrow swath of Twitter's speech.  But that swath goes to the heart of Twitter's First Amendment interest in this case:  consistent with its terms of service and express commitment to its users, Twitter has a vital interest in notifying users, who have entrusted Twitter with their private data, when the government compels Twitter to produce that data.

To this end, contrary to the government's representation that Twitter has uniquely brought this challenge to protect the former President, Twitter reviews non-disclosure orders issued to it and frequently challenges those appearing to contain procedural or substantive deficiencies.[14]   In its February 8, 2023 letter to this Court, Twitter identified 32 such instances dating back to 2011.  While Twitter does not challenge each and every one of the thousands of non-disclosure orders it receives on a yearly basis, where the statutory factors do not appear to be met, or where a non-disclosure order appears to be otherwise invalid, Twitter has pursued its First Amendment interests and challenged non-disclosure orders accompanying legal process requests for user data in cases like this one.[15]

Here, the Non-Disclosure Order appeared to be plainly invalid for two reasons: certain of the justifications in the order appeared facially to not apply, and (as outlined above) the

---

[14] Twitter's non-disclosure order challenges are often successful, and the Court should not discount—as the government does—situations where Twitter meets and confers with law enforcement and they withdraw or modify an order without court action.  These pre-filing conferences are appropriate actions to conserve judicial resources, and, as noted in its filing, Twitter's outreach to law enforcement challenging non-disclosure orders frequently results in law enforcement withdrawing or modifying the non-disclosure order.

[15] Twitter challenges facially invalid non-disclosure orders regardless of the legal process to which they are attached.  It is of no matter that, as the government points out, the invalid orders have typically attached to subpoenas or national security letters, rather than warrants.  The point is that Twitter has exercised its First Amendment right to contest non-disclosure orders where they have appeared to be improper on their face.

18

underlying investigative action all but matched other actions widely known to the public in a very public criminal case. It was also clear that Twitter's exercise of its First Amendment rights was particularly important in this case because the targeted account contained communications written by the President himself that were potentially privileged.

As submitted to Twitter, the Non-Disclosure Order stated that the former President was likely to flee from prosecution if the Warrant were disclosed. (Doc. 3 at 1.) The Court acknowledged that this justification did not apply. (Sealed Hr'g Tr. (Feb. 7, 2023) at 48.) And indeed, the Government now admits that this finding—one of the facial deficiencies identified by Twitter in its Motion—was, in fact, an error. Opp. 2 n.1 (acknowledging that the templated language about flight applied to another statute and was "erroneously included" in the Non-Disclosure Order).

Additionally, there is reason to believe that Twitter's user, the former President, may have a claim of privilege that presents unique issues not previously addressed by any court in a public decision. As an initial matter, public reports indicate that during his presidency, Mr. Trump did not use email, text, or any other form of electronic communication besides Twitter.[16] The former President's private Twitter communications appear to be the only such electronic communications written by the former President himself, and the government seized those

---

[16] Jonathan Swan & Maggie Haberman, *OMG. Trump Has Started Texting.*, N.Y. TIMES (Jan. 25, 2023), available at https://www.nytimes.com/2023/01/25/us/politics/trump-texting.html; Alex Leary, *Trump Copes With Facebook, Twitter Ban By Relying On Email, Media Interviews*, THE WALL STREET JOURNAL (May 5, 2021), available at https://www.wsj.com/articles/trump-copes-with-facebook-twitter-ban-by-relying-on-email-media-interviews-11620226189.

For instance, the "message" from former President Trump to General Michael Flynn that he "stay strong" (cited by the court in the hearing on February 7, 2023) was passed in person by KT McFarland—not by an electronic communication written by former President Trump to Gen. Flynn. Sealed Hr'g Tr. (Feb. 7, 2023) at 49 (referencing Mueller Report, Vol. II, p44, n.267).

19

private written communications from a third-party provider without some notice to him.  No court has ever addressed the application of executive privilege in that set of circumstances, and the plain text of Section 2703, Federal Rule of Criminal Procedure 41, and the Presidential Records Act did not contemplate this scenario.  Further, if the government has not yet reviewed the communications it seized, there remains for the real parties in interest the issue of whether the privilege may still be asserted at the outset.[17]

Finally, there remains the separate issue of how the government might make derivative use of those communications outside the Executive Branch, which raises a distinct and significant basis for the former President to claim privilege.  The Court and government both suggest that there is no executive-privilege issue here because the materials have been seized by the Executive Branch.  Gov. MTSC Reply 6-7 (citing *Nixon*, 418 U.S. at 708); Sealed Hr'g Tr. (Feb. 7, 2023) at 51-52.  But that does not account for possible derivative uses outside of the Executive Branch, such as the incorporation of privileged information into warrant affidavits, witness questioning, and—as the government suggests throughout its brief—disclosure to a grand jury.  Disclosure of the privileged materials in these contexts would raise precisely the

---

[17] As Twitter previously explained, the executive privilege at issue here is likely injured at the time communications are viewed by another party.  *See In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997) (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).  In other privilege contexts, courts have permitted the return of potentially privileged matter even after the materials were seized.  *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (granting defendant's motion to return attorney-client privileged materials seized during execution of search warrant); *see also In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 183-184 (4th Cir. 2019) (reversing district court's denial of injunction on federal agents reviewing seized attorney-client privileged materials obtained through execution of search warrant).

20

Separation-of-Powers issues that the government claims are not triggered when the material stays within the Executive Branch.[18]

In short, while Twitter may not be able to assert the former President's potential privilege—and takes no position here on whether it applies—the issues in play make Twitter's exercise of its First Amendment rights particularly important in this case.[19]

### III. Twitter's Stay Motion is Not Moot

Twitter's Motion included a request that the Court stay execution of the Warrant until litigation on the Non-Disclosure Order was resolved. Mot. 16. The government argues that the Court's order that Twitter comply with the Warrant "necessarily mooted that stay request." Opp. 13.

This is incorrect for two reasons. First, the Court's compliance order ruled on, and rejected, Twitter's stay request. The request has thus been denied, not mooted. Second, even if the Court had not done so, the request would not be moot because it is "'capable of repetition, yet evading review.'" *People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv., et al*, 59 F. Supp. 3d 91, 97 (D.D.C. 2014). A challenged action is not moot when it is "'typically … in its duration too short to be fully litigated prior to its cessation or expiration,'" and there is "'a reasonable expectation that the same complaining party would be

---

[18] Even if the government's possible use of a filter team might temporarily isolate privileged materials, the former President retains an interest in actually asserting privilege such that his private Presidential communications are not being protected by the mere exercise of a prosecutor's discretion.

[19] The government states that "[a] Twitter user's potential ability to challenge the legal process at issue—here, the Warrant—is entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO." Opp. 9-10. This concession— that Twitter's First Amendment rights do not rise or fall with the success or failure of the user's claims—underscores the point that Twitter's constitutional interest is in disclosing the privacy breach to its user, not in litigating the user's claims.

21

subjected to the same action again.'" *Id.*. That is the case here, where litigation over this Non-Disclosure Order spanned less than one month, and Twitter expects to be subject to non-disclosure orders that it will challenge in the future.

On the merits of Twitter's stay request, Twitter has made a "a strong showing" that it is "likely to succeed on the merits" and "will be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Twitter has demonstrated that the government's Non-Disclosure Order cannot withstand strict scrutiny. *See supra* 3-21. And it has demonstrated "unquestionabl[e]" irreparable injury through "[t]he loss of First Amendment freedoms, for even minimal periods of time." *Elrod v. Burns*, 427 U.S. 347, 373-374 (1976).

### IV. CONCLUSION

The Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) is a blanket prohibition prohibiting Twitter from notifying anyone about the Warrant or Non-Disclosure Order, and cannot be justified by a compelling governmental interest. Accordingly, the Non-Disclosure Order impermissibly burdens Twitter's First Amendment rights and should be vacated or modified to allow Twitter to notify its user of the government's demand. In addition, this Court should stay Twitter's compliance with the Warrant until resolution of these constitutional issues.

22

FILED UNDER SEAL

Dated: February 24, 2023

Respectfully submitted,

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel:  (617) 526-6000
Fax:  (617) 526-6363

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
    *admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.*
    *admission pending)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Twitter, Inc.*

23

FILED UNDER SEAL

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February 2023, I caused the foregoing to be

served by email upon:

James Pearce, Assistant Special Counsel

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

24

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31 - BAH

**UNDER SEAL**

## EXHIBIT B

USCA Case #23-5044     Document #2017106     Filed: 09/15/2023     Page 330 of 403

FILED UNDER SEAL

2/24/23, 12:51 PM          GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump



CRIMINAL JUSTICE & POLICING     ELECTION 2020     ELECTIONS     LAW & GOVERNMENT

**A TO Z**

# GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump

BY: **JIM SMALL** - FEBRUARY 17, 2023     7:15 AM



 House Speaker Ben Toma, Senate President Warren Petersen and Sen. Sonny Borrelli all received federal grand jury subpoenas from the U.S. Department of Justice's special counsel investigation of Donald Trump's efforts to overturn his 2020 election loss. Photos by Gage Skidmore | Flickr/CC BY-SA 2.0

At least three Arizona Republican state legislators have been subpoenaed by the U.S. Justice Department's special counsel, Jack Smith, as part of the criminal investigation into former President Donald Trump and his efforts to reverse his 2020 election loss.

The federal grand jury subpoenas were issued to Senate President Warren Petersen, Sen. Sonny Borrelli and House Speaker Ben Toma. And at least one

2/24/23, 12:51 PM    GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump

former state senator, Michelle Ugenti-Rita, who led the Senate's Election Committee in 2021, received a subpoena. All four have been ordered to produce records and travel to Washington, D.C., to testify.

 GET THE MORNING HEADLINES DELIVERED TO YOUR INBOX

**SUBSCRIBE**

The Arizona Mirror obtained a copy of one of the subpoenas on the condition that it would not be published. In addition to the command to testify before the grand jury, the office of the special counsel is demanding any documents already provided to the congressional panel that investigated the Jan. 6 U.S. Capitol riot and any documents given to any other state or federal inquiry related to the 2020 presidential election.

The subpoena also seeks all communications with Trump or his campaign. It also specifies 18 different campaign employees, attorneys and surrogates: Kenneth Chesebro, Justin Clark, Joe DiGenova, John Eastman, Jenna Ellis, Boris Epshteyn, Rudy Giuliani, Bernard Kerik, Bruce Marks, Cleta Mitchell, Matthew Morgan, Kurt Olsen, William Olson, Sidney Powell, Bill Stepien, Victoria Toensing, James Troupis and L. Lin Wood.

The state Senate and House of Representatives both confirmed the existence of the subpoenas for the three sitting lawmakers, but refused to release them under the state's public records law or to discuss if other lawmakers were also subpoenaed. Spokespeople and legislative attorneys also refused to answer questions about the subpoenas.

"The Special Counsel's Office has informed us that public release of its subpoenas could impede its investigation and interfere with federal law enforcement," Pete Galvan, an associate rules attorney in the Senate, wrote in an email. "In light of the position of the Special Counsel's office, the Senate won't release the materials at this time but may revisit the issue in the future as circumstances change."

A House attorney also initially cited a request from the Special Counsel's Office to keep the records secret as justification. Upon further questioning, both Justin Riches, the House's public records counsel, and Galvan said the legislative bodies were under no obligation to release the subpoenas because of case law and administrative rules allowing records to be shielded if doing so is "in the best interests of the state."

Ugenti-Rita did not respond to questions about the subpoena.

Borrelli, Petersen, Toma and Ugenti-Rita are not the first Arizona officials to be subpoenaed by the Justice Department in connection to Trump's effort to convince GOP officials in battleground states he lost to overturn the election results in a bid to retain power. In November, officials in Maricopa County were among the first to receive subpoenas from Smith's office.

And before Smith was appointed late last year, the FBI subpoenaed at least two Republican state senators — then-President Karen Fann and Kelly Townsend — as part of its investigation into Trump's pressure campaign to overturn the 2020 election.

Those earlier subpoenas to Maricopa County and the former senators sought communication records with 19 different Trump campaign members, attorneys or surrogates, including Rudy Giuliani, Sidney Powell and L. Lin Wood.

Prior to that, the Department of Justice had subpoenaed Arizonans who signed a document that would have sent fake electors to Congress backing Trump. Among them was Kelli Ward, then the chair of the Arizona Republican Party.

Smith's probe appears to be intensifying and moving aggressively. This month, he issued a subpoena to former Vice President Mike Pence, and some sources have reportedly been called to testify to the grand jury multiple times.

## SUPPORT NEWS YOU TRUST.

### DONATE



**REPUBLISH**

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site. Please see our republishing guidelines for use of photos and graphics.*

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    Page 335 of 403

FILED UNDER SEAL

2/24/23, 12:51 PM    GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump



## JIM SMALL 

Jim Small is a native Arizonan and has covered state government, policy and politics since 2004, with a focus on investigative and in-depth policy reporting, first as a reporter for the Arizona Capitol Times, then as editor of the paper and its prestigious sister publications. He has also served as the editor and executive director of the Arizona Center for Investigative Reporting.

**MORE FROM AUTHOR**

---

### RELATED NEWS



**UPDATED Trump's fake electors: Here's the full list**

BY **KIRA LERNER**

June 29, 2022



**How David Stevens is making Cochise County a 'laboratory'...**

BY **JEN FIFIELD/VOTEBEAT**

February 7, 2023

## INSIGHTFUL. INVESTIGATIVE. INDEPENDENT.

### DEMOCRACY TOOLKIT



Amplifying the voices of Arizonans whose stories are unheard; shining a light on the relationships between people, power and policy; and holding public officials to account.

DEIJ Policy | Ethics Policy | Privacy Policy



Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site.

USCA Case #23-5044      Document #2017106      Filed: 09/15/2023      Page 335 of 403

FILED UNDER SEAL

2/24/23, 12:51 PM        GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump

© Arizona Mirror, 2023

**The New York Times** | https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html

## Jared Kushner and Ivanka Trump Subpoenaed in Jan. 6 Investigation

The special counsel overseeing the inquiry into Donald Trump's efforts to retain power after the 2020 election wants the former president's daughter and son-in-law to testify to a grand jury.

 

**By Maggie Haberman and Michael S. Schmidt**

Feb. 22, 2023                                                                                             3 MIN READ

Former President Donald J. Trump's daughter Ivanka and his son-in-law, Jared Kushner, have been subpoenaed by the special counsel to testify before a federal grand jury about Mr. Trump's efforts to stay in power after he lost the 2020 election and his role in a pro-Trump mob's attack on the Capitol on Jan. 6, 2021, according to two people briefed on the matter.

The decision by the special counsel, Jack Smith, to subpoena Ms. Trump and Mr. Kushner underscores how deeply into Mr. Trump's inner circle Mr. Smith is reaching, and is the latest sign that no potential high-level witness is off limits.

The disclosure about the subpoena comes two weeks after it was revealed that Mr. Smith had subpoenaed former Vice President Mike Pence to testify before the grand jury. Mr. Pence plans to fight the subpoena, invoking his role as the president of the Senate to argue that it violates the "speech or debate" clause of the Constitution.

It is unclear whether Mr. Trump will seek to block Ms. Trump and Mr. Kushner from testifying on the grounds of executive privilege, as he has tried with some other witnesses. Both of them served as White House officials in the Trump administration. Mr. Trump declined to try to stop them from testifying before the House special committee that investigated the Jan. 6 attack and what led to it.

An aide to Ms. Trump and Mr. Kushner did not respond to a request for comment. Josh Stueve, a spokesman for Mr. Smith, declined to comment. Aides to Mr. Trump did not respond to a request for comment.

Ms. Trump was in the Oval Office on Jan. 6 as her father placed a late-morning call to Mr. Pence to pressure him to block or delay congressional certification of the Electoral College results documenting Joseph R. Biden Jr.'s victory. As president of the Senate, Mr. Pence, who rejected Mr. Trump's demands, was to serve in a ceremonial role overseeing the process that day.

Ms. Trump also accompanied her father to the rally of his supporters at the Ellipse near the White House. Hundreds of his supporters moved from there to the Capitol, where they attacked the building, some chanting, "Hang Mike Pence!" for his refusal to do what Mr. Trump wished.

Mr. Kushner returned from the Middle East that day, ultimately going to the White House after the pro-Trump mob had been rioting for hours. Both he and his wife were involved in efforts to get Mr. Trump to tell the rioters to go home, and then to commit to a peaceful transfer of power to Mr. Biden.

Both testified before the Jan. 6 House select committee, appearing for videotaped interviews in which both provided memories about the day. The committee, in turn, repeatedly played clips of their testimony at some of its public hearings.

One clip that got considerable attention showed Ms. Trump making clear that she accepted Attorney General William P. Barr's declaration that there was no evidence of widespread fraud in the election, despite Mr. Trump's repeated claims otherwise.

Mr. Trump was infuriated by the clips and what was said in them, according to people in contact with him.

Since then, Mr. Kushner and Ms. Trump, who relocated with their three children to Florida after they left the White House, have maintained family contact with the former president. But while Mr. Kushner appeared at Mr. Trump's campaign kickoff in November, Ms. Trump declined to and put out a statement saying she would not be involved in her father's campaign this time.

Both were intimately involved in his 2016 race before going to work at the White House.

In December, Mr. Trump posted on his social media site, Truth Social, that he did not want them to be involved in his third campaign.

"Contrary to Fake News reporting, I never asked Jared or Ivanka to be part of the 2024 campaign for president and, in fact, specifically asked them not to do it," Mr. Trump wrote, going on to say the campaign would be "too mean and nasty."

"There has never been anything like this 'ride' before, and they should not be further subjected to it," he added.

2/24/23, 11:17 AM                        Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by Grand Jury - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/mark-meadows-trumps-last-chief-of-staff-subpoenaed-by-grand-jury-8c7ad44e

POLITICS

# Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by Grand Jury

Special counsel Jack Smith seeks former top aide's testimony in probe of efforts to reverse 2020 presidential election



The subpoena for Mark Meadows could set the stage for further court battles.
PHOTO: YURI GRIPAS/REUTERS

*By C. Ryan Barber* [Follow]  *and Sadie Gurman* [Follow]
Updated Feb. 15, 2023 9:47 pm ET

WASHINGTON—Former White House chief of staff Mark Meadows has been subpoenaed by the special counsel investigating former President Donald Trump's efforts to overturn his loss in the 2020 election, according to a person familiar with the matter.

Mr. Meadows received the subpoena in late January, the person said, as special counsel Jack Smith's investigation escalated his probe into steps Mr. Trump and his allies took to keep him in office. As Mr. Trump's final White House chief of staff, Mr. Meadows would be among the closest advisers of the former president to be summoned before the grand jury.

The demand for his testimony predated a separate subpoena issued to former Vice President Mike Pence as part of the investigation. Two top aides to Mr. Pence—his former chief of staff

Marc Short and counsel Greg Jacob—are among the former Trump administration officials who have already appeared before the grand jury.

The subpoena for Mr. Meadows could set the stage for further court battles between prosecutors and Mr. Trump, whose lawyers have cited executive privilege in attempts to block or delay the testimony of top aides in investigations examining the former president. Mr. Pence plans to resist his subpoena by arguing that, as vice president, he served also as president of the Senate and is covered by the Constitution's Speech or Debate clause, which protects members of Congress from being questioned in court about legislative acts.



Former President Donald Trump's chief of staff Mark Meadows has been at the center of other investigations into efforts to overturn the 2020 presidential election.
PHOTO: MANDEL NGAN/AGENCE FRANCE-PRESSE/GETTY IMAGES

A lawyer for Mr. Meadows, George Terwilliger, and a Justice Department spokesman declined to comment. CNN earlier reported that Mr. Meadows has been subpoenaed.

Attorney General Merrick Garland appointed Mr. Smith as special counsel in November to take on the dual investigations into Mr. Trump's efforts to cling to power and the handling of classified documents at the former president's Mar-a-Lago estate in southern Florida. It couldn't immediately be determined whether prosecutors want to question Mr. Meadows also in connection with the Mar-a-Lago investigation.

Mr. Meadows has been at the center of other investigations into Mr. Trump's efforts to reverse his electoral defeat in 2020. Last year, the South Carolina Supreme Court ordered him

to testify before an Atlanta-area grand jury as part of a local prosecutor's investigation into the former president's efforts to interfere with election results in Georgia.

The House referred Mr. Meadows to the Justice Department for prosecution after holding him in contempt for refusing to testify before the panel that investigated the Jan. 6, 2021, attack on the Capitol. The Justice Department declined to prosecute him.

In the course of its investigation, the House Jan. 6 committee aired testimony that cast Mr. Meadows as a close Trump adviser with some awareness of the potential for violence on Jan. 6, 2021, the day Congress was set to certify Mr. Trump's loss to President Biden.

A top aide to Mr. Meadows, Cassidy Hutchinson, testified that he told her on Jan. 2, 2021, that "things might get real, real bad on Jan. 6." In videotaped testimony, Ms. Hutchinson said Messrs. Meadows and Trump were both told that members of the crowd for Mr. Trump's speech at the Ellipse on that day were armed with knives, guns, bear spray and other weapons.

The recent subpoenas suggest Mr. Smith's investigation is intensifying.

In the separate investigation of classified documents at Mar-a-Lago, prosecutors are asking a judge to compel further testimony from one of the former president's lawyers, in a bid to break through claims of executive privilege raised during a recent grand jury appearance, according to people familiar with the Justice Department's action.

The prosecutors have asked the chief judge in Washington's federal trial court to invoke the so-called crime-fraud exception, which would allow them to bypass attorney-client privilege and extract more testimony from Trump lawyer Evan Corcoran, the people said. The exception applies in instances where there is reason to believe legal advice has been used in furtherance of a crime.

The move to invoke the crime-fraud exception suggests that federal prosecutors suspect that Mr. Trump or his allies used Mr. Corcoran's services in such a way.

A spokesman for Mr. Trump declined to comment on the tactics of the investigation, which he called a "targeted, politically motivated witch hunt against President Trump, concocted to try and prevent the American people from returning him to the White House."

—*Alex Leary contributed to this article.*

Write to C. Ryan Barber at ryan.barber@wsj.com and Sadie Gurman at
sadie.gurman@wsj.com

*Appeared in the February 16, 2023, print edition as 'Special Counsel Subpoenas Meadows'.*

**JA335**

FILED UNDER SEAL

2/24/23, 12:50 PM                                    Mike Pence Subpoenaed by Special Counsel in Trump Investigation - The New York Times

*The New York Times*  |  https://www.nytimes.com/2023/02/09/us/politics/pence-subpoena-trump.html

## Pence Gets Subpoena From Special Counsel in Jan. 6 Investigation

The move by Jack Smith, the special counsel, is one of the most aggressive in his investigation of Donald Trump's efforts to stay in power and is likely to lead to a battle over executive privilege.

 

**By Maggie Haberman and Glenn Thrush**

Feb. 9, 2023                                                                                                                                         4 MIN READ

Former Vice President Mike Pence has been subpoenaed by the special counsel investigating former President Donald J. Trump's efforts to cling to office after he lost his bid for re-election, a person familiar with the matter said on Thursday.

The move by the Justice Department sets up a likely clash over executive privilege, which Mr. Trump has previously used to try to slow, delay and block testimony from former administration officials in various investigations into his conduct.

The existence of the subpoena was reported earlier by ABC News.

It was not immediately clear when the special counsel, Jack Smith, sought Mr. Pence's testimony. The move is among the most aggressive yet by Mr. Smith in his wide-ranging investigation into Mr. Trump's role in seeking to overturn the outcome of the 2020 election. He is also overseeing a parallel inquiry into Mr. Trump's handling of classified documents.

The New York Times previously reported that the Justice Department was seeking to question Mr. Pence in connection with the investigation into Mr. Trump's efforts to remain in power after he lost the 2020 election and had reached out to his team.

Mr. Pence is potentially a key witness because he is one of the people best positioned to provide information about Mr. Trump's state of mind at the time, even though his relationship with Mr. Trump reached the breaking point in the days leading up to the Jan. 6, 2021, riot at the Capitol, legal experts said.

Mr. Pence's team held discussions with the Justice Department about a voluntary interview, according to the person familiar with the matter, but those talks were at an impasse, leading Mr. Smith to seek the subpoena.

An aide to Mr. Pence declined to confirm the existence of the subpoena. A Justice Department official did not respond to a request for comment.

It is not clear whether investigators will also seek to question Mr. Pence in the matter of Mr. Trump's handling of classified material, or what he could have to share that would be relevant. Mr. Pence's advisers recently alerted the Justice Department that he had found some documents with classified markings at his home in Indiana, after conducting a search following the discovery of classified documents at President Biden's home in Delaware and at a think tank office he used in Washington.

Justice Department officials have signaled that they plan a more thorough search of Mr. Pence's home.

The subpoena from Mr. Smith comes at a moment of rising tension between the Pence team and the Justice Department over the discussions about searching the former vice president's home.

Lawyers with the department's national security division have been discussing the details of a possible agreement to search Mr. Pence's house in Indiana for additional government documents on a parallel track; Mr. Pence's advisers were incensed by the disclosure of a pending search last week and blamed the department for leaking details to pressure them.

Another former Trump administration official, the final national security adviser, Robert C. O'Brien, has received a subpoena in connection with the handling of the documents found to be in Mr. Trump's possession, according to a person familiar with the matter.

But Mr. Pence figures most centrally in the inquiry into Mr. Trump's efforts to use the government to remain in power. Mr. Trump seized on Mr. Pence's ceremonial role in overseeing the congressional certification of the Electoral College results to try to press his vice president into blocking or delaying the outcome on Jan. 6.

Mr. Pence refused, a fact highlighted publicly by Mr. Trump as he stirred up a crowd of supporters that day before they marched to the Capitol and breached it. Some of the rioters chanted, "Hang Mike Pence."

Mr. Pence described some of his ordeal in his recently published book, "So Help Me God."

Mr. Trump has frequently tried to assert executive privilege when officials have sought testimony from people who worked for him in the White House. He has generally been unsuccessful, but those battles over which matters privilege covers have slowed some of the investigations.

JA336

That included when two top aides to Mr. Pence — his former chief of staff, Marc Short, and his former counsel, Greg Jacob — were subpoenaed to testify before a grand jury.

Mr. Pence is being represented by Emmet T. Flood, a veteran lawyer who was the lead official in the White House Counsel's Office under Mr. Trump dealing with the special counsel investigation into whether Mr. Trump's 2016 campaign conspired with Russian officials, and whether the former president obstructed justice.

Mr. Pence is a potential rival to Mr. Trump for the 2024 Republican presidential nomination. Mr. Trump is so far the only declared candidate in that race. And Mr. Biden, who is also the subject of a recently named special counsel looking into the documents found at his home and the Penn Biden Center, is widely expected to declare another presidential campaign for a second term.

Mr. Smith has vowed to expedite the investigation into Mr. Trump, and has moved to consolidate and focus what was seen inside the department as a sprawling inquiry into Mr. Trump's efforts to overturn the election and the Jan. 6 attack, according to people familiar with the situation.

That has intensified in recent weeks, as Mr. Smith's staff — led by Thomas Windom, a veteran prosecutor who had been working out of the office of the U.S. attorney in Washington — has pored through hundreds of witness transcripts turned over by the House committee that investigated the Jan. 6 attack.

JA337

USCA Case #23-5044      Document #2017106      Filed: 09/15/2023    Page 342 of 403
FILED UNDER SEAL

2/24/23, 12:51 PM                Special counsel Jack Smith is locked in at least 8 secret court battles in Trump investigations | CNN Politics



☰   **CNN** politics                                                    AudioLive TV

WATCH LIVE

Disgraced former lawyer Alex Murdaugh returns to the stand in his own defense at his double-murder trial

# Special counsel is locked in at least 8 secret court battles in Trump investigations

By Katelyn Polantz, Casey Gannon and Evan Perez, CNN

Published 6:00 AM EST, Thu February 16, 2023



Jack Smith, left, and Donald Trump

**(CNN)** — Special counsel Jack Smith is locked in at least eight secret court battles that aim to unearth some of the most closely held details about Donald Trump's actions after the 2020 election and handling of classified material, according to sources and court records reviewed by CNN.

The outcome of these disputes could have far-reaching implications, as they revolve around a 2024 presidential candidate and could lead courts to shape the law around the

presidency, separation of powers and attorney-client confidentiality in ways they've never done before.

Yet almost all of the proceedings are sealed, and filings and decisions aren't public.

The sheer number of grand jury challenges from potential witnesses is both a reflection of the scope of the special counsel's investigation and a hallmark of Trump's ultra-combative style in the face of investigations.



**RELATED ARTICLE**
Pence says he's willing to take fight against DOJ subpoena in Trump probe to Supreme Court

---

By comparison, Robert Mueller's grand jury investigation into Trump had a smattering of sealed proceedings where investigators used the court to pry for more answers, and independent counsel Kenneth Starr's Whitewater investigation ultimately totaled seven similar sealed cases.

A key sealed case revealed Wednesday is an attempt to force more answers about direct conversations between Trump and his defense attorney Evan Corcoran, where the Justice Department is arguing the investigation found evidence the conversations may be part of furthering or covering up a crime related to the Mar-a-Lago document boxes.

A spokesman for Smith's office declined to comment.

About half a dozen cases are still ongoing in court, either before Chief Judge Beryl Howell or in the appeals court above her, the DC Circuit. Most appear to follow the typical arc of miscellaneous cases that arise during grand jury investigations, where prosecutors sometimes use the court to enforce their subpoenas.

More challenges from subpoenaed witnesses – including former Vice President Mike Pence – are expected to be filed in the coming days, likely under seal as well. Pence may raise novel questions about the protections around the vice presidency.

Investigations that implicate government officials often beget sealed court proceedings, because confidential grand jury witnesses become more likely to assert privileges that prompt prosecutors to ask judges to compel more answers, criminal law experts say.

"I think we are in extraordinary times. Part of it is I think President Trump continues to assert these theories long after they've been batted away by the court," Neil Eggleston, a former White House counsel who argued for executive privilege during the Clinton

JA339

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    FILED UNDER SEAL    Page 344 of 403

2/24/23, 12:51 PM                    Special counsel Jack Smith is locked in at least 8 secret court battles in Trump investigations | CNN Politics

administration and the Whitewater investigation.

In Whitewater, after the court in DC ruled that privilege claims wouldn't hold up when a federal grand jury needed information, other witnesses shied away from trying to refuse to testify, Eggleston recalled. But in the Trump investigations, witnesses aligned continue to test whether he still may have special confidentiality protections.

Still, the number of cases is out of the ordinary.

The other known cases are:

The Justice Department's long-running effort to enforce a May 2022 subpoena for all classified records in Trump's possession. After a sealed December hearing, Howell gave Smith's investigators an avenue to ask more questions of two people hired to search Trump's properties in December and found more documents with classified markings. Those two people testified to the grand jury late last month. Sixteen national media outlets, including CNN, have asked Howell to make public transcripts of hearings and other records in the case.

An appeal over whether former Pence chief counsel Greg Jacob and chief of staff Marc Short should have been forced to answer questions about Trump interactions around January 6. Both went to the grand jury in DC on the same Friday last July and refused to give some answers because of Trump's attempted claims of confidentiality around the presidency. Court orders prompted them to testify a second time, seeking out more testimony from them in October last year, CNN previously confirmed. They both appeared a second time at the grand jury. The Trump team still has filed an appeal of Howell's decisions.

An appeal over whether former Trump White House counsel Pat Cipollone and deputy White House counsel Patrick Philbin could decline to answer questions about direct conversations with Trump from the end of his presidency. Both men cited various privileges when they testified to the grand jury in September, but were forced to appear a second time and give more answers after court rulings in November and December, CNN previously confirmed. Though they have already testified twice, Trump's team filed an appeal.



**RELATED ARTICLE**
Trump lawyer says searches for classified material at Trump properties are complete

Following the seizure of Pennsylvania GOP Rep. Scott Perry's cell phone in August in the January 6 investigation, lawyers for the congressman challenged the Justice Department's ability to access data taken from the phone, citing protection around Congress under the Constitution's Speech or Debate Clause. Howell refused to keep the records from investigators, but an appeals court panel has blocked the DOJ from seeing the records so far, according to indications in the court record. The case is set for oral arguments on February 23 at the appeals court in Washington. The circuit court also has a request from the Reporters Committee for Freedom of the Press to unseal documents in the case.

Both Republican and Democratic leadership in the US House have wanted a part in the case because of the implications for Congress, CNN has confirmed.

Howell has released redacted versions of two attorney confidentiality decisions she made last year giving prosecutors access to emails between Perry and three lawyers – John Eastman, Jeffrey Clark and Ken Klukowski – before January 6, 2021.

Howell separately denied Clark's attempt to keep from investigators a draft of his autobiography that discussed his efforts at the Justice Department on behalf of Trump before January 6. Clark had tried to mark the draft outline about his life as an attorney work product.

The Justice Department secured a court order for Trump adviser Kash Patel to answer questions under oath in the Mar-a-Lago investigation. Patel initially declined to answer questions before the grand jury in October, citing his Fifth Amendment protection against self-incrimination. Then prosecutors fought for more answers by immunizing his testimony from prosecution, CNN previously reported.

## Transparency is lacking

The suite of special counsel's office grand jury cases raises questions how transparent the courts will be regarding these cases, and how soon documents filed in court could become available.

The New York Times and Politico are trying to convince Howell to release redacted versions of any sealed court fights related to the grand jury where Trump or others in his administration have tried to limit the investigation with claims of executive privilege, according to court filings.

The media organizations argue there's a "profound national interest" in those legal papers.

But the Justice Department is against making disclosures related to the grand jury

USCA Case #23-5044     Document #2017106     Filed: 09/15/2023     Page 346 of 403

FILED UNDER SEAL

2/24/23, 12:51 PM          Special counsel Jack Smith is locked in at least 8 secret court battles in Trump investigations | CNN Politics

investigations – and won't even admit the proceedings are taking place.



**RELATED ARTICLE**
Third Trump attorney appears before federal grand jury investigating Mar-a-Lago documents

On Monday, they argued to Howell that with the intense public interest around the cases, there should be even more secrecy than when the court releases other records.

"To advance the policy goals underlying grand jury secrecy, it may well be necessary for a court to more frequently decline to release judicial opinions ancillary to grand jury investigations that are the subject of intense press attention as opposed to matters that have attracted little public attention," lawyers from the DOJ's civil division wrote.

Howell is still deciding what to do.

Search CNN...

Log In

Live TV

Audio

US

World

Politics

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    Page 347 of 403
**FILED UNDER SEAL**

2/24/23, 12:51 PM                    Special counsel Jack Smith is locked in at least 8 secret court battles in Trump investigations | CNN Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

**JA343**

USCA Case #23-5044    Document #2017106    Filed: 09/15/2023    Page 348 of 403

FILED UNDER SEAL

2/24/23, 12:51 PM    Special counsel Jack Smith is locked in at least 8 secret court battles in Trump investigations | CNN Politics

2/24/23, 11:17 AM                     Trump Copes With Facebook, Twitter Ban by Relying on Email, Media Interviews - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/trump-copes-with-facebook-twitter-ban-by-relying-on-email-media-interviews-11620226189

POLITICS

# Trump Copes With Facebook, Twitter Ban by Relying on Email, Media Interviews

Cut off from social media, the former president pursues other ways to get his message out



When he was president, Donald Trump relied on Twitter to communicate with supporters; now he relies on email. Supporters of the former president marched down Fifth Avenue in New York City on March 5.
PHOTO: JOHN MINCHILLO/ASSOCIATED PRESS

*By Alex Leary*  [Follow]

May 5, 2021 10:49 am ET

In the heat of the 2016 presidential campaign, then-candidate Donald Trump said, "I'm just not a believer in email." Since he was banned from social media earlier this year, it has been his go-to communication tool.

Unable since January to tweet, put videos on YouTube or post to Facebook—whose oversight board upheld the ban on Wednesday and gave the company six months to determine whether Mr. Trump should be permanently banned—the former president has been blast emailing statements to comment on daily news developments, endorse candidates and target critics.

He continues to claim in emailed statements and in private gatherings with supporters that the election was rigged. There is no evidence there was widespread fraud in the election, and Mr. Trump's campaign and his allies failed in dozens of court challenges to the results.

JA345

"They're really much more elegant. And the word is getting out," Mr. Trump said of his emailed statements in a recent Newsmax interview.



Mr. Trump spoke at the Conservative Political Action Conference, or CPAC, in Orlando, Fla., on Feb. 27.
PHOTO: ELIJAH NOUVELAGE/BLOOMBERG NEWS

"The tweeting gets you in trouble," Mr. Trump added. "You're retweeting people and you find out that the retweets were not so good, because the person—if you didn't do research—that you're retweeting is not the best. ... I like this better than Twitter. Actually, they did us a favor."

But while Mr. Trump once could instantly communicate to tens of millions of people, his email reach is smaller and slower, people familiar with the process say. News outlets that once hung on his every word are being more selective. Lawmakers too say they are relieved not to have to react to the barrage of tweets.

A spokesman declined to say how large the email list is.

Mr. Trump has floated the idea of creating his own social-media platform. On Tuesday, Mr. Trump's website added a section— titled "From the Desk of Donald J. Trump" —that contains his statements with buttons for people to share on Twitter and Facebook. Trump spokesman Jason Miller said in a tweet that the site is "not a new social media platform. We'll have additional information coming on that front in the very near future."

FILED UNDER SEAL



Mr. Trump made a speech at a dog-rescue fundraising event at Mar-a-Lago on March 12.

PHOTO: VALENTINA AVED VIA STORYFUL

Mr. Trump has done a handful of TV interviews, with Newsmax, One America News Network and Fox News, allowing him a broad audience. He has also appeared on podcasts and radio shows. In a conversation last week with conservative host Dan Bongino, Mr. Trump suggested he is planning to revive his campaign-style rallies, while he continues to tease the idea of running for president in 2024.

He has closely followed the news from his Mar-a-Lago club in Florida, aides say, and has regular talks with political advisers. A stream of candidates have visited him in hopes of an endorsement. Some are holding fundraisers at the club, in hopes the former president makes a personal appearance. Mr. Trump is planning to relocate to his Bedminster golf club in New Jersey for the summer.

The Trump statements are sent through his official office or political action committee, Save America PAC. They read like long versions of his former tweets, full of capital letters, exclamation points, boasts about his record in office, attacks on rivals and general musings.

"What used to be called The Academy Awards, and now is called the 'Oscars'—a far less important and elegant name—had the lowest Television Ratings in recorded history, even much lower than last year, which set another record low," he wrote last week.

"Why is it that every time the 2020 ELECTION FRAUD is discussed, the Fake News Media consistently states that such charges are baseless, unfounded, unwarranted, etc.?" he lamented on April 2. "Other than that, Happy Easter!"

Mr. Trump dictates the messages to an aide, according to two people familiar with the process, and the message is reviewed by staff before being sent out. He is given a printed-out copy and sometimes makes edits in black marker.

Some of the emails have generated news, such as one attacking Senate Minority Leader Mitch McConnell (R., Ky.) following his criticism of Mr. Trump's rhetoric leading up to the Jan. 6 Capitol riot. Despite the Twitter ban, the statements have appeared in tweets from other users.

Republican adversaries are a frequent target, including House GOP Conference Chairwoman Liz Cheney of Wyoming, Utah Sen. Mitt Romney and his former national security adviser John Bolton.

The back and forth with Ms. Cheney escalated this week, after Mr. Trump issued an email statement calling the 2020 election "THE BIG LIE." She responded on Twitter that calling the election stolen poisons the democratic system, prompting him to call her a "warmonger" who polls badly.

Regardless of the Facebook decision, Mr. Trump appears to have moved on from Twitter, which banned him permanently. Speaking on Fox News in late March, he said, "It's become very, very boring."

**Write to** Alex Leary at alex.leary@wsj.com

*Appeared in the May 6, 2021, print edition as 'Former President Turns To Email'.*

*The New York Times*  |  https://www.nytimes.com/2023/01/25/us/politics/trump-texting.html

# OMG. Trump Has Started Texting.

The former president, averse to leaving records of his communications, had long avoided text and email.

**By Jonathan Swan and Maggie Haberman**

Jan. 25, 2023

3 MIN READ

One of former President Donald J. Trump's most consistent personal traits — one that his advisers say has helped keep him out of even worse legal jeopardy — has been his refusal to communicate by text or email.

Until now.

Mr. Trump, 76, who is heading into his third presidential campaign and is still under scrutiny by investigators on multiple fronts, has at last become a texter, according to three people with knowledge of his new habit. His messages have recently shown up in the phones of surprised recipients, they said.

The former president's resistance to texting frustrated investigators for the House Jan. 6 committee as they tried to track his thoughts and actions when he worked to overturn the 2020 election. In his testimony before the committee, the former president's eldest son, Donald Trump Jr., said he texted the White House chief of staff, Mark Meadows, during the Capitol attack because his father "doesn't text."

That changed around the beginning of this year. Friends, confidants and even people not especially close to Mr. Trump began receiving text messages from his cellphone, most of them described as innocuous, such as new year greetings or political observations. A spokesman for Mr. Trump declined to comment.

The former president has long been constantly on his phone, but only to talk into it — or, before he was kicked off Twitter, to send streams of tweets. (The former aide who helped set up his Twitter account once told Politico that when Mr. Trump, who initially relied on aides to write his posts, began to tweet on his own, it was akin to the scene in the film "Jurassic Park" when the velociraptors learned to open doors.)

For years, people corresponding with him sent him text messages, which always went unanswered. He was unreachable by email. He sometimes asked aides to send electronic messages to reporters, referring to the missives as "wires," like a telegram.

Now, his delayed embrace of what has long been a default mode of communication spanning generations signals not only a willingness to join in the world of LOL's and BRB's but also a small shift from his aversion to leaving paper or electronic trails.

People who have worked for Mr. Trump in the White House and in his private business say he has prided himself on being "smart" for leaving almost no documentation of his communications and discussions in meetings. That included snatching notes being taken in real time by a junior legal associate in his offices in the 1990s, when Mr. Trump spotted the man scribbling, according to a consultant working for him then.

Those who have witnessed firsthand his visceral aversion to record-keeping said they were shocked to learn about his new electronic habit.

"Has he now also started to take notes?" John R. Bolton, Mr. Trump's former national security adviser, dryly texted when told about the former president's texting.

Mr. Trump upbraided Mr. Bolton, who wrote one of the most searing book-length accounts of the Trump presidency, for taking notes during meetings.

Mr. Trump also chided Donald F. McGahn II, his first White House counsel, for notes he took. Mr. McGahn, when interviewed by the special counsel Robert S. Mueller III during the Russia investigation, described informing Mr. Trump that he took notes because he was a "real lawyer."

"I've had a lot of great lawyers, like Roy Cohn. He did not take notes," Mr. McGahn recounted Mr. Trump saying, referring to his ruthless longtime fixer and mentor who became the prototype for what Mr. Trump sought in a lawyer.

The fact that Mr. Trump is now sending texts has caused alarm among some of his associates, who are concerned about what he might say. Still, they have been relieved about another shift: His phone now sends calls that are not from numbers in his contacts to voice mail, according to two people familiar with the change.

That shift occurred this month, after an NBC reporter called Mr. Trump directly during Representative Kevin McCarthy's desperate fight to be elected speaker of the House. Mr. Trump picked up, giving a brief interview that created some political heartburn for Republicans.

Still unclear is Mr. Trump's position on emojis.

2/24/23, 11:21 AM    Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/trump-lawyers-appeared-before-grand-jury-as-part-of-classified-documents-probe-3d1c8040

POLITICS

# Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe

Evan Corcoran and Christina Bobb's appearances come as the Justice Department ramps up Mar-a-Lago investigation



Evan Corcoran has represented Donald Trump in dealings with the Justice Department over the classified documents.
PHOTO: MARCO BELLO/AGENCE FRANCE-PRESSE/GETTY IMAGES

*By C. Ryan Barber* [Follow] *and Alex Leary* [Follow]

Updated Feb. 11, 2023 6:57 pm ET

Two lawyers for Donald Trump appeared before a grand jury last month as part of the special counsel investigation into the handling of classified documents and other records discovered at the former president's South Florida residence and private club, according to people familiar with the matter.

Christina Bobb and Evan Corcoran, lawyers who have represented Mr. Trump in dealings with the Justice Department over the classified documents, made their appearances in the early weeks of January as the special counsel, Jack Smith, ramped up his investigation, the people said.

The two have faced scrutiny since last year, when the Federal Bureau of Investigation found a cache of classified documents at Mr. Trump's Mar-a-Lago estate during a court-authorized search. In a court filing after that search, the Justice Department said the discovery of documents during the Aug. 8 search "cast serious doubt" on a sworn statement Ms. Bobb had signed in June attesting that all materials requested by a subpoena to Mr. Trump had been turned over to the Justice Department. In fact, more records were later retrieved from the property.

The Justice Department declined to comment.

Ms. Bobb declined to comment on Saturday. Her grand jury appearance hasn't previously been reported.

Mr. Corcoran's appearance was earlier reported by Bloomberg News. He didn't respond to repeated requests for comment.

Their appearances came as the Justice Department ramped up the investigation into the potential mishandling of sensitive records at Mar-a-Lago. Attorney General Merrick Garland appointed Mr. Smith, a former public integrity and war crimes prosecutor, in November to oversee the dual investigations into the mishandling of classified records and Mr. Trump's efforts to overturn the 2020 election results.



A cache of classified documents was discovered last year at Donald Trump's Mar-a-Lago estate.
PHOTO: JOE RAEDLE/GETTY IMAGES

In recent weeks, Mr. Smith's office has moved aggressively with subpoenas to associates of Mr. Trump and requests for prompt productions of documents, according to people familiar with the investigation. The Wall Street Journal reported Thursday that the special counsel

subpoenaed former Vice President Mike Pence as part of the investigation into efforts to overturn the 2020 election.

Ms. Bobb had previously spoken with federal investigators. In an October interview, Ms. Bobb said Mr. Corcoran had assured her that he conducted a thorough search of Mar-a-Lago before he asked her to certify that all records requested by a subpoena had been returned, the Journal reported. Ms. Bobb at the time insisted on adding language to the certification that said she was acting "based upon the information that has been provided to me," and "to the best of my knowledge." She declined an offer of immunity, saying she didn't need it, according to people familiar with the process.

Mr. Corcoran handled Mr. Trump's responses to government requests for the return of records from his presidency. He accepted a subpoena requesting those documents, according to court records, and was present at Mar-a-Lago in June when federal officials arrived at the West Palm Beach estate to collect more materials.

In May, Mr. Corcoran wrote a letter to the Justice Department asserting that Mr. Trump had "readily and voluntarily agreed" to send the materials to the National Archives after the agency requested them. In the letter, which was revealed in court filings following the Mar-a-Lago search, Mr. Corcoran also warned it was critical that the Justice Department's steps "not involve politics," and he argued that a president's actions with classified documents aren't subject to criminal sanction.

Mr. Corcoran has more recently represented Mr. Trump in legal proceedings related to the investigation into mishandling of classified documents at Mar-a-Lago, which is also examining potential obstruction of justice. In December, he was observed entering the chambers of Chief Judge Beryl Howell for a sealed proceeding related to a grand jury matter.

A former federal prosecutor, Mr. Corcoran has also represented close allies of Mr. Trump. Last year, he defended Mr. Trump's former strategist Steve Bannon against criminal contempt of Congress charges stemming from his defiance of a subpoena issued by the House committee that investigated the Jan. 6, 2021, attack on the Capitol. A jury found Mr. Bannon guilty in July. Mr. Bannon was later sentenced to four months in prison, but a judge allowed him to remain free while Mr. Bannon challenges the criminal conviction in the U.S. Court of Appeals for the D.C. Circuit.

In January, just weeks after his grand jury appearance, Mr. Corcoran appeared on Mr. Trump's behalf in the contempt of Congress case against another onetime Trump White House adviser,

2/24/23, 11:21 AM                    Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe - WSJ

Peter Navarro. In a Jan. 23 letter, which was filed in federal court, Mr. Corcoran endorsed Mr. Navarro's decision to rebuff a subpoena from the House Jan. 6 committee by raising executive privilege claims.

Write to C. Ryan Barber at ryan.barber@wsj.com and Alex Leary at alex.leary@wsj.com

*Appeared in the February 13, 2023, print edition as 'Trump Lawyers Appeared Before Grand Jury in Probe'.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 <br><br> **<u>Under Seal</u>** <br><br> Chief Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of Twitter, Inc.'s ("Twitter") motion to modify or vacate the non-disclosure order in this matter; the government's sealed and *ex parte* oppositions; the government's notice for accrued sanctions; Twitter's notice regarding the applicability of sanctions; the exhibits attached thereto; and the underlying record, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that Twitter's Motion to Vacate or Modify the Non-Disclosure Order and Stay Twitter's Compliance with the Search Warrant, ECF No. 7, is **DENIED**; it is further

**ORDERED** that the Non-Disclosure Order, ECF No. 3, shall remain in effect until, at least, July 16, 2023; it is further

**ORDERED** that the government submit to the Court, by March 3, 2023, at 2:00 P.M, any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to Twitter and its counsel; it is further

**ORDERED** that the parties shall submit a joint status report by March 10, 2023 at noon, advising the Court whether this Order and the Opinion may be unsealed, in whole or in part with redactions; it is further

**ORDERED** that Twitter is held in civil contempt for failing to comply with the Court's February 7, 2023, Minute Order, which ordered that Twitter would be held in contempt if it did not comply with the Search and Seizure Warrant, ECF No. 1, by 5:00 PM that day, and that Twitter

"shall be fined $50,000, a fine amount that shall double every day, for failing to comply[;]" it is further

      **ORDERED** that Twitter is assessed a $350,000 sanction for failing to comply with the February 7, 2023 Minute Order, which sanction is promptly payable to the Clerk of this Court no later than March 13, 2023.

      **SO ORDERED.**

      Date:  March 3, 2023

      *This is a final and appealable order.*

_____

BERYL A. HOWELL
Chief Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Under Seal and**<br>**Ex Parte to Government**<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

For what appears to be the first time in their nearly seventeen-year existence as a company, *see generally* Letter from Counsel for Twitter, Inc. (SEALED), ECF No. 14, Twitter Inc. ("Twitter") seeks to vacate or modify an order, issued under the Stored Communications Act of 1986 ("SCA"), 18 U.S.C. § 2701 *et seq.*, commanding that the company not disclose the existence of a search warrant for a user's Twitter account, and further seeks to condition any compliance by the company with that search warrant on the user (or user's representatives) first being notified about the warrant and given an opportunity to stop or otherwise intervene in execution of the warrant. *See* Twitter's Mot. to Vacate or Mod. NDO and Stay Twitter's Compl. with Warrant ("Twitter's Motion") (SEALED), ECF No. 7; *see also* Twitter's Mem. Supp. Twitter Mot. ("Twitter Mem.") (SEALED), ECF No. 7-1. This is an extraordinary request. Twitter denies that this action is being taken by the company due to the identity of the targeted Twitter account ("Target Account") or its user, suggesting instead that Twitter regularly engages in challenging SCA nondisclosure orders ("NDOs")—though concededly never before regarding a covert search warrant—and assuring the Court that the fact that the user of the Target Account ("the User") is a high-profile public figure is merely coincidence. *See* Feb. 7, 2023 Hrg. Tr. at 60:9-22 (SEALED)

1

(Twitter's counsel declaiming that the company "has no interest other than litigating its constitutional rights").[1]

Twitter justifies initiating this dispute on grounds that the NDO violates the First Amendment as a content-based prior restraint on speech the company wants to have with a customer that fails to satisfy the exacting requirements of strict scrutiny. Twitter Mem. at 2. Specifically, Twitter is not satisfied with the government's proffered reasons for nondisclosure, based upon what the company has read in media reports, *id.*, notwithstanding that both the warrant and the NDO were issued by this Court after being apprised of extensive reasons sufficient to establish probable cause for issuance of the warrant and to meet the statutory requirements for an NDO, to which reasons Twitter is neither privy nor entitled to be privy. The government opposes Twitter's motion, arguing that disclosure of the warrant's existence would result in statutorily cognizable harms, under 18 U.S.C. § 2705(b), *see* Gov't's *Ex Parte* Opp'n to Twitter's Mot. at 1 ("Gov't's *Ex Parte* Opp'n") (SEALED), ECF No. 22, and such harms provide compelling reasons for the NDO, even under the exacting requirements of strict scrutiny review, assuming that standard should apply here, *id.* at 13.[2]

Separately, the parties also dispute whether monetary sanctions are warranted against Twitter because, while focusing on intervening in this criminal investigation and obtaining

---

[1]    The Twitter account at issue is @realDonaldTrump, which is the recently reinstated account of former President Donald J. Trump. *See* Claire Duffy and Paul LeBlanc, "Elon Musk restores Donald Trump's Twitter account," CNN (Nov. 20, 2022), available at https://www.cnn.com/2022/11/19/business/twitter-musk-trump-reinstate/index html (last visited on Mar. 1, 2023) ("The much-anticipated decision from the new owner sets the stage for the former president's return to the social media platform, where he was previously its most influential, if controversial, user. With almost 90 million followers, his tweets often moved the markets, set the news cycle and drove the agenda in Washington.").

[2]    The government's opposition summarizes extensive evidence of the User's conduct, and those of his associates, raising legitimate concerns ███████████████████████████████████████ ███████████████████████. *See* Gov't's *Ex Parte* Opp'n at 3–9; *see infra* nn.4, 6.

2

permission to alert the User about the search warrant, the company failed fully and timely to comply with the Warrant, in violation of two court orders.

As explained below, the government has established that, even if strict scrutiny analysis applies—which the Court assumes without deciding—the compelling interests of avoiding the harms to the criminal investigation, as authorized in § 2705(b), warrant Twitter's continued nondisclosure of the warrant's existence, and the NDO is the narrowest possible way available to protect those compelling government interests. Accordingly, Twitter's motion to vacate or modify the NDO is denied. Moreover, Twitter must pay $350,000 in contempt fines for failing to comply with the warrant in a timely manner, a delay for which Twitter bears full responsibility.

## I.    BACKGROUND

The relevant statutory, factual and procedural background is summarized below.

### A.    Statutory Framework

The SCA governs how providers of "electronic communications service[s] ["ECS"]," as defined in 18 U.S.C. § 2510(15), and "remote computing service ["RCS"]" providers, as defined in 18 U.S.C. § 2711(2), may be compelled to supply records related to that service in response to a subpoena, court order, or search warrant. As relevant here, the SCA's §§ 2703(a), (b)(1)(A), and (c) provide that the government may obtain contents of communications, as well as non-content information and records or other information, about a subscriber or customer of such service, via a search warrant. *See Id.* § 2703(a)-(c). Twitter enables account holders to share and interact with electronic content and to send and receive electronic communications with other users, publicly or privately, and is indisputably an ECS and RCS provider. *See* NDO Appl. ¶ 3.

The SCA is silent as to any obligation of ECS/RCS providers to notify subscribers about the providers' production of records in response to subpoenas, court orders, or search warrants, implicitly allowing such notification on a voluntarily basis. Indeed, Twitter promotes a policy of

3

"notify[ing] its users of any requests from law enforcement for account information, particularly requests for contents of communications, unless prohibited from doing so." Twitter Mem. at 1. The SCA is explicit, however, in authorizing "governmental entit[ies]," which includes federal "department[s] or agenc[ies]" and those of "any State or political subdivision thereof," 18 U.S.C. § 2711(4), to apply for and obtain a judicial order "commanding" a provider of ECS or RCS "to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id*. § 2705(b). Upon receipt of such an application, the SCA requires that "[t]he court *shall* enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in" any of five enumerated harms. *Id*. (emphasis added). These enumerated harms broadly cover: "(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial." *Id*. "The explicit terms of section 2705(b) make clear that if a court[] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate." *Matter of Application of U.S. of Am.*, 45 F. Supp. 3d 1, 5 (D.D.C. 2014).

A service provider is authorized to move "promptly" to quash or modify an order for disclosure of the contents of communications, such as the warrant at issue here, under two specific circumstances: first, "if the information or records requested are unusually voluminous in nature," 18 U.S.C. § 2703(d), or, second, "compliance with such order otherwise would cause an undue

4

JA359

burden on such provider," *id*.  Twitter does not contend that either of those circumstances are present here. The SCA is notably silent in providing any statutory authorization for a service provider to challenge an NDO.  Instead, in a mechanism designed to encourage compliance with NDOs and minimize litigation, particularly during an ongoing criminal investigation when SCA authorities are employed by law enforcement, the SCA expressly relieves providers from any liability on any claim in any court for disclosing their customer's information in compliance with an SCA order.  *See id*. § 2703(e) ("No cause of action shall lie in any court against any provider of wire or [ECS], its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter.").

**B.    The Search Warrant and NDO At Issue**

On November 18, 2022, Attorney General Merrick Garland announced the appointment of Jack Smith to serve as Special Counsel to oversee two ongoing criminal investigations into (1) unlawful interference with the transfer of power following the 2020 presidential election, including certification of the Electoral College vote held on January 6, 2021, ("the January 6th Investigation"), and (2) unlawful retention of classified documents and possible obstruction ("the Classified Documents Investigation").  *See* "Appointment of a Special Counsel," Department of Justice (Nov. 18, 2022), available at https://www.justice.gov/opa/pr/appointment-special-counsel-0 (last visited on Mar. 2, 2023).  As part of the January 6th Investigation, on January 17, 2023, the government applied for, and the Court issued, based on an affidavit establishing probable cause to believe the Target Account contains evidence of criminal activity, a search warrant to search the Target Account and seize responsive records ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

5

**JA360**

██████████████████████████ . *See* Search and Seizure Warrant ("Warrant") (SEALED), ECF No. 4; *see also* Gov't's Appl. And Aff. in Supp. of Appl. for a Search Warrant ("Warrant Affidavit" and "Warrant Application"), ECF No. 1. The Warrant itself has two attachments: Attachment A, describing the "Property to Be Searched," and Attachment B, the "Particular Things to Be Seized," and is separate from both the Warrant Application and the Warrant Affidavit. Warrant at 2.

In addition to the Warrant, the government applied for, and this Court issued, an order sealing the Warrant and related materials, and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days. *See* Order Granting the Gov't's Appl. for an Ord. Pursuant to 18 U.S.C. § 2705(b) as to Twitter, Inc. ("NDO") (SEALED), ECF No. 3. The NDO was granted based on the government's proffered facts showing reasonable grounds to believe that notifying the Target Account's User of the existence of the Warrant "would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to this investigation." NDO Appl. ¶ 10; 18 U.S.C. § 2705(b)(3)-(5).[3] The government's accompanying lengthy Warrant Affidavit detailed various actions of the User, and the User's associates, ████████████████████████████

████████████████████████████ .[4]

---

[3]     By contrast to the Application for the NDO, the NDO itself also offered as grounds for nondisclosure the basis that the user of the Target Account would "flee from prosecution." NDO at 1. The government has since explained that justification to the NDO was erroneously included. *See* Gov't's *Ex Parte* Opp'n at 3 n.1.

[4]  ███████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

6

**C.  Procedural History**

The Warrant was issued on January 17, 2023, and required Twitter's compliance within ten days of "issuance," Warrant, Att. B. § I, ¶ 5, meaning by January 27, 2023.   Twitter's compliance ended up taking over double the amount of time provided in the Warrant.

1.   *Service on Twitter of Relevant Part of Warrant and NDO*

On the same day as issuance of the Warrant, the government attempted to serve the Warrant and the NDO on Twitter through the company's Legal Requests Submissions online site.   Gov't's Mot. for Ord. Show Cause at 2 ("Gov't's Mot.") (SEALED), ECF No. 5.   Specifically, six pages



of the Warrant were submitted to Twitter, consisting of the Warrant with Attachment A and part
of Attachment B.  *See* Gov't's *Ex Parte* Opp'n, Ex. A. (SEALED), ECF No. 22-1; *see also* Feb.
7, 2023 Hrg. Tr. at 9:1-19 (same). Twitter has thus never been privy to the remaining parts of
Attachment B to the Warrant, the Warrant Affidavit or Application, nor even the Application for
the NDO. Twitter Mem. at 1 (conceding "Twitter has not seen" the *ex parte* application for the
NDO); Feb. 7, 2023 Hrg. Tr. at 9:1-19 (government counsel agreeing that Twitter has only seen
the warrant, Attachment A, and Part 1 of Attachment B).

The government's initial service attempts on Twitter failed twice, with the government's
receipt both times of an automated message indicating that Twitter's "page [was] down." Gov't's
Mot. at 2 (alteration in original).  On January 19, 2023, the government was finally able to serve
Twitter through the company's Legal Requests Submissions site. *Id.*

Twitter, however, somehow did not know of the existence of the Warrant until January 25,
2023—two days before the Warrant returns were due.  That day, the government contacted Twitter
about the status of the company's compliance with the Warrant, and Twitter's Senior Director of
Legal, ▮▮▮▮▮▮▮▮, "indicated she was not aware of the Warrant but would consider it a
priority."  *Id.*; *see also* Decl. of ▮▮▮▮▮▮▮▮, Senior Director of Legal for Twitter
("▮▮▮ Decl.") ¶ 2 (SEALED), ECF No. 9-1.  The government indicated that "they were looking
for an on time production, in two days[,]" to which ▮▮▮ responded, "without knowing more or
taking any position that would be a very tight turnaround for us." ▮▮▮ Decl. ¶ 2.  The
government sent the six pages of the Warrant and the NDO directly to ▮▮▮ later that evening.
Meanwhile, ▮▮▮ directed Twitter's personnel to preserve data available in its production
environment associated with the Target Account, and "have confirmed that the available data was
preserved." *Id.* ¶ 4.

Twitter notified the government in the evening of January 26, 2023, that the company would not comply with the Warrant by the next day, *id.* ¶ 5, and responded to the government's request for more specific compliance information, by indicating that "the company was prioritizing the matter and taking it very seriously" but that ▮▮▮ had the Warrant and NDO only "for two days," *id.* ¶ 8, even though the government had tried to submit the Warrant and NDO through Twitter's Legal Requests Submissions site nine days earlier. The Warrant's deadline for compliance makes no exception for the provider's failure to have a fully operational and functioning system for the timely processing of court orders.

On January 31, 2023, Twitter indicated for the first time that the company would not comply with the Warrant without changes to the NDO, stressing as "essential to Twitter's business model (including [its] commitment to privacy, transparency, and neutrality) that [Twitter] communicate with users about law enforcement efforts to access their data." *Id.* ¶ 10. Referencing that "on occasion, [Twitter has] challenged nondisclosure orders," ▮▮▮ asserted that the NDO "did not . . . meet[] the factors outlined in § 2705(b), given the intense publicity around the investigation." *Id.* In a subsequent conversation with government counsel, ▮▮▮ made clear that "Twitter's position would be that we should not produce until we resolved our questions as to the NDO." *Id.* ¶ 12.

### 2. *Government and Twitter's Cross Motions*

Given Twitter's refusal to comply with the Warrant unless and until its condition was met allowing disclosure of the Warrant to the Target Account user (or user's representatives), on February 2, 2023, the government moved for an Order to Show Cause "why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant." Gov't Mot. at 1. The government explained Twitter had no basis for refusing to comply with the Warrant, pointing out that the Warrant and NDO were different court orders, so Twitter could "not delay, to an unknown

9

**JA364**

future date, compliance with the Warrant by challenging the NDO," *id.* at 3, and arguing that neither "the Warrant itself nor Section 2703 provide for intervention by a third party before compliance with the Warrant is required," *id.*

The same day, Twitter filed its motion to vacate or modify the NDO and stay compliance with the Warrant, arguing that the requested stay was required to "(1) prevent irreparable injury to Twitter's interests that would occur if production under the Warrant were required prior to resolution, and (2) to preserve the status quo as to the user's interest in potentially seeking to assert privilege or otherwise curtail derivative use of potentially privileged communications." Twitter Mem. at 3. Twitter highlighted that the Target Account's User could, in theory, exert a privilege over his private communications on Twitter (through direct messages with other users), and should have the opportunity to exert privilege prior to Twitter turning over the information to the government. *Id.* at 12–14

The parties were directed to confer and propose a briefing schedule for the pending motions, Min. Order (Feb. 2, 2023) (SEALED), and the schedule proposed by the government was ultimately adopted, *see* Min. Order (Feb. 3, 2023) (SEALED).

### 3. *Hearing on and Resolution of Government's Motion For Order To Show Cause*

At a hearing held on February 7, 2023 on the government's motion, *see* Minute Entry (Feb. 7, 2023) (SEALED), Twitter conceded that: (1) the company had no standing to assert any privilege by any of its users, including the Target Account's User, Feb. 7, 2023 Hrg. Tr. at 66:3-4; *accord* Twitter Opp'n Mot. Ord. Show Cause at 3 ("Twitter Opp'n") (SEALED) (same), ECF No. 9 (SEALED); (2) the company had no confirmation that the Target Account's User wanted or would seize on any opportunity to assert any privilege if such opportunity were provided, *see* Feb. 7, 2023 Hrg. Tr. at 54:11-25; and (3) the company was operating on a mere sliver of the

10

information presented to the Court in support of issuance of the Warrant and the NDO, *see id.* at 48:15-19.

Nevertheless, Twitter argued that "producing the requested information prior to allowing it the opportunity to alert the [Target Account's User] would irreparably injure its First Amendment rights." *Id.* at 65:10-14. This argument was rejected for both practical and logistical reasons as well as legal grounds.  If accepted, Twitter's argument would invite repeated litigation by Twitter and other ECS providers to challenge NDOs in order to alert users to SCA orders, particularly for high profile, highly placed users, such as current or former government officials, with whom the providers might want to curry favor, with concomitant and inevitable delays in execution of SCA orders and resultant frustration in expeditiously conducting criminal investigations.  *See id.* at 65:14-20.  As a legal matter, the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each.

These concerns had been well articulated by another court in a similar situation of being confronted with a government motion to compel compliance with an SCA warrant and an ECS provider simultaneously seeking to challenge an NDO, and capsulized this Court's decision to grant the government's motion because the "public interest is served by prompt compliance with the [W]arrant" because "any challenge to a NDO is separate from a challenge to a search warrant [since] any further delay on the production of the materials responsive to the Warrant increases the risk that evidence will be lost or destroyed, heightens the chance the targets will learn of the investigation, and jeopardizes the government's ability to bring any prosecution in a timely fashion."  *Id.* at 66:11-17 (paraphrasing *Google v. United States,* 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020)).

In response to the Court's direct question, Twitter's counsel represented that the company was prepared to and could comply with the Warrant by 5:00 PM that day. *See* Feb. 7, 2023 Hrg. Tr. at 63:16-19 (THE COURT: Okay. Can Twitter produce the [W]arrant returns by 5 p.m. today? MR. VARGHESE: I believe we are prepared to do that. Yes, Your Honor."). The government requested that if Twitter failed to comply with the Warrant by 5:00 PM that day, an escalating sanction should be imposed, starting at a sanction of $50,000, an amount that should "double each day thereafter." *Id.* at 33:6-22; *see also id.* at 33:2-5 (the Court noting that the company "was bought for $40 billion, and the CEO, sole owner is worth . . . over $180 billion"); Gov't Reply Supp. Mot. Order Show Cause ("Gov't Reply") at 10 (SEALED), ECF No. 11 (requesting "escalating daily fines" for continued noncompliance by Twitter with the Warrant, at an amount "commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay"). With Twitter's assurance of full compliance by close of business that day, and given Twitter's already tardy compliance with the Warrant, the Court ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant. *See* Min. Order (Feb. 7, 2023) ("Show Cause Order") (SEALED).

### 4.    *Twitter Fails To Comply Timely With Court's Show Cause Order*

Despite representing that the company would and could comply with the Warrant by 5:00 p.m. on February 7, 2023—by that point, nearly two weeks late—Twitter failed timely to comply with the Show Cause Order. Gov't Notice Re. Twitter's Non-Compliance with the Warrant (SEALED), ECF No. 25. The government explained that prior to 5:00 PM on February 7, "Twitter made a production to the [g]overnment," but "[i]n a follow up call on February 8, counsel for Twitter identified certain information that may (or may not) exist in their holdings and that had not been produced to the [g]overnment." *Id.* Twitter made another production on February 9, and

12

in a subsequent call, alerted the government that further productions were expected, though the company could not provide a timeframe when "all materials responsive to the Warrant would be produced." *Id.* The government accordingly requested a prompt in-person hearing that day regarding Twitter's continued failure to fully comply with the Warrant. *Id.*

At a hearing held later on February 9, 2023, *see* Minute Entry (Feb. 9, 2023); Feb. 9, 2023 Hrg. Tr. 4:1-5 (SEALED), the Court reviewed with Twitter each part of Part I of Attachment B to the Warrant to assess the extent of compliance and noncompliance by identifying the responsive records Twitter had yet to produce. *See* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20. During this process, Twitter raised questions for the first time about certain requests, demonstrating that the company had failed to confer effectively with the government. *See, e.g.,* Feb. 9, 2023 Hrg. Tr. at 5:1-7 (government counsel commenting about Twitter "attempting to cabin one of the requests in the warrant," during a call earlier on February 9); *id.* at 18:25–19:4 (government counsel explaining that "[t]his is the first time I have heard a complaint about a date limitation on 1H"); *id.* at 31:21-24 (government counsel, stating, "What [the government was] told was that there was one preservation done of the entire history of the account on January 11th. This is the first time we are hearing about another preservation between January 3rd and January 9."); *id.* at 30:2-22, 31:25–32:3 (after Twitter counsel explained that they were collecting data on potentially responsive "fleets," *i.e.* "vanishing tweets," government counsel responded, "I have never heard of 'fleets' in part of any discussion that we have had. I don't know if that is information in this account; it may or may not be. It still will be relevant, it still will be responsive.").

After a line-by-line review of Twitter's responsive and not yet completed productions to the Warrant, Twitter promised to provide an update to the government, by 4:00 PM that day, explaining what responsive records were left to produce and when production would be completed.

*Id.* at 48:21-24.  At the end of the hearing, the Court instructed the government to calculate the total penalty for Twitter's failure to comply with the Show Cause Order by the 5:00 p.m. deadline on February 7, and submit notice of the same to the Court.  *Id.* at 49:5-14.

The government supplied notice, on February 13, 2023, *see* Gov't's Not. Re. Accrued Sanction ("Government Notice") (SEALED), ECF No. 19, that Twitter advised the government, at 8:28 p.m. on February 9, 2023, that "it believed 'Twitter's obligations under the Warrant and the Court's order were complete.'"  *Id.* at 1–2.  With respect to the fine amount, the government calculated that Twitter owed "$350,000, payable to the Clerk of the Court."  *Id.* at 2 ("By the terms of the Court's order, Twitter was in contempt as of 5:00 p.m. on February 7, 2023, at which point a $50,000 sanction came into effect.  An additional amount of $100,000 accrued at 5:00 p.m. on February 8, 2023, since Twitter still had not fully complied with the Warrant as of that time. And at 5:00 p.m. on February 9, 2023, an additional amount of $200,000 accrued.").

Twitter disputes that any sanction is appropriate, *see* Twitter Not. Re. Appl. Of Sanctions at 1 ("Twitter Notice") (SEALED), ECF No. 18, because the company acted in good faith to comply speedily after the February 7 hearing, and the government bears the fault for production delays due to the government's nonstandard requests combined with the government delaying clarifying the scope of the Warrant's requirements.  *See generally id.*

## II.   DISCUSSION

Twitter's motion asserts that the NDO violates its First Amendment right to inform the Target Account's User of the existence of the Warrant, and accordingly requests the NDO be modified to allow notification to that User (or his authorized representatives).  *See* Twitter Mem. at 2–3.  The government opposes Twitter's motion, with both a sealed opposition shared with Twitter and in an *ex parte* filing.  *See* Gov't's *Ex Parte* Opp'n; Gov't's Sealed Opp'n Twitter's

Mot. to Vacate or Modify NDO (SEALED), ECF No. 22.  As discussed below, Twitter's motion is denied and sanctions are appropriately levied here.

### A.     Twitter's Challenge to the NDO Is Without Merit

Twitter asserts that the NDO "constitutes a content-based prior restraint on [its] speech," and the government's interests in keeping the Warrant secret cannot "satisfy strict scrutiny in light of the significant publicity surrounding the Department of Justice's criminal investigation into the" January 6th Investigation and the Classified Documents Investigation.  Twitter Mem. at 2.  Claims under the Free Speech Clause of the First Amendment, U.S. CONST. AMEND. I, are analyzed in three steps: (1) "whether the activity at issue is protected by the First Amendment[;]" (2) "whether the regulation at issue is content based or content neutral, *i.e.*, if it applies to particular speech because of the topic discussed or the idea or message expressed[;]" and (3) whether the government's justifications for restricting the plaintiff's speech satisfy the relevant standard, *i.e.*, strict or intermediate scrutiny.  *Green v. United States Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (cleaned up).  Strict scrutiny requires that the government show its restriction on speech is "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

As to the first step, Twitter correctly points out that "the government does not seriously contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that the Non-Disclosure Order operates as a prior restraint on such speech[.]"  Twitter Reply Supp. Mot. to Vacate or Modify NDO ("Twitter Reply") at 1 (SEALED), ECF No. 27.  Other courts have concluded, and this Court so finds here, that a nondisclosure orders issued under the authority of the SCA's § 2705(b) "implicate First Amendment rights because they restrict a service provider's speech" and "also constitute[] prior restraint, a characterization typically used to describe 'judicial

15

orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155 (3d Cir. 2020) *("Matter of Subpoena")* (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)); *see also Google*, 443 F. Supp. 3d at 452; *In re Info. Associated with E-Mail Accts.*, 468 F. Supp. 3d 556, 560 (E.D.N.Y. 2020) ("*In re E-Mail Accounts*"); *Matter of Search Warrant for [redacted].com*, 248 F. Supp. 3d 970, 980 (C.D. Cal. 2017) (collecting cases).

With respect to the second step, no decision from this Court, the D.C. Circuit, or the Supreme Court has established whether strict scrutiny or intermediate scrutiny applies when an ECS provider challenges a nondisclosure order issued pursuant to the SCA's § 2705(b). On the one hand, a nondisclosure order is a content-based restriction on speech, and content-based restrictions are normally evaluated under strict scrutiny. *Green*, 54 F.4th at 745 ("[W]e apply . . . strict scrutiny for content-based statutes[.]"); *see also In re Nat'l Sec. Letter*, 33 F.4th 1058, 1072 (9th Cir. 2022) (applying strict scrutiny to a nondisclosure requirement because it "is content based on its face" since "the nondisclosure requirement prohibits speech about one specific issue"). At the same time, in this context, a "nondisclosure requirement" is "not a typical example of such a restriction for it is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 876 (2d Cir. 2008). Indeed, considering that nondisclosure orders tend to be narrow in scope, limited to their accompanying orders or warrants and the facts surrounding them, good reasons exist to subject such orders only to intermediate scrutiny instead of the exacting requirements of strict scrutiny. *See id.* at 876 ("[T]he nondisclosure requirement is triggered by the content of a category of information . . . is far more

limited than the broad categories of information that have been at issue with respect to typical content-based restrictions.").

The strict-scrutiny debate need not be resolved here.  Assuming, without deciding, that strict scrutiny applies to nondisclosure orders, the NDO at issue here survives strict scrutiny review as a narrowly tailored restriction for which no less restrictive alternative is available that would be at least as effective in serving the government's compelling interests.

### 1.    *The NDO serves a compelling government interest*

The government says that the NDO safeguards "the integrity and secrecy of an ongoing [criminal] investigation" ███████████████████████████████.  Gov't's *Ex Parte* Opp'n at 14–15.  According to the government, these secrecy interests are particularly salient here because ███████████████████████████████████████████████████ ████████████ based on the evidence outlined in its *ex parte* opposition.  *Id.* at 15; *see also supra* at n. 4, *infra* n.6, and associated text

The government is correct.  For starters, "[m]aintaining the integrity of an ongoing criminal investigation is a compelling governmental interest."  *In re E-Mail Accounts*, 468 F. Supp. 3d at 560; *see also United States v. Smith*, 985 F. Supp. 2d 506, 545 (S.D.N.Y. 2013) ("[T]he [g]overnment has demonstrated that there is good cause for a protective order because of its compelling interest in ongoing investigations into potentially serious criminal conduct that could be jeopardized by dissemination of the discovery."); *Matter of Subpoena 2018R00776*, 947 F.3d at 156 ("The government's interest is particularly acute where, as here, the investigation is ongoing.").  That compelling interest here is magnified by the national import of the January 6th investigation into conduct that culminated in a violent riot at the U.S. Capitol on January 6, 2021, and the disruption of the Joint Session of Congress to certify the results of the 2020 presidential election.  Ferreting out activity intended to alter the outcome of a valid national election for the

17

**JA372**

leadership of the Executive Branch of the federal government, which activity undermines foundational principles of our democracy, and assessing whether that activity crossed lines into criminal culpability, presents as compelling a governmental interest as our very national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) (quotation marks omitted) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *see also* Gov't's Opp'n at 14 ("And that interest is all the more compelling where the investigation concerns an effort to overturn the results of an election and thwart the transfer of presidential power—an effort that culminated in a mob attack on the United States Capitol as lawmakers sought to carry out their constitutional and statutory obligation to certify the Electoral College results.").

Additionally, the government has a strong interest in maintaining the "confidentiality of [its] investigative techniques and [not] cause the subjects of other investigations to change their conduct to evade detection and otherwise thwart future investigations of similar allegations." *Cf. In re Los Angeles Times Commc'ns LLC*, No. MC 21-16 (BAH), 2022 WL 3714289, at *8 (D.D.C. Aug. 29, 2022) (quotation marks omitted) (holding that these weighty law enforcement interests, in the context of an application to unseal court records under the common-law right of public access to judicial records, weighed in favor of continued sealing of certain search-warrant materials). Thus, the SCA deems certain factors to be sufficiently compelling to justify issuance of a nondisclosure order based on reason to believe that disclosure otherwise would pose a risk of destruction or tampering with evidence, intimidation of witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5). In short, maintaining the confidentiality of the government's criminal investigation into any efforts ███ ████████████████████████ to overturn the 2020 election to ensure that all those responsible and criminally liable, or not, are identified and that relevant documentary and

testimonial evidence is both preserved and collected, without spoliation, alteration or tampering, plainly serves compelling government interests.

Twitter disagrees.  In Twitter's view, "the government cannot credibly show that the [NDO] . . . serves a compelling governmental interest," citing "the voluminous publicly available information about the investigation," Twitter Mem. at 8; *id*. at 9-10 (describing, *inter alia*, media reports about witnesses "subpoenaed to testify before a federal grand jury" and the appointment of Special Counsel Jack Smith); *see also* Twitter Opp'n at 13 (arguing that public revelation of the search and seizure Warrant at issue here would pose "no credible risk" because "the publicity surrounding the investigations" being conducted by Special Counsel Jack Smith "is widespread and unprecedented," making this investigation "wholly distinct from any typical covert law enforcement investigation where the targets are unaware of the government's activities").  With this perception of "no credible investigative reasons to bar disclosure [] of the existence of the Warrant," Twitter urges that the Target Account's User be alerted to the Warrant so he "may raise whatever concerns he has, if any, for determination by this Court in a full adversarial proceeding." Twitter Mem. at 14.  While Twitter denies taking any position "on the applicability of [any] privilege or the validity of the Warrant," Twitter Opp'n at 1 ("Twitter is not taking a position . . . ."); *id*. at 7 ("Twitter takes no position on the applicability of [] privilege as to these communications in this circumstance."), Twitter's real objection then is that the government is proceeding covertly with a criminal investigation when, in the company's view, any privilege issue "should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing." *Id.* at 8; Twitter Mem. at 2 ("Allowing Twitter . . . to notify the account holder would afford the user . . . an opportunity to address the legal issues surrounding a

19

**JA374**

demand for [ ] communications in this unique context, and give this Court a full adversarial process in which to evaluate them.").

 Twitter makes this demand for an adversarial assessment of privilege issues as a condition of complying with the Warrant, despite not being privy to the full Warrant, ███████████ ████████████████████████████████, let alone the other proffered evidence presented to the Court in issuing the Warrant and the NDO.  *See* Feb. 7, 2023 Hrg. Tr. at 9:20–10:19.  Put another way, Twitter is taking the extraordinarily aggressive position as a service provider to demand that a covert step taken in an ongoing grand jury and criminal investigation be made public, at least to the account user, before complying with a court order, notwithstanding the informational void on which it stands.

 Despite the fact that Twitter has been privy to only a sliver of the government documentation underlying the Warrant and NDO, and thus is quite ignorant of details about and the scope of the government's current investigation into unlawful interference with the transfer of power following the 2020 presidential election and ████████████████████ in such illegal activity, the company nonetheless boldly contests any compelling interest the government may have in continuing to conduct its investigation covertly, bolstered by the NDO, for three reasons, each of which is meritless.  First, Twitter challenges each of the government's articulated justifications for the NDO under Section 2705(b), arguing that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the Target Account's User will "alter the current balance of public knowledge in any meaningful way" since that disclosure would at most be "incremental."  Twitter Mem. at 11.[5]  For instance, the

---

[5] In support, Twitter cites news articles discussing the existence of the government's investigations and certain public steps the government has taken as part of its investigations or courthouse citing of witnesses.  Twitter Mem. at 9–11; *see also* Twitter Opp'n, Ex. B (SEALED), ECF No. 9-2 (culling eighty pages of similar articles discussing the investigations); Twitter Reply at 5–6 (identifying several members of former president's administration that have been

company argues that disclosure of the Warrant is not likely to prompt "the destruction of *other* evidence," Twitter Reply at 4 (emphasis in original), because the public and the User know that the User is under investigation for any involvement in interfering "with Congress's certification of the presidential election on January 6," *id.* Nor would it be reasonable, Twitter asserts, "to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications," or that the investigation would be seriously jeopardized because the Attorney General "confirmed the investigation, its scope, and the identity of the target" to the country. *Id.* at 7–8.

Twitter misapprehends the risks of disclosure here. For one thing, without being privy to any non-public information about the investigation, including the full Warrant, Warrant Application and Affidavit, and NDO Application submitted to the Court, Twitter is simply in *no position* to assess how much of the media reports and general public information about the investigation are accurate and how limited that information may be compared to what is known to investigators. Put bluntly, Twitter does not know what it does not know.

More importantly, Twitter's argument is unmoored from the realities of what disclosure would mean here. As the government observes, Gov't's *Ex Parte* Opp'n at 16, Attachment B to the Warrant provides significant insight into the type and nature of information that the government requested and targets a key social media account. No public reporting has, thus far, indicated execution of search warrants for the contents of the User's personal electronic communications and records, even if the User is aware of the general contours of the government's

---

subpoenaed or compelled to testify, including former vice president Pence, the former president's daughter and advisor Ivanka Trump and her husband Jared Kushner, his former chief of staff Mark Meadows, and others). Twitter also observes that government has itself "confirmed it has seized and is reviewing the email accounts of [the former president's] associates as part of the investigation." Twitter Reply at 9 (citing *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826 (D.D.C. Feb. 23, 2023) ("*In re N.Y. Times*")).

investigation. Specific identification of the Warrant could prompt witnesses, subjects, or targets of the investigation to destroy their communications or records, including on Twitter or other social media platforms, and could lead the User to ratchet up public and private pressure on others to refuse to be cooperative with the government, or even to engage in retaliatory attacks on law enforcement and other government officials that have real world and violent consequences. This is not a "conclusory" harm Twitter dismisses out of hand based on its limited information, but rather could "endanger the life or physical safety of" government officers or "otherwise seriously jeopardiz[e]" the government's investigation. *See* 18 U.S.C. §§ 2705(b). Permitting Twitter to alert the Target Account's User of the Warrant may prompt a response to this new investigative scrutiny of the User's conduct that could very well result in one of the enumerated harms set out in Section 2705(b).

Twitter points to "'the partial unsealing of two judicial decisions resolving filter team motions'" in relation to one of Special Counsel Smith's investigations, Twitter Reply at 9 (quoting *In re N.Y. Times*, 2023 WL 2185826 *15), but this is both unpersuasive and supports maintaining the NDO. The two unsealed judicial decisions addressed review of the contents of email accounts that are not those of the Target Account's User, so the unsealing of those decisions raise entirely different risk assessment contexts than here. Furthermore, this Court's decision in *In re N.Y. Times* makes clear that "reliance on and deference to the government is necessary" when considering whether the release of grand jury materials might harm the government's investigation because "courts are not made aware of the full scope of materials presented to the grand jury and therefore are not best positioned to execute redactions[.]" *Id.* at *9. As Twitter correctly notes, the Warrant exists outside the grand jury context—though Warrant returns may be presented to the grand jury and to that extent become "a matter occurring before the grand jury," subject to secrecy, under

FEDERAL RULE OF CRIMINAL PROCEDURE 6(e). Yet, the exact same point made in *In re N.Y. Times* supports maintaining the NDO because the government remains, both in the grand jury and covert SCA warrant contexts, in the best position to understand how, when, and whether alerting the user of certain information might impair an ongoing criminal investigation. The government's *ex parte* filing, as well as the Warrant and NDO Application, provide ample good reason to support the NDO here to avoid any enumerated harm under the SCO's § 2705(b). *See John Doe*, 549 F.3d at 881 (explaining that "the court will normally defer to the Government's considered assessment of why disclosure in a particular case may result in an enumerated harm" if the government has "at least indicate[d] the nature of the apprehended harm and provide[d] a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial").[6] That justification for the NDO supplies sufficient compelling

---

[6] 

23

reason for preventing Twitter from disclosing the Warrant to anyone, including the Target Account's User (or the User's representatives).

Second, Twitter believes that "[u]nique and [i]mportant" privilege issues support the relief it seeks, Twitter Mem. at 12, but that argument is irrelevant to whether the government has a compelling interest in maintaining the NDO.[7] Twitter's interests here are purely about its right to speak to the Target Account's User, not what privileges that User may assert. Indeed, Twitter concededly has no standing to raise any issue as to any privilege the User may hold. *See* Twitter Mem. at 4. As the Court previously explained, the Warrant and the NDO do not travel together "because any further delay on the production of the materials" creates an ongoing harm to the government's investigation, Feb. 7, 2023 Hrg. Tr. at 66:11-17; *see also Google*, 443 F. Supp. at

---

Even though Twitter is not privy to the information contained in the government's *ex parte* filings, Twitter is plainly aware of, and even cites to, former Special Counsel Robert Mueller's investigation into then-President Trump. *See* Twitter Opp'n at 5 n.5 (citing Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election* ("Mueller Report"), Vol. II at pg. 82 n. 546, Dept. of Justice (March 2019), available at https://www.justice.gov/storage/report_volume2.pdf (last visited on Mar. 2, 2023)). The Mueller Report details extensively how former President Trump engaged in obstructive conduct to thwart the former Special Counsel's investigation into Russian Interference in the 2016 presidential election. *See, e.g.*, Mueller Report, Vol. II at pg. 85–90 (discussing how, in June 2017, the former president directed White House Counsel Don McGahn to order the firing of the Special Counsel after press reports that Mueller was investigating the former for obstruction of justice); *id.* at 109-13 (observing that, in 2017 and 2018, the former president pressed Attorney General Sessions to "un-recuse" himself from the Special Counsel Mueller's inquiry, and a "reasonable inference" could be made that, from those actions, the former president "believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing Russia Investigation"). Given that Twitter is aware of the former president's prior efforts to obstruct investigative efforts into his and his associates' conduct, it should be no surprise that the government can demonstrate that revealing the existence of the Warrant poses the reasonable risk of resulting in several of the deleterious consequences under the SCA's § 2705(b).

[7]    Twitter cites to the Mueller Report as an example of then-President Trump being given advance notice of interviews with witnesses that might implicate the executive privilege to give the former president the opportunity to invoke the privilege in advance of the interviews. Twitter Opp'n at 5 n.5 (citing Mueller Report, Vol. II at pg. 82 n. 546). This example, however, elides the fact that while the former president was given advanced notice to invoke executive privilege for witness interviews, no such representation is made about him being given advance notice to assert privilege as to evidence collected through the issuance of "more than 2,800 subpoenas under the auspices of a grand jury sitting in the District of Columbia; [] nearly 500 search-and-seizure warrants; [] more than 230 orders for communications records under 18 U.S.C. § 2703(d)," and other covert orders. Mueller Report, Vol. I at pg. 13.

24

455, and that harm plainly outweighs a temporary denial of Twitter's ability to speak to its user about the existence of the Warrant. In any event, no matter the privileges the Target Account's User may hold, what matters for purposes of the First Amendment is whether the government has established that the NDO is narrowly tailored to serve a compelling government interest to keep the Warrant confidential. The government's interests here are plainly compelling. *See supra* at nn. 4, 6, and associated text.

Third, as a last-ditch argument, Twitter says that the government "was required to make the requisite showing prior to the [NDO] being signed[,]" and any new, "secret rationale" should be rejected as a "*post hoc* rationalization[.]" Twitter Reply at 13. Twitter's argument is both factually and legally flawed. The government's argument is not a *post hoc* rationalization because the Warrant Affidavit, which was considered simultaneously with the NDO Application, provides ample reason justifying the NDO. Furthermore, Twitter cites no decision in which an NDO has been vacated because the government offered *additional* evidence to support that order when challenged. *See, e.g., John Doe*, 549 F.3d at 881 n. 15 (noting that the court permitted the government "to amplify its grounds for nondisclosure in a classified declaration submitted *ex parte* . . . and made available for [the court's] *in camera* review").

The case Twitter relies on to assert that the government cannot provide new support for the NDO "that [was] not offered at the time the government first sought the" order, Twitter Reply at 13 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("*Lakewood*")), is entirely inapposite. *Lakewood* addressed a facial challenge to a city ordinance that gave unbridled discretion to the mayor to issue permits for placement of news racks on public property. *Id.* at 753–54. The Court struck down the ordinance, because, without objective standards for determining whether a permit should issue, impermissible, content-based rejections could be

disguised by "*post hoc* rationalizations, . . . making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* at 758. Unlike in *Lakewood*, the government here does not possess unbridled discretion to silence ECS/RCS providers when applying for an NDO. Rather, an NDO may issue when, as here, the government has adduced evidence to demonstrate to the Court that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b).

### 2. The NDO is narrowly tailored

In the strict-scrutiny context, which is assumed to apply here, the narrow-tailoring requirement is a least restrictive–means test. This test requires that "[i]f a less restrictive alternative for achieving that interest exists, the government 'must use that alternative.'" *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 510 (D.C. Cir. 2016) (quoting *Playboy Entm't Grp.*, 529 U.S. at 804). The less restrictive alternative must "be at least as effective in achieving the legitimate purpose that the [government action] was [taken] to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997); *see also McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (same). The government explains, correctly, that the NDO is narrowly tailored because: (1) "The scope of speech regulated by the NDO is extremely narrow" since the NDO only "prohibits Twitter from disclosing the existence or contents of the Warrant" and "is limited to 180 days[,]" Gov't's Opp'n at 17–18; and (2) notifying the user or his representatives is untenable because it would be ineffective in maintaining the confidentiality of its investigation, leading to the harms described above, *see id.* at 18–19.

Courts have routinely found that non-disclosure orders satisfy the narrow-tailoring requirement under strict scrutiny so long as the orders are limited in scope and time, and notifying the subject of the investigation, or any other authorized person, would not satisfy the government's

compelling interest in maintaining the confidentiality of its investigation.  For example, in *Google v. United States*, the court held the nondisclosure order in that case was narrowly tailored because "it prohibit[ed] only the disclosure of the existence of the Warrant and of the investigation[,] . . . [and it was] also limited to a one-year time period."  443 F. Supp. 3d at 453.  The government satisfied the least-restrictive-means requirement by demonstrating that notifying "the person or entity to whom the warrant is directed . . . would result in at least one of [§ 2705(b)'s] five enumerated harms" based on the government's lengthy *ex parte* "affidavit setting out . . .why premature disclosure of the warrant and the existence of the investigation could reasonably lead to the destruction of or tampering with evidence and intimidation of potential witnesses, thus making information inaccessible to investigators, and how the disclosure could seriously jeopardize the ongoing investigation."  *Id.*; *see also in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62 (rejecting a similar First Amendment challenge to a one-year NDO as to a warrant and existence of the investigation because the government's *ex parte* affidavit showed "there was a risk that other employees, including higher-ups, were involved in the conspiracy[,]" such that notifying the company of the existence of the warrant could lead to one of the numerated harms under Section 2705(b) and "jeopardize [the government's] investigation").

The NDO is narrowly tailored for the same reasons articulated in *Google* and *In re E-mail Accounts*.  First, the NDO here is even more narrow in scope and time duration than those at issue in *Google* and *In re e-mail Accounts*: the subject matter Twitter is barred from speaking about is limited to the Warrant's contents and existence, and does not impinge at all on the company speaking to the public about the general subject of the January 6th Investigation.  Plus, the NDO applies for 180 days, which is half the duration of the year-long NDOs at issue in *Google* and *In re E-Mail Accounts*.  Second, the NDO presents the least-restrictive means for the government to

satisfy its compelling interests here because notifying the User or his representatives of the Warrant's existence would, for the reasons explained above, likely result in the enumerated harms outlined in 2705(b).  *See supra* at nn. 4, 6, and associated text; *see also Google*, 443 F. Supp. 3d at 453; *in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62.

Twitter does not dispute that the NDO is narrow in scope and in time.  Instead, Twitter posits that purportedly narrower alternatives could be adopted to preserve the company's "[e]ssential First Amendment [r]ights."  Twitter Mem. at 14.  Twitter's suggestions are untenable, however, and do not come close to satisfying the government's interests in maintaining confidentiality about this covert investigative Warrant.  First, Twitter's suggestion that notifying "just its user" plainly fails because this would likely result in the statutory harms outlined in § 2705(b) for the reasons outlined above.  *See supra* at nn. 4, 6, and associated text.  Second, Twitter suggests notifying certain of the User's representatives, Twitter Mem. at 14–15; Twitter Reply at 16, but that proposal is preposterous since such the suggested representatives not only may themselves be witnesses, subjects, or targets of either the January 6th or Classified Documents Investigation, but also would be under no bar from immediately alerting the User.[8]

The Third Circuit's decision in *Matter of Subpoena* is instructive here.  In challenging an order preventing disclosure of a grand jury subpoena for the data of a customer's employees, the SCA provider that received the grand jury proposed two alternatives, both of which involved notifying the customer's bankruptcy trustee.  *Matter of Subpoena*, 947 F.3d at 158.  The Third Circuit categorically rejected the proposals as "untenable" and "impractical" because notifying the trustee "would be ineffective in maintaining grand jury secrecy" and would "undermine[] the

---

[8]    Twitter's suggestion that the government obtain the responsive data from NARA, Twitter Mem. at 15, is a nonstarter, both because the Warrant demands more information from Twitter than Twitter provided to NARA about the Target Account, Feb. 7 Hrg. Tr. at 11:7-13, and because this proposal is moot in light of Twitter's representation that it has now fully complied with the Warrant.

government's interest in maintaining the confidentiality of an ongoing investigation." *Id.* at 158–59. Similar to Twitter's naïve suggestion here that, if not the User, the User's associates should be trusted with the existence of the Warrant, the Third Circuit was invited to "assess the trustworthiness of a would-be confidante chosen by a service provider" for disclosure, but expressly rejected that invitation since neither "courts nor the government can be expected to vet individuals selected by service providers and determine their risk of subverting an ongoing investigation." *Id.* at 159.

For the same reasons articulated in *Matter of Subpoena*, evaluating the viability of Twitter's proposed alternative disclosure tactics is unnecessary since revealing the Warrant to either the User or one of his representatives fall far short of meeting the government's compelling interests in maintaining the confidentiality of its investigation for all of the ample reasons presented in support of the NDO. *See supra* at nn. 4, 6, and associated text. In short, "[s]trict scrutiny does not demand that sort of prognostication," *Matter of Subpoena*, 947 F.3d at 159, so Twitter's proposed alternatives lack merit.

For the above reasons, the government has satisfied that the NDO meets the exacting requirements of strict scrutiny review under the First Amendment.

### B.    Sanctions

The last dispute between the parties is whether Twitter should be sanctioned for failing to comply on a timely basis, first with the Warrant and then with the Show Cause Order, the latter of which required full compliance by February 7 at 5:00 PM. Twitter does not contest—nor could it—that the company was in violation of the Warrant and the Show Cause Order as of February 7 at 5:01 PM. Instead, the company claims a full defense to any sanctions, contending that Twitter substantially, if not fully, complied by the Show Cause Order deadline and acted diligently to finish production in response to the government's nonstandard requests, while accusing the

29

government of being dilatory in responding to Twitter's requests for clarification.  *See generally*
Twitter Notice.

The D.C. Circuit has described three stages in a civil contempt proceeding: "(1) issuance
of an order; (2) following disobedience of that order, issuance of a conditional order finding the
recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant
party purges itself of contempt by complying with prescribed purgation conditions; and (3)
exaction of the threatened penalty if the purgation conditions are not fulfilled." *N.L.R.B. v. Blevins
Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981).  "At the second stage[,] the recalcitrant party
is put on notice that unless it obeys the court's decree and purges itself of contempt it will be fined
or face other sanctions." *Id.* at 1185.  "At the third stage the court determines whether the party
has fulfilled the purgation conditions.  If it has, it escapes the threatened penalty; if it has not, the
penalty is imposed." *Id.*

Given that both parties agree that Twitter failed timely and fully to comply with the
Warrant and Show Cause Order, which imposed monetary sanctions for failure to do so, stage
three of the proceedings must be considered: whether monetary sanctions should be imposed.
"Once the [movant has] establish[ed] that the [contemnor] has not complied with the order, the
burden shifts to the [contemnor] to justify its noncompliance." *Int'l Painters & Allied Trades
Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 39 (D.D.C.
2010).  "The contemnor is required to show that it has 'done all within its power' to comply with
the court's order." *Id.* at 40.  (quoting *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004)).

Twitter asserts a good faith and substantial compliance defense to being assessed civil
sanctions.  The D.C. Circuit has left open the ability of a contemnor to assert a defense of good
faith and substantial compliance to avoid a civil sanction.  *See Food Lion, Inc. v. United Food and*

*Commercial Workers*, 103 F.3d 1007, 1017 (D.C. Cir. 1997); *see also id.* at n.16 (collecting three district court decisions leaving open the availability of a good faith and substantial compliance defense to avoid civil contempt sanctions); *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014) (quotation marks omitted) ("Once the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance by, for example, demonstrating its financial inability to pay the judgment or its good faith attempts to comply."). "Assuming that the defense survives in this circuit, however, the burden of proving good faith and substantial compliance is on the party asserting the defense[.]" *Food Lion*, 103 F.3d at 1017 (footnote omitted). "In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Id.* (quotation marks omitted); *see also Latney's Funeral Home*, 41 F. Supp at 30 (quoting *Int'l Painters*, 736 F.Supp.2d at 40) ("At this stage, conclusory statements about the financial inability to comply or good faith substantial compliance are insufficient; instead, [the contemnor] must demonstrate any offered justification 'categorically and in detail.'").

Ultimately, the decision to hold a party in contempt and assess civil sanctions against a party is left up to the discretion of the district court, based on the record evidence concerning that party's efforts to comply with the court order. *See In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 822–23 (D.C. Cir. 2009) ("District judges must have authority to manage their dockets . . . and we owe deference to their decisions whether and how to enforce the deadlines they impose. Though we recognize [the contemnor's] strenuous efforts to comply, the district court found them to be 'too little too late[.]' . . . Were we on this record to overturn the district court's fact-bound

conclusion that [the contemnor] dragged its feet until the eleventh hour, we would risk undermining the authority of district courts to enforce the deadlines they impose.")

Based on the record above, Twitter's good faith and substantial compliance defense is insufficient to avoid the sanction imposed because the company's substantial compliance with the Show Cause Order deadline (February 7 at 5:00 PM) occurred only *after* it had already delayed production since January 27, the original deadline for compliance with the Warrant in an important ongoing criminal investigation.   Twitter repeatedly represented that the company stood ready to comply promptly with the Warrant soon after in-house counsel was made aware of the Warrant's existence on January 25, 2023.  *See* ▮▮▮▮ Decl. ¶ 4 (noting that ▮▮▮▮ directed Twitter's personnel to preserve data available in its production environment associated with the Target Account on January 25, and "have confirmed that the available data was preserved"); Twitter Opp'n at 14 (promising "[a]s a continued demonstration of its good faith efforts to comply with this Court's orders while its First Amendment interests are resolved, . . . to be willing to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until [its Motion] is resolved"); Feb. 7, 2023 Hrg. Tr. at 63:16-19 (Twitter counsel responding to Court's query whether Twitter could comply with the Warrant by February 7 at 5:00 PM, that Twitter is "prepared to do that.").  Yet, Twitter waited until after the Show Cause Order deadline passed on February 7 to raise, *for the first time*, multiple questions about the Warrant's document demands, *see* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20, including the company's inability to produce records responsive to data concerning "associated accounts," *id.* at 7:20-8:7 (discussing Warrant, Att. B, ¶ I.B), and cabining date and scope limitations in another request, *id.* at 20:12-20 (discussing Warrant, Att. B, ¶ I.H).

If Twitter had been diligent and serious in its good faith intention to comply with the Warrant, those questions should have been identified, raised, and resolved with the government upon receipt of the Warrant on January 19, 2023, or subsequently upon review by in-house counsel on January 25 and 26, 2023, or even during ongoing conversations with the government through February 1, 2023. That did not happen. To be sure, Twitter advised the government on February 1, 2023, about "want[ing] to further discuss . . . Attachment B and technical issues [it would] need to work through in responding once the issue is resolved." ███ Decl. ¶ 14. Yet, those issues were not pursued by Twitter and appeared to be dropped in favor of litigating, until raised at the February 9, 2023, hearing under the Court's supervision, with sanctions mounting. That context for raising these issues for the first time does not demonstrate "adequate detailed proof" of good faith and substantial compliance. *See Int'l Painters*, 736 F. Supp. 2d at 38; *cf. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d at 34-35 (citation omitted) (alteration in original) ("Although Defendants maintain that they are 'aggressively working to find monies to pay [their] past due taxes,' their good faith alone does not absolve them of the fact that they remain in substantial violation of the Injunction.").

Moreover, Twitter represented in its opposition to the government's Motion, and at the February 7, 2023 Hearing, that it stood ready promptly to produce responsive records in full, when required, but plainly this was not so. Twitter's good faith and substantial defense fails because it did not attempt to resolve specific questions concerning the Warrant's document demands with the government prior to either the February 7 or February 9, 2023, hearings. *Cf. Food Lion*, 103 F.3d at 1018 (holding that the contemnor "failed to prove that it complied substantially and in good faith with the order" because the order "clearly directed [the contemnor] to search all of its

records[,]" and the contemnor "did not seek a clarification of this order"). In short, Twitter was "too little too late." *In re Fannie Mae Sec. Litig.*, 552 F.3d at 822 (quotation marks omitted).

As a fallback position, Twitter seeks to excuse the incremental $200,000 penalty assessed on February 9, citing the fact that the government did not clarify its position regarding the scope of the Warrant on February 9 until 3:52 PM that day—giving Twitter just 68 minutes to comply before the final $200,000 penalty was purportedly triggered. Twitter Notice at 4. Twitter's argument is rejected for two reasons. For one thing, Twitter incorrectly assumes that the $200,000 fine was triggered at 5:00 PM on February 9. The Show Cause Order did not specify that the subsequent fine would trigger at 5:00 PM the next day, but merely provided that Twitter "shall be fined $50,000, a fine amount that shall double *every day*, for failing to comply with this Order[.]" Minute Order (Feb. 7, 2023) (emphasis added). That means that Twitter's additional fine of $200,000 accrued as soon as 12:00 AM on February 9, not at 5:00 PM. Even if Twitter's last fine were to have accrued at 5:00 PM on February 9, however, the government cannot be blamed for the timeliness of its response on February 9, when Twitter could have resolved all these issues with the government prior to the original return date for the Warrant on January 27, 2023, or even during conversations with Twitter's in-house counsel through February 1, 2023, but Twitter skipped those opportunities. *See Pigford*, 307 F. Supp. 2d at 58 (quoting *Twelve John Does v. District of Columbia*, 855 F.2d 874, 877 (D.C. Cir. 1988)) ("When a district court determines . . . that a contemnor has 'not done all within its power' to comply with the court's orders, contempt may be appropriate even where compliance is difficult.").

Accordingly, Twitter's civil sanction for failing to comply with the Warrant and the Show Cause Order stands at $350,000.

III.    **CONCLUSION**

For the foregoing reasons, Twitter's Motion is denied, and the NDO shall remain in effect for 180 days from issuance, until, at least, July 16, 2023.  Additionally, Twitter is assessed a $350,000 sanction for failing timely and fully to comply with the Show Cause Order, which sanction is promptly payable to the Clerk of this Court within ten days.  Twitter shall file a notice for filing in the docket of this matter upon payment in full of the sanction.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 3, 2023

_____

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Under Seal**<br><br>Chief Judge Beryl A. Howell |

<u>**MEMORANDUM AND ORDER**</u>

Twitter seeks a stay pending its appeal ("Motion" or "Mot."), ECF No. 34, of the Court's March 3, 2023 Order Denying Twitter's Motion to Vacate or Modify Non-Disclosure Order ["NDO"] and Directing Twitter to Pay Contempt Sanctions ("Order"), ECF No. 29, in some form, including "an administrative stay of that order[,]" Twitter Reply In Supp. of Its Mot. For Stay Pending Appeal ("Twitter Reply") at 10, ECF No. 38. Twitter believes that the Order should be stayed pending appeal, *see* Twitter's Not. of Appeal, ECF No. 34, based on its belief that "once Twitter pays the $350,000 in contempt fines on March 13 and thereby purges its contempt," any appeal will be moot. Mot. at 1–2. This may be so, at least as to the contempt sanction, and may already be so as to Twitter's underlying challenge to the execution of the Warrant and NDO at issue. Mootness will be a matter for the D.C. Circuit to resolve as to all these issues on appeal. Nonetheless, saving an appeal from mootness is simply not sufficient to satisfy the extraordinary remedy requested. *See Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966) ("A stay pending appeal is always an extraordinary remedy[.]"); *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) ("CREW") (describing a stay pending appeal as "extraordinary relief"). Avoiding mootness is Twitter's main argument for a stay, however.

1

A stay request requires a court to "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis v. N. Am. Co.,* 299 U.S. 248, 244–45 (1936)), and balance the following factors as applied to the specific facts of the case: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation marks omitted).  The first two factors are the "most critical" to determining whether a stay is warranted, *CREW*, 904 F.3d at 1017 (quoting *Nken*, 556 U.S. at 434), while the third and fourth factors "merge" when the stay applicant so moves against the government, *Nken*, 556 U.S. at 435.  The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to [someone] else." *Landis*, 299 U.S. at 255.  The first two factors here weigh heavily against Twitter, with the irreparable injury boiling down to potential mootness of the contempt sanctions.  In this balancing, Twitter's Motion must be denied.

First, Twitter is unlikely to succeed on the merits of its appeal.  Twitter contends that the Court likely committed reversible error by (1) requiring Twitter's compliance with the Warrant prior to resolving its NDO challenge, and (2) rejecting Twitter's good-faith and substantial-compliance defense by ordering Twitter to pay contempt fines for failing to comply with the Show Cause Order, *see* Mot. at 6–11, but Twitter is wrong.  Even were Twitter's appeal of the Court's contempt order not mooted by compliance with the Warrant, the company's arguments on the merits are rejected for the same reasons outlined in the Court's March 3, 2023 Memorandum Opinion.  *See* Mem. Op. Re. Ord., ECF No. 30.  To summarize, Twitter (1) willfully violated an

unambiguous Warrant by conditioning compliance on obtaining a modification of a separate NDO that would allow disclosure of the Warrant to its account holder—one of the company's most prolific and high-profile political users—and thereby provide that account holder the opportunity to litigate pre-indictment motions; and (2) knowingly failed to take the requisite steps timely to comply with the Warrant, misrepresented to the Court its ability timely to comply with the Minute Order (Feb. 7, 2023) ("Show Cause Order"), and, ultimately, delayed the government's investigation into the user of the Twitter account at issue. Twitter essentially exploited its position as a large social media platform to usurp the Court's role to determine both the validity of the Warrant's execution methodology and the need for the NDO—despite the company's concededly incomplete information—due to the unique position of the Twitter account user. For these reasons, Twitter's counterarguments do not present a "'fair ground of litigation,'" as it posits in its reply. Twitter Reply at 2 (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)).

Second, Twitter unpersuasively complains about irreparable injury by paying the $350,000 contempt sanction because the Court's "contempt order [will be] purged and the dispute over it mooted." Mot. at 4. To be sure, Twitter has yet to pay the civil sanction required by the Order, but those funds will not disappear. Should Twitter prevail on its argument that the $350,000 contempt fine was unduly punitive, the Clerk of the Court can always return some or all of those funds to Twitter. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1057 (7th Cir. 1998) ("Payment of the sanction does not moot the appeal because the appellate court can fashion effective relief to the appellant by ordering that the sum paid in satisfaction of the sanction be returned."); 13B FED. PRAC. & PROC. JURIS. § 3533.2.2 ("An effective remedy is most clearly possible if the fine remains in the district court, not yet covered into the Treasury."). Indeed, Twitter provides no reason why holding payment of any fines in escrow will moot its challenge to

the Order regarding sanctions.  *See* Reply at 6 n.1 ("Twitter likewise agrees that holding the money

Twitter pays in escrow will help reduce the risk of mootness.").  Moreover, the cases upon which

Twitter relies to suggest that stays are appropriate to prevent mootness, Mot. at 1–3, are inapposite

because, as the government points out, they concern "1) stays designed to prevent sanctions from

*accruing* during an appeal by a contemnor who has not complied with the underlying order, and

(2) mootness findings resulting from compliance with the underlying order itself, rather than

mootness resulting from the payment of fully accrued contempt sanctions." Gov't's Opp'n at 12–

13 (emphasis in original ) (citing *In re Grand Jury Investigation of Possible Violations of 18 U.S.C.*

*§ 1956 and 50 U.S.C. § 1705*, 2019 WL 2182436, at *5–6 (D.D.C. Apr. 10, 2019) (staying "accrual

of the contempt sanctions" during the pendency of an "expedited appeal"); *In re Grand Jury*

*Subpoena No. 7409*, 2018 WL 8334866, at *3–4 (D.D.C. Oct. 5, 2018) (similar); *United States v.*

*Griffin*, 816 F.2d 1, 7 n.4 (D.C. Cir. 1987) (appeal of contempt order was mooted after defendant

fully complied with the underlying restitution order); *In re Hunt*, 754 F.2d 1290, 1293–94 (5th Cir.

1985) (similar)).  Even were Twitter correct that payment of the sanctions may moot the pending

appeal of the sanctions order, the company cites no case holding that avoiding mootness is a reason

to grant a stay.

Twitter also raises the specter of an approach to preserve appellate rights of "refus[ing] to

produce anything to the government even *after* being held in contempt—prolonging any harm to

the government's investigations and quickly threatening financial ruin for the company as fines

doubled daily."  Twitter Reply at 4 (emphasis in original).  This is an argument that may be

persuasive on appeal to avoid a finding of mootness but still does not meet the prerequisites for a

stay.

4

**JA394**

Given that Twitter is unlikely to succeed on the merits and will face no irreparable injury if it promptly pays the contempt sanctions, it is hereby:

**ORDERED** that Twitter's Motion for a Stay Pending Appeal, ECF No. 34, is **DENIED**; it is further

**ORDERED** that, upon payment by Twitter of the $350,000 sanction to the Clerk of the Court for failing to comply with the Show Cause Order, the Clerk of the Court shall not transmit the fine to the U.S. Department of the Treasury but hold those funds in escrow until further order from this Court.

**SO ORDERED**.

Date:  March 10, 2023

_____
BERYL A. HOWELL
Chief Judge

**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-00031-BAH<br><br>**UNDER SEAL** |

### NOTICE OF PAYMENT

Notice is hereby given that on March 24, 2023, Twitter, Inc. made payment of $350,000

to the Clerk of the United States District Court for the District of Columbia. Twitter made this

payment under protest, and with the understanding that the funds will be held in escrow pending

further order of this Court, per this Court's March 10, 2023, order.

Dated: March 27, 2023

Respectfully submitted,

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
George.Varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823
Whitney Russell, D.C. Bar 987238
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006

FILED UNDER SEAL

Ari.Holtzblatt@wilmerhale.com
Benjamin.Powell@wilmerhale.com
Whitney.Russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Twitter, Inc.*

2

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March 2023, I caused the foregoing motion to be

served by email upon:

James Pearce, Assistant Special Counsel

George P. Varghese (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-6363

**FILED UNDER SEAL**

# CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2023, I caused the foregoing

to be served by email upon:

James I. Pearce
Assistant Special Counsel
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 840-7000

s/ Ari Holtzblatt
Ari Holtzblatt